```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF VIRGINIA
 2                     ROANOKE DIVISION

 3     ***************************************************************
       JOHN DOE,
 4                                    CIVIL NO.: 7:21CV378
                                      December 14, 2021
 5                                    Motions Hearing –
                Plaintiff,            Zoom Videoconference
 6
          vs.
 7
       VIRGINIA POLYTECHNIC INSTITUTE   Before:
 8     and STATE UNIVERSITY,            MICHAEL F. URBANSKI
                                        CHIEF U.S. DISTRICT JUDGE
 9              Defendant,              WESTERN DISTRICT OF VIRGINIA

10     ***************************************************************

11     APPEARANCES:

12     For the Plaintiff:

13     ROBERT EDWIN DEAN, II
       Rob Dean Law
14     401 Campbell Avenue, Suite 302
       Roanoke, VA 24016
15     (540) 585-1776
       rob@robdeanlaw.com
16
       For the Defendant:         MARVIN HUDSON McCLANAHAN
17                                KAY KURTZ HEIDBREDER
       NATHAN HENRY SCHNETZLER     KRISTINA JULIA HARTMAN
18     KATHERINE CABELL LONDOS     STEPHEN FREDERICK CAPALDO
       Frith Anderson & Peake PC   VPI&SU
19     29 Franklin Road, SW        University Legal Counsel
       Roanoke, VA 24011           236 Burruss Hall (0121)
20     540-725-3371                Blacksburg, VA 24601
       nschnetzler@faplawfirm.com  540-231-6293
21                                 hud3@vt.edu
       _____
22                  Mary J. Butenschoen, RPR, CRR
                   210 Franklin Road, S.W., Room 540
23                    Roanoke, Virginia  24011
                      540-857-5100, Ext. 5312
24
       PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY; TRANSCRIPT
25     PRODUCED BY COMPUTER.
```

1    (Proceedings commenced at 3:32 p.m.)

2              THE COURT:  It looks like we have everybody we need.

3    Ask the clerk to call the case.

4              THE CLERK:  Okay.  This is *John Doe v. VPI&SU* and

5    others, Civil Action Number 7:21-cv-00378.

6              THE COURT:  Okay, good afternoon.  This case has been

7    set down today for a hearing on several motions, including the

8    ECF Number 2, motion to proceed by pseudonym; ECF Number 10,

9    motion to dismiss for lack of jurisdiction under 12(b)(1); ECF

10   Number 12, motion to dismiss for failure to state a claim under

11   12(b)(6).

12             First I want to hear about this pseudonym issue.

13   Mr. Dean, why does this case meet the standard for proceeding

14   via pseudonym?

15             MR. DEAN:  Judge, this case like other cases that

16   we've litigated in the past implicate the same kind of matter

17   that concerns something that's sensitive in nature which has to

18   do with an allegation of sexual assault, something that the

19   plaintiff has always maintained his innocence and denied.  He

20   denied the allegations at the university level.  He was never

21   charged criminally.  He must be concerned about his academic

22   standing and his professional reputation as he's now looking

23   for work having left Virginia Tech, and we set forth in the

24   motion and we filed in the complaint his request to proceed

25   under a pseudonym.  And the reason for it is, even though he is

1   older as a graduate student than some of the undergraduate

2   students who sometimes proceed under a pseudonym having been

3   accused and claiming they were falsely accused of sexual

4   assault, that's the only kind of factor that maybe kind of

5   takes detour from what has otherwise been kind of the standard

6   practice that when somebody is accused of something that is a

7   matter of sensitive and highly personal nature like sexual

8   assault and is seeking to vindicate their constitutional due

9   process rights in revisiting that decision.  We would ask that

10  under the *Jacobson* factors he be allowed to proceed under a

11  pseudonym.

12          There's the other factors that we can go through if

13  the Court wants us to do so, but really it's because he has

14  been accused of sex assault.  And like other litigants in the

15  past, that is the kind of sensitive and highly personal subject

16  matter that is justified to proceed under a pseudonym before

17  and we ask that he be allowed to do so as well.

18          THE COURT:  You know, there are cases that are

19  brought in this Court every day that involve some sort of claim

20  of sexual harassment or sexual assault.  And in fact, Mr. Dean,

21  you yourself brought this claim against a Virginia Tech

22  professor claiming that he engaged in sex discrimination and

23  against another Virginia Tech employee claiming that she

24  engaged in gender discrimination.  So what's the difference?

25  Why does the plaintiff get to name the defendants and accuse

1    them of these violations of law dealing with sexual matters,

2    but, yet, the plaintiff is able to proceed anonymously?  What's

3    the difference?

4              MR. DEAN:  Judge, there's two differences.  The first

5    is age.  The plaintiff in this case, though he is a graduate

6    student, he's not 18, 19 or 20 years old like we sometimes see

7    with other --

8              THE COURT:  Right.

9              MR. DEAN:  Age is something the Fourth Circuit

10   said we can --

11             THE COURT:  How old is your client?

12             MR. DEAN:  I believe he's in his mid 20s.  I don't

13   know his exact age, but I know he's older than undergraduate

14   age.

15             THE COURT:  Right.

16             MR. DEAN:  So age is one distinguishing factor.  The

17   other --

18             THE COURT:  That factor doesn't weigh in favor of a

19   pseudonym if he's over 21.  It's a public court.  The public is

20   entitled to know what's goes on in federal court.

21             MR. DEAN:  That is true, but then the other factor

22   that I think weighs in his favor, as opposed to the Court's

23   point about, well, what about these defendants who are being

24   accused of sex discrimination, he was accused of sexual

25   assault.  He was accused of a crime.  And it would frustrate

1   the purpose of his litigation, which is to clear his name, if

2   you're required to use his true name and proceed in the

3   litigation.  Because even if he were to prevail in the case

4   itself, he would just merely be publicizing the thing that he

5   says he was falsely accused of in the first place.

6           THE COURT:  I get that.  I understand that argument,

7   Mr. Dean.

8           MR. DEAN:  That is the main concern for him.

9           THE COURT:  Okay.  Let's hear -- we have got a whole

10  bunch of defendants.  I don't know who is going to speak to

11  this particular issue.  I'm happy to hear from whichever --

12  either Mr. Schnetzler or Mr. McClanahan.

13          MR. SCHNETZLER:  Good afternoon, Your Honor.  Nathan

14  Schnetzler on behalf of all the defendants.  With respect to

15  the pseudonym issue, I believe the Court has already identified

16  one of the issues that Virginia Tech would have called the

17  Court's attention to, which is the difference in this case is

18  the age of the plaintiff.  Particularly, also, it appears the

19  plaintiff has appeared for the hearing as well, which also I

20  think would cut against the request for a pseudonym to show up

21  for a public hearing.

22          Your Honor, with respect to the other factors, you

23  know, as you identified, there are all sorts of claims that are

24  brought in federal court that deal with pretty salacious

25  allegations, and those individuals aren't permitted to proceed

1    under a pseudonym, whether it's a Title VII sex discrimination

2    case which might involve allegations of sexual assault, or even

3    worse.

4              And so, Your Honor, for that reason, you know, we

5    would just bring that to the Court, but, obviously, this is a

6    deferential issue with respect to the Court so we would defer

7    to your judgment.

8              THE COURT:  All right, Mr. Schnetzler.  Thank you for

9    that.

10             All right.  Let's hear from the defendants on the

11   motion to dismiss, and you can -- either on 12(b)(1) or

12   12(b)(6), and here are my questions.  And let me just frame

13   this for you-all.  In this complaint there are three counts.

14   Count One charges due process violation; Count Two is Title IX;

15   Count Three is defamation.  All right.  So here are my issues

16   with this complaint:

17             Count One:  How can we have a due process claim in

18   the Fourth Circuit anymore after the Fourth Circuit's decision

19   in April of 2021 in Sheppard v. Visitors of Virginia State

20   University?  I don't see how we can have a property claim.

21   Judge Quattlebaum's opinion seems to do that issue in, at

22   least -- at least as regards -- I mean, at the end of the day,

23   he starts at the end and gets back to the beginning and says

24   qualified immunity controls here because this property right is

25   not clearly established either by the Supreme Court or the

1    Fourth Circuit or any -- any state court.  He doesn't mention

2    in his opinion all the district court opinions, but it's the

3    Fourth Circuit.  I'm bound by the Fourth Circuit.  And so it's

4    a published decision of the Fourth Circuit.  Why doesn't that

5    eliminate Count One?  There's my first question.

6              Second question, Count Two, Title IX:  Aren't there

7    sufficient allegations -- I mean, I'm a little concerned

8    about -- about Count Nine in terms of how vague it is.  First,

9    Mr. Dean, okay, page 10 of your complaint, you go through 1

10   through 52 on the paragraph numbers.  And then on the top of

11   page 10 you start off with paragraph 36, okay?  So you've

12   got -- I can't refer just to specific paragraph numbers because

13   you've got a bunch of them that are repeated, okay?  So I'll

14   try to mention paragraph numbers and page numbers.

15             It seems to me the crux of the Title IX claim are --

16   is in summary fashion in paragraph 49 on page 12 and in

17   paragraph 50 and 51 on page 12.  And the question, therefore,

18   becomes are those allegations sufficient enough to give rise to

19   a Title IX claim?  And I know Virginia Tech argues that as

20   regards to grant issue that that's barred by the statute of

21   limitations.

22             So focusing on the allegations, when you look at 49,

23   50, and 51, they are pretty thin, and so the question is are

24   those allegations sufficient to allow the complaint to go

25   forward.  And if not, should we allow Mr. Dean to amend to add

1   some more factual matter to his claims under 50 and 51?

2          And then the last issue is, with regard to Count

3   Three, it seems to me that -- I just wonder why truth doesn't

4   eviscerate a claim for defamation here.  The statement was

5   "attempted to earn a Ph.D. in physics" semicolon.  Well, unless

6   Mr. Dean tells me otherwise, I think that's right.  I think

7   that's true.  Then, "In spring 2020 after about seven years in

8   the program" -- and I don't know if he spent seven years in the

9   program or not.  I don't know whether that's true or not.  "In

10  spring 2020 after about seven years in the program was

11  dismissed from the University."

12          Well, paragraph -- the first paragraph 47 on page 9

13  that Mr. Dean has says, "On March 9, 2020, the University's

14  student conduct office found Mr. Doe responsible for sexual

15  assault and dismissed him from the University."  So Mr. Dean

16  pleads pretty much exactly the second part of the statement

17  that is allegedly defamatory.  So why doesn't as just a matter

18  of law truth bar Count Three?

19          So those are the issues.  Garrison Ambrose and I, my

20  law clerk, we've studied this issue.  I've got a bench memo --

21  you don't want to know how long this bench memo is.  27 pages.

22  But we've studied the issue.  We've looked at the law.  But I

23  thought I'd give you a heads up of my thinking before we start

24  the argument, and maybe that will help you focus your argument.

25          Mr. Schnetzler?

1          MR. SCHNETZLER:   Thank you, Your Honor.  May it
2     please the Court.
3          I think -- and I will jump right into those questions
4     in just one second because I think that in reviewing the
5     opposition briefs that the parties are really in agreement on
6     several issues; particularly with respect to the 12(b)(1)
7     motion.  And so with respect to -- it's my understanding, based
8     on the opposition brief to the 12(b)(1) motion, Mr. Dean is not
9     bringing any individual capacity claims against the individual
10    defendants.  He's only alleging official capacity claims for
11    equitable relief.
12         Second, Mr. Dean has conceded that individuals are
13    not proper defendants to the Title IX claim.  So I think that
14    really does address the issues with respect to the 12(b)(1)
15    motion.  If I'm incorrect about that, I know Mr. Dean will
16    correct me.
17         And so to get to the questions the Court has with
18    respect to the due process claim, you know, what's I think
19    important here is the issue in *Sheppard* obviously comes into
20    the context of discussion of qualified immunity.  Qualified
21    immunity would not apply to official capacity claim for
22    equitable relief, and -- but that doesn't necessarily mean that
23    this claim still has legs, particularly because, with respect
24    to the individual defendants sued in their official capacities,
25    those claims are simply duplicative of a claim against Virginia

1   Tech.  The proper party is Virginia Tech with respect to that
2   claim if that's how plaintiff is really intending to proceed.
3          But going a step further, if this is really just an
4   official capacity claim, there has to be a customer policy.
5   It's a *Monell* claim.  And so in order for our due process claim
6   to lie, the plaintiff has to have suffered some sort of
7   constitutional infringement as a result of a custom or policy
8   of Virginia Tech, which just simply isn't alleged in this
9   complaint.
10         The allegation with respect to the due process claim
11  is simply that the plaintiff was not afforded sufficient time
12  in advance of the hearing -- or sufficient notice of the date
13  of the hearing, and that the Ms. Cherry-Clarke the named
14  defendant, refuses request for a continuance.
15         There's no allegation that either the setting of the
16  hearing or the refusal to grant that request was some sort of
17  customer policy under *Monell*.  And so for that reason alone the
18  due process claim is just -- is completely fraught and can't go
19  forward.  And so I think we don't even need to get to --
20         THE COURT:  If there's no property interest, there's
21  no due process claim.
22         MR. SCHNETZLER:  Correct.
23         THE COURT:  Can't you read -- can't you read the
24  *Sheppard* case to say the Fourth Circuit doesn't agree that
25  there is a property claim here for continued education?

1        MR. SCHNETZLER:  Absolutely, Judge.  And we've cited

2   the litany of cases that preceded *Sheppard* that reach the same

3   conclusion that, while courts had assumed that there might be a

4   property interest, the most recent authority has been that

5   there is not, which was, again, clarified by *Sheppard*.  And so

6   I think you can look at this issue, this due process claim, in

7   one of two ways.  There's really two options for the Court.

8   The Court can look and say, well, there's no property interest

9   here, and, therefore, the claim fails as a matter of law, but

10   also there's no customer policy that is causing the alleged

11   harm.  And so for that reason, too, that would be grounds for

12   dismissal of the case with respect to the due process claim.

13        Moving into the Title IX claim, Your Honor, we do not

14   believe these allegations are sufficient.  And I will address

15   the statute of limitations issue in a moment.  But with respect

16   to how this claim has been alleged, we've really seen it as two

17   separate claims.  There's this grant opportunity or the grant

18   funding and then, ultimately, the expulsion from school as a

19   result of the disciplinary process.  And with respect to --

20   excuse me --

21        THE COURT:  Well, the problem with reading it that

22   way is -- is the last three words of paragraph 50 on page 12

23   where Mr. Dean alleges that Mr. Doe was -- the female student

24   was favored over Mr. Doe in the allocation of grant funding --

25   I got that part -- and educational opportunities.  Okay?  It's

1    that "and educational opportunities" which goes, it seems to

2    me, to transcend just the issue of grant funding.

3            And in the briefs Mr. Dean seems to argue that he

4    was -- you know, that he was given menial tasks and he was

5    demeaned and all kinds of other things, not rising to the level

6    of a hostile work environment, but that he was treated lesser

7    than the -- basically on his gender.  So isn't it more -- I

8    mean, isn't a fair reading of this complaint is that it's more

9    than just the grant funding, Mr. Schnetzler?

10           MR. SCHNETZLER:  Your Honor, that we have to actually

11   turn to the allegations in the complaint.  Obviously, you know,

12   we've looked at this case from paragraph 17 which went really

13   to his Title IX allegations, and there's a number of

14   subparagraphs to that.  Obviously, subpart C is the issue with

15   respect to the research grant.  And then the way this is

16   alleged is that you go into subparagraph D and --

17           THE COURT:  Is that "D" as in dog?

18           MR. SCHNETZLER:  Yes, sir, I'm sorry.

19           THE COURT:  Okay, go ahead.  I'm following you.

20           MR. SCHNETZLER:  Mr. Doe insisted that it was

21   improper to allocate the research stipend to a female student

22   in a lab whose work did not support paying the grant and goes

23   on.  And so Mr. Doe is complaining, and he's complaining about

24   this treatment.  And that is what then results in all of these

25   other allegations about how -- what this -- what this professor

1    allegedly tried to do.  And so it's really teed up -- these are

2    essentially claims that would be relevant to a retaliation

3    claim that's simply not been pled in this case.  And so, you

4    know, retaliation is a separate cause of action under Title IX,

5    and that's -- these actions that he alleged happened are -- if

6    you look at subpart G -- as in good -- after Mr. Doe's valid

7    complaints about the research funding were ignored.  That's

8    when he starts alleging that Dr. Onufriev began outwardly

9    retaliating.  But Mr. Doe has not alleged retaliation claim

10   under Title IX.  And so that's why we believe that that is the

11   distinguishing characteristic here with respect it's not just

12   about grant funding or educational opportunities.  That really

13   leads to a totally separate cause of action that was never pled

14   in the case.

15          And, you know, with respect to timing, that becomes

16   another issue, too, because the allocation of grant funding

17   occurred in 2018.  Mr. Doe does not specifically allege when

18   this alleged retaliation or, you know, when he had to start

19   doing these menial tasks occurred, but he does allege -- when

20   you go and look into paragraph 22, that's when we jump into

21   2019.  And so the reasonable reading of these allegations is

22   all that activity occurred in 2018, and, therefore, would be

23   time barred under the statute of limitations.

24          THE COURT:  Okay.  Well, obviously, paragraph 17

25   feeds into paragraph -- the second paragraph 49, 50 and 51.

1    All right.  I understand your argument on that.

2              What about on defamation?

3              MR. SCHNETZLER:  On defamation, Your Honor, you've

4    hit the nail on the head.  It's a completely true statement

5    what the plaintiff claims was defamatory, and it's true based

6    on the plaintiff's own allegations.  If you look at, you know,

7    paragraph 13 of the complaint, plaintiff claims he enrolled in

8    2014.  In paragraph 47 -- I have to check to make sure that's

9    the correct 47 -- that would be earlier on on the complaint.

10             THE COURT:  Yeah.  That's the first 47 on page 9.

11             MR. SCHNETZLER:  He alleges he was dismissed from the

12   school.  And so everything about the statement is true.

13             Now, I anticipate based on the briefing that

14   plaintiff is going to argue that there are grounds here to find

15   a defamation by implication claim and that the -- you know,

16   that a reasonable reading would suggest to someone that the --

17   the defendant when he made the statement was trying to create

18   an inference that the plaintiff was dismissed for either

19   academic reasons for some other reasons, but that's just simply

20   not there.  I mean, the statement speaks for itself.  You can't

21   read into it what's not there, and you can't read it from the

22   lens of the plaintiff, either.  If you read it through the

23   plaintiff's version with that information, you're not looking

24   at it from a reasonable person's standard with respect to

25   whether or not it's determined defamatory.  So the truth of the

1  statement and then looking at it from a reasonable person, it's

2  simply not defamatory.

3          THE COURT:  Okay.  Thank you, Mr. Schnetzler.

4          Let's hear from Mr. Dean on these various arguments.

5          MR. DEAN:  Thank you, Judge.  May it please the

6  Court.  I want to start with *Sheppard*.  I don't think *Sheppard*

7  closes the door.  I've puzzled over *Sheppard* and we've talked

8  about it in other cases.  But I think the way I read *Sheppard*,

9  at least, is that *Sheppard* has not foreclosed student due

10 process litigation within the Fourth Circuit, but, rather,

11 *Sheppard* merely stands for the proposition that a student's

12 constitutionally protected property interest in their continued

13 education is not clearly established at this point.

14         *Sheppard* had to do with -- in section B of the

15 opinion from April of 2021 had to do with an analysis of the

16 due process claim simply with respect to government officials

17 sued in their personal capacity.  And of course, when

18 government officials are sued in their personal capacity --

19 which they are not sued here in their personal capacity, at

20 least for the due process claim -- the Court has to look at,

21 well, are they entitled to qualified immunity.

22         THE COURT:  Right, right, for damages purposes.

23         MR. DEAN:  Exactly.  And so that's what I believe the

24 Fourth Circuit was evaluating.

25         THE COURT:  Well, it's interesting because, I mean,

1   Judge Quattlebaum doesn't say "we find there is no property
2   interest".
3              MR. DEAN:  Right.
4              THE COURT:  And he also doesn't say "we find there is
5   a property interest".  He says it's not -- for the purposes of
6   qualified immunity, there is -- it is not --
7              MR. DEAN:  Clearly established.
8              THE COURT:  "There's no clearly established right to
9   continued enrollment in higher education."  That's what he
10  says.
11             So we didn't sue in an individual capacity -- you may
12  have, but you're conceding that point now.  So you're only
13  seeking injunctive relief for the due process claim?
14             MR. DEAN:  That's exactly right.  We're seeking
15  injunctive relief that the relief with respect to the due
16  process portion of Mr. Doe's complaint is that eventually we'll
17  ask the Court to enjoin the individual defendants sued in their
18  official capacity -- namely, Dr. Sands and his delegates at
19  Virginia Tech -- to remove the disciplinary action from his
20  record and allow him, of course, to re-enroll, if possible, in
21  a graduate program to finish his degree and move forward.
22             THE COURT:  What about Mr. Schnetzler's argument that
23  that really is a *Monell* claim and there's no policy here?
24  There's no policy alleged.
25             MR. DEAN:  Well, the -- so the due process claim has

1    to do with his expulsion following the allegation of sexual

2    assault.  It's not a *Monell* claim.  It has to do with whether

3    he was afforded due process in the context of the student

4    misconduct hearing in 2020.

5            And so to pin it back to the Court's question about

6    *Sheppard*, I only think *Sheppard* stands for the proposition that

7    the Fourth Circuit is telling the district courts this isn't

8    clearly established yet.  And because it's not clearly

9    established, qualified immunity applied in that case, but it

10   doesn't mean the Fourth Circuit has dropped the iron curtain,

11   so to speak, on student due process litigation within the

12   Fourth Circuit.  It's still, you know, in question.  It's still

13   something that is assumed without deciding, in many cases, but

14   it's not something that the Fourth Circuit has weighed on one

15   side or the other yet.  It's left it to the district courts

16   still to sort that out.

17           And I would submit we've submitted sufficient

18   arguments similar to the *Doe* against *Alger* case that but for

19   the disciplinary process that was employed here, as long as he

20   continues to pay his tuition, attend to his responsibilities as

21   a graduate student, and participate in his academic pursuits,

22   that he was -- he could reasonably expect to continue his

23   education at Virginia Tech and proceed towards his degree

24   Similar as we found in other cases.  So I don't think *Sheppard*

25   closes the door on his due process claim.

1          I want to now move to, unless the Court has any other

2   questions on the due process claim -- I think that was the main

3   question the Court had.  I do want to move, though, to the

4   allegation of the deprivation of due process.  And the

5   allegation there is that with one day's notice he's told he's

6   going to have to show up and defend against a sexual assault

7   allegation.

8          I understand in the briefing the defendants argued,

9   well, he was afforded sufficient due process because he was

10  told about the allegation 17 days earlier.  In that 17-day

11  period he went to a mental health institution in Southwest

12  Virginia, he's discharged from the hospital, meets with

13  Dr. Cherry-Clarke about the student conduct process, is told

14  with 24 hours notice he had a trial tomorrow and then is

15  expected to show up and defend himself against an allegation

16  that eventually resulted in his expulsion.  I don't believe

17  that's a meaningful opportunity to be heard.  I think if the

18  Court -- you know, just in applying common sense to what a

19  meaningful opportunity to be heard looks like, certainly,

20  meaningful opportunity means an opportunity to prepare.  And I

21  think 24 hours notice -- I couldn't find a single case to

22  support the idea of 24 hours notice of a expulsion hearing is

23  sufficient due process.

24          The defendants cite I think it's the *Tigrett* case.

25  That is a University of Virginia case where the charges were

amended 48 hours before the hearing.  Basically, essentially,
this group of students at UVA, they added in a disorderly
conduct charge --

THE COURT:  Right.

MR. DEAN:  -- out nine months.  I mean, they had nine
months to prepare.  Ordinarily, our ordinary experience in
Title IX hearings at the university level is you have at least
weeks, if not months sometimes, because so much is at stake.
24 hours notice after just getting out of the hospital is very
troublesome, and I find that to be a deprivation of due
process.  I think we've sufficiently stated that at least at
this stage of the litigation.

Judge, I want to move to the Title IX claim.  I
appreciate the Court's point about whether it's too vague in
terms of discrimination on the basis of his gender.  If the
Court, in looking at just kind of the itemized list, and that's
really what it is -- and these are not all intended to be pled
as having occurred in the year 2018.  There is one allegation
having to do with allocation of grant funding that began in
2018, and that's in paragraph 17 subsection C.  But the rest of
these, and the way we briefed it in opposition, is that this is
something that was continuing and ongoing with this particular
professor going on as late as 2019 into 2020 until he was
expelled.  And I suspect, if given the opportunity to amend our
complaint to provide some more definition in terms of when

1    these actual issues occurred, that my client could supply dates

2    that are well within the two-year statute of limitations.  And

3    we agree it's a two-year statute of limitations, I think,

4    analogous to a personal injury claim in the Commonwealth of

5    Virginia.

6            Moving to the defamation claim, I appreciate the

7    Court's caution doesn't truth eviscerate a claim for

8    defamation.  Truth is an absolute defense, and we have to look

9    at -- it looks like, when we look at Virginia law having to do

10   with defamation, we have to look at the statement itself, and

11   this is something that the Court can resolve at this stage of

12   the litigation.  But the statement is, "Attempted to earn a

13   Ph.D. in physics; in spring 2020, after about seven years in

14   the program, was dismissed from the University."  The

15   implication there is that he was dismissed, I think, based on

16   his inability to satisfy the professional and academic

17   requirements to earn a Ph.D. in physics.  We would take issue

18   with the word "attempted to earn".  There would be, if allowed

19   to amend additional allegations, that he actually already

20   defended his dissertation and was prepared to earn his

21   doctorate that spring when he was otherwise expelled and that

22   it is a false statement to say he attempted to earn his Ph.D.

23   He would have additional facts to plead that he in fact already

24   completed the requirements to earn a Ph.D. in that he had -- he

25   had -- nothing was attempted.  He had already done it.  He had

1    already defended his dissertation.

2            And then there's also this -- you know, the fact that

3    this statement gets posted on the professor's website after he

4    files this initial complaint I think speaks to kind of what the

5    sting of that statement was.  It was basically to sort of

6    poison the well as he's looking for jobs and looking for other

7    programs to finish his coursework that, when you Google this

8    person's name -- and it's a very Googleable name if we were to

9    put his true name into the complaint -- this suggests that he's

10   somehow academically insufficient or incapable of doing the

11   work as opposed to being dismissed from the University for

12   totally unrelated reasons to his ability to do physics and do

13   drug design research.

14           So with that I hope I've answered the Court's

15   questions.  I'm happy to answer any other questions the Court

16   may have.

17           THE COURT:  I was a little confused by what you said

18   about when this statement was posted.  Are you telling me it

19   was -- that this was posted -- it says "after he filed his

20   initial complaint against Virginia Tech".  You mean after this

21   lawsuit was filed?

22           MR. DEAN:  Yes, sir.  So what -- this is actually the

23   second iteration of this complaint.

24           THE COURT:  Oh, okay.

25           MR. DEAN:  Mr. Doe had filed this exact complaint

1    without Count Three in 2020.  And for reasons having to do with

2    COVID and getting these various defendants served and other

3    issues we weren't able to serve within the time required under

4    the rules, and so Judge Cullen had issued an opinion saying we

5    needed to strike the complaint and refile it so it could

6    be served at the time required.

7              THE COURT:  You mean I should transfer this case to

8    Judge Cullen because he's already worked on it?

9              MR. DEAN:  I have not asked.  He just made a

10   procedural ruling on it, and, Judge, you've already had a

11   27-page bench memo on it.

12             THE COURT:  But I didn't know that Judge Cullen

13   already worked on it.  I would have been happy to send this

14   case to him.

15             MR. DEAN:  Judge, I appreciate that; only on the

16   issue of service of process.

17             THE COURT:  Garrison, how did we miss that?

18             LAW CLERK:  I don't know.  That's my fault.

19             THE COURT:  I don't know how we missed the fact that

20   there was a related -- oh, you know how we didn't know?

21   Because it's John Doe.  That's why we didn't know.  We didn't

22   know it was a related case to the other one because the

23   plaintiff doesn't have a name.  That's why our system didn't

24   send this case to Judge Cullen.  So this is the first I'm

25   hearing of this.

1          MR. DEAN:  I understand.  But what's interesting, we

2    filed the complaint and then --

3          THE COURT:  Usually cases will go to -- to the judge

4    who has already done some work on it, right, unless there's a

5    conflict or something.  So, hmm, okay, I'll think about that.

6          MR. DEAN:  And Judge, we had never briefed the Court

7    on these issues.  It had not matured to this point when it was

8    struck for service of process.

9          THE COURT:  Well, we have started thinking about

10   these issues, so I -- I don't see any reason to transfer it to

11   him, much as I would like to give him some work and alleviate

12   some work from me, but it's fine.  I won't transfer -- I'll

13   keep it.  We've already started with it.

14         MR. DEAN:  Very good.  But as we alleged in paragraph

15   63, we filed that other complaint --

16         THE COURT:  Okay.

17         MR. DEAN:  -- in that Doctor Onufriev updates his

18   website to kind of slander Mr. Doe.  We argue that he's doing

19   so maliciously.  He knows that Mr. Doe, obviously, is

20   struggling and has some complaints about him, and so in

21   response posts the statement "attempted to earn a Ph.D. in

22   physics" to sort of denigrate him academically, when, if we're

23   required to replead, he would have additional facts that he had

24   already defended his dissertation.  He was perfectly qualified.

25   He felt he was discriminated against and certainly sought

1   relief in court as a result of that.

2            THE COURT:  Okay.  That's helpful to me.  That's

3   background I was not aware of, and I appreciate you filling in

4   that picture for me, Mr. Dean.  I appreciate that.

5            Mr. Schnetzler, let's go back to -- let's start with

6   defamation.  If in fact he had already completed all of the

7   requirements he needed to earn a Ph.D. in physics, is it --

8   isn't it -- isn't it arguable that using the word "attempted"

9   is -- is false and defamatory?

10           Mr. Schnetzler, I can't hear you.

11           MR. SCHNETZLER:  Judge, can you hear me now?

12           THE COURT:  I can.  Thank you.

13           MR. SCHNETZLER:  One second.

14           All right.  Are we back on?

15           THE COURT:  Yes.

16           MR. SCHNETZLER:  Okay, I apologize.  My computer has

17   been having issues today.

18           I guess, Your Honor, the allegation with respect

19   to -- I don't know the ins and outs of where he was with his

20   degree requirement, so I can't really speak to that, but the

21   degree certainly wasn't conferred so he certainly hadn't earned

22   it.  And by the plaintiff's own allegations in paragraph 10, he

23   enrolled in 2013 to pursue that degree.  He never alleges that

24   he earned it or completed it.  And those allegations were

25   completely within his knowledge and should have been pled the

1    first time around when this case was filed in 2020 and

2    certainly should have been alleged in 2021.  And Your Honor, we

3    did try to draw to the Court's attention this case had been

4    filed previously in footnote one of our opening brief on the

5    12(b)(6).  And so but, Your Honor, it's just -- I understand

6    the plaintiff's argument that he believes that he completed his

7    requirements, but he never alleged that.  There's been no

8    degree conferred, and so "attempted" is not false.  You know,

9    until that degree is conferred, you haven't earned it.  You

10   may -- so that would be the response of Virginia Tech.

11          And then in response -- I believe that the plaintiff

12   is trying to allege that there is this sort of implication

13   argument with respect to the defamation claim because the

14   statement was allegedly posted after the first lawsuit was

15   filed, but that first lawsuit was filed under a pseudonym as

16   well.  So how can a reasonable person looking at the statement

17   have any indication that it had anything to do with this case

18   that's been filed in federal court?

19          THE COURT:  How could it be defamatory if the suit

20   that was filed was filed under a pseudonym?  I mean, why would

21   that be malicious or defamatory or intended to harm?  Because

22   it doesn't name -- I mean, his -- his -- the website,

23   obviously, names him, right?  But there's no reference to the

24   lawsuit.

25          MR. SCHNETZLER:  Exactly, Your Honor.  There's no

1    reference to the lawsuit whatsoever in the alleged statement.

2            THE COURT:  It's just a website that updates who

3    worked for this professor at this lab and what's happened to

4    those folks.  This person has gone on to this grade of claim

5    and this person has done this.

6            And Mr. Dean, do I have to read the -- do I have to

7    read the allegations with regard to Mr. Doe in the context of

8    the other allegations that are there with regard to the other

9    people who worked at that lab?  In other words, is this the

10   only bad one, you know, that he was dismissed and everybody

11   else is like chairman of the board of this drug company or that

12   drug company?

13           MR. DEAN:  It's the only bad one out of 40 on the

14   website.  It really appears --

15           THE COURT:  Doesn't the context matter in defamation?

16           MR. DEAN:  I think it does.

17           MR. SCHNETZLER:  Your Honor --

18           THE COURT:  Mr. Schnetzler?

19           MR. SCHNETZLER:  If the statement is true, though.

20   There's nothing wrong with writing a true statement on a

21   website lauding 45 other former students as long as the

22   statement is true, and the statement here --

23           THE COURT:  What if I had a website where I was

24   addressing all of my former law clerks, right?  And one of them

25   didn't pass the bar, okay?  All right.  All of these other

1    folks have gone to big firms and one didn't pass the bar.

2    Would it be defamatory if I said "law clerk X attempted to pass

3    the bar and he's not practicing law"?

4          MR. SCHNETZLER:  It wouldn't be defamatory because

5    it's a true statement.  I mean, it's a factual statement.

6          THE COURT:  Okay, all right.  I got that.  I get

7    that.  I understand that argument, okay?

8          I want to talk about *Monell*, right?  I want to

9    understand your point on *Monell* because Mr. Dean, he just

10   back-of-the-hands it and says *Monell* has nothing to do with

11   this case.  And I get his argument on *Sheppard*; I see that; I

12   understand that.  There can be no claim for damages against

13   these individuals.  The only possible claim can be injunctive

14   relief.  So tell me why *Monell* controls, Mr. Schnetzler.

15   Because my 27-page bench memo didn't discuss it.

16         MR. SCHNETZLER:  We did raise that issue in our reply

17   brief, Your Honor, and I'll tell you why it controls, and I'll

18   refer the Court to two decisions.

19         THE COURT:  Well, it may have discussed it and I

20   might have missed it.  I don't want to throw my law clerk under

21   the bus, okay?  It may be in there and I just may have, in my

22   own feeble mind, blown past it.  But tell me why it applies.

23   So Garrison, I'm not saying it's your fault.  I might have just

24   blown past it, all right?  Because it was 27 pages.

25         Go ahead.

1          MR. SCHNETZLER:  Your Honor, *Sutherlin v. Smith*.

2     That was a Judge Kiser decision in 2016.  And also *Flanagan v.*

3     I believe it's *Scearce*.  That's Judge Cullen from this year.

4     Both cases talk about official capacity claims brought against

5     individuals named in their official capacity.  And it really

6     does boil down to whether or not the entity is the moving force

7     behind the alleged deprivation.

8          THE COURT:  Wasn't Judge Cullen's case a police case?

9          MR. SCHNETZLER:  I believe so, Your Honor.  Actually,

10    no, she was a -- I think it may have had something to do with

11    Social Services.

12         THE COURT:  It was an agent.  It was an agent, some

13    sort of -- okay, all right.  Yeah, I got that.  I remember that

14    case.  Go ahead.

15         MR. SCHNETZLER:  Directly on point here where Judge

16    Cullen in the *Flanagan* case has found that there was no sort of

17    official policy or custom of the Department of Social Services

18    board that actually played a part in the alleged violation.  So

19    what would be different if this were a case where like some

20    other Title -- excuse me, due process claims that are brought

21    involving similar circumstances, they usually allege some sort

22    of problem with the procedures and the policies that are in

23    place at the school, right?  You know, you don't allow for

24    cross-examination or that --

25         THE COURT:  Or you make him go to hearing on one

1    day's notice.

2              MR. SCHNETZLER:  I'll address that in just one

3    second.  But -- and so but that's not the argument here.

4    There's no -- there's no allegation that, you know, the

5    hearings are always set with one day notice or that they

6    refused to grant continuances or anything like that.  It's

7    simply a single decision made by an individual, and so that's

8    not sufficient under *Monell*.

9              THE COURT:  What about -- *Monell* was addressed in

10   some detail in footnote one of the 27-page bench memo that I

11   got, and let me just tell you what it says there.  It says that

12   Doe does not address Virginia Tech's argument that -- Doe

13   doesn't allege any custom or policy that Virginia Tech violated

14   by denying his request for a hearing extension.  And then talks

15   about *Monell* and some of the cases that follow it.

16             What about the argument that Defendant Cherry-Clarke

17   had policy making authority?  And that this stage, shouldn't we

18   give them leave to amend to see -- wouldn't it be fair for the

19   Court to assume that she had policy making authority because of

20   her position as assistant director of student conduct at

21   Virginia Tech and that because she had policy making authority,

22   that that's the policy that is -- that is subject to the

23   violation here?

24             MR. SCHNETZLER:  One, you know, on this complaint

25   there's no allegation that she had policy making authority.

1    And even a step before that, by failing to even address the

2    issue, I think the plaintiff has forfeited any argument that

3    she had such policy making authority. So at this point we're

4    sort of -- defendants are facing a moving target.

5            THE COURT: No, no, I understand.

6            MR. SCHNETZLER: When these issues should have been

7    addressed at the forefront, or at least addressed in the

8    briefing so that they could be properly teed up before the

9    Court.

10           THE COURT: Well, they were properly teed up for the

11   Court because my brilliant law clerk addressed it well in a

12   very detailed footnote one.

13           MR. SCHNETZLER: Even if there was an allegation she

14   had policy making authority, that's not enough in and of itself

15   either because it still has to come from the -- you know, it

16   can't -- just because an individual has policy making authority

17   doesn't necessarily make it a custom or policy.

18           THE COURT: There's got to be a policy, right? I

19   mean, there's got to be a custom or policy. That's what *Monell*

20   says.

21           MR. SCHNETZLER: Right.

22           THE COURT: Every individual act of every government

23   employee is subject to a 1983 violation. That's what *Monell*

24   says. That's what the Supreme Court said.

25           MR. SCHNETZLER: Exactly, Your Honor. And so for

1    that reason we don't think that that would make a difference

2    and leave to amend would not be warranted in that case.

3            THE COURT:  In her official capacity, right?  That's

4    what we're talking about.  Official capacity injunctive relief

5    only that you've got to have a custom or policy in order to tag

6    the institution under 1983.  That's what *Monell* says.

7            MR. SCHNETZLER:  Correct, Your Honor, absolutely.

8            And so but even if the Court goes a step further, you

9    know, we've talked about the property interest, and we believe

10   the weight of authority is clearly in favor that there is not a

11   protected property right in continued post secondary school

12   education, and I know --

13           THE COURT:  Would Virginia Tech like the Court to

14   simply hold that so that the Fourth Circuit could just take

15   that up squarely?

16           MR. SCHNETZLER:  Absolutely.  Judge Dillon happily

17   did it before us in the *Doe v. Virginia Tech* case we cited in

18   our briefs and she found there was no protected property

19   interest.

20           THE COURT:  But she found -- but she found there was

21   one at James Madison.

22           MR. SCHNETZLER:  And that case was unique because,

23   you know, they actually made an attempt to allege that there

24   were circumstances at the school that might give rise to a

25   property right.  And Judge Dillon only said I'm going to give

1  the plaintiff the opportunity to prove it.  James Madison

2  ultimately conceded the issue prior to summary judgement.

3          THE COURT:  They did.

4          MR. SCHNETZLER:  That's the only reason that claim

5  went forward on that claim.  It was never really fully

6  addressed.  But if you look at the allegation --

7          THE COURT:  I agree with that.  I remember that case.

8  In fact, that case was my case, and then when Judge Dillon came

9  on I sent it to her.  And so -- but she did a good job with it,

10  so I'm glad -- I'm glad that she was able to deal with that.

11          MR. SCHNETZLER:  And the difference between that

12  case, Your Honor, and this one is if you look at the

13  allegations in the *Alger* complaint versus the allegations here,

14  here we just have a conclusory allegation that the plaintiff

15  has protected property rights in continued education.

16          In *Alger* the plaintiff pointed out that there was

17  a -- that there was a custom or at least some sort of

18  understanding you could only be dismissed from the school for

19  cause or for certain circumstances, and then there was another

20  allegation that -- that the policies or some -- and I

21  apologize.  I can't articulate it completely accurately.  But I

22  know Judge Dillon differentiated the allegations in the *Doe v.*

23  *Alger* case to similar conclusory allegations like we have here

24  that were in the *Doe v. Virginia Tech* cases that were cited.

25          THE COURT:  But *Doe v. Alger* was also a dismissal of

1    the alleged sexual misconduct.

2            MR. SCHNETZLER:  It was, Your Honor, in a little bit

3    different context because the plaintiff was originally found

4    not responsible, and I believe on appeal or in a second

5    proceeding was found responsible where additional information

6    may have been brought in.  It wasn't -- that was sort of the

7    issue in that case, is that there was sort of a reversal in the

8    finding against the student in that case.

9            THE COURT:  Okay.  What about the substance of the

10   claim, of the Title IX claim, with regard to the disciplinary

11   proceeding?  I mean, isn't that just -- in fact, the complaint

12   alleges the only possible reason that he didn't get his

13   extension was because he's a man.  I mean, are those sufficient

14   facts to allow a Title IX claim to go forward?  I mean, because

15   that is -- that's exactly what's pled in this case, that

16   Ms. Cherry-Clarke is a -- is a female and that she is a

17   champion of women's issues, and I think it says -- yeah, it's

18   in page 12, paragraph 53.  "The decision of the student conduct

19   office in refusing to grant an extension had no rational basis

20   in fact and can only be explained by Virginia Tech's

21   discriminatory and inadequate procedures and predetermination

22   of guilty in its investigation of Mr. Doe."  That doesn't even

23   say because of his gender.

24           I don't know.  Seems to me the claim about -- the

25   Title IX claim for the extension based on gender seems awfully

1    thin.

2              MR. SCHNETZLER:  I agree, Your Honor.  And the reason

3    being is sort of the only sort of implication that the

4    plaintiff can rely on for purposes of that Title IX claim --

5    and let's take a step back and remember under *Sheppard* we're

6    talking about but for causation and, specifically, it as to be

7    the but for cause.  Gender discrimination, the specific

8    language from *Sheppard* in the closing paragraph in the Title IX

9    claim is that it needs to be the but for cause.  And so we're

10   talking about a pretty strict standard here, not a motivating

11   factor under Title VII or anything like that.  We're talking

12   about the but for cause.

13             THE COURT:  Right.  It's on page 238.

14             MR. SCHNETZLER:  Correct, Your Honor.

15             THE COURT:  "That is, there is no plausible inference

16   that *Sheppard*'s gender was the 'but-for' cause of his treatment

17   under Virginia State University's disciplinary proceedings.

18   Accordingly, his claim was properly dismissed."

19             MR. SCHNETZLER:  And Your Honor, here, the only

20   allegations we have are that Ms. Cherry-Clarke is a member of

21   these organizations.  Well, I mean, we're getting into

22   dangerous territory if now Virginia Tech and other colleges and

23   universities have to start policing their administrators in

24   their First Amendment rights to associate with organizations.

25   What you really need to look at for purposes of Title IX

1    claims, are there other -- are there particularized

2    allegations, not just these conclusory allegations in the

3    counts of the complaint, but particular allegations of gender

4    discrimination.  And courts have looked for, you know,

5    statements made by the individual in the past, patterns of

6    decision making.  In the Washington & Lee case -- not the most

7    recent one Judge Moon entered on summary judgement, but the

8    prior iteration of the Washington & Lee case, Judge Moon looked

9    at a PowerPoint presentation that one of the investigators or

10   hearing officers had given that gave an indication there was

11   some sort of gender bias there.  Here we just have this

12   individual's affiliation with some of these organizations which

13   shouldn't in and of itself be sufficient absent some other

14   indication, some other allegation, that gender was the but for

15   cause of the reason to decline the request for extension.  I

16   mean, you can -- I understand the allegation is there was no

17   other reason it could have been, but we're also talking about

18   organizing people's calendars and, you know, all these sorts of

19   things.  And so there is certainly other reasons that, you

20   know, despite the -- you know, the reality that the Court has

21   to look at the complaint with, just looking at this conclusory

22   allegation that, oh, it had to be the only reason isn't

23   sufficient for Title IX, particularly under that higher

24   pleading standard under *Sheppard*.

25            THE COURT:  All right.  Anything you want to say

1   about the Title IX claim with regard to the stuff that goes on

2   in the office -- I mean, in the lab?  I'm sorry.

3        MR. SCHNETZLER:  Your Honor, no, not with respect to

4   the lab.  We think that, honestly, it's clearly time barred,

5   but we did raise in our brief, you know, again, we have to look

6   at gender bias, right?  And so the allegation is that he gave

7   this -- the professor gives this research opportunity to a

8   female over a male, but at the same time the professor is

9   allegedly making all these derogatory statements about females.

10  And so where is the bias coming into play here if he's making

11  derogatory statements about females but then Mr. Doe is

12  claiming that he -- the professor is biased against males by

13  offering -- or by giving this research position to a female?

14  We think that that kind of contradicts itself.

15       The only other thing, Your Honor, I would add is with

16  respect to any requests for leave to amend, one, that should

17  have been raised a long time ago by the plaintiff.  We started

18  briefing -- the briefs I think closed in September on this

19  issue.  Leave to amend should have been requested then.

20  Proposed amended complaints should have been filed.  Neither

21  one of those was done, and here we are three months after the

22  briefing closed.

23       And then lastly, Your Honor, even -- if the Court

24  even gets there, I think it's really important to look at the

25  allegations with respect to the due process claim and notice

1    because this -- this is not about the meaningful opportunity to

2    be heard.  It's about notice.  And if you look at -- what we're

3    trying to articulate in our briefs is that notice has to do

4    with the charges, okay?  To have adequate notice, we have to be

5    able to defend yourself by knowing what the charges are.  And

6    so if you look at the allegations in the complaint, we can see

7    that on February 17, 2020, Mr. Doe is notified that a sexual

8    assault investigation is going to begin.  And he actually has

9    notice of the claim -- it appears from the complaint he has

10   notice even before then, but, in any event, February 17, giving

11   the benefit of the doubt to the plaintiff --

12          THE COURT:  I've lost you.  Your bandwidth is

13   struggling.

14          It appears we have a technical issue with

15   Mr. Schnetzler's connection.

16          Mr. Schnetzler, are you back with us?

17          MR. McCLANAHAN:  Your Honor, we've texted him and

18   sent him an email to let him know he's frozen a bit there.  I

19   think he's trying to get back to us.

20          MR. SCHNETZLER:  Judge, is that better?

21          THE COURT:  That's a lot better than what you were.

22          MR. SCHNETZLER:  Judge, how about now?  Can you hear

23   me?

24          THE COURT:  Yes.  I think you have to start -- you

25   were -- go to paragraph -- you've got to go back to February 17

1   when he got notice.  You were making a point about notice, and

2   so go back to February 17 because that's where I think you

3   started to break up.

4          MR. SCHNETZLER:  All right.  And I apologize, Judge.

5          So February 17 Doe gets notified of sexual assault

6   investigation.  On February 18 he's suspended, the next day,

7   because of this allegation.  So -- and I'm looking, Your Honor,

8   at page 7 of the complaint.  On February 28, Mr. Doe alleges

9   that he's discharged from the hospital, has a meeting to go

10  over the student conduct process, and receives a letter from

11  Defendant Cherry-Clarke formally charging him with sexual

12  assault.  So we have the 28th.  The hearing occurred on March

13  the 6th.  And February 2020 was leap year, so there were 29

14  days that year.

15         And so then he meets with Cherry-Clarke on March 3

16  and then has another meeting with Cherry-Clarke on March 5, the

17  day before the hearing.  And that's when he's notified about

18  the date of the hearing.

19         And, Your Honor, with respect -- you know, if the

20  case law on these Title IX -- or on these due process claims

21  that have to do with notice, look at notice of a charge and the

22  ability to -- to present a defense.  He had full knowledge of

23  the allegations against him in February 17 and no later than

24  February 28, approximately a week before the hearing, to gather

25  witnesses and that sort of thing.  And there actually isn't

1   really an allegation in this complaint -- I mean, there's an

2   allegation that he wasn't provided sufficient time to gather

3   witnesses, but there isn't actually an allegation suggesting

4   there were witnesses that he wasn't able to actually produce

5   for the hearing.  And so that's where, if the Court even gets

6   to the notice issue, it still doesn't have legs and this dog

7   won't hunt.

8         So Your Honor, with that I'll close and I'll

9   apologize again for the technical issues.

10         THE COURT:  Well, it only happens in every Zoom

11   hearing.  It happens all the time.

12         Okay.  Let me ask Mr. Dean for any response he would

13   like to make, and then I have a few observations.  Mr. Dean?

14         MR. DEAN:  Thank you, Judge.  First, I didn't mean to

15   swat away the Defendant's *Monell* claim argument, but it's not a

16   case that usually comes up in student due process litigation

17   cases.  *Monell* has to do with who is a person under section

18   1983 that you can sue.  *Monell* basically was a decision by the

19   Supreme Court of the United States that said, you know, of

20   course, you can sue actual persons, you know, with two arms and

21   two legs and two eyes and all that, and we've done that here.

22   We've sued Dr. Sands in his official capacity under Section

23   1983.

24         *Monell* goes on to say you can sue entities as a

25   person if you're alleging that the deprivation was because of a

1    general practice, custom, policy.  You see it in municipal

2    liability cases.  You see it in police force cases.  You

3    usually don't see it in university cases.

4            To be clear, we're not making a *Monell* claim against

5    Virginia Tech.  The 1983 due process claim is against

6    Dr. Sands.  It's also against Dr. Cherry-Clarke.  They are the

7    individual persons under Section 1983 that we are suing in

8    their official capacity and asking the Court to enjoin to --

9            THE COURT:  What did Dr. Sands have to do -- I mean,

10   if the due process claim has to do with the fact that he didn't

11   get -- he was told your hearing date is tomorrow, what did

12   Dr. Sands have to do with that?

13           MR. DEAN:  Well, the allegation is that Dr. Sands

14   ultimately -- like Harry Truman, the buck stops with him.  And

15   so he delegates others at Virginia Tech who work in the student

16   conduct department who would minister, ultimately, policies and

17   procedures that, ultimately, he is responsible for as the

18   president of the university.  And so that's why Dr. Sands --

19           THE COURT:  Well, what is it about the fact that he

20   was told on March 5 that the hearing was on March 6?  What is

21   it about that that violates due process?  He had known about

22   this charge for a few weeks.  He had met with Ms. Cherry-Clarke

23   three or four days before this.  What is it that constitutes a

24   due process violation?  He had notice.  He had opportunity to

25   be heard.  What else is there?

1          MR. DEAN:  We would submit he did not have a

2    meaningful opportunity to be heard.

3          THE COURT:  Okay.  Well, what was it he wasn't able

4    to do in the one day?

5          MR. DEAN:  Have just enough time to prepare, the

6    marshal evidence, to review the evidence.

7          THE COURT:  What evidence did he not get to -- I

8    mean, he had -- he had this stuff for two weeks.

9          MR. DEAN:  No, and I think we would be able to plead

10   facts that he didn't -- that the notice of the allegations is

11   just that.  It's a short letter that said you're accused of

12   sexually assaulting so and so on such and such date, and that's

13   it.  But then when these Title IX investigations proceed,

14   there's a packet of information the student has to be provided.

15   There is the statements by both the complainant and then by --

16         THE COURT:  When did he get that?  When did he get

17   the statements by the complainant?

18         MR. DEAN:  My understanding is that is information

19   that he got either the day before or two days before when he

20   got out of the mental hospital.  That's not --

21         THE COURT:  Well, he -- he got February 20 --

22   February 17 they notified him he was under investigation.  You

23   allege that in paragraph 29 of your complaint.  February 18

24   he's suspended.  February 28 he meets with a Title IX

25   investigator to go over the student conduct process.  That's

paragraph 33 of your complaint. Paragraph 34,
Ms. Cherry-Clarke sends him a letter formally charging him on
28. On paragraph 35, March 3 he meets with Ms. Clarke. And
then he meets with her again on March 5.

So when did he get the information advising him at
what these charges were? That's not pled here.

MR. DEAN: Right. And those are additional facts
that maybe we need to put in. But my argument would be that a
meaningful opportunity to be heard implicit in that is a
meaningful opportunity to prepare, and he did not have a
meaningful opportunity to prepare both because of the fact that
he was just discharged from the hospital and the fact that it
was not even referred to the student conduct office until
February 28. He doesn't even meet with the student conduct
office to talk about what the hearing would look like until
March 3. He's not even told when this hearing would be until
less than 24 hours before it would take place. I would find
that would be problematic.

I understand, obviously, that due process is a
flexible standard, but it's also a common sense standard in
that he, in 24 hours, would not have enough time to
meaningfully prepare in order to present his side and defend
against these most serious charges given the circumstances.
And so that -- that would be the argument on the substance of
his due process --

1          THE COURT:  Paragraph 37 says on March 5 Mr. Doe
2    contacted Tamara Cherry-Clarke and asked for extension.  He
3    advised that he did not have enough time to prepare and collect
4    all the evidence he needed to properly defend himself at the
5    hearing.
6          Was that done in person, over the phone, by email?
7    How was that -- how was that done, Mr. Dean?
8          MR. DEAN:  Judge, that was done by email.  We have an
9    email to that effect.  And it was denied.
10         THE COURT:  Okay.  I understand that.  That's --
11   that's paragraph 38.  Okay.  All right.
12         All right.  I'm sorry, go ahead.  You're not making a
13   *Monell* claim.
14         MR. DEAN:  Right.
15         THE COURT:  You're making a claim against these
16   individuals.
17         MR. DEAN:  In their official capacity.
18         THE COURT:  In their official capacity.
19         MR. DEAN:  That's right.  That's right.  And I don't
20   have anything else to say in response
21         THE COURT:  All right.  Thank you, Mr. Dean.
22         All right the Court is going to grant the motion to
23   dismiss this complaint.  It is insufficient on its face to
24   raise the claims of violation of due process, the Title IX
25   claims, and defamation across the board.

1           There is -- certainly, there's no basis for a claim

2   over liberty interest here, and there is -- there's -- the

3   Court would -- in order to grant a due process claim, the Court

4   would have to find the existence of a property interest, and I

5   don't think that this complaint has pled a sufficient basis to

6   find a property interest.

7           Also, I think it -- it's not adequately pled in terms

8   of indicating what respect the notice was not meaningful.  It

9   simply says -- it simply says he was unfairly influenced by --

10  I'm sorry, I was looking at the wrong page.

11          It says he was -- so many allegations.  Well,

12  paragraph 37, the first 37.  "He advised that he did not have

13  enough time to prepare and collect all the evidence he needed

14  to properly defend himself at the hearing."  There's no

15  indication as to what -- how in any respect his due process

16  rights were violated by just having one day to do the hearing.

17  I mean, it's just conclusory.  There's no facts alleged as to

18  what he would have done differently.

19          The Title IX claim, as regards the -- to suggest that

20  he was -- he was -- the disciplinary process was manufactured

21  because he's a man and that it was skewed against him because

22  he's a man is insufficiently pled on these allegations.  Also,

23  with regard to the claims as to what happened in the lab, some

24  of them are plainly barred by the statute of limitations, and

25  it's hard to tell when these other ones were based on this

1    complaint.

2            Next, as regards to the defamation allegation, on its

3    face it looks to me to be truthful and doesn't state a claim.

4    Mr. Dean argues no, no, he had done everything he needed to do

5    to earn a Ph.D. and that, therefore, the "attempted" somehow

6    maligns his scholastic performance, right?  It somehow suggests

7    that he is -- based on the use of the word "attempted".  But

8    that's not alleged in this complaint.

9            And so I'm going to dismiss this complaint across the

10   board.  I'm going to give Mr. Dean 20 days to file a first

11   amended complaint to attempt to remedy the deficiencies in this

12   complaint, and then we will deal with any motion to dismiss

13   that is filed thereafter.

14           I don't know why it took so long to get a hearing on

15   this.  We have been really, really busy.  We're a little backed

16   up from the pandemic, but I don't want the next hearing on the

17   motion to dismiss to be pushed out -- I'm already going to lose

18   my law clerk.  I'm going to have to stay up on this myself,

19   which is trouble because, you know, I'm old, and, you know, I

20   have to try to remember these things.  So let's try to get a

21   hearing.

22           I would like -- I assume, Mr. Schnetzler, you're

23   going to file another motion to dismiss.  I assume that's

24   right.

25           MR. SCHNETZLER:  We don't know until we see the --

1      THE COURT:  Why don't you do this:  Why don't you do
2  this:  Why don't you and Mr. Dean agree with Ms. Ayersman,
3  okay, and just get a date for a status conference in this case,
4  and let's do that sometime in early February, okay?  Let's get
5  a status conference set, and we'll either have a Rule 26
6  conference for which we will set a trial date or we will have a
7  second round of the motion to dismiss argument.

8      Now, Mr. Dean, I really think there are some
9  substantive problems with some of the claims that you have
10  raised.  And so when you go back and look at these facts, take
11  heed of what the Court has said and what has been argued
12  because perhaps some of the claims -- well, if the claims don't
13  have factual bases, then they ought not to be pursued, right?
14  And the one I'm really focused on is this Title IX claim that
15  suggests that he wasn't given an extension on his hearing
16  because of his gender.  I mean, there is -- that's nothing but
17  supposition.  Nothing.  Nothing.  And I think you need to do
18  more than that.

19      On the defamation claim, there's got to be more facts
20  pled.

21      On the -- I'm going to look at the *Monell* issue
22  myself because I'm not convinced that -- as pled, I am not
23  convinced that, absent some showing that Ms. Cherry-Clarke had
24  policy making authority, that you can make this claim, this due
25  process claim against her and against President Sands.

1          So I'm not sure where we'll go after this, but let me
2    give you 20 days to file an amended complaint.  You state what
3    claims you can.  Mr. Schnetzler, you file a motion -- let's
4    see.  The rules say that after the filing of an amended
5    pleading you've got to respond within -- how much time do you
6    want to respond to this?

7          MR. SCHNETZLER:  I think the rule says 14 days.  If
8    we could have 21, that will be helpful, Your Honor.

9          THE COURT:  I'll give you 20 because I like even
10   numbers.  So Mr. Dean, you've got 20 days to file your amended
11   complaint.  Virginia Tech and the other individual defendants
12   have 20 days to respond.  And then you all work with Kristin by
13   email.  Let's get a hearing date in early February, and we'll
14   either address any lingering motions to dismiss or we'll set a
15   trial date in this case and go from there, okay?

16         All right.  I really appreciate the argument,
17   Counsel.  I think it's given me a lot to think about.  These
18   cases always have a lot to think about, but I do think there
19   are some problems with some of these causes of action as
20   alleged and that they, as pled, do not state a claim.  But I'm
21   going to see whether Mr. Dean can plead facts that give these
22   causes of action some basis to go forward.  So I think it's
23   appropriate for the Court to grant leave to amend.

24         So oral order granting motion to dismiss; 20 days
25   leave to amend; 20 days thereafter for the defendants to

1    respond.

2            All right, folks.  Thank you all.  Thank you all for

3    the argument.  Very helpful.  I will look forward to seeing

4    you-all again.  Thank you.

5            COUNSEL:  Thank you.

6            (The proceedings concluded at 4:48 p.m.)

7                          **CERTIFICATE**

8            I, Mary J. Butenschoen, certify that the foregoing

9    is a correct transcript from the record of proceedings in the

10   above-entitled matter.

11   /s/ Mary J. Butenschoen, RPR, CRR                1/11/2022