IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 7:21-cv-00378 |
| v. | ) | |
| | ) | |
| VIRGINIA POLYTECHNIC INST. | ) | By:    Michael F. Urbanski |
| & STATE UNIV., et al., | ) | Chief United States District Judge |
| Defendants | ) | |

## MEMORANDUM OPINION

This matter is before the court on Virginia Polytechnic Institute & State University's

(Virginia Tech)[1] motion to dismiss plaintiff John Doe's first amended complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6). ECF No. 26. Doe has responded to the motion to

dismiss, ECF No. 30, incorporating by reference ECF No. 15, and defendants have replied.

ECF No. 32. The issues are fully briefed and a hearing was held on February 15, 2022. For the

reasons stated below, the court will **GRANT** Defendants' motion to dismiss, with two of

Doe's claims being dismissed with prejudice and the remaining claims being dismissed without

prejudice. Doe will be given an opportunity to file a second amended complaint on the claims

that are dismissed without prejudice.

### I. BACKGROUND

Plaintiff John Doe, a male Iranian citizen, was a graduate student at Virginia Tech

pursuing a doctoral degree in physics. Am. Compl., ECF No. 21 ¶¶ 2, 10. Beginning in 2015,

---

[1] Also named as defendants in the First Amended Complaint are Timothy Sands, Alexey Onufriev, and Tamara
Cherry-Clarke, referred to collectively as "Virginia Tech" or "defendants."

Dr. Alexey Onufriev was Doe's graduate advisor. Id. ¶ 13. Doe alleges that Onufriev began to discriminate against him based on his sex in 2018. Specifically, at an academic conference, a researcher from another school approached Doe and asked if Onufriev was still "chasing after" female graduate students. Id. ¶ 19. During another conference, Onufriev told Doe that they needed to go see a "good poster," which Doe later discovered was Onufriev's code for looking at an attractive woman presenter. Id. ¶ 20.

Additionally, in 2018, Onufriev received a grant from the National Institute of Health (NIH) for his research performed with Doe. Id. ¶ 21. Typically, a graduate student would receive a research stipend from a grant in recognition of the work that resulted in the grant award. Id. ¶ 22. However, Onufriev did not pay Doe funds from the grant money and instead provided a female graduate student with a $40,000 research stipend even though she was not involved with the grant research. Id. ¶ 23. Doe protested Onufriev's decision to provide the female student with the grant money, and in response, Onufriev said, "[W]ho can resist a Persian princess?" Id. ¶ 24.

Although Doe was not receiving grant funds, Onufriev attempted to attach the grant number to Doe's research in reports to the NIH, which Doe refused to permit as he believed it would have been fraudulent to do so. Id. ¶ 27. Doe then reported Onufriev's conduct to the chair of the physics department at Virginia Tech. Id. ¶ 28. Consequently, Onufriev began retaliating against Doe by "withholding a letter certifying the completion of Doe's Master's degree; assigning excessive, redundant, and contradictory research tasks; setting false deadlines to publish papers; and creating a hostile condition in the lab in an effort to cause Doe to voluntarily resign from the program." Id. ¶ 30. In late 2019, Doe developed stress and anxiety

as a result of his treatment by Onufriev and sought counseling for his mental health at Virginia Tech's counseling center. Id. ¶¶ 31, 32.

Around this same time, a different female student accused Doe of making unwanted sexual advances towards her. Id. ¶ 34. Doe refuted the allegations and claimed that he met the student on a dating app and had a consensual relationship with her. Id. ¶¶ 36, 38. Nonetheless, on November 20, 2019, the female student met with a Title IX investigator at Virginia Tech and requested that Doe be ordered not to contact her but did not pursue the matter further at that time. Id. ¶ 41.

On February 17, 2020, Virginia Tech's Title IX office informed Doe that he was "under investigation for sexual assault," and the next day placed Doe on an interim suspension pending a student conduct hearing. Id. ¶¶ 43–44. Doe believed that Onufriev "influenced the university in pursuing the student conduct case, over the [female] student's initial wishes, due to Mr. Doe's complaints within the department about the NIH grant fund." Id. ¶ 45. Subsequently, Doe returned to counseling and was hospitalized to receive mental health treatment. Id. ¶ 46. On February 28, 2020, Doe was released from the hospital. See id. ¶ 48.

Later that day, Doe met with a Title IX investigator to "go over the student conduct process." Id. On that same day, defendant Tamara Cherry-Clarke, Virginia Tech's Assistant Director of Student Conduct, sent Doe a "letter formally charging him with sexual assault and instructing him to meet with her to discuss the process." Id. ¶ 49. On March 3, 2020, Cherry-Clarke met with Doe and informed him that he had been accused of violating six Virginia Tech policies on intimate partner contact. Id. ¶ 50. On March 5, 2020, Cherry-Clarke told Doe that his hearing would take place the next day. Id. ¶ 51. Doe requested an extension, explaining

that he did not have enough time to prepare for the hearing and collect evidence to adequately defend himself, but Cherry-Clarke denied Doe's request, asserting that 24 hours was enough time to prepare. Id. ¶ 59–61.

On March 6, 2020, Doe's student conduct hearing proceeded, and on March 9, 2020, Virginia Tech found Doe responsible for sexual assault and dismissed him from the university. Id. ¶¶ 63–64. Doe appealed the decision to the Dean of Student Affairs, but his appeal was denied. Id. ¶ 65. As a result of his dismissal from the university, Doe now fears that he may be deported to Iran when his student visa expires. Id. ¶ 66. Because of Iran's current political climate, Doe is "gravely concerned about his physical safety should he be deported to Iran[.]" Id. ¶ 67.

On June 25, 2021, Doe brought suit against (1) Virginia Tech; (2) Timothy Sands, as president of Virginia Tech in his official capacity; (3) Alexey Onufriev as a professor at Virginia Tech in his official capacity; and (4) Tamara Cherry-Clarke, as an Assistant Director of Student Conduct at Virginia Tech in her official capacity, alleging a 42 U.S.C. § 1983 Fourteenth Amendment due process claim against all defendants (Count I), a claim under Title IX of the Education Act of 1972, 20 U.S.C. § 1681 et. seq., (Title IX), against all defendants (Count II), and a defamation claim against Onufriev solely in his individual capacity (Count III). Virginia Tech filed motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). ECF Nos. 10, 12. The court heard oral argument and subsequently granted in part and dismissed in part the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and granted the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) in its entirety. ECF No. 20. However, the court also granted Doe leave to

amend his complaint. Id. Doe filed a first amended complaint, ECF No. 21, alleging a § 1983 claim against Sands and Cherry-Clarke in their official capacities (Count I) and a Title IX claim against Virginia Tech and Onufriev in his official capacity (Count II). Defendants filed another motion to dismiss for failure to state a claim, ECF No. 26, and this motion is pending before the court.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." Id. at 679; see also Simmons v. United Mortg. & Loan Invest, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (quotation and emphasis omitted).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Foundation v. Nat'l Security Agency, 857 F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286

(1986); conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted). "'Thus, in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), a court must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level.'" Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009)).

## III. DISCUSSION

### A. Violation of the Due Process Clause of the Fourteenth Amendment

To succeed on a procedural due process claim, a plaintiff must show (1) that he had a constitutionally cognizable life, liberty, or property interest; (2) that deprivation of that interest was caused by some form of state action; and (3) that the procedures employed were constitutionally inadequate. Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) (internal citations and quotations omitted). Defendants in this case argue that Doe fails to state a claim for relief because he did not allege that any deprivation resulted from a custom or policy of Virginia Tech; he failed to allege a recognized liberty or property interest; and that he received advance notice and an opportunity to be heard prior to the adverse action.

#### 1. Official Custom or Policy

In order to state a § 1983 claim against a local governing body, the "action that is alleged to be unconstitutional [must] implement[ ] or execute[ ] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v.

New York Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). "Section 1983 plaintiffs seeking to impose liability on a municipality must … adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." Jordan by Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994). A custom or policy that may be actionable under § 1983 is a "decision taken by the highest officials responsible for setting policy in that area of the government's business." St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). Wrongful conduct of a single officer without any policymaking authority or a decision by a subordinate employee is insufficient to prove a § 1983 claim. Collins v. City of Harker Heights, 503 U.S. 115, 121–22 (1992). Even if a decisionmaker has policymaking authority, their decisions still may not be actionable if they lack "final authority to establish municipal policy with respect to the action ordered." Davison v. Randall, 912 F.3d 666, 689 (4th Cir. 2019). However, if a governing body (e.g., a school board) acts as the final policymaking authority and approves the decision of an official, Monell does not bar the suit. See Starbuck v. Williamsburg James City County Sch. Bd., 28 F.4th 529, 534 (4th Cir. 2022) ("[W]hen a final policymaker has the authority to review the decision of a subordinate, its approval of that allegedly unconstitutional decision can also give rise to liability under Section 1983.")

In his complaint, Doe alleges that Cherry-Clarke acted in her official capacity as an Assistant Director of Student Conduct at Virginia Tech. First Am. Compl., ECF No. 21 ¶ 6. He also alleges that defendant Sands delegated responsibility for adjudicating allegations of student misconduct to staff in the Virginia Tech Office of Equity and Accessibility (VTOEA) and the Virginia Tech Office of Student Conduct (VTOSC). He further alleges that Sands

ultimately was responsible for supervising and overseeing staff in the VTOEA and the VTOSC who were given the task of investigating and adjudicating misconduct claims and enforcing student conduct policies at the university. Id. ¶¶ 39–40.

Doe next asserts that defendant Cherry-Clarke told him on March 5, 2020, that the hearing would occur on March 6, 2020. When he told her that he needed more time to prepare, she refused to grant the extension and told him that 24 hours was enough time to prepare for the hearing. Id. ¶¶ 51, 59–61. The hearing occurred the next day and Doe appeared without counsel to defend himself against the charge. On March 9, 2020, he was found responsible for sexual assault and dismissed from Virginia Tech. Id. ¶¶ 63–64. Doe alleges based on these facts that Virginia Tech failed to provide adequate due process when it neglected to afford him sufficient time to prepare for the hearing. Id. ¶ 76.

Defendants argue that Doe has failed to allege that any deprivation resulted from a custom or policy of Virginia Tech. They claim that Doe's allegation relies only on Cherry-Clarke's denial of a continuance of the student conduct hearing and does not identify a custom or policy of Virginia Tech that caused this alleged deprivation. They also aver that Doe did not allege that Cherry-Clarke had policy-making authority, nor that anyone at Virginia Tech with policy-making authority knew of this decision and approved it. Doe did not address these arguments in his response. See Opp'n to Mot. to Dismiss, ECF No. 30; see also Opp'n to Mot. to Dismiss, ECF No. 15.

The court agrees with Virginia Tech that Doe has not pled sufficient facts to show that the university is liable for any violation of his due process rights. He has pled no facts alleging that the denial of a continuance of his hearing was the result of an express policy of Virginia

Tech, that Ms. Cherry-Clarke had "final policymaking authority," that there was an omission that "manifest[ed] indifference to the rights of citizens," or that this decision was part of a practice so "persistent and widespread" as to be a "custom or usage with the force of law." See Starbuck, 28 F.4th at 533 (citing Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003)) (internal citations omitted). It is unclear from the pleadings whether Doe is alleging that Cherry-Clarke scheduled his hearing pursuant to a policy that called for giving a student charged with disciplinary infractions 24 hours to prepare for a hearing, or whether Cherry-Clarke was acting contrary to a policy that allowed more time for preparation. This distinction is key to determining whether Doe has stated a claim. He is suing Cherry-Clarke only in her official capacity, meaning that if he is alleging that she acted contrary to Virginia Tech policy, he has failed to state a claim against Virginia Tech.

In the Davison case, the Chair of a county board of supervisors temporarily barred Davison, a constituent, from commenting on a Facebook page where the Chair interacted with the public in her capacity as Chair of the board. Davison, 912 F.3d at 673–76. Davison filed a lawsuit, alleging several causes of action, including that his First Amendment right to free speech and his right to due process were violated when the Chair barred him from commenting on her Facebook page. Davison sued the Chair in her official capacity under 42 U.S.C. § 1983. The district court dismissed the official capacity claim after finding that no official policy played any role in the Chair's decision to ban Davison from her Facebook page. Davison, 912 F.3d at 689 (citing Davison v. Loudoun County Bd. of Supervisors, 267 F.Supp. 3d 702, 715 (E.D. Va. 2017)).

The Fourth Circuit affirmed the dismissal. Davison argued that the county had

implicitly delegated its final policymaking authority to the Chair by not addressing individual board members' official pages in its social media policy. Id.  The Fourth Circuit concluded the following:

> Davison is correct that delegation of final policy making authority may be "implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official." [Davison's Br.] at 48 (quoting Spell v. McDaniel, 824 F.2d 1380, 1387 (4th Cir. 1987)). But Davison identifies no evidence that the Loudoun Board knew of the Chair's Facebook Page, let alone that it "aquiesce[d]" in [the Chair's] administration of the page and banning of Davison, in particular. On the contrary, the district court found that [the Chair] made a one-off, "unilateral decision to ban [Davison] in the heat of the moment, and reconsidered soon thereafter," Davison, 267 F.Supp.3d at 715—before the Loudoun Board had a chance to learn of her action. In such circumstances, the district court did not reversibly err in rejecting Davison's official capacity claim.

Id. at 689–90.

In Doe's case, he has not alleged any facts to support his allegation that Cherry-Clarke was acting in accordance with Virginia Tech policy or that Virginia Tech acquiesced in her decision to postpone Doe's hearing. The only factual allegation that comes close to claiming that a final policymaker at Virginia Tech ratified Cherry-Clarke's decision to deny the request for extension of time is Doe's allegation that he "appealed the university's decision to the Dean of Student Affairs, and it was denied." First Am. Compl., ECF No. 21 ¶ 65. But Doe does not allege that he complained about the denial of the extension of time, or even that he informed the Dean of Student Affairs about the short time he was given to prepare for the hearing.

The court is mindful of the Fourth Circuit's admonition regarding the assessment of a complaint alleging violation of civil rights:

> [W]hen as here, a Rule 12(b)(6) motion is testing the sufficiency of a civil rights

> complaint, "we must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." <u>Harrison v. United States Postal Serv.</u>, 840 F.2d 1149, 1152 (4th Cir.1988) (internal quotation marks omitted) (emphasis added). We do note, however, that for purposes of Rule 12(b)(6), we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint. <u>See District 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.</u>, 609 F.2d 1083,1085 (4th Cir.1979).

<u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999). <u>See also</u> <u>Francis v. Giacomelli</u>, 588 F.3d 186, 193 (4th Cir. 2009) ("[N]aked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief.") (internal quotation marks omitted). In this case, Doe has not made even a bare factual assertion that Cherry-Clarke was acting according to an official policy, or that her decision was ratified by a policymaker. Without doing so, he has not stated a claim that Virginia Tech violated his right to due process in the disciplinary hearing. However, in an effort to be "solicitous of the wrongs alleged," the court will give Doe a second opportunity to file an amended complaint because it does not appear to a certainty that he is not entitled to relief under the facts alleged.

## 2. Property Interest

Defendants also argue that Doe fails to clearly show he has a protected Fourteenth Amendment property or liberty interest in his continued enrollment or reputation. To plead a due process claim, a plaintiff must allege facts to show that he was deprived of "'life, liberty or property, by governmental action.'" <u>Equity in Athletics, Inc. v. Dept. of Education</u>, 639 F.3d 91, 109 (4th Cir. 2011) (quoting <u>Beverati v. Smith</u>, 120 F.3d 500, 502 (4th Cir. 1997)). "A protected property interest cannot be created by the Fourteenth Amendment itself, but rather

must be created or defined by an independent source." Id. (citing Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); Tri-County Paving, Inc. v. Ashe County, 281 F.3d 430, 436 (4th Cir. 2002)). "In order to have a property interest in a benefit, a person must have more than a mere 'unilateral expectation of it' or 'abstract need or desire for it.'" Id. (citing Roth, 408 U.S. at 577).

Doe's allegation that Virginia Tech deprived him of a property interest is based on the fact that in 2013 he had enrolled as a graduate student at Virginia Tech to pursue a doctoral degree in Physics. He alleges that "By accepting Virginia Tech's offer to enroll as a student, Mr. Doe and Virginia Tech agreed through its various policies and customs, that so long as Mr. Doe paid tuition, met the university's academic and conduct standards, and abided by its policies, he would be permitted to enroll in subsequent semesters at the university as he pursued his graduate degree." Am. Compl., ECF No. 21 ¶ 11. He further alleges that because he paid tuition for the 2019-2020 academic year, met the university's academic and conduct standards, and abided by its policies, he had a reasonable expectation that he would be permitted to enroll in subsequent semesters at the university as he pursued his graduate degree, but for the student conduct matter that made the basis of his lawsuit. Id. ¶¶ 12, 71, 72.

The issue of whether a student attending a public university has a property interest in continued enrollment is not settled. Neither the Supreme Court nor the Fourth Circuit have "explicitly recognized a property interest in a student's continued enrollment in a public college or university or a liberty interest in his good name, resulting from a constitutionally infirm disciplinary process." Doe v. Alger, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) (Alger I). However, both courts have assumed that one or both interests exist. In Regents of Univ. of

Mich. v. Ewing, 474 U.S. 214, 223 (1985), the Court "accept[ed] the University's invitation" to 'assume the existence of a constitutionally protectible property right in [Ewing's] continued enrollment,'" before deciding that the plaintiff had not suffered a violation of his substantive right to due process. The Court made a similar assumption in Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 84–85 (1978) ("Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires.") The Fourth Circuit also has assumed a property interest in continued enrollment before finding that a student who was expelled received due process. See Butler v. Rector and Bd. of Visitors of Coll. of William and Mary, 121 F. App'x. 515, 518 (4th Cir. 2005) (assuming for purposes of appeal that Butler had a property interest in continued enrollment in university program that was protected by the due process clause); Tigrett v. Rector and Visitors of Univ. of Va., 290 F.3d 620, 627 (4th Cir. 2002) ("Assuming the Appellants possessed some constitutionally protected interest in continued enrollment, they were not deprived of such an interest by the actions of the [university disciplinary committee.]); Henson v. Honor Comm of Univ. of Va., 719 F.2d 69, 73 (4th Cir. 1983) (same); see also Sheppard v. Visitors of Virginia State Univ., 993 F.3d 230, 239 (4th Cir. 2021) (recognizing historical assumption of property interest but finding that right to continued enrollment is not clearly established for purposes of a § 1983 lawsuit).

"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law." Phillips v. Washington Legal Found., 524 U.S. 156, 164 (1998) (citing Roth, 408 U.S. at 577). It is undisputed that the Commonwealth of

Virginia has not created a property interest in a continued university education. Davis. v. George Mason University, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005); Alger I, 175 F. Supp. 3d at 657. In Goss v. Lopez, 419 U.S. 565 (1975), several high school students sued the Columbus, Ohio, public school system for violations of due process when they were temporarily suspended from their high schools without a hearing. Id. at 567. In assessing the due process claim, the Supreme Court held that where a state mandates a free education and compels students to attend, students "plainly had legitimate claims of entitlement to a public education." Id. at 573. But Goss does not establish a property interest in a continued university education which is not supplied free of charge by the Commonwealth and to which attendance is not compulsory.

A property interest also may be conferred by contract, or by a clearly implied promise of the right. Roth, 408 U.S. at 577. "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." Perry v. Sindermann, 408 U.S. 593, 601 (1972) (citing Roth, 408 U.S. at 577). A written contract is evidence of a formal understanding that supports a claim of a property interest, but absence of a contract may not always foreclose the possibility that a person has a property interest. Id.

> For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.' 3 A. Corbin on Contracts §§ 561–572A (1960). Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' Id., at § 562. And, '(t)he meaning of (the promisor's) words and acts is found by relating them to the usage of the past.' Ibid.

Perry, 408 U.S. at 601-602.

14

In <u>Alger I</u>, the court looked at whether a university student established that either a contract or policies and procedures conferred on him a right to continue his university education. Plaintiff alleged that his right to due process was violated when he was suspended from James Madison University (JMU) following allegations that he sexually assaulted another student with whom he maintained he had a consensual relationship. As in the instant case, the court examined the issue of whether public university students have a property or liberty interest in their continued enrollment in the context of defendant's motion to dismiss. The plaintiff in <u>Alger I</u> alleged that JMU "substantially limited its ability to suspend, expel or dismiss" students through its adoption of certain policies and practices. <u>Alger I</u>, 175 F. Supp. 3d at 657. He claimed that by "regularly and routinely" dismissing, suspending, or expelling students only after a finding of cause, JMU created a property interest in students' continued enrollment. <u>Id.</u> Defendants agreed that property interests could arise from regulations, municipal ordinances, or from an express or implied contract, such as rules or understandings that secure certain benefits and that support claims of entitlement to the benefits. <u>Id.</u> Defendants nevertheless moved to dismiss plaintiff's claim, arguing that the pleadings were insufficient to establish a property interest because even if it were JMU's practice to suspend a student only for cause, plaintiff had no right to enforce any such entitlement. <u>Id.</u>

The court cited <u>Perry</u>, 408 U.S. at 599-60, for its holding that a public junior college professor was entitled to an opportunity to prove the legitimacy of his claim of wrongful termination in light of his allegation that the college had a de facto tenure policy arising from rules and understandings officially promulgated and fostered by the college. <u>Alger I</u>, 175 F. Supp. 3d at 657. Relying on <u>Perry</u>, the court denied the motion to dismiss to give plaintiff an

opportunity to prove the legitimacy of his claim to a property right in light of the policies and practices at JMU. Id.

The <u>Alger</u> case proceeded to summary judgment. In <u>Doe v. Alger</u>, 228 F. Supp. 3d 713 (2016) (<u>Alger II</u>), the court determined that the undisputed facts showed that plaintiff had a protected property interest in continued enrollment at JMU. <u>Id.</u> at 729. The finding was based in part on the fact that JMU admitted in its answer that the plaintiff had a legitimate entitlement to continued enrollment. Plaintiff had alleged that in return for his paying tuition and fees, JMU had agreed to provide an undergraduate educational program that required the earning of a minimum of 120 credit hours to be earned over several years in order to be eligible for a degree. <u>Id.</u> at 726. In its answer, JMU admitted the allegation. <u>Id.</u> at 727. Plaintiff also alleged that in reliance on the policies, practices, and understandings regarding "Student Rights," he accepted JMU's offer of acceptance and paid the tuition. He alleged that by doing so, he entered into a relationship with JMU that entitled him to be enrolled thereafter so long as he paid the required fees, remained in good standing academically, and otherwise met the requirements for graduation. <u>Id.</u> Once again, JMU admitted that after accepting admission and paying the deposit, plaintiff was entitled to be enrolled so long as he met all the stated requirements. <u>Id.</u>

Despite agreeing with plaintiff's contention about the agreement, JMU argued that the plaintiff was trying to enforce an implied contract, or quasi-contract, and that such contracts are not enforceable against the sovereign in Virginia, citing in support <u>Dr. William E.S. Flory Small Bus. Dev. Ctr. v. Commonwealth</u>, 261 Va. 230, 541 S.E.2d 915 (2000). The <u>Flory</u> case held that although a sovereign is not shielded from liability for its valid contracts under

common law, it had immunity, unless it had waived it, from "quasi-contractual doctrines" which were premised on the absence of a valid contract. Id.

The Alger II court distinguished Flory, finding that to the extent plaintiff was relying on an implied contract theory at all, he was relying on an "implied-in-fact" contract and that such contracts can be enforced against the sovereign. Alger II, 228 F. Supp. 3d at 728 (citing Nossen v. Hoy, 750 F. Supp. 740, 744 (E.D. Va. 1990)). "The court's conclusion that a property right may be based upon an implied-in-fact contract, even in Virginia, is also consistent with Fourth Circuit authority holding that '[a] claim of entitlement based on an understanding is enforceable in Virginia ... only if the understanding is mutual, i.e., both parties have assented to it.'" Id. (quoting Sabet v. E. Va. Med. Auth., 775 F.2d 1266, 1270 (4th Cir. 1985)). The court found that the admissions of defendants showed a clear and mutual understanding that as long as Doe maintained sufficient academic progress, paid tuition and applicable fees, and did not commit a conduct violation, he had an "entitlement" to continued enrollment at JMU and thus had a protectable property interest. Id. The court's conclusion was supported by JMU's long-standing practice of not suspending or expelling students except for cause as defendants acknowledged in their depositions. Id. The Alger II court concluded that based on the undisputed evidence, Doe had not just a subjective sense of entitlement, but a "legitimate entitlement" to due process before being effectively expelled, and therefore, a protected property interest in his continued enrollment. Id.

Notably, in Doe v. Va. Polytechnic Inst. and State Univ., 400 F. Supp. 3d 479 (W.D. Va. 2019), the court found that Joseph Doe failed to state a claim for violation of his procedural due process rights in a university disciplinary hearing. The court acknowledged its

previous determination in <u>Alger I</u> that the plaintiff there had stated a claim based on his allegation that policies and practices at JMU had established a right to continuing enrollment at the university. <u>Joseph Doe</u>, 400 F.Supp.3d at 499–500.[2] Joseph Doe did not allege that Virginia Tech only expels students for cause or point to other facts supporting a "legitimate claim of entitlement." The court concluded that "even the sparse allegations present in <u>Alger</u>" were missing from Joseph Doe's complaint and that plaintiff had failed to adequately allege a property interest. <u>Id.</u> at 500.

Similarly, in <u>Jacob Doe v. Va. Polytechnic Inst. and State Univ.</u>, No. 7:19-cv-00249, 2020 WL 1309461, at *6 (W.D. Va. Mar. 19, 2020), the court reiterated its holding in <u>Alger I</u> and found that Jacob Doe did not allege that Virginia Tech employed a policy of expelling students only after a finding of cause as set forth in the student's rights policy. Rather, he relied on conclusory allegations that he had a liberty and property interest. <u>Id.</u> Jacob Doe also asserted that he had a contractual property right because his paid tuition created an implied contract between himself and Virginia Tech. He claimed that his "enrollment in, and attendance of, classes at Virginia Tech created in Doe an expectation that he would be allowed to continue his course of study until he earned his degree from the University, provided that he maintained satisfactory grades and complied with University rules and policies." <u>Id.</u> (citing Jacob Doe's Complaint). He argued that one of the terms of the implied contract was that Virginia Tech had the "duty not to suspend or expel Doe for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith." <u>Id.</u> The court

---

[2] There were four plaintiffs in 400 F. Supp. 3d 479, designated as John Doe, James Doe, Jack Doe, and Joseph Doe. The court addressed Joseph Doe's claim of a property interest in his continuing university education. <u>Id.</u> at 499-500.

repeated the holding from Doe v. Washington & Lee Univ., No. 6:19-cv00023, 2020 WL 618836, at *8 (W.D. Va. Feb. 10, 2020), that there is a dearth of authority from Virginia courts holding that an implied contract is created through payment of tuition. Jacob Doe, 2020 WL 618836, at *8. See also Doe v. Marymount Univ., 297 F. Supp. 3d 573, 587-88 (E.D. Va. 2018) (finding that under Virginia law, a university's conduct policies are not enforceable contracts; rather, they are behavior guidelines that may be revised at any time). The court concluded that Jacob Doe had not identified any authority suggesting that Virginia law recognizes an implied contract arising simply out of the payment of tuition. Id. at *6.

In this case, Doe alleges that by accepting Virginia Tech's offer to enroll as a student, he and Virginia Tech agreed through its "various policies and customs," that so long as Doe paid tuition, met the university's academic and conduct standards, and abided by its policies, he would be permitted to enroll in subsequent semesters at the university as he pursued his graduate degree. Am. Compl., ECF No. 21 ¶ 11. He further alleges that because he paid tuition for the 2019-2020 academic year, met the university's academic and conduct standards, and abided by its policies, he had a reasonable expectation that he would be permitted to enroll in subsequent semesters at the university as he pursued his graduate degree, but for the student conduct matter that made the basis of his lawsuit. Id. ¶¶ 12, 71, 72.

Based on Alger I and Alger II, these allegations are insufficient to state a claim. Doe does not identify the "various policies and customs" that he believes confer a property right on him. Without doing so, his allegations are factually insufficient to plausibly state a claim that he is entitled to relief. Ashcroft, 556 U.S. at 678; Alger I, 175 F. Supp. 3d at 657.

Nor does Doe state a claim by his allegation that based on his payment of tuition and compliance with Virginia Tech's standards and policies he had a "reasonable expectation" of continued enrollment. See Tri-County Paving, Inc., 281 F.3d at 436 (noting that an abstract need or desire for a property interest or a unilateral expectation of a property interest is insufficient to state a claim). Doe does allege that he and "Virginia Tech agreed through its various policies and customs" that he would be permitted to enroll in subsequent semesters as long as he paid tuition and met academic and conduct standards, but again, he did not describe the "policies and customs" upon which he is relying. Without doing so, he cannot show that he had a protected property interest in his continued enrollment at Virginia Tech and the court must dismiss his claim. However, in an effort to be "solicitous of the wrongs alleged," Edwards, 178 F.3d at 244, the court will provide Doe an opportunity to file a second amended complaint.

### 3. Liberty Interest

To make out a liberty interest based on damage to one's good name, reputation, or integrity, a person must show more than a reputational injury to make out a constitutional claim. Shirvinski v. U.S. Coast Guard, 673 F.3d 308, 314–15 (4th Cir. 2012) (citing Siegert v. Gilley, 500 U.S. 226, 233 (1991)). A plaintiff must show that his reputational injury was accompanied by a state action that "'distinctly altered or extinguished'" his legal status. Id. at 315 (quoting Paul v. Davis, 424 U.S. 693, 712 (1976)). In Paul, 424 U.S. at 711, the Court pointed out that a plaintiff made out a cause of action when "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished." (emphasis added). This type of injury is sometimes referred to as "stigma-plus."

20

Ridpath v. Board of Governors Marshall University, 447 F.3d 292, 309, n.16 (4th Cir. 2006).

See also Siegert, 500 U.S. at 233 ("Defamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation.")

"In the context of public employment, this change in status occurs when the government acting as an employer discharges one of its employees." Shirvinski, 673 F.3d at 315. In this case, Doe is not alleging that he lost a job with Virginia Tech along with damage to his good name. Nor has the Commonwealth of Virginia established a right for any person to attend Virginia Tech. Without a statutory right to be a public college or university student, Doe cannot show that his status under state law was altered or extinguished. Alger I, 175 F.Supp.3d at 660 (citing Shirvinski, 673 F.3d at 315-16). Accordingly, Doe has failed to allege facts to show that he had a liberty interest in his good name, reputation, or integrity, and the court must **DISMISS** this claim with prejudice.

### 4. Due Process

Looking at the third prong of the test to determine whether Doe established a violation of his constitutional right to due process, Doe must plead that that the procedures employed in his disciplinary case were constitutionally inadequate. Sansotta, 724 F.3d at 540. The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal citations omitted). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972). Once it has been determined that some process is due, the flexibility of the requirement "is a recognition that

not all situations calling for procedural safeguards call for the same kind of procedure." Id.

The process that is warranted depends on the balancing of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Mallette v. Arlington Cnty. Employees' Supplemental Ret. Sys. II, 91 F.3d 630, 640 (4th Cir. 1996) (citing Mathews, 424 U.S. at 335).

In Henson v. Honor Committee of U. Va., 719 F.2d 69, 74 (4th Cir. 1983), the Fourth Circuit commented on the flexibility of due process requirements in the context of disciplinary proceedings for failure to meet academic standards versus requirements based on allegations of misconduct, concluding that "disciplinary proceedings require more stringent procedural protection than academic evaluations, even though the effects of an adverse decision on the student may be the same." Id. (citing Bd. of Curators v. Horowitz, 435 U.S. 78, 88 (1978)). Nevertheless, school disciplinary proceedings do not require "complete adherence to the judicial model of decisionmaking[.]" Id.

The Fourth Circuit follows the standards established by the Fifth Circuit in Dixon v. Ala. State Bd. of Educ., 294 F.2d 150 (5th Cir. 1961). Brown v. Porter, No. 2:19cv376, 2019 WL 8503313, at *8 (E.D. Va. Nov. 26, 2019); Henson, 719 F. 2d at 74 ("Although Dixon was decided more than twenty years ago, its summary of minimum due process requirements for disciplinary hearings in an academic setting is still accurate today."). Dixon described the procedure due a student accused of a disciplinary infraction as follows:

The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the Board of Education…. [A] hearing which gives the Board or the administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities, might be detrimental to the college's educational atmosphere and impractical to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college. In the instant case, the student should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies. He should also be given the opportunity to present to the Board, or at least to an administrative official of the college, his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf. If the hearing is not before the Board directly, the results and findings of the hearing should be presented in a report open to the student's inspection. If these rudimentary elements of fair play are followed in a case of misconduct of this particular type, we feel that the requirements of due process of law will have been fulfilled.

Dixon, 294 F.2d at 158–59.

In this case, the female student met with the staff of VTOEA on November 20, 2019, and asked that Doe be told to have no further contact with her. On January 22, 2020, she again contacted the VTOEA to pursue a formal complaint. On February 17, 2020, an investigator with the VTOEA notified Doe that he was under investigation for assault and suspended him the next day pending a student conduct hearing. Shortly thereafter, Doe, who was very upset at the accusation and had previously sought mental health counseling, was admitted to a hospital for a psychiatric evaluation. He was released from the hospital on February 25, 2020, and met with an investigator to review the student conduct process on February 28, 2020. That same day, Cherry-Clarke told Doe that he was formally charged with sexual assault and told him to meet with her on March 3, 2020, to discuss the process. On March 3, 2020, they met, and Cherry-Clarke told Doe that he had violated six of the

university's policies on intimate partner contact. On March 5, 2020, Cherry-Clarke told Doe that the hearing would take place the next day, March 6, 2020.

Doe alleges that he had learned that the charges stemmed from an allegation that he had touched the female student in an elevator at the Graduate Life Center. Doe knew of a witness who was present at the Graduate Life Center but did not have time to arrange for the witness to attend the hearing with him.[3] Doe further alleges that he did not have time to review the investigative report Virginia Tech had provided him, to meet with an advisor, or to obtain counsel. Doe emailed Cherry-Clarke on March 5, 2020, telling her he did not have enough time to prepare and collect the evidence he needed to defend himself, but Cherry-Clarke refused to grant him an extension.

In its motion to dismiss, Virginia Tech argues that Doe received notice on February 17, 2020, that he was under investigation for assault and was suspended pending the outcome of a student conduct hearing. The defendants allege that he knew from at least February 18, 2020, that there would be a "forthcoming hearing" regarding the assault and that when he met with Cherry-Clarke on March 5, 2020, more than two weeks had passed since he first learned that he was suspended pending an investigation. Virginia Tech asserts that this two-week period was enough time to prepare for the hearing.

The timing and nature of a hearing "depend on appropriate accommodation of the competing interests involved." Goss, 419 U.S. at 579. The timing of notice of a hearing will comport with due process if it is "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present

---

[3] Doe agrees that he had time to obtain a statement from the witness.

their objections." Memphis Light, Gas, and Water Div. v. Craft, 436 U.S. 1, 13 (1978) (citing

Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314 (1950)).

The court finds that, under the unique facts of this case, Doe has sufficiently alleged

that the one-day notice of the hearing Doe received was inadequate to afford him due process.

While he was told on February 17, 2020, that he had been accused of sexual assault and learned

on February 18, 2020, that he would be suspended pending an investigation and hearing, he

spent part of the following week receiving in-patient mental health care. Doe did not find out

the specific charges being made against him until March 3, 2020, and learned on March 5,

2020, that a hearing would be held on March 6, 2020. Given these circumstances, Doe has

alleged that he had an insufficient amount of time to prepare for a hearing that carried the very

serious consequence of being expelled from the university. Accordingly, the court finds that

under the particular facts of this case, Doe has stated a claim that Virginia Tech did not employ

constitutionally adequate procedures when it gave Doe one day's notice of the hearing.

## B. Title IX Cause of Action

Title IX states:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or be
> subjected to discrimination under any education program or
> activity receiving Federal Financial assistance.

20 U.S.C. § 1681(a). "The Supreme Court has concluded that a victim of sex discrimination is

entitled to pursue a private cause of action against a federally-funded educational institution

for a violation of Title IX." Feminist Majority Found. v. Hurley, 911 F.3d 674, 686, (4th Cir.

2018) (citing Cannon v. Univ. of Chi., 441 U.S. 677, 709 (1979)). Doe claims that he was

discriminated against on the basis of his sex in violation of Title IX when Onufriev allocated

$40,000 of research grant funding to a female graduate student who was not involved in Doe's NIH research. <u>See</u> Am. Compl., ECF No. 21 ¶ 85. He also alleges in cursory fashion that Virginia Tech created a hostile environment and retaliated against him for reporting discrimination.

### 1. Withholding of Grant Funds

Doe asserts that in 2018, Onufriev received NIH grant funds for research, and rather than paying Doe, who was participating in the research, Onufriev distributed those funds to a female student who was not involved in the grant research. Doe argues that the distribution of the funds to the female student violated his rights under Title IX. <u>See</u> Am. Compl., ECF No. 21 ¶ 23. Virginia Tech asserts that this claim is barred by the statute of limitations.

Title IX does not contain an express statute of limitations. <u>Wilmink v. Kanawha Cnty. Bd. of Educ.</u>, 214 F. App'x 294, 296 n.3 (4th Cir. 2007); <u>Doe v. Bd. of Educ. of Prince George's Cnty.</u>, 888 F. Supp. 2d 659, 663 (D. Md. 2012). Thus, courts should apply "the most closely analogous statute of limitations under state law." <u>Reed v. United Transp. Union</u>, 488 U.S. 319, 323–24 (1989); <u>Wolsky v. Med. Coll. of Hampton Rds.</u>, 1 F.3d 222, 224 (4th Cir. 1993). In this case, the most analogous statute of limitations under state law is Virginia's two-year personal injury limitations period. <u>See</u> <u>discussion</u>, <u>Joseph Doe v. Virginia Tech</u>, 400 F. Supp. 3d at 494–96.

Although the statute of limitations is defined by state law, the question of when a cause of action accrues is one of federal law. <u>Howell v. Cnty. Comm. of Hampshire County</u>, No. 21-1023, 2022 WL 61428 (4th Cir. Jan 6, 2022). "Under federal law, a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable

inquiry will reveal his cause of action." <u>Nasim v. Warden, Maryland House of Corr.</u>, 64 F.3d 951, 955 (4th Cir. 1995). A plaintiff must know that he has been hurt and who inflicted the injury. <u>Id.</u> (citing <u>United States v. Kubrick</u>, 444 U.S. 111, 122-24 (1979)). "When the plaintiff becomes aware of these two facts, he is on inquiry notice and has a duty to inquire about reasonably discoverable details." <u>Slaey v. Adams</u>, No. 1:08cv354, 2008 WL 5377937 (E.D. Va. Dec. 23, 2008).

Doe learned at some point in 2018 that Onufriev was giving the research funds to the female student rather than to Doe. Thus, no later than December 31, 2018, Doe had notice about the 2018 grant funds and Onufriev's allocation of the funds to the female student. Doe also averred that in March 2019 he documented his concerns in an email to Onufriev. Am. Compl. ECF No. 21, ¶ 24. Virginia Tech argues that the Title IX two-year statute of limitations began to run no later than December 31, 2018, and that because Doe did not file his lawsuit until June 25, 2021, it is time-barred.

In denial of tenure cases arising under Title IX, the limitations period begins to run when the tenure decision is made and the plaintiff is notified, and not when the effect of the denial of tenure is felt. <u>Delaware State Coll. v. Ricks</u>, 449 U.S. 250, 259 (1980). As the Court explained, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." <u>Id.</u> at 258. <u>See</u> <u>also</u> <u>Martin v. Clemson University</u>, 654 F. Supp. 2d 410, 431 (D.S.C. Aug. 28, 2009) (applying <u>Ricks</u> to find that plaintiff's cause of action accrued when she was denied tenure in April 2005, rather than in March 2007 when university issued its final ruling on her appeal). Virginia Tech argues that <u>Ricks</u> is applicable to Doe's case and that his cause of action accrued in 2018 when Onufriev

first diverted the research funds to the female student.

Applying <u>Ricks</u> to Doe's allegation, it is clear that he knew about Onufriev's decision regarding the 2018–2019 academic year research grant monies no later than December 31, 2018. Because he did not file his lawsuit until June 25, 2021, his claim based on the 2018 decision is barred by the two-year statute of limitations.

Doe counters that the statute of limitations on this claim was tolled while an earlier lawsuit he filed was pending. Doe first brought his claims in a lawsuit he filed on November 25, 2020, <u>Doe v. Virginia Polytechnic Inst. and State Univ.</u>, No. 7:20-cv-00711-TTC (W.D. Va.). That lawsuit was dismissed without prejudice on May 27, 2021, for failure to properly serve defendants.

Approximately one month later, on June 25, 2021, Doe filed the instant lawsuit. On December 20, 2021, the court dismissed Doe's lawsuit on various grounds, but granted him leave to amend his complaint. ECF No. 20. On January 3, 2022, he filed his first amended complaint. ECF No. 21. On January 24, 2022, Virginia Tech filed the pending motion to dismiss the complaint and a hearing was held on February 15, 2022. One of the issues raised in the motion to dismiss was that the Title IX claim was time-barred. Doe argued that the statute of limitations was tolled while that action was pending, and the issue was discussed at the hearing. The court told the parties they could submit additional briefing on the statute of limitations issue and Virginia Tech did so, but Doe did not.

At the hearing and in their supplemental brief, defendants argue that Doe waived any tolling argument by failing to timely raise it and that "even if tolling applied, Plaintiff's claim is still time-barred because it accrued no later than December 31, 2018." Defs' Suppl. Mem.,

ECF No. 32 at 3. Virginia Tech cites <u>Wood v. Milyard</u>, 566 U.S. 463, 470 n.4 (2012), in support of its argument that Doe waived his right to assert that the filing deadline in his case was tolled by the statute of limitations, but <u>Wood</u> does not support that conclusion.

In <u>Wood</u>, the issue was whether a circuit court of appeals could <u>sua</u> <u>sponte</u> raise the issue of the timeliness of a habeas corpus petition when the respondent had twice informed the district court that it was neither challenging nor conceding the timeliness of the petition. <u>Id.</u> at 465. As part of its discussion, the Court noted that "'Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto.'" <u>Id.</u> at 470 (quoting <u>Day v. McDonough</u>, 547 U.S. 198, 202 (2006) (in turn citing Fed. Rules Civ. Proc. 8(c), 12(b), and 15(a)). The court also noted that "[a]n affirmative defense, once forfeited, is 'exclu[ded] from the case,' and as a rule, cannot be asserted on appeal." <u>Id.</u> (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1278, pp. 644–45 (3d ed. 2004)).

In this case, Doe is not asserting an affirmative defense and the case is not on appeal. Rather, Virginia Tech asserted the affirmative defense that the claim is time-barred and Doe responded at the hearing with his tolling argument. While Doe certainly could have responded earlier, Virginia Tech was not prejudiced by the delay because the court gave them an opportunity to respond to the tolling argument.[4]

Turning to the merits of the tolling argument, federal courts applying state statutes of limitation are obligated to also "apply the State's rule for tolling that statute of limitations."

---

[4] Virginia Tech also cited <u>Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.</u>, 369 F.3d 385, 395 n.7 (4th Cir., 2004), but the passage cited explains the distinction between forfeiting and waiving a right and offers no support to Virginia Tech's argument that Doe waived his right to argue equitable tolling.

Scoggins v. Douglas, 760 F.2d 535, 537 (4th Cir. 1985). Virginia law provides that "statutes of limitation are strictly enforced and exceptions thereto are construed narrowly." Hunter v. Custom Business Graphics, 635 F. Supp. 2d 420, 431 (W.D. Va. 2009) (citing Arrington v. Peoples Security Life Ins. Co., 250 Va. 52, 55, 458 S.E.2d 289, 290 (1995)). Under Virginia Code § 8.01-229(E)(1):

> Except as provided in subdivision 3, if any action is commenced within the prescribed limitation period and for any cause abates or is dismissed without determining the merits, the time such action is pending shall not be computed as part of the period within which such action may be brought, and another action may be brought within the remaining period.

The Fourth Circuit has stated that "[a]n action is commenced for statute of limitations purposes when the complaint is filed if service of process is accomplished within 120 days, as required by Fed. R. Civ. P. 4(j), or one year, under Va. Sup. Ct. R. 3.3, and the plaintiff has exercised due diligence in the service of process." Arabian v. Bowen, 966 F.2d 1441, at *2 (4th Cir. 1992) (table decision) (citing West v. Conrail, 481 U.S. 35, 39 (1987)). If a lawsuit is dismissed without prejudice, meaning it can be refiled, "'the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the cause of action accrued, without interruption by that filing.'" Angles v. Dollar Tree Stores, Inc., 494 F. App'x 326, 330 (4th Cir. 2012) (quoting Elmore v. Henderson, 227 F.3d 1009, 1011 (7th Cir. 2000)). When a plaintiff fails to serve a defendant within the 120-day period, "the action is subject to dismissal without prejudice and the plaintiff is in the same position as if the action had never commenced and the statute of limitations was never tolled." Wright v. Hill, No. 1:03CV00109, 2008 WL 942101, at *3 (M.D.N.C. Apr. 7, 2008) (citing Pusey v. Dallas Corp., 938 F.2d 498, 500-01 (4th Cir. 1991); Quinn v. Watson, 119 F. App'x

517, 518 n.* (4th Cir. 2005) ("In instances where a complaint is timely filed and later dismissed, the timely filing of the complaint does not 'toll' or suspend the [ ] limitations period"); <u>Brennan v. Kulick</u>, 407 F.3d 603, 606 (3d Cir.2005) ("A statute of limitations is not tolled by the filing of a complaint subsequently dismissed without prejudice, as the original complaint is treated as if it never existed.").

Cases decided in this district are in accord. <u>Broome v. Iron Tiger Logistics</u>, No. 7:17cv444, 2018 WL 3978998 (W.D. Va. Aug. 20, 2018) ("Moreover, Broome did not show good cause for his untimely service. If the case were dismissed without prejudice, the statute of limitations would not be tolled. Broome would not benefit from the Virginia savings statute and the claim would be barred from being refiled."); <u>Stump v. Wilkie</u>, No. 7:20cv369, 2021 WL 2044201 (W.D. Va. May 21, 2021) ("Generally, outside the Title VII context—if [a] suit is dismissed without prejudice, meaning that it can be refiled, then the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the cause of actions accrued, without interruption by that filing." (quoting <u>Angles</u>, 494 F. App'x at 329–30, and <u>Elmore v. Henderson</u>, 227 F.3d 1009, 1011 (7th Cir. 2000)).

Here, Doe's 2020 lawsuit was dismissed without prejudice for failing to timely serve the defendants. Defs'. Supp. Mem. in Supp. of Mot. to Dismiss, ECF No. 32 at 1. Because Doe failed to timely serve the 2020 lawsuit and it was dismissed without prejudice, federal law compels the conclusion that it had not been commenced for the purposes of applying the tolling provision set forth in Virginia Code § 8.01-229(E)(1). Accordingly, Doe's Title IX claim based on the grant funding decision made in 2018, raised in the lawsuit filed on June 25, 2021,

is time-barred and the court **DISMISSES** the claim with prejudice.

Doe's first amended complaint seeks to extend the Title IX claim beyond 2018, asserting in cursory fashion that Onufriev favored female researchers and discriminated against him based on research stipends and hostile lab conditions during both the "2018–2019 and 2019–2020 academic years, up until Mr. Doe left in March 2020." Am. Compl., ECF No. 21 ¶23. Doe claims that 2019–2020 academic year grant monies were denied him for the same reasons as were the 2018–2019 academic year monies, i.e., Onufriev gave it to the female student because he could not "resist a Persian princess." ECF No. 21 ¶¶ 23–30. However, neither he, nor Virginia Tech in its motion to dismiss, have alleged when the decision regarding the 2019–2020 academic year grant funds was made, or when Doe learned of it. If he learned of the decision to divert the 2019–2020 academic year grant monies prior to June 25, 2019, his claim is time-barred. If he learned of it on or after June 25, 2019, his claim may be timely. The problem is that Doe's pleadings do not provide sufficient clarity on this issue. Because Doe has the burden of pleading facts to show that he is entitled to relief and he has not done so here, his claim based on the diversion of the research monies for the 2019–2020 academic year is **DISMISSED** without prejudice for failure to state a claim. Doe will be given an opportunity to replead this claim in a second amended complaint.

### 2. Hostile Environment

Regarding Doe's allegation about "hostile lab conditions," the claim, were it adequately pled, would be analogous to a Title VII sex discrimination claim based on hostile environment. To state such a claim, a plaintiff must allege the following:

> (1) that the educational institution receives federal funds; (2) that the plaintiff "was subjected to harassment based on [his] sex"; (3) that "the harassment was

sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity"; and (4) that "there is a basis for imputing liability to the institution."

Hurley, 911 F.3d at 686 (quoting Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc)). Here, however, although Doe uses the phrase "hostile condition," he described no facts to support the claim. He simply makes a conclusory allegation that Onufriev "created a hostile condition in the lab in an effort to cause Mr. Doe to voluntarily resign from the program." Am. Compl., ECF No. 21 ¶ 30. That allegation is insufficient to state a claim and therefore is **DISMISSED** without prejudice. Doe may replead the cause of action in a second amended complaint if he wishes to do so.

### 3. Retaliation

Doe also seems to suggest that Onufriev retaliated against him after Doe complained about the research grant. To plead a Title IX cause of action for retaliation, a plaintiff must allege that he engaged in protected activity under Title IX, and that, as a result of the protected activity, suffered an adverse action attributable to the defendant educational institution. Id., 911 F.3d at 694. Doe states that Onufriev withheld a letter certifying completion of Doe's Master's degree, assigned excessive, redundant, and contradictory research tasks, and set false deadlines to publish papers. Am. Compl., ECF No. 21 ¶ 30. Doe does not allege that any of the actions are attributable to Virginia Tech. Moreover, Doe did not plead a retaliation claim as part of his Title IX cause of action. See id. ¶¶ 70–87. Accordingly, any claim Doe makes based on retaliation is **DISMISSED** without prejudice for failure to state a claim. Doe may replead the cause of action in a second amended complaint if he wishes to do so.

## IV. CONCLUSION

For the reasons stated above, the court **GRANTS** Virginia Tech's motion to dismiss for failure to state a claim, ECF No. 26. Doe's claim based on the allocation of the 2018–2019 academic year research grant funds is **DISMISSED with prejudice** as time barred. In addition, his claim based on his loss of a liberty interest is **DISMISSED with prejudice** for failure to state a claim. His remaining claims that (1) he was deprived of a property interest in continued enrollment without due process; (2) he was deprived of grant funds in the 2019–2020 academic year in violation of Title IX; (3) he was subjected to a hostile environment based on sex in violation of Title IX; and (4) he was retaliated against in violation of Title IX, are **DISMISSED without prejudice** for failure to state a claim.

Doe may file a Second Amended Complaint within thirty (30) days of entry of this opinion and order if he wishes to proceed on any of the claims that were dismissed without prejudice.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: July 28, 2022

Digitally signed by
Michael F. Urbanski
Chief U.S. District Judge
Date: 2022.07.28 11:29:34
-04'00'

Michael F. Urbanski
Chief United States District Judge

34