CLERK'S OFFICE U.S. DISTRICT. COURT
AT ROANOKE, VA
FILED

FEB 23 2023

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

LAURA A. AUSTIN, CLERK
BY:
DEPUTY CLERK

| | |
|---|---|
| **JOHN DOE,** | ) |
| **Plaintiff** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **VIRGINIA POLYTECHNIC INST.** | ) |
| **& STATE UNIV., et al.,** | ) |
| **Defendants** | ) |

**Case No. 7:21-cv-00378**

**By:    Michael F. Urbanski**
**Chief United States District Judge**

## MEMORANDUM OPINION

Pending in this case are three motions: Virginia Polytechnic Institute & State University's (Virginia Tech)[1] motion to dismiss plaintiff John Doe's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), ECF No. 38; Virginia Tech's motion to dismiss Plaintiff John Doe's second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), ECF No. 41; and attorney Rob Dean's motion to withdraw as counsel, ECF No. 57. Doe has responded to the motions to dismiss, ECF Nos. 47 and 48, and defendants have replied. ECF Nos. 49, 50. The issues are fully briefed, and the court does not find that a hearing will aid in the decisional process. For the reasons stated below, the court will **GRANT** ECF No. 38 and **GRANT in part and DENY in part** ECF No. 41. Attorney Rob Dean's motion to withdraw as attorney is **GRANTED**.

---

[1] Also named as defendants in the Second Amended Complaint are Timothy Sands, Alexey Onufriev, and Tamara Cherry-Clarke. All defendants joined in the motions to dismiss.

# I.

Plaintiff John Doe filed his first lawsuit based on the facts in this case on November 25, 2020. Doe v. Virginia Polytechnic Inst. and State Univ., No. 7:20-cv-00711-TTC (W.D. Va. filed Nov. 25, 2020). That lawsuit was dismissed without prejudice on May 27, 2021, for failure to properly serve defendants. Approximately one month later, on June 25, 2021, Doe filed the instant lawsuit. On December 20, 2021, the court dismissed Doe's lawsuit on various grounds, but granted him leave to amend his complaint. Order, ECF No. 20. On January 3, 2022, he filed his first amended complaint. ECF No. 21. Following a motion to dismiss filed by defendants, the court dismissed with prejudice two of Doe's claims and dismissed without prejudice four remaining claims. Order, ECF No. 36. Doe has now filed a second amended complaint, ECF No. 37, and Virginia Tech has moved for dismissal of the causes of action on several grounds.

## A. Factual Allegations

Plaintiff John Doe, a male Iranian citizen, was a graduate student at Virginia Tech pursuing a doctoral degree in physics. Second Am. Compl., ECF No. 37 ¶¶ 2, 11. Beginning in 2015, Dr. Alexey Onufriev was Doe's graduate advisor. Id. ¶ 14. Onufriev is a molecular biophysicist and Doe joined Onufriev's laboratory at the Virginia Tech Center for Theoretical and Computation Molecular Biophysics as he pursued his doctoral degree. Id. ¶ 18.

Doe alleges that after he joined the lab and continuing through the 2019–2020 academic year, Onufriev discriminated against him based on his sex. Id. ¶ 19. Specifically, at an academic conference, a researcher from another school approached Doe and asked if Onufriev was still "chasing after" female graduate students. Id. ¶ 20. At another conference,

Onufriev told Doe through another graduate student that they needed to go see a "good poster." Id. ¶ 21. When Doe and the other student visited the booth to see the "good poster," they discovered it was not related to their research and the other student explained that "good poster" was code that Onufriev used to describe an attractive woman presenter. Id.

In the 2019–2020 academic year, Dr. Onufriev received a sizeable grant from the National Institute of Health (NIH) based on research Doe had performed in the lab. Id. ¶ 22. Typically, a graduate student would receive a research stipend from a grant in recognition of the work that resulted in the grant award. Id. ¶ 23. However, Onufriev did not pay Doe funds from the grant money and instead provided a female graduate student with a $40,000 research stipend even though she was not involved with the grant research. Id. ¶ 24. Without the research funds, Doe had to take a full-time job as a teaching assistant in addition to the research work he was doing. Id. ¶ 24. Doe protested Onufriev's decision to provide the female student with the grant money, and in response, Onufriev "remarked about Mr. Doe's ethnicity" and said, "[W]ho can resist a Persian princess?" Id. ¶ 25.

In March 2019, Doe emailed Onufriev, saying, "All I want is equality between students without respect to gender, race, ethnic [sic] …Something that, unfortunately, I don't see it in our group." Id. ¶ 26.[2] Onufriev did not reply to the email. Id. ¶ 30. In August 2019, Doe discovered, once again, that he would not receive the NIH research stipend for work he was performing, but the female student would be receiving the funds instead. Id. ¶ 28.[3] Onufriev

---

[2] Although Doe mentions his race and ethnicity in his second amended complaint, he does not appear to bring a race- or ethnicity-based discrimination claim. Rather, the only claims he brings are for violation of his right to due process and Title IX discrimination based on sex.

[3] In his first amended complaint, Doe alleged that he did not receive research funds for the 2018–2019 academic year and alleged Title IX discrimination based on those facts. First Am. Compl., ECF No. 21 ¶ 23. The court dismissed the claim as time-barred. Order, ECF No. 36. In Doe's second amended complaint, he makes the

once again called the female student a "princess" and said to Doe, "You cannot compete with her, you are not at her level." In addition, Onufriev would pay "undue attention" to the female student, ignore Doe's requests to meet for office hours to discuss his upcoming publications, and fail to keep scheduled appointments, while Doe observed Onufriev "constantly" meeting with the female student at the lab. Id. ¶ 29. Even though Onufriev did not give Doe any money from the research grant, he tried to attach the grant number to Doe's 2019–2020 research reports to the NIH. Doe would not allow him to do that because he believed that doing so would have been misleading and would constitute grant fraud. Id. ¶ 30.

In December 2019, Doe reported Onufriev's conduct to Dr. Mark Pitt, chair of the physics department at Virginia Tech. Id. ¶ 32. Doe alleges that Pitt shared the details of the complaint with Onufriev, who began retaliating against Doe by withholding a letter certifying the completion of Doe's Master's degree, assigning excessive, redundant, and contradictory research tasks, setting false deadlines to publish papers, and creating a hostile condition in the lab in an effort to cause Doe to voluntarily resign from the program. Id. ¶¶ 32–34. In late 2019, Doe developed stress and anxiety as a result of his treatment by Onufriev and sought counseling for his mental health at Virginia Tech's counseling center. Id. ¶¶ 35–36. On information and belief, Doe alleges that the counseling center shared information with Onufriev, because Onufriev openly talked about Doe's parents and other matters that Doe had shared only with the university counselor. Id. ¶ 37.

---

same allegations, but omits reference to the 2018–2019 academic year. Second Am. Compl., ECF No. 21 ¶¶ 21, 24.

4

Around this same time, a different female student accused Doe of making unwanted sexual advances towards her in September and November 2019. Id. ¶ 38. Doe, who was "devastated and shocked" by the allegations, asserted that he met the student on a dating app and had a consensual relationship with her. He had later seen her on campus and had a friendly conversation with her. Id. ¶¶ 38–41. He denied having assaulted her. Id. ¶ 42.

On November 20, 2019, the female student met with staff at the Virginia Tech Office of Equity and Accessibility (VTOEA) and asked that they order Doe not to contact her. Doe was told not to contact the student and she did not pursue the matter further at that time. Id. ¶ 45. However, on January 22, 2020, the student contacted the VTOEA to pursue a formal complaint. Id. ¶ 46.

On February 17, 2020, Virginia Tech's Title IX office informed Doe that he was "under investigation for sexual assault," and the next day placed Doe on an interim suspension pending a student conduct hearing. Id. ¶¶ 47–48. Doe thought perhaps that Onufriev "influenced the university in pursuing the student conduct case, over the [female] student's initial wishes, due to Mr. Doe's complaints within the department about the NIH grant fraud." Id. ¶ 49. Subsequently, Doe returned to counseling and was hospitalized to receive mental health treatment. Id. ¶ 50–51. On February 25, 2020, Doe was released from the hospital. Id. ¶ 51.

On February 28, 2020, Doe met with a Title IX investigator to "go over the student conduct process." Id. ¶ 52. On that same day, defendant Tamara Cherry-Clarke, with the Virginia Tech Office of Student Conduct (VTOSC), sent Doe a "letter formally charging him with sexual assault and instructing him to meet with her to discuss the process." Id. ¶ 53. On

March 3, 2020, Cherry-Clarke met with Doe and informed him that he had been accused of violating six Virginia Tech policies on intimate partner contact. Id. ¶ 54. On March 5, 2020, Cherry-Clarke told Doe that his hearing would take place the next day. Id. ¶ 55.

Doe had learned that the allegations stemmed from allegedly touching the woman in an elevator at the Graduate Life Center (GLC) and Doe knew of a witness who was present at the GLC on the day the incident was alleged to have occurred. Doe asked Cherry-Clarke via email for an extension of time so that he could contact the witness and ask him to appear at the hearing. Doe also needed additional time to review the investigative report provided to him by Virginia Tech, and to contact an advisor or obtain counsel to represent him at the hearing. Id. ¶¶ 57–61. Cherry-Clarke denied Doe's request, asserting that 24 hours was enough time to prepare. Id. ¶ 65. She also told him that he first was notified of the charge on February 17, 2022. Id. ¶ 66.

On March 6, 2020, Doe's student conduct hearing was held and Doe appeared without counsel to defend himself. Id. ¶ 68. On March 9, 2020, Virginia Tech found Doe responsible for sexual assault and dismissed him from the university. Id. ¶ 69. Doe appealed the decision to the Dean of Student Affairs, but the appeal was denied. Id. ¶ 70. As a result of his dismissal from the university, Doe now fears that he may be deported to Iran when his student visa expires. Id. ¶ 66. Because of Iran's current political climate, Doe is "gravely concerned about his physical safety should he be deported to Iran[.]" Id. ¶ 72.[4]

---

[4] The court notes that although neither Doe's location nor his immigration status are known, he participated in a conference call with United States Magistrate Judge Robert Ballou on January 9, 2023. ECF No. 54.

## B. Relief Sought

In Doe's second amended complaint, he asserts claims against defendant Timothy Sands, as president of Virginia Tech in his official capacity, and defendant Cherry-Clarke, in both her official and individual capacities, for violation of the Due Process Clause of the Fourteenth Amendment to the Constitution. Doe also asserts claims against Virginia Tech, and Onufriev for violation of Title IX, 20 U.S.C. § 1681 et seq. As relief, he requests (1) money damages as compensation to his reputation and in compensation for the damage done to his mental, emotional, and physical health and well-being, punitive damages, prejudgment interest, attorney's fees, expenses, and court costs; (2) a declaratory judgment that Virginia Tech violated his rights to Due Process; (3) injunctive relief in the form of (a) expunging from his records at Virginia Tech any indication of a finding that he committed an act of assault or was dismissed from Virginia Tech, (b) refraining from continuing to enforce any sanction against Doe for alleged assault; (c) noting in his educational record any information related to the incidents described in this complaint; and (d) making any disclosure to a third party that any adverse disciplinary action was taken against him arising out of the incidents described in this complaint; (4) attorney's fees and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1920, and other appropriate authority; and (5) any further relief the court deems just and proper.

## II.

Defendants move to dismiss Doe's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## A. Rule 12(b)(1)

To move for dismissal under Rule 12(b)(1), a party must allege that the court lacks subject matter jurisdiction. When a defendant argues that a claim fails to allege facts upon which subject matter jurisdiction can be based, all the facts alleged in the complaint are assumed to be true and the plaintiff is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant alleges that the jurisdictional allegations in a complaint are not true, a trial court may go beyond the allegations of the complaint and hold an evidentiary hearing to determine if there are facts to support the jurisdictional allegations. Id.

Defendants do not argue that the jurisdictional facts are untrue. Rather, they contend that Doe's claims for money damages against Sands and Cherry-Clarke in their official capacities are barred because a plaintiff may seek money damages only against a person under 42 U.S.C. § 1983 and an official-capacity suit against a state officer is not a suit against the person, but rather against the person's office. See Kentucky v. Graham, 473 U.S. 159, 165 (1985); Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Defendants also argue that Title IX authorizes lawsuits against institutions and programs only, and not against school officials, teachers, or other individuals. See Fitzgerald v. Barnstable School Comm., 555 U.S. 246, 257 (2009).

Doe agrees with defendants that he cannot recover money damages against any of the defendants in their official capacities and asserts that he is seeking only injunctive relief in his claims against Virginia Tech and the individual defendants sued in their official capacities. ECF Nos. 48, 14. Doe also agrees that Onufriev is not a proper defendant in his Title IX cause of

action and concedes that he can only proceed against Virginia Tech on those allegations. Accordingly, defendants' motion to dismiss under Rule 12(b)(1), ECF No. 38, is **GRANTED**. Doe's claims for money damages brought against Sands and Cherry-Clarke in their official capacities are **DISMISSED with prejudice**. In addition, Doe's claim for relief under Title IX against Onufriev is **DISMISSED with prejudice**.

### B. Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." Id. at 679; see also Simmons v. United Mortg. & Loan Invest, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (quotation and emphasis omitted).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Foundation v. Nat'l Security Agency, 857 F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286

9

(1986); conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks omitted). "'Thus, in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), a court must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level.'" Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009)).

### C. Due Process Clause of the Fourteenth Amendment

To succeed on a procedural due process claim, a plaintiff must show (1) that he had a constitutionally cognizable life, liberty, or property interest; (2) that deprivation of that interest was caused by some form of state action; and (3) that the procedures employed were constitutionally inadequate. Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009). Defendants in this case argue that Doe fails to state a claim for relief because he failed to allege a recognized liberty or property interest and because he received advance notice and an opportunity to be heard prior to the adverse action.[5] As discussed below, the court finds that Doe has failed to plead facts showing that he had a property interest in his continuing enrollment at Virginia Tech.

---

[5] Defendants do not argue that any deprivation was not caused by state action. See Am. Mot. to Dismiss, ECF No. 44 at 9 n.5.

### 1. Property Interest

Defendants argue that Doe failed to show he has a protected Fourteenth Amendment property interest in his continued enrollment or reputation. "A protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source." Id. (citing Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972); Tri-County Paving, Inc. v. Ashe County, 281 F.3d 430, 436 (4th Cir. 2002)). "In order to have a property interest in a benefit, a person must have more than a mere 'unilateral expectation of it' or 'abstract need or desire for it.'" Id. (citing Roth, 408 U.S. at 577).

"Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to "existing rules or understandings that stem from an independent source such as state law." Phillips v. Washington Legal Found., 524 U.S. 156, 164 (1998) (citing Roth, 408 U.S. at 577). It is undisputed that the Commonwealth of Virginia has not created a property interest in a continued university education. Davis. v. George Mason University, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005); Doe v. Alger, 175 F. Supp. 3d 646, 657 (W.D. Va. 2016).

Nor have either the Supreme Court or the Fourth Circuit "explicitly recognized a property interest in a student's continued enrollment in a public college or university or a liberty interest in his good name, resulting from a constitutionally infirm disciplinary process." Alger, 175 F. Supp. 3d at 656. However, both courts have assumed that one or both interests exist. See Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 223 (1985) (accepting "the University's invitation" to assume the existence of a constitutionally protectible property right in the plaintiff's continued enrollment, before deciding that he had not suffered a violation of

11

his substantive right to due process) (internal quotations and citations omitted); Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 84–85 (1978) ("Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires."); Butler v. Rector and Bd. of Visitors of Coll. of William and Mary, 121 F. App'x. 515, 518 (4th Cir. 2005) (assuming for purposes of appeal that Butler had a property interest in continued enrollment in university program that was protected by the due process clause); Tigrett v. Rector and Visitors of Univ. of Va., 290 F.3d 620, 627 (4th Cir. 2002) ("Assuming the Appellants possessed some constitutionally protected interest in continued enrollment, they were not deprived of such an interest by the actions of the [university disciplinary committee.]); Henson v. Honor Comm. of Univ. of Va., 719 F.2d 69, 73 (4th Cir. 1983) (same). The Fourth Circuit stated explicitly in Sheppard v. Visitors of Virginia State Univ., 993 F.3d 230, 239 (4th Cir. 2021), that although courts have assumed a property right for purposes of analyzing due process claims, the right to continued enrollment in a public university is not clearly established for purposes of a § 1983 lawsuit.

In some circumstances, a property interest may be conferred by contract, or by a clearly implied promise of the right. Roth, 408 U.S. at 577. "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." Perry v. Sindermann, 408 U.S. 593, 601 (1972) (citing Roth, 408 U.S. at 577). A written contract is evidence of a formal understanding that supports a claim of a property interest, but absence of a contract may not always foreclose the possibility that a person has a property interest. Id.

12

> For example, the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.' 3 A. Corbin on Contracts §§ 561–572A (1960). Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in the light of the surrounding circumstances.' Id., at § 562. And, '(t)he meaning of (the promisor's) words and acts is found by relating them to the usage of the past.' Ibid.

Perry, 408 U.S. at 601–02.

In Alger, the court looked at whether a university student established that either a contract or policies and procedures conferred on him a right to continue his university education. The plaintiff alleged that his right to due process was violated when he was suspended from James Madison University (JMU) following allegations that he sexually assaulted another student with whom he maintained he had a consensual relationship. As in the instant case, the court examined the issue of whether public university students have a property or liberty interest in their continued enrollment in the context of a defendant's motion to dismiss.

The plaintiff in Alger set forth sections of the JMU Policy on Student Rights that described the process to be followed when a student was accused of misconduct. Alger, 175 F. Supp. 3d at 649–50.[6] Based on the written policy, the plaintiff alleged that JMU "substantially limited its ability to suspend, expel or dismiss" students through its adoption of

---

[6] The policies cited by the plaintiff included "the right to fair and equitable procedures which shall determine the validity of charges that they have violated university regulations. ... 1. Each student has a right to expect the procedures shall be structured to facilitate a reliable determination of the evidence of the charges, provide a fundamental fairness to the parties involved, and be effective as an instrument for the maintenance of the community; 2. Each student has the right to know in advance of sanctions for university policies. The definition of adequate cause for separation from the university should be clearly formulated and made public." Alger, 175 F. Supp. 3d at 650 (citing JMU policy on Student Rights). "A student accused of [committing] Sexual Misconduct has the following rights: 1. The right to a fair and impartial case review. 2. The right to a presumption of being not responsible for a violation until proven responsible by a preponderance of the evidence presented at the case review." Id. (citing JMU policy on Student Rights).

certain policies and practices. Id. at 657. He claimed that by "regularly and routinely" dismissing, suspending, or expelling students only after a finding of cause, JMU created a property interest in students' continued enrollment. Id. The JMU defendants agreed that property interests could arise from regulations, or municipal ordinances, or from an express or implied contract, such as rules or understandings that secure certain benefits and that support claims of entitlement to the benefits. Id. Defendants nevertheless moved to dismiss the plaintiff's claim, arguing that the pleadings were insufficient to establish a property interest because even if it were JMU's practice to suspend a student only for cause, plaintiff had no right to enforce any such entitlement. Id.

The court cited Perry, 408 U.S. at 599–60, for its holding that a public junior college professor stated a wrongful termination claim based on his allegation that the college had a de facto tenure policy arising from rules and understandings officially promulgated and fostered by the college. Alger, 175 F. Supp. 3d at 657. Relying on Perry, the court denied the motion to dismiss to give the plaintiff an opportunity to prove the legitimacy of his claim to a property right in light of the policies and practices at JMU. Id.

Notably, in Joseph Doe v. Va. Polytechnic Inst. and State Univ., 400 F. Supp. 3d 479 (W.D. Va. 2019), the court found that Joseph Doe failed to state a claim for violation of his procedural due process rights in a university disciplinary hearing. The court acknowledged its previous determination in Alger that the plaintiff there had stated a claim based on his allegation that policies and practices at JMU had established a right to continuing enrollment

at the university. Joseph Doe, 400 F. Supp. 3d at 499–500.[7] Joseph Doe did not allege that Virginia Tech only expels students for cause or point to other facts supporting a "legitimate claim of entitlement." The court concluded that "even the sparse allegations present in Alger" were missing from Joseph Doe's complaint and that the plaintiff had failed to adequately allege a property interest. Id. at 500.

Similarly, in Jacob Doe v. Va. Polytechnic Inst. and State Univ., No. 7:19-cv-00249, 2020 WL 1309461, at *6 (W.D. Va. Mar. 19, 2020), the court reiterated its holding in Alger and found that Jacob Doe did not allege that Virginia Tech employed a policy of expelling students only after a finding of cause as set forth in the student's rights policy. Rather, he relied on conclusory allegations that he had a liberty and property interest. Id. Jacob Doe also asserted that he had a contractual property right because his paid tuition created an implied contract between himself and Virginia Tech. He claimed that his "enrollment in, and attendance of, classes at Virginia Tech created in Doe an expectation that he would be allowed to continue his course of study until he earned his degree from the University, provided that he maintained satisfactory grades and complied with University rules and policies." Id. (citing Jacob Doe's Complaint). He argued that one of the terms of the implied contract was that Virginia Tech had the "duty not to suspend or expel Doe for disciplinary misconduct arbitrarily, capriciously, maliciously, discriminatorily, or otherwise in bad faith." Id. The court repeated the holding from Doe v. Washington & Lee Univ., No. 6:19-cv00023, 2020 WL 618836, at *8 (W.D. Va. Feb. 10, 2020), that there is a dearth of authority from Virginia courts

---

[7] There were four plaintiffs in 400 F. Supp. 3d 479, designated as John Doe, James Doe, Jack Doe, and Joseph Doe. The court addressed Joseph Doe's claim of a property interest in his continuing university education. Id. at 499–500.

holding that an implied contract is created through payment of tuition. Jacob Doe, 2020 WL 618836, at *8. See also Doe v. Marymount Univ., 297 F. Supp. 3d 573, 587–88 (E.D. Va. 2018) (finding that under Virginia law, a university's conduct policies are not enforceable contracts; rather, they are behavior guidelines that may be revised at any time). The court concluded that Jacob Doe had not identified any authority suggesting that Virginia law recognizes an implied contract arising simply out of the payment of tuition. Id. at *6.

In the instant case, Doe alleges that Virginia Tech deprived him of a property interest based on the following recitation of facts:

> By accepting Virginia Tech's offer to enroll as a student, Mr. Doe and Virginia Tech agreed through its various policies and customs, that so long as Mr. Doe paid tuition, met the university's academic and conduct standards, and abided by its policies, he would be permitted to continue to enroll in subsequent semesters at the university as he pursued his graduate degree.

> Mr. Doe did pay tuition through the 2019-2020 academic year, meet the university's academic and conduct standards, and abided by its policies, and he reasonably expected to enroll in subsequent semesters at the university as he pursued his graduate degree – but for the student conduct matter that is the basis for this Complaint.

Second Am. Compl., ECF No. 37 ¶¶ 12–13. This language is insufficient to show that Doe has a property right, either express or implied, in continued enrollment at Virginia Tech. Doe does not identify any policy or custom on the part of Virginia Tech that substantially limits its ability to suspend, expel, or dismiss students. The plaintiff in Alger made the factual assertion that "JMU has never dismissed, suspended, expelled or separated an undergraduate student for alleged misconduct without proving cause through a fair and impartial process. . . ." Alger, 175 F. Supp. 3d at 657. The court relied on that assertion, and on the student rights policy, to

find that the plaintiff had stated a claim to a property right "'in light of the policies and practices of the institution.'" Id. at 658 (quoting Perry, 408 U.S. at 603).

Doe has made no similar factual assertion here. Rather, he has made the same conclusory allegation rejected by the court in Jacob Doe, 2020 WL 1309461 at *6, and Joseph Doe, 400 F. Supp. 3d at 500, that he has a property interest in continued enrollment arising from his and Virginia Tech's agreement based on Virginia Tech's "various policies and customs." Without identifying the policy or custom that confers on him the property right in continued enrollment, Doe cannot state a claim for deprivation of his right to Due Process.

Doe further alleged that the Virginia Tech Code of Conduct guaranteed that he could not be arbitrarily removed as a student if he paid tuition, met the academic requirements, and abided by the university's conduct system. Id. ¶ 78. He sets forth this language from the Code of Conduct:

> When a student accepts admission to Virginia Tech . . ., they also accept membership in the university community and responsibility for upholding its shared values and expectations. The Student Code of Conduct outlines policies established by the university that set standards for students' behavior, along with procedures for adjudicating and sanctioning violations of these standards.

Id. ¶ 79. Regarding student disciplinary matters, Doe cites to this provision from the Code of Conduct:

> Authority to approve policies and procedures for student discipline, as outlined in the Student Code of Conduct, lies with Virginia Tech's governing body, the Board of Visitors, as authorized by the Code of Virginia. The Vice President for Student Affairs has responsibility for the university conduct system, with direct supervisory oversight of disciplinary matters assumed by the Office of Student Conduct, under the direction of the Director of Student Conduct.

Id. ¶ 80.

17

Finally, Doe points out that the Code of Conduct provides that Virginia Tech students enjoy the rights guaranteed by the Constitutions of the United States and the Commonwealth of Virginia. Id. ¶ 81.

However, nothing in any of the language cited creates a property interest in continued enrollment. The language apprises the students that they are expected to follow university policies and if a complaint is made that they have failed to do so, the complaint will be addressed following procedures for "adjudicating and sanctioning" violations set forth in the Student Code of Conduct. This language does not describe an agreement or understanding that a student will not be dismissed in the absence of cause following a hearing. Nor does Doe allege that Virginia Tech "regularly and routinely" dismisses, suspends, or expels students only after a finding of cause, as the plaintiff did in Alger.

As far as Virginia Tech students enjoying the rights guaranteed by the constitutions of the United States and the Commonwealth of Virginia, this passage in the Code of Conduct does not confer any rights not found in the constitutions. And, as set forth above, neither the Commonwealth nor the United States have found that students have a constitutional right to continued enrollment.

Doe has not pled facts showing that he has a property interest in his continued enrollment at Virginia Tech. Accordingly, his claim that he did not receive due process must be **DISMISSED**.

### 2. Timing of the Hearing

As the court noted in the memorandum opinion entered on July 28, 2022, given that Doe had one day to prepare for the disciplinary hearing, he sufficiently alleged that the short

18

time period was inadequate to afford him due process. See Mem. Op., ECF No. 35 at 21–25. Nevertheless, because he has failed to plead facts to support the first prong of the test, that he had a property interest in his continued enrollment, he has failed to state a claim for violation of his right to due process.

### 3. Qualified Immunity

Defendants argue in the alternative that that even if Cherry-Clarke did not provide Doe with constitutional due process, she enjoys qualified immunity against Doe's claims brought against her in her personal capacity. The court agrees.

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Stated another way, "[q]ualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" Booker v. South Carolina Dept. of Corrections, 855 F.3d 533, 537–38 (4th Cir. 2017) (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). The doctrine weighs the need to hold public officials accountable for irresponsible exercise of power against the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly. Booker, 855 F.3d at 538 (citing Pearson, 555 U.S at 231).

In performing a qualified immunity analysis, a court must first determine the specific right that the plaintiff alleges was infringed by the challenged conduct. Id. (citing Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). The court then must ask whether a

constitutional violation occurred and whether the right violated was clearly established at the time the official violated it. The questions need not be asked in a particular order. Id. (citing Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010) and Pearson, 555 U.S. at 236). The plaintiff bears the burden of showing that a constitutional violation occurred, while the defendant bears the burden of showing entitlement to qualified immunity. Purnell, 501 F.3d at 377.

Doe alleges his right to due process was violated by Cherry-Clarke when she gave him one day to prepare for a disciplinary hearing and refused to give him an extension of time when asked. As discussed above, the court has found that Doe did not state a claim for a constitutional violation because he failed to allege a property interest in his continued enrollment at Virginia Tech.

Moreover, even if Doe had alleged facts showing that his right to Due Process had been violated, he cannot show that the right was clearly established. To determine whether a right is clearly established, courts in the Fourth Circuit look at cases of controlling authority, such as decisions from the United States Supreme Court, the Fourth Circuit Court of Appeals, and the Virginia Supreme Court. Booker, 855 F.3d at 538. When there is no such controlling authority, courts may look to a "consensus of cases of persuasive authority" from other jurisdictions if such authority exists. Id. at 538–39 (quoting Wilson v. Layne, 526 U.S. 602, 617 (4th Cir. 2004)).

In Sheppard, 993 F.3d at 240, the Fourth Circuit granted qualified immunity to a defendant on a due process claim against Virginia State University after concluding that it is not clearly established that students have a protected property right in their continued

20

enrollment in higher education. The court acknowledged that both the Supreme Court and the Fourth Circuit have assumed such a right exists but found that "[t]he Supreme Court and this Court's assumptions, without express recognition, hardly amount to a clearly established right." Id.

Doe argues that it is clearly established that he was entitled to more than twenty-four hours to prepare for his hearing and cites in support Tanyi v. Appalachian State Univ., No. 5:14-CV-170RLV, 2015 WL 4478853 (W.D.N.C. July 22, 2015). The Tanyi court assumed, as other courts have, that students at public universities maintain protected property rights in their continued enrollment. Id. at *2. The court found that Tanyi's right to due process at a student disciplinary hearing had been violated in many ways, including that he was informed the night before a hearing that additional charges had been assessed against him, after he had designated his witnesses. Id. at *6. The court found that although "educational institutions are largely left to their own devices regarding student disciplinary proceedings," due process required more notice of the additional charges. Id.

Doe's case is distinguishable from Tanyi on two bases. First, Tanyi was decided before Sheppard and its holding that despite multiple courts' assumptions, "there is clearly no established right to continued enrollment in higher education." Sheppard, 993 F.3d at 240. Second, Tanyi learned the night before his hearing that new charges that had been brought against him. Doe was informed of the charges against him on February 28, 2020, and his hearing was held on seven days later on March 6, 2020. Although he had only one day's notice of the actual hearing, he had knowledge of the charges seven days before the hearing.

Doe also cites <u>Doe v. Rector and Visitors of George Mason Univ.</u>, 149 F. Supp. 3d 602, 618 (E.D. Va. 2016), for its statement that due process requires notice sufficient to allow an accused student at a meaningful time to prepare. While this statement is true, the case was decided before <u>Sheppard</u>, did not address whether a student has a property interest in continued enrollment in a public university, and did not discuss qualified immunity. Accordingly, it does not affect this court's analysis of qualified immunity.

Based on the foregoing, even if Doe had stated a claim for a Due Process violation, defendant Cherry-Clarke is entitled to qualified immunity on his claim. For all the reasons stated above, Doe's claims against Virginia Tech and defendant Cherry-Clarke in her individual capacity for violation of his right to due process are **DISMISSED with prejudice.**

### D. Title IX Cause of Action

Title IX states:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal Financial assistance.

20 U.S.C. § 1681(a). Enforcement of the statute is administrative in that federal agencies that distribute education funding must establish requirements to effectuate the nondiscrimination mandate and agencies may enforce requirements through any means authorized by law, including, ultimately, the termination of federal funding. <u>Gebser v. Lago Vista Independent School District</u>, 524 U.S. 274, 280–81 (1998) (citing 20 U.S.C. § 1682). In addition, Title IX is enforceable through an implied private right of action. <u>See Feminist Majority Found. v. Hurley</u>, 911 F.3d 674, 686, (4th Cir. 2018) ("The Supreme Court has concluded that a victim of sex discrimination is entitled to pursue a private cause of action against a federally-funded

educational institution for a violation of Title IX[]") (citing Cannon v. Univ. of Chi., 441 U.S. 677, 709 (1979)). Monetary damages are available to plaintiffs who bring lawsuits via the implied private action. Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992). The defendant in a Title IX lawsuit is the institution and not the individual alleged to have acted in violation of the statute. Fitzgerald, 555 U.S. at 257.

Doe claims that he was discriminated against on the basis of his sex in violation of Title IX when Onufriev allocated $40,000 of research grant funding to a female graduate student who was not involved in the grant research. He also alleges that Virginia Tech created a hostile environment and retaliated against him for reporting discrimination.

To summarize his allegations, Doe learned at some point in 2018 that for the 2018–2019 academic year, Onufriev was giving research funds to the female student rather than to Doe. Doe also averred that in March 2019 he documented his concerns in an email to Onufriev. In the previous memorandum opinion addressing Doe's first amended complaint, the court agreed with Virginia Tech that Doe's cause of action for denial of the 2018–2019 funds was time-barred because he would have learned about the denial no later than December 2018 and did not file his lawsuit until June 25, 2021. However, because it was unclear when Doe learned of the denial of the 2019–2020 grant funds, the court dismissed that claim without prejudice. See Mem. Op., ECF No. 35 at 28.

Doe asserts that after he did not receive grant funds in March 2019, he emailed Onufriev, asking for equality between students without respect to their gender, race, or ethnicity, but received no response. In August 2019, Doe discovered that he would not receive the NIH research stipend for work he had continued to perform, and that a female student

23

would be receiving the funds instead. Onufriev once again called the female student a "princess" and told Doe, "You cannot compete with her, you are not at her level." Doe further alleges that Onufriev paid "undue attention" to the female student and met with her frequently at the lab. At the same time, Onufriev ignored Doe's requests to meet for office hours to discuss his upcoming publications and failed to keep scheduled appointments. Even though Onufriev did not give Doe any money from the research grant, he tried to attach the grant number to Doe's 2019–2020 research reports to the NIH, which Doe would not allow.

Doe alleges that in December 2019, he reported Onufriev's conduct to Mark Pitt, chair of the physics department at Virginia Tech. Doe claims that Pitt shared the details of the complaint with Onufriev, who began retaliating against Doe by withholding a letter certifying the completion of Doe's Master's degree, assigning excessive, redundant, and contradictory research tasks, setting false deadlines to publish papers, and creating a hostile condition in the lab in an effort to cause Doe to voluntarily resign from the program.

## 1. Timeliness

Virginia Tech asserts that Doe's Title IX claim is barred by the statute of limitations. Because Title IX does not contain an express statute of limitations, courts apply "the most closely analogous statute of limitations under state law." Wilmink v. Kanawha Cnty. Bd. of Educ., 214 F. App'x 294, 296 n.3 (4th Cir. 2007); Reed v. United Transp. Union, 488 U.S. 319, 323–24 (1989); Wolsky v. Med. Coll. of Hampton Rds., 1 F.3d 222, 224 (4th Cir. 1993). In this case, the most analogous statute of limitations under state law is Virginia's two-year personal injury limitations period. See discussion, Joseph Doe v. Virginia Tech, 400 F. Supp. 3d at 494–96.

Although the statute of limitations is defined by state law, the question of when a cause of action accrues is one of federal law. Howell v. Cnty. Comm. of Hampshire County, No. 21-1023, 2022 WL 61428 (4th Cir. Jan 6, 2022). "Under federal law, a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." Nasim v. Warden, Maryland House of Corr., 64 F.3d 951, 955 (4th Cir. 1995). A plaintiff must know that he has been hurt and who inflicted the injury. Id. (citing United States v. Kubrick, 444 U.S. 111, 122-24 (1979)). "When the plaintiff becomes aware of these two facts, he is on inquiry notice and has a duty to inquire about reasonably discoverable details." Slaey v. Adams, No. 1:08cv354, 2008 WL 5377937 (E.D. Va. Dec. 23, 2008).

In denial of tenure cases arising under Title IX, the limitations period begins to run when the tenure decision is made and the plaintiff is notified, and not when the effect of the denial of tenure is felt. Delaware State Coll. v. Ricks, 449 U.S. 250, 259 (1980). As the Court explained, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful." Id. at 258. See also Martin v. Clemson University, 654 F. Supp. 2d 410, 431 (D.S.C. Aug. 28, 2009) (applying Ricks to find that plaintiff's cause of action accrued when she was denied tenure in April 2005, rather than in March 2007 when university issued its final ruling on her appeal).

Applying Ricks to Doe's allegation, if he learned about the second decision to deny grant funding in August 2019, his complaint was timely filed. Virginia Tech argues that because Doe had notice of the alleged discriminatory act in March 2019 when he emailed Onufriev about his concerns of discrimination, his cause of action accrued at that time. Virginia Tech

25

also points out that Doe did not allege that Onufriev received a new or different grant after March 2019 that served as the source of funding for the research assistant position. While that is true, Doe has alleged that he learned in August 2019 that he would not be receiving funds for a second year, regardless of the source or origin of the grant. Accepting Doe's allegation as true, the court finds that for purposes of this motion to dismiss, the claim is timely.

### 2. Sufficiency of the Pleadings

### a. Withholding of Grant Funds

The Supreme Court made clear in Gebser, 524 U.S. at 287–88, that a Title IX claim for damages cannot rest solely on principles of vicarious liability or constructive notice. Title IX imposes a contractual obligation on entity recipients who agree to not discriminate on the basis of sex as a condition of receiving federal funds. The contractual nature of the agreement indicates that a recipient entity must have actual knowledge of discrimination. "Title IX's express means of enforcement – by administrative agencies – operates on an assumption of actual notice to officials of the funding recipient." Id. at 288.

> Presumably, a central purpose of requiring notice of the violation "to the appropriate person" and an opportunity for voluntary compliance before administrative enforcement proceedings can commence is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs and is willing to institute prompt corrective measures.

Id. at 289 (quoting 20 U.S.C. § 1682). "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Id. at 290. In cases that do not involve official policy of the recipient entity, "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the

26

recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." Id. In addition, if a recipient entity has notice of a violation, to be liable, the response "must amount to deliberate indifference to discrimination." Id.

> The administrative enforcement scheme presupposes that an official who is advised of a Title IX violation refuses to take action to bring the recipient into compliance. The premise, in other words, is an official decision by the recipient not to remedy the violation. That framework finds a rough parallel in the standard of deliberate indifference. Under a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions.

Id.

In Doe's case, he alleges that in December 2019, he reported Onufriev's alleged misconduct to Pitt, the chair of the physics department of Virginia Tech, who shared the details of the complaint with Onufriev. Second Am. Compl., ECF No. 37 ¶ 32. This allegation, although slight, is sufficient to state a Title IX claim against Virginia Tech. Development of the facts may establish that Pitt had authority to take corrective action to end the alleged discrimination. Also, if Pitt had such authority and informed Onufriev of Doe's complaint but took no further action, his behavior could be considered deliberate indifference to discrimination.

In addition, to state a claim for discrimination under Title IX, a plaintiff must show that gender was the "but for" cause of negative treatment. Sheppard, 993 F.3d at 236. Doe has plausibly alleged that Onufriev denied him grant funding on the basis of sex when Onufriev gave the funding to a female student and asked, "Who can resist a Persian princess?" Virginia Tech points out that Onufriev also told Doe that he could not compete with the female student and was "not at her level," and argues that the statements undermine Doe's

claim that gender was the "but for" cause of the alleged discrimination. However, the court finds that Doe's allegation meets the pleading threshold and that Doe has plausibly stated a claim based on the Onufriev's explanation for not sharing the grant funds with Doe. Whether gender was the "but for" cause of the decision to deny Doe the grant funds may be addressed after further development of the facts.

Based on the foregoing, Doe may proceed on his Title IX complaint based on the allocation of NIH grant funds. Virginia Tech's motion to dismiss this cause of action is **DENIED**.

### b. Hostile Environment

Regarding Doe's allegation about "hostile lab conditions," the claim, were it adequately pled, would be analogous to a Title VII sex discrimination claim based on hostile environment. To state such a claim, a plaintiff must allege the following:

> (1) that the educational institution receives federal funds; (2) that the plaintiff "was subjected to harassment based on [his] sex"; (3) that "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity"; and (4) that "there is a basis for imputing liability to the institution."

Hurley, 911 F.3d at 686 (quoting Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc)). There is no dispute that Virginia Tech receives federal funds. To satisfy the second and third prongs of the test, Doe must show that Onufriev subjected him to harassment based on his sex and the harassment created a hostile or abusive environment. Jennings, 482 F.3d at 695. "Sexual harassment occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate." Id. (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331–32 (4th Cir. 2003)).

Harassment reaches the sufficiently severe or pervasive level "when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim [himself] 'subjectively perceive[s] ... to be abusive.'" Jennings, 482 F.3d at 696 (quoting Harris v. Forklift Sys., Inc., 510 U.S.17, 21 (1993)).

The basis of Doe's hostile environment allegation is that Onufriev often met with the female student but ignored Doe's requests to meet for office hours, left him waiting for long periods of time, and often simply failed to show up to scheduled meetings. These allegations do not plausibly state a claim of hostile environment sexual harassment. To compare, in Hurley, 911 F.3d at 680–81, the court found that the plaintiffs stated a claim for hostile environment based on sex when they alleged that other students shouted "F*** the feminists" at them, shouted a chant that glorified sexual violence against women, posted on social media comments of a derogatory, sexist, and threatening nature at them, and when tensions escalated, threatened individual plaintiffs with rape and murder. In Jennings, 482 F.3d at 691–94, the plaintiff alleged that the coach of her women's soccer team engaged in sexually charged talk in team settings, repeatedly asked players crude questions about their sexual activities, expressed his sexual fantasies about players, commented inappropriately about players' bodies, made inappropriate advances toward players, and paid inordinate attention to one player by hugging her, rubbing her back, whispering in her ear, dangling a hand in front of her chest and touching her stomach.

Doe's complaints about Onufriev at most show that Onufriev was rude and disrespectful of Doe's time, but do not make out a claim of hostile environment based on sex. Indeed, courts are cautioned that the standards for judging hostility are to ensure that Title IX

does not become a "general civility code." Id. at 696 (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). In addition, Doe has alleged no facts to indicate that any Virginia Tech official had actual knowledge that Onufriev was ignoring Doe's requests to meet to discuss for office hours or otherwise was wasting his time. Doe has wholly failed to allege facts showing that Onufriev created a hostile environment based on sex. Accordingly, his claim for hostile environment sexual harassment is **DISMISSED with prejudice** for failure to state a claim.

### c. Retaliation

Doe also alleges that after he complained to Pitt about Onufriev's alleged misconduct, Onufriev retaliated against him. To plead a Title IX cause of action for retaliation, a plaintiff must allege that he engaged in protected activity under Title IX, and that, as a result of the protected activity, he suffered an adverse action attributable to the defendant educational institution. Hurley, 911 F.3d at 694. Doe states that Onufriev withheld a letter certifying completion of Doe's Master's degree, assigned excessive, redundant, and contradictory research tasks, and set false deadlines to publish papers.

As discussed above, Doe's allegation that he reported to Pitt that he did not receive the NIH grant funds is sufficient at this point in the proceedings to show that Doe engaged in protected activity under Title IX. And Doe's allegation that Pitt shared information about the complaint with Onufriev and Onufriev purposefully created unnecessary obstacles that impeded Doe's ability to finish his degree states a claim that he suffered an adverse action. Accordingly, Doe has stated a claim based on these allegations and Virginia Tech's motion to dismiss this cause of action is **DENIED.**

30

### E. Motion to Withdraw

Also pending in this matter is a motion to withdraw as counsel by Doe's attorney, Robert Dean. ECF No. 57. Dean advises that Doe has discharged him as counsel. Because Doe has discharged Dean, and because it appears proper to do so, the motion for Dean to withdraw as counsel is **GRANTED** with the following caveat: Dean is **DIRECTED** to provide Doe with a copy of this memorandum opinion and accompanying order. Doe is **DIRECTED** to apprise the court of the name and address of his substitute counsel within fourteen (14) days. If Doe has not retained substitute counsel within fourteen (14) days, he is **DIRECTED** file under seal with the court his contact information, including his real name, address, email address, and telephone number.

### III. CONCLUSION

For the reasons stated above, the court **GRANTS** ECF No. 38 and **GRANTS in part and DENIES in part** ECF No. 41.

1. Doe's claims for violation of his due process rights against Virginia Tech, Tamara Cherry-Clarke, and Timothy Sands are **DISMISSED with prejudice;**

2. Doe's Title IX claim against Alexey Onufriev is **DISMISSED with prejudice;**

3. Doe's Title IX claim based on hostile environment is **DISMISSED with prejudice;**

4. Doe may proceed on his Title IX claims against Virginia Tech based on his allegations related to the NIH grant funding and retaliation;

5. The motion to withdraw as attorney in this case, ECF No. 57, is **GRANTED**, with the caveat that Dean is **DIRECTED** to provide Doe with a copy of this memorandum opinion and accompanying order.

6. Doe is **DIRECTED** to apprise the court of the name and address of his substitute counsel within fourteen (14) days. If Doe has not retained substitute counsel within fourteen (14) days, he is **DIRECTED** file under seal with the court his contact information, including his real name, address, email address, and telephone number.

An appropriate order will be entered.

It is so **ORDERED**.

Entered:   02-22-2023

Michael F. Urbanski
Chief United States District Judge