IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:21-cv-00378 |
| | ) | |
| VIRGINIA POLYTECHNIC | ) | |
| INSTITUTE AND STATE | ) | |
| UNIVERSITY, et al., | ) | |
| | ) | |
| Defendants. | | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

COMES NOW the Plaintiff, John Doe ("Plaintiff" or "Mr. Doe"), and submits this brief opposing the Defendants' Motion to Dismiss. In support thereof, Plaintiff states as follows:

**INTRODUCTION**

At its core, this case is about a graduate student who was treated unfairly by Virginia Polytechnic Institute and State University ("Virginia Tech") and its employees, which unfair treatment manifested in three ways: discrimination, retaliation, and unfair dismissal. First, Mr. Doe suffered discrimination on account of his gender, because his graduate advisor at Virginia Tech, Dr. Onufriev, improperly favored a female student, awarded her with NIH grant funding that rightfully should have been allocated to Mr. Doe. Second, Mr. Doe was retaliated against when he brought these concerns to the attention of Dr. Onufriev and other Virginia Tech employees; among other things, Dr. Onufriev withheld a recommendation for Mr. Doe's green card application (Mr. Doe comes from Iran) and subjected Mr. Doe to a hostile educational environment, and it also appeared that Dr. Onufriev had influenced Virginia Tech in pursuing a fabricated student conduct case against him. Third, Virginia Tech dismissed Mr. Doe after a student conduct hearing for which he had less than 24 hours' notice,

1

thereby depriving Mr. Doe of his due process rights. These claims, though separate and arising under Title IX and the Fourteenth Amendment, respectively, are thus interrelated.

Since filing this action, Defendants have at various stages sought to dismiss the claims against them. They succeeded, in part, when this Court granted their Motion to Dismiss certain of Mr. Doe's claims, though they did not succeed with respect to Mr. Doe's Title IX claims related to NIH grant funding and retaliation. Subsequently, however, and in the interests of justice, this Court permitted Mr. Doe to amend his Complaint "to fully address all of [his] allegations against Virginia Tech at one time." ECF No. 79. It does not appear that Defendants objected to this Order. Later, the Court entered an oral order reflecting that the due process claims were now dismissed without prejudice, *see* ECF No. 91, which Mr. Doe construes as clarifying the legal effect of the prior Order (ECF No. 79).

Unsurprisingly, Defendants have once again moved to dismiss Mr. Doe's Complaint, likening themselves to Sisyphus—the figure of Greek mythology sentenced (perhaps deservingly) to endlessly push a boulder up a hill, only to see it roll down again. But while one must imagine Sisyphus happy,[1] the same cannot be said of Mr. Doe, who to this day suffers the consequences of Virginia Tech's discrimination, retaliation, and unfair dismissal. The allegations in Mr. Doe's newly amended Complaint firmly establish, among other things, that Mr. Doe had a property interest in, his continued enrollment at Virginia Tech; Defendants, moreover, provide this Court no reason to disturb its earlier rulings regarding Mr. Doe's Title IX claims or that the process he received prior to dismissal was inadequate. For these reasons, discussed in more detail below, this Court should deny Defendants' Motion to Dismiss and permit Mr. Doe's claims to proceed at last to where they might fully and fairly be litigated: trial before a jury of his peers.

---

[1]       As Albert Camus quipped in his famous essay, <u>The Myth of Sisyphus</u>.

## STATEMENT OF FACTS[2]

In 2013, Mr. Doe enrolled at Virginia Tech to pursue a PhD in physics. ECF No. 86, ¶ 8. In 2015, he began working with Dr. Onufriev as his graduate advisor. Id. at ¶ 9. He planned to pursue a career as a pharmaceutical scientist, and his research focus was disordered proteins. Id. at ¶¶ 11–12. Dr. Onufriev was a well-known molecular biophysicist whose research generated a considerable amount of National Institutes of Health ("NIH") grant funding for Virginia Tech. Id. at ¶ 13. Mr. Doe joined Dr. Onufriev's laboratory at Virginia Tech, the Center for Theoretical and Computation Molecular Biophysics, in pursuit of his PhD. Id. at ¶ 14.

Upon joining Dr. Onufriev's lab, Mr. Doe began suffering severe discrimination by Dr. Onufriev on account of his gender. Id. at ¶ 15. Dr. Onufriev openly favored Mr. Doe's colleague, a female graduate student, in awarding her a grant stipend and refused to pay Mr. Doe, even though Mr. Doe performed the research that supported of the grant, not the other student. Id. at ¶ 20. Mr. Doe asked why the female student received a stipend, and Dr. Onufriev reportedly told Mr. Doe, "who can resist a Persian princess?" in front of Mr. Doe and their lab colleagues. Id. at ¶ 22. Dr. Onufriev's improper interest in female students was apparently an open secret; for instance, at a poster presentation during a conference of the American Chemical Society, a researcher from another school came up to Mr. Doe to talk about his research, only to ask if Dr. Onufriev was still "chasing after" female graduate students. Id. at ¶ 16.

In August 2019, Mr. Doe again discovered he would not receive a research stipend during the 2019-2020 academic year and that the female student in the lab noted above would receive the

---

[2]     In their brief in support of their motion, Defendants assert that they "have apprised Plaintiff of several material misstatements of fact contained in the Third Amended Complaint" and "expect Plaintiff will be correcting those misstatements prior to completion of briefing on Defendants' Motion to Dismiss." ECF No. 94, at 4. At the time of their filing, Defendants had made no such appraisal, although they did email the undersigned counsel on October 11, 2023—the day this Memorandum was due under the Court's Scheduling Order—regarding their concerns. While Mr. Doe has not yet had the opportunity to digest Defendants' concerns, he would note that it is not uncommon—and indeed to be expected—that opposing parties will disagree as to the facts of a matter. In any event, it is axiomatic that, when ruling upon a Rule 12(b)(6) motion, the Court must accept as true all facts pleaded by the plaintiff.

funds instead. Id. at ¶ 25. Dr. Onufriev again remarked that she was a "princess" and said, "You cannot compete with her, you are not at her level." Id. at ¶ 26. Dr. Onufriev gave undue attention to this female student in his lab in other ways: he ignored Mr. Doe's requests to meet for office hours to discuss upcoming publications, including even for simple questions, such as what color Dr. Onufriev wanted to be used in a plot/graph, and he kept Mr. Doe waiting hours for appointments, then not show up at all, while Dr. Onufriev constantly met with the female student at the lab. Id. Mr. Doe also witnessed Dr. Onufriev and this female student kissing in Dr. Onufriev's car, suggesting that Dr. Onufriev and this female student's relationship went beyond that of mere advisor and student. Id.

Mr. Doe brought these concerns to Dr. Onufriev's attention. However, Dr. Onufriev ignored Mr. Doe's concern that he was being denied a fair opportunity to obtain grant funds and opportunities in the lab on account of his gender and did not reply to the email. Id. at ¶ 28. To the contrary, as Dr. Onufriev continued to divert the research assistant funding, he still tried to attach the grant number to Mr. Doe's subsequent research in 2019-2020 reports to the National Institutes of Health, which Mr. Doe refused to permit, because to do so would have misled the National Institutes of Health and constituted grant fraud. Id. Ultimately, Dr. Onufriev never allocated grant funds to Mr. Doe for his research during the academic year. Id. at ¶ 30. The female student could focus on her research and advancing toward her doctoral degree because she received financial assistance from grant funds, whereas Mr. Doe had to take on a teaching position, supervising over 100 students, just to make ends meet, in addition to the long hours required at the lab. Id. This second, full-time job as a teaching assistant—done all while maintaining his research responsibilities—resulted in significant hardship to Mr. Doe, which had a severe impact on his mental health. Id. at 21. While Dr. Onufriev touted the benefits of joining his laboratory as furthering Mr. Doe's education, Dr. Onufriev's preoccupation with a female student prevented Mr.

Doe from receiving such benefits, all because Mr. Doe was male. Id. at 31.

In December 2019, after Mr. Doe's complaints about the research funding were ignored by Dr. Onufriev, Mr. Doe reported Dr. Onufriev's conduct to Dr. Mark Pitt, Chair of the Physics Department at Virginia Tech. Id. at ¶ 32. Rather than undertake an investigation of Mr. Doe's complaint, however, Dr. Pitt shared its details with Dr. Onufriev. Id. at ¶ 33. Dr. Onufriev then began outwardly retaliating against Mr. Doe; he withheld a recommendation for Mr. Doe's green card application and a letter certifying completion of Mr. Doe's Master's degree; assigned excessive, redundant, and contradictory research tasks; set false deadlines to publish papers; and created hostile conditions in the lab in an effort to cause Mr. Doe to voluntarily resign from the program. Id. at ¶ 34. It was also during this time period that the mother of Mr. Doe's neighbor was apparently "warned" about Mr. Doe by Virginia Tech, after which she showed up at Mr. Doe's front door and asked him questions about him knocking on the neighbor's door; subsequently, Radford police officers came to Mr. Doe's door and asked the same sort of questions while also making a racist comment towards him. Id. at 35.

Consequently, Mr. Doe developed a tremendous amount of stress, anxiety, and turmoil, which caused him to seek counseling at the university's counseling center. Id. at ¶ 36–37. However, when Mr. Doe returned to the lab, Dr. Onufriev openly talked about Mr. Doe's parents and other matters than Mr. Doe had only shared in confidence with the university counselor; thus, the only explanation is that it appears that the university's counseling center failed to keep Mr. Doe's treatment confidential. Id. at 38.

It was also during this same time period—around the end of 2019 and the beginning of 2020—that Mr. Doe was falsely accused by another student, whom he had met on a dating app, of having made unwanted sexual advances toward her in September 2019 and November 2019. Id. at ¶ 39. The accuser also made a racist comment towards Mr. Doe, referring to him as a "brown guy

who smelled very bad" (much like the police officer who had questioned Mr. Doe, as discussed above). Id.

Mr. Doe was devastated and shocked by this false accusation. Id. at ¶ 40. He and the other student had met on a dating app and engaged in a consensual relationship. Id. at ¶ 41. Mr. Doe had then seen the student later in the semester at a campus building and had a friendly conversation with her. Id. at ¶ 42. Thus, Mr. Doe denied the allegation that he had assaulted the student in the strongest possible terms. Id. at ¶ 43.

On November 20, 2019, the complaining student met with staff at the Virginia Tech Office of Equity and Accessibility—to whom Dr. Timothy Sands (president at Virginia Tech) had delegated responsibility for adjudicating allegations of student misconduct—and asked that they order Mr. Doe not to contact her. Id. at ¶¶ 44–46. They did so, and she declined to pursue the matter further. Id. at ¶ 46. However, on January 22, 2020, the student changed her mind and contacted the Virginia Tech Office of Equity and Accessibility to pursue a formal complaint. Id. at ¶ 47. Mr. Doe could not comprehend why this other student would make the accusation; the only explanation was that Dr. Onufriev had influenced the university in pursuing the student conduct case, over the student's initial wishes, due to Mr. Doe's complaints within the department about the grant fraud and gender discrimination he experienced. Id. at ¶ 50.

On February 18, 2020, Virginia Tech temporarily suspended Mr. Doe pending a student conduct hearing. Id. at ¶ 49.  These accusations, along with the lab conditions, further caused Mr. Doe's mental health to spiral, and so he met with his counselor and was hospitalized for an extended period of time for mental health treatment. Id. at ¶ 51–52.  He was discharged from the hospital on February 25, 2020. Id. at ¶ 51. Three days later, Ms. Cherry-Clarke from the Virginia Tech Office of Student Conduct advised Mr. Doe that he was being charged with violating the university's Title IX policy, and he met with the investigator to go over the student conduct process. Id. at ¶¶ 53–54.

6

On March 3, 2020, Ms. Cherry-Clarke met with Mr. Doe to discuss the student conduct process. She advised that he had been accused of violating six of the university's policies on intimate partner contact. Id. at ¶ 55. On March 5, 2020, Ms. Cherry-Clarke notified Mr. Doe the university would hold a hearing to adjudicate the charge the next day—giving Mr. Doe less than 24 hours to prepare. Id. at ¶ 56. Mr. Doe, of course, needed more time, as among other things he had learned that the allegations stemmed from allegedly touching the complainant in an elevator at the Graduate Life Center (GLC) and knew of a witness who was present at the GLC, but was not able to arrange for the witness to attend. Id. at ¶¶ 57–61. Nor did Mr. Doe have enough time to review the investigative report that the university had provided him or meet with an advisor or retain counsel to assist at the hearing. Id. at ¶ 62. Mr. Doe was also an international student who spoke English as a second language and had just been discharged from a mental health facility; he could not be expected to meaningfully prepare for a hearing that could end his academic career, and cause him to be deported, with less than 24 hours' notice. Id. at 63. Indeed, no person could reasonably prepare for a student conduct hearing based on allegations as serious as sexual assault in less than 24 hours. Id.

Therefore, Mr. Doe asked for an extension. Id. at ¶ 64.  He said he did not have enough time to prepare and collect all the evidence that he needed. Id. However, Ms. Cherry-Clarke refused, taking the position that less than 24 hours was enough time to prepare. Id. at ¶ 65. In refusing to grant an extension of time, Ms. Cherry-Clarke stated that the Title IX office first notified Mr. Doe of the charge on February 17, 2022, implying that Virginia Tech's Title IX office and its custom and policy of proceeding without delay would not permit her to grant time to prepare. Id. at ¶ 66. However, Ms. Cherry-Clarke's refusal to grant an extension—forcing Mr. Doe to go forward, without witnesses, without the advice and/or presence of an advisor and/or counsel, and with less than 24 hours to prepare—was entirely unreasonable given the severity of the charge and a

7

deprivation of Mr. Doe's rights to due process. Id. at ¶ 67.

On March 6, 2022, the hearing went forward, yet Mr. Doe did not have the benefit of an advisor or counsel, was not permitted to question any of the witnesses, and, due to the lack of adequate notice, was unable to present witnesses of his own. Id. at ¶¶ 68–69. On March 9, 2020, the university's student conduct office found Mr. Doe responsible for sexual assault and dismissed him from the university. Id. at ¶ 70. He appealed, but it was denied. Id. at ¶ 71.

This dismissal caused Mr. Doe to face deportation to his home country of Iran due to the expiration of his student visa. Id. at ¶ 72. Mr. Doe was (and still is) gravely concerned about his physical safety should he ever be deported back to Iran, based on the current state of the country's politics.[3] Id. at ¶ 73. The dismissal also meant that Mr. Doe was unable to complete his PhD or transfer the credits he earned for coursework to another program, thereby depriving him not only of his continued enrollment, but of the benefits of the PhD and course credits he spent seven years earning. Id. at ¶ 74.

## RELEVANT PROCEDURAL HISTORY

Mr. Doe first filed his Complaint in this matter on June 25, 2021; at that time, Mr. Doe had counsel other than the undersigned. See ECF No. 1. Since then, Defendants have moved to dismiss the Complaint a number of times on various grounds, culminating in this Court's Memorandum Opinion and Order which granted Defendants' Motion to Dismiss in part, but denied it in part. See ECF Nos. 59–60. In that that same Opinion and Order, this Court granted Mr. Doe's former counsel permission to withdraw. Id. In the weeks that followed, Mr. Doe, proceeding pro se, urged the Court to reconsider its ruling and provided additional evidence. See ECF No. 79. A status conference was held on June 22, 2023, in which Mr. Doe proceeded pro se. See id. At the conference, Mr. Doe "indicated that his former counsel did not include certain information he

---

[3]        Fortunately, Mr. Doe is not presently at risk of deportation.

deemed pertinent in the original or amended complaint," and thus, "[i]n order to <u>fully address all of Doe's allegations against Virginia Tech</u> at one time, the court determined, in the interest of justice," to permit Mr. Doe to amend his Complaint. <u>Id.</u> (emphasis added). Also at this conference, the Court directed the Clerk to reach out to the undersigned counsel regarding representing Mr. Doe. <u>See id.</u> Shortly thereafter, the undersigned counsel entered their notices of appearance in this matter. <u>See</u> ECF Nos. 81–83.

On August 23, 2023, Mr. Doe, through his new counsel, filed an amended Complaint, which added alleged a number of new and additional facts and reasserted several of the claims dismissed by the Court's prior Opinion and Order (ECF Nos. 59–60). <u>See</u> ECF No. 86. The parties, however, disagreed as to the import of the Order permitting Mr. Doe to amend his Complaint (ECF No. 79). Mr. Doe's position was that the Order permitted Mr. Doe to reassert all of his claims that had been previously dismissed with prejudice, essentially "turning the clock back" on Mr. Doe's claims, while Defendants' position was that the dismissed claims would remain so. For guidance, the parties sought a status conference with this Court, which was held on September 19, 2023. <u>See</u> ECF No. 90. At the status conference, the Court appeared to agree with Mr. Doe's interpretation, and, moreover, entered an oral order amending its prior Opinion and Order (ECF Nos. 59–60) to reflect that Mr. Doe's claims arising under the Fourteenth Amendment would be dismissed without prejudice. <u>See</u> ECF No. 91.

Defendants have now filed a Motion to Dismiss pursuant to Rule 12(b)(6), arguing that this Court lacked the authority to revive any of Mr. Doe's claims that were previously dismissed with prejudice and that Mr. Doe has not stated claims under either the Fourteenth Amendment (due process) or Title IX. <u>See</u> ECF Nos. 93–94. Defendants also filed a Motion to Reconsider Pursuant to Rule 54(b), seeking entry of an Order reconsidering and vacating the Court's Order amended its partial dismissal Order (ECF No. 91), which simply relies on the arguments set forth in Defendants'

Memorandum in Support of Motion to Dismiss. See ECF No. 95.

## STANDARD FOR RULING ON MOTION TO DISMISS

In a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a "court must regard as true all of a plaintiff's well-pleaded allegations . . . as well as any facts that could be proven consistent with those allegations." Jones v. Imaginary Images, Inc., 2012 WL 3257888, *5 (E.D. Va. Aug. 8, 2012). The complaint "need not be supported by evidence but must 'state a claim for relief that is plausible on its face.'" Id. (quoting Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009)). "If the complaint alleges . . . each of the elements of 'some viable legal theory,' the plaintiff should be given the opportunity to prove that claim." Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007)).

A plaintiff need not allege facts in "painstaking detail." Suntrust Mortgage, Inc. v. Sharpe Mortgage Lending Services of Georgia, Inc., 2011 WL 6178221, *3 (E.D. Va. Dec. 12, 2011). Rather, Rule 8(a) requires only a short and plain statement of facts showing that the pleader is entitled to relief. Id. "Determining whether a complaint states a plausible claim for relief is 'a context specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Oakes v. Patterson, 2014 WL 1569427, *2 (W.D. Va. April 17, 2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

## ARGUMENT

The allegations in Mr. Doe's newly amended Complaint firmly establish that Mr. Doe had a property interest in, among other things, his continued enrollment at Virginia Tech. They also (as they did before) establish that Mr. Doe was discriminated against in violation of Title IX and that the process he received prior to dismissal was insufficient, and Defendants have provided no meritorious argument for this Court to alter its earlier rulings regarding these issue. Therefore, this Court should deny Defendants' Motion to Dismiss.

I.      **Plaintiff's Claims Previously Dismissed With Prejudice are Now Properly Before the Court**

On February 23, 2023, this Court entered an Order dismissing with prejudice (1) Mr. Doe's claims for violation of his due process rights against Virginia Tech, Tamara Cherry-Clarke, and Timothy Sands; (2) Mr. Doe's Title IX claim against Dr. Onufriev; and (3) Mr. Doe's Title IX claim based on hostile environment. See ECF No. 60. However, the Court allowed Mr. Doe's Title IX claims based on allegations related to NIH grant funding and retaliation to proceed. See id. In other words, not all of Mr. Doe's claims were adjudicated.

> When an action presents more than one claim for relief—whether as a claim, counterclaim, crossclaim, or third-party claim—or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added). Thus, by its plain terms, the Court was well within its authority to alter its prior rulings, which it did implicitly by the Order entered June 26, 2023 (ECF No. 79) and explicitly by the Order entered September 19, 2023 (ECF No. 91) (collectively the "Reconsideration Orders").[4]

Defendants, however, argue that it was improper to "revive" Mr. Doe's claims because the Fourth Circuit has "cabined" a district court's discretion under Rule 54(b), citing U.S. Tobacco Coop. Inc. v. Big South Wholesale of Va., LLC, 899 F.3d 236 (4th Cir. 2018). According to Defendants, U.S. Tobacco held that such discretion can be exercised by a court only under the same circumstances in which it may depart from the law of the case, i.e., where there has been "(1) a subsequent trial

---

[4]      While the Order entered orally on September 19, 2023, only mentions Mr. Doe's due process claims, the Order entered on June 26, 2023, makes no such distinction. It is Mr. Doe's position that the Reconsideration Orders, taken together, "revived" all claims dismissed with prejudice as a result of the Court's February Order (ECF No. 60).

producing substantially different evidence;  (2) a change in applicable law; or (3) clear error causing manifest injustice." Id. at 257 (cleaned up). Defendants argue that Mr. Doe has not shown any of these circumstances, and thus the Court's Reconsideration Orders were incorrect.[5]

As an initial matter, Fourth Circuit precedents do not support such a narrow, unbending standard for Rule 54(b) discretion. While the Court in U.S. Tobacco focused on these three circumstances,  it did not use the word "only" to describe them. Indeed, in an earlier case cited by the U.S. Tobacco Court, the Fourth Circuit noted: "Law of the case is just that however, it does not and cannot limit the power of a court to reconsider an earlier ruling. The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 515 (4th Cir. 2003) (emphasis added); see also Carlson v. Bos. Sci. Corp., 856 F.3d 320, 325 (4th Cir. 2017) ("Compared to motions to reconsider final judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise interlocutory orders before final judgment as the litigation develops and new facts or arguments come to light." (emphasis added)). While the American Canoe Court held that a district court abused its discretion by not reconsidering a motion involving jurisdictional issues, these Fourth Circuit cases demonstrate that the cornerstone of Rule 54(b) discretion is correctness, not rigid adherence to particular factors. The circumstances of this case, including Mr. Doe's frustrations with prior counsel and the new allegations in his most recently amended Complaint, fully support this Court's Reconsideration Orders.

However, even assuming that the exercise of Rule 54(b) discretion requires one of the three circumstances discussed above, Mr. Doe has met that burden.[6]

---

[5]    As noted above, Defendants have also filed a Motion to Reconsider Pursuant to Rule 54(b) (ECF No. 95). Presumably, Defendants will argue that the Court's Reconsideration Orders constituted "clear error causing manifest injustice," but they have not yet said as much. In any event, as discussed further in this brief, the Court's Reconsideration Orders were well within its discretionary power and thus not erroneous at all.

[6]    Mr. Doe does not argue that there has been a change in applicable law.

First, Mr. Doe's most recently amended Complaint includes new factual allegations, including those which Mr. Doe's prior counsel did not include, i.e., those allegations relating to his personal experiences, and those which Mr. Doe did not know or, as a layman, likely did not know the import of, i.e., those allegations relating to Virginia Tech's policies and procedures. To begin with, it is important to clarify that, contrary to Defendants' assertion, Mr. Doe does allege new facts pertaining to his due process claim, including the following (additions emphasized):

> 63.     Mr. Doe was an international student who spoke English as a second language. He had just been discharged from a mental health facility. He could not be expected to meaningfully prepare for a hearing that could end his academic career, and cause him to be deported, with less than 24 hours' notice; indeed, no person could reasonably prepare for a student conduct hearing based on allegations as serious as sexual assault in less than 24 hours.

> 67.     Ms. Cherry-Clarke's refusal to grant an extension – forcing Mr. Doe to go forward, without witnesses, without the advice and/or presence of an advisor and/or counsel, and with less than 24 hours to prepare – was entirely unreasonable given the severity of the charge and a deprivation of Mr. Doe's rights to due process.

> 68.     On March 6, 2020, the hearing went forward and Mr. Doe appeared without an advisor or counsel to defend himself against the charge.

> 69.     During the hearing, Mr. Doe was not permitted to question any of the witnesses, and, due to the lack of adequate notice, was unable to present witnesses of his own.

> 74.     Furthermore, as a result of Virginia Tech's unequal, gender-based treatment as described above, which ultimately resulted in Mr. Doe's dismissal from the university, Mr. Doe was unable to complete his PhD or transfer the credits he earned for coursework to another program, thereby depriving him of the benefits of the PhD and course credits he spent seven years earning.

> 83.     The Student Code of Conduct outlined procedures to address behavior that is alleged to have violated university policy, referred to as the Student Conduct Process. These procedures included, but are not limited to, a formal hearing, in which a student is entitled to a number of procedural guarantees and opportunities, included but not limited to the right to (a) receive written notice of charges at least five (5) business days in advance of the hearing and in reasonable detail to

13

allow the respondent to prepare for the hearing; (b) present witnesses/witness statements and question any witnesses present; and (c) be accompanied by an advisor.

84.     The Student Code of Conduct further stated that, upon a complaint or conduct referral, "Student Conduct will review the conduct referral to determine if there is information regarding behavior that may violate the Student Code of Conduct and thus warrants resolution within the conduct system" (emphasis added), and lists a number of sanctions that might be imposed during the Student Conduct Process, including but not limited to dismissal.

85.     By providing for the sanction of dismissal solely as an outcome of the Student Conduct Process, Virginia Tech created an agreement and expectation that students, like Mr. Doe, could only be dismissed after a finding is made that a student violated the Student Code of Conduct and in accordance with the procedures of the Student Conduct Process, including but not limited to a formal hearing with procedural guarantees and opportunities provided for by the Student Code of Conduct, including but not limited to the rights identified in paragraph 83, supra.

86.     Based on the terms of Virginia Tech's various policies and customs, including but not limited to Virginia Tech's Student Code of Conduct, it was Mr. Doe's understanding that a student could not be dismissed or otherwise sanctioned by Virginia Tech in the absence of cause following a formal hearing with the procedural guarantees and opportunities provided for by the Student Code of Conduct, including but not limited to the rights identified in paragraph 83, supra.

87.     Furthermore, Virginia Tech regularly and routinely only dismisses students after a finding is made that the student violated the Student Code of Conduct and in accordance with the procedures of the Student Conduct Process, including but not limited to a formal hearing with procedural guarantees and opportunities provided for by the Student Code of Conduct, including but not limited to the rights identified in paragraph 83, supra.

88.     Mr. Doe thus had a protected property interest in his continued education at Virginia Tech, including the various educational and training programs it supports.

89.     Virginia Tech's various policies and customs also established and created in Mr. Doe a reasonable understanding and expectation that he would be entitled to his PhD and each credit hour for his graduate-level courses so long as he put in the attendant amount of work represented in intended learning outcomes.

14

90.     Mr. Doe thus also had a protected property interest in the value of the PhD, which he had all but earned by the time he was unfairly dismissed from Virginia Tech, and the course credits he earned as part of his graduate studies at Virginia Tech.

95.     Ms. Cherry-Clarke, acting both in her official capacity in applying the University's policy to expeditiously process Title IX claims, and in her individual capacity subject to Section 1983, failed to provide adequate due process when she neglected to afford Mr. Doe sufficient time to prepare for the hearing. The speed with which Virginia Tech scheduled the hearing – less than 24 hours – and her refusal to grant a reasonable request for an extension was a denial of Mr. Doe's right to have a meaningful opportunity to prepare and be heard, including by rendering Mr. Doe unable to present witnesses, question any witnesses present, and have an advisor and/or counsel accompany him.

96.     Furthermore, notwithstanding Virginia Tech's official policies as described above, which provided Mr. Doe the reasonable expectation that he could not arbitrarily be removed as a student, provided he continued to pay tuition, met the requirements of his classwork, and abided by the university's conduct system, and Virginia Tech's routine practice of dismissing students only for cause and in accordance with the procedures described above, Virginia Tech has on numerous occasions denied students the full due process rights they are entitled to under the Fourteenth Amendment and the Student Code of Conduct, thereby creating a custom of depriving students of such rights.

97.     As a result of the due process violations herein, Mr. Doe was wrongly disciplined and suffers ongoing harm to his good name and educational progress. He has been deprived of his interest in continued enrollment at Virginia Tech, his PhD, and the course credits he earned as part of his graduate studies at Virginia Tech, which have been rendered valueless because he is unable to transfer such credits to other universities because of Virginia Tech's constitutionally deficient disciplinary proceedings against him and sanctions resulting therefrom.

ECF No. 86, at ¶¶ 63, 67–69, 74, 83–90, 95–97.

To the extent they recognize these new factual allegations, Defendants argue they are insufficient to warrant the exercise of Rule 54(b) discretion because they were available to Mr. Doe previously. However, as noted above, they were either facts that Mr. Doe's prior counsel did not include (despite Mr. Doe believing them to be pertinent) or which Mr. Doe—who is not an attorney—

did not know of or had no reason to recognize the legal import of. Moreover, the Fourth Circuit has never held that new facts alleged under the specific circumstances at issue here are insufficient to justify reconsidering a prior ruling; indeed, as the U.S. Tobacco Court emphasized, the focus on this inquiry is on whether the evidence is "substantially different."

Defendants' other argument—that Mr. Doe's "blamelessness" is immaterial—is equally unpersuasive. Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 396 (1993), did not involve Rule 54(b) nor the broad discretion it affords to district courts. Rather, Pioneer involved holding a client accountable for their counsel's missing of court-ordered deadlines, and it is in that context that the Supreme Court disagreed that "it would be inappropriate to penalize respondents for the omissions of their attorney." Id. at 395–97. The cases cited by the Supreme Court in Pioneer likewise involved similar circumstances. See United States v. Boyle, 469 U.S. 241 (1985) (holding that a client could be penalized for counsel's tardy filing of a tax return); Link v. Wabash R. Co., 370 U.S. 626, 8 L. Ed. 2d 734, 82 S. Ct. 1386 (1962) (holding that a client may be made to suffer the consequence of dismissal of its lawsuit because of its attorney's failure to attend a scheduled pretrial conference). Those circumstances are fundamentally distinguishable from a client whose former counsel failed to allege facts the client deemed pertinent or which Mr. Doe, a layman, could have hypothetically discovered but had no reason to know. The broad discretion district courts have under Rule 54(b) militates against adopting the principles articulated in Pioneer.

Second, for the reasons articulated below and in Mr. Doe's prior memoranda (ECF Nos. 15, 47), this Court's dismissal with prejudice of (1) Mr. Doe's claims for violation of his due process rights against Virginia Tech, Tamara Cherry-Clarke, and Timothy Sands; (2) Mr. Doe's Title IX claim against Dr. Onufriev; and (3) Mr. Doe's Title IX claim based on hostile environment, were clearly erroneous. Although the Court did not rely on this circumstance in entering the Reconsideration Orders, this

16

circumstance provides another, independent basis for the Court to exercise its discretion under Rule 54(b).

For all of these reasons, this Court was well within its discretion Under Rule 54(b) to revise its prior rulings, as it did in the Reconsideration Orders. Therefore, all of the claims asserted in Mr. Doe's Third Amended Complaint are properly before the Court. Defendants' Motion to Dismiss must be denied.

## II.    Plaintiff's Third Amended Complaint States Due Process Claims

Defendants seek to dismiss Mr. Doe's claims arising under 42 U.S.C. § 1983 and the Fourteenth Amendment (procedural due process) on the grounds that (1) Mr. Doe has not alleged a property interest; (2) Mr. Doe received due process; and (3) Defendant Cherry-Clarke has qualified immunity. For the reasons stated below, Defendants' Motion to Dismiss Mr. Doe's claims arising under the Fourteenth Amendment (procedural due process) is without merit and must be denied.[7]

A.   Mr. Doe Has Asserted Valid, Recognized Property Interests

In order to plead a due process claim, the plaintiff must allege facts to show that he was "deprived of life, liberty or property, by government action." Beverati v. Smith, 120 F.3d 500, 502 (4th Cir. 1997). "A protected property interest cannot be created by the Fourteenth Amendment itself, but rather must be created or defined by an independent source." Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 109 (4th Cir. 2011). This property interest must be "more than a mere 'unilateral expectation of it' or 'abstract need or desire for it.'" Id. (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). Thus, Mr. Doe must show that "a state created property interest in continued enrollment at a public education institution exists in Virginia." Davis v. George Mason

---

[7]      Defendants also briefly argue that the official capacity claims are duplicative because "Virginia Tech is already named as a defendant in this case and is the real party in interest for purposes of the official capacity claims." See ECF No. 94, at 14. While Mr. Doe recognizes that an official capacity is claim is essentially a claim against the entity in question, Mr. Doe would note that his 42 U.S.C. § 1983 claims are only against Dr. Sands, in his official capacity, and Ms. Cherry-Clarke, in her official and individual capacities, and thus neither are "duplicative" of a claim against Virginia Tech.

Univ., 395 F. Supp. 2d 331, 336 (E.D. Va. 2005), aff'd per curiam, 193 F. App'x 248 (4th Cir. 2006).

Mr. Doe maintains that his allegations have always shown a property interest in his continued enrollment at Virginia Tech, as articulated in prior memoranda (ECF Nos. 15, 47).[8] However, Mr. Doe's new factual allegations—even excluding those which, according to Defendants' representations, appear to not have been in effect during Mr. Doe's enrollment—cement that he had such a property interest. Moreover, as alleged in his Third Amended Complaint, Mr. Doe also had a property interest in the value of the PhD, which he had all but earned by the time he was unfairly dismissed from Virginia Tech, and the course credits he earned as part of his graduate studies at Virginia Tech. These property interests are sufficient to trigger the procedural due process guarantees of the Fourteenth Amendment.

First, Defendants assert that paragraphs 80, 81, 83, and 84 of Mr. Doe's Third Amended Complaint use language from a policy not in effect at the time of Mr. Doe's enrollment, referencing the 2019-2020 Hokie Handbook.[9] Assuming Defendants' representations are correct, Mr. Doe has nevertheless alleged property interests that are sufficient to trigger the procedural due process guarantees of the Fourteenth Amendment. To begin with, as noted above, Mr. Doe's Third Amended Complaint alleges a significant number of new facts related to his due process claims. Moreover,  while the precise language in paragraphs 80, 81, 83, and 84 does not appear in the 2019-2020 Hokie Handbook, there is substantively similar language, as demonstrated by the table below:

| Allegation | 2019-2020 Hokie Handbook Language |
|---|---|
| Virginia Tech's Student Code of Conduct stated: "When a student accepts admission to Virginia Tech as an undergraduate, graduate, or professional student, they also accept membership in the university community and responsibility for upholding its shared values | "Behaviors that violate the Student Code of Conduct are addressed through the student conduct system." (Page 5)  "These policies include the Student Code of |

---

[8]     Rather than relitigate these issues here, however, Mr. Doe will instead defer to the arguments ably made by Mr. Doe's former counsel.

[9]     Defendants indicate that they attached the 2019-2020 Hokie Handbook as Exhibit B to their Motion to Dismiss, but it does not appear that they did so; however, they did provide a web link to the 2019-2020 Hokie Handbook.

| | |
|---|---|
| and expectations. The Student Code of Conduct outlines policies established by the university that set standards for students' behavior, along with procedures for adjudicating and sanctioning violations of these standards." See ECF No. 86, at ¶ 80. | Conduct, which outlines and defines behavioral expectations for all students and organizations . . . ." (Page 6) |
| The Student Code of Conduct stipulated that the rules and policies set forth governing student discipline applied to all students, including Mr. Doe: "Authority to approve policies and procedures for student discipline, as outlined in the Student Code of Conduct, lies with Virginia Tech's governing body, the Board of Visitors, as authorized under the Code of Virginia. The Vice President for Student Affairs has responsibility for the university conduct system, with direct supervisory oversight of disciplinary matters assumed by the Office of Student Conduct, under the direction of the Director of Student Conduct." See ECF No. 86, at ¶ 81. | "The President of Virginia Tech is ultimately responsible for the discipline of all students at the university. Administrative authority and responsibility for Student Conduct policies and procedures is delegated to the Vice President for Student Affairs. Within Student Affairs, director supervisory jurisdiction of disciplinary matters involving violations of University Policies for Student Life and the Student Code of Conduct is assumed by Student Conduct. The Director for Student Conduct serves as the Chief Student Conduct Officer for the university." (Page 8) |
| The Student Code of Conduct outlined procedures to address behavior that is alleged to have violated university policy, referred to as the Student Conduct Process. These procedures included, but are not limited to, a formal hearing, in which a student is entitled to a number of procedural guarantees and opportunities, included but not limited to the right to (a) receive written notice of charges at least five (5) business days in advance of the hearing and in reasonable detail to allow the respondent to prepare for the hearing; (b) present witnesses/witness statements and question any witnesses present; and (c) be accompanied by an advisor. See ECF No. 86, at ¶ 83. | "In formal conduct hearings, a student or organization is entitled to the following procedural guarantees[, including providing a written statement with sufficient detail to enable the student to prepare for the formal hearing; questioning witnesses; producing witnesses; and be accompanied by an advisor]." (Page 11) |
| The Student Code of Conduct further stated that, upon a complaint or conduct referral, "Student Conduct will review the conduct referral to determine if there is information regarding behavior that may violate the Student Code of Conduct and thus warrants resolution within the conduct system" | "The following student conduct sanctions may be imposed upon a student or student organization for violation of university policy[, including dismissal]." (Pages 31–32) |

19

| (emphasis added), and lists a number of sanctions that might be imposed during the Student Conduct Process, including but not limited to dismissal. <u>See</u> ECF No. 86, at ¶ 84. | |

Substantively, there is little difference between Virginia Tech's policies as alleged in the Complaint and the 2019-2020 Hokie Handbook. Defendants emphasize that language regarding five business days' advance notice prior to a formal hearing is absent from the 2019-2020 Hokie Handbook. However, though that may be true, the 2019-2020 Hokie Handbook makes clear that the written materials provided to a charged student must be sufficient to enable the student to prepare for the formal hearing, contemplating some form of advance notice, creating a "mutual expectation" between Mr. Doe and Virginia Tech that, at the very least, Mr. Doe would not be notified of the hearing without sufficient time to prepare; less than 24 hours is <u>per se</u> insufficient time to prepare, regardless of circumstance.

Second, whether the Court considers the allegations in the Third Amended Complaint or credits the language of the 2019-2020 Hokie Handbook, Mr. Doe has sufficiently alleged property interests sufficient to trigger the procedural due process guarantees of the Fourteenth Amendment. Mr. Doe now alleges that, with precise detail, that Virginia Tech only disciplines students through the student conduct process; that dismissal is a sanction resulting only from the student conduct process; that the student conduct process provides students with a number of procedural guarantees; and that Virginia Tech regularly and routinely only dismisses students after a finding is made that the student violated the Student Code of Conduct. <u>See</u> ECF No. 86, at ¶¶ 85–87.

These allegations place this case squarely within the ambit of <u>Doe v. Alger</u>, 175 F. Supp. 3d 646 (W.D. Va. 2016). There, the Court found that the plaintiff pleaded constitutionally protected property interest based on allegations that the university "substantially limited its ability to suspend, expel or dismiss through its adoption of certain policies and practices . . . [and] that by regularly and

routinely dismissing, suspending, or expelling students only with cause, [the university] created a property interest." Id. at 657 (cleaned up). The Alger Court also credited the plaintiff's allegation that the university "never dismissed, suspended, expelled or separated an undergraduate student for alleged misconduct without proving cause through a fair and impartial process," id. at 657, an allegation that seems difficult to reconcile with the plaintiff's allegation that the university merely "regularly and routinely" dismissed students only with cause.

While this Court has opined that Doe v. Alger was decided on the grounds of the plaintiff's allegation that the university never dismissed a student without cause through a fair and impartial process, the Fourth Circuit has never imposed such a requirement. Rather, the Fourth Circuit has for decades consistently assumed that students have property interests sufficient to trigger due process rights for university hearings. See, e.g., Henson v. Honor Comm. of U. Va., 719 F.2d 69, 73 (4th Cir. 1983) (honor code proceeding); Tigrett v. Rector & Visitors of the Univ. of Va., 290 F.3d 620, 627 (4th Cir. 2002) (university judiciary committee); Doe v. Va. Polytechnic Inst. & State Univ., 77 F.4th 231, 236 (4th Cir. 2023) (student conduct hearing); accord Krasnow v. Virginia Polytechnic Institute & State University, 414 F. Supp. 55, 56 (W.D. Va. 1976) (recognizing that "students enrolled in state supported institutions acquire a contractual right for the period of enrollment to attend, subject to compliance with scholastic and behavioral rules of the institution, and to dismissal for violation thereof, provided the dismissal was not arbitrary or capricious"). The United States Supreme Court, likewise, has made the same assumption. See Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 222-23, 106 S. Ct. 507, 511-12 (1985). Courts outside this circuit, moreover, have explicitly recognized a property interest in the pursuit of a college education. See, e.g., Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 633 (6th Cir. 2005) ("In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions."); Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ., 245 F.3d 1172, 1181 (10th Cir. 2001) (finding that

a student had a property interest in his place at a university's nursing school program); Stoller v. College of Medicine, 562 F. Supp. 403, 412 (M.D. Pa. 1983); aff'd, 727 F.2d 1101 (3rd Cir. 1984) (finding student has constitutionally protected interest in continuing his medical education and holding substantive due process requires that his education not be terminated for "arbitrary or capricious" reasons); Siblerud v. Colo. State Bd. of Agric., 896 F. Supp. 1506, 1513 (D. Colo. 1995) (holding that the plaintiff had a property interest in attending a university); Gagne v. Trs. of Ind. Univ., 692 N.E.2d 489, 493 (Ind. Ct. App. 1998) ("[A] a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property, and a student facing expulsion from a public educational institution is entitled to the protections of due process."). In the absence of any binding precedent on this issue, these authorities persuasively argue for the recognition of a property interest in continued enrollment, especially under the facts as Mr. Doe has alleged them. None of these cases, however, suggest that the lynchpin of finding a property interest ought to be whether the institution has never dismissed a student without cause through a fair and impartial process.

Further, imposing such a requirement would create a striking dilemma for almost every student deprived of due process during a student conduct hearing at a particular institution, creating absurd and harsh results. To illustrate the point, assume that a student is dismissed from a university without the university proving cause through a fair and impartial process (i.e., a due process claim); is able to accurately allege that they have a property interest in continued enrollment because their university has never before dismissed a student without the university proving cause through a fair and impartial process; and then goes on to win their case. It would logically follow that every single other student, from that time forward, would be barred from asserting a claim for a violation of due process, regardless of how egregious the violation was, because the fact that the first plaintiff was dismissed without the university proving cause through a fair and impartial process means that

22

future plaintiffs would not be able to truthfully allege that university has never so dismissed a student. In other words, it would be <u>impossible</u> for any subsequent plaintiff to establish a property interest, despite the first plaintiff's victory. Consequently, in such a world, there could only ever be a single student at a particular university with a property interest in their continued enrollment, giving universities essentially free reign to deprive future students of due process. The absurdity of the result speaks for itself; indeed, Mr. Doe can recall no other legal test that would impose such a "one-and-done" standard for a particular type of claim against a particular defendant.

Defendants also argue that because Virginia Tech's policies are subject to unilateral revision, they cannot create an express or implied contract and thus cannot create a property interest. As an initial matter, Mr. Doe has not alleged that Virginia Tech's policies and procedures are subject to unilateral revision, but presumably Defendants reference the 2019-2020 Hokie Handbook relied upon them elsewhere in their brief. The 2019-2020 Hokie Handbook, however, makes clear that these policies are reviewed annually and, as applicable to student conduct, are subject to a lengthy process involving the Student Affairs Policy Review Committee, the Commission on Student Affairs, University Council, and the Board of Visitors (page 7). Therefore, at the very least, Mr. Doe and Virginia Tech had a mutual expectation as to how the student conduct process would proceed in the 2019-2020 academic year, for that entire academic year. Moreover, in <u>Perry v. Sindermann</u>, 408 U.S. 593, 600 (1972), the plaintiff sufficiently alleged a property interest based on his reliance of a provision "in the college's official Faculty Guide." <u>Id.</u> at 576–78. Notably, the <u>Perry</u> Court did not consider whether the college had a unilateral right to revision of the Faculty Guide.

Finally, Defendants do not address Mr. Doe's allegations that he had a property interest in the value of the PhD, which he had all but earned by the time he was unfairly dismissed from Virginia Tech, and especially the course credits Mr. Doe earned as part of his graduate studies at Virginia Tech. While the Fourth Circuit does not appear to have addressed this precise issue, the

Vermont District Court did so in <u>Merrow v. Goldberg</u>, 672 F. Supp. 766, 771 (D. Vt. 1987), when it readily concluded that such a property interest can form the basis for a due process claim. "We are unable to find a case considering due process protection of a student's college or graduate school credit," the court wrote. <u>Id.</u> "It seems clear, however, that public college and university graduates have protected property interests in their degrees. . . . Since degrees are awarded as the result of accumulated credits, the parties agree that credits should be entitled to protection similar to that afforded degrees."). <u>Id.</u>; <u>accord</u> <u>Dauven v. George Fox Univ.</u>, 2010 U.S. Dist. LEXIS 142066, at *69 (D. Or. Dec. 2, 2010) ("Similarly, a student at a public institution also has a property right to individual credits earned."); <u>Buxton v. Lovell</u>, 559 F. Supp. 979, 993-94 (S.D. Ind. 1983) ("An individual has a 'property' interest in his/her academic degree." (citing cases)). The Fourth Circuit, however, has held that "[a] license issued by the state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment." <u>Richardson v. Eastover</u>, 922 F.2d 1152, 1156 (4th Cir. 1991). A degree awarded by a university, including the credits already awarded in the process of earning that degree, is not meaningfully different. Such a result would also be consistent with <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972), because Mr. Doe clearly had "a legitimate claim of entitlement to" the credits he earned in pursuit of his graduate degree, which have now been effectively rendered worthless.

As in <u>Merrow</u>, Mr. Doe has alleged facts showing "that that his 'understanding of entitlement' to the credits has an objective basis in [Viginia Tech's] 'policies and practices' of general application." <u>Merrow v. Goldberg</u>, 674 F. Supp. 1130, 1133 (D. Vt. 1986); <u>see</u> ECF No. 86 at ¶ 89. Mr. Doe thus had a property interest in his PhD, which Virginia Tech did not award, and at the very least the course credits he had earned in pursuit of his PhD, which due to the nature of his dismissal have been rendered effectively worthless. Defendants do not argue otherwise. Accordingly, it was unlawful for Defendants to deprive Mr. Doe of this property interest without

sufficient due process—and, as discussed further below, Mr. Doe did not in fact receive such process.

Therefore, the Court should find that Mr. Does has asserted one or more property interests sufficient to trigger the due process protections of the Fourteenth Amendment. Defendants' Motion to Dismiss must be denied.

**B.** <u>Assuming Mr. Doe Had a Property Interest, He Did Not Receive Due Process</u>

This Court has twice held that Mr. Doe's allegation that he had less than one day to prepare for the disciplinary hearing is sufficient to establish that he was not afforded due process. <u>See</u> ECF No. 35, at 21–25; ECF No. 59, at 18–19.

Defendants offer two arguments in an effort for the Court to abandon these prior holdings. First, Defendants argue that Mr. Doe does not allege that Defendant Cherry-Clarke knew Mr. Doe was recently hospitalized when she refused to grant Mr. Doe an extension for his hearing. Second, Defendants argue that <u>Doe v. Va. Polytechnic Inst. & State Univ.</u>, 77 F.4th 231 (4th Cir. 2023) undermines the basis for this Court's prior holding. Neither argument, however, has merit.

First, Defendants' contention that Defendant Cherry-Clarke was unaware of Mr. Doe's then-recent hospitalization misses the forest for the trees. It is irrelevant whether she knew or did not know of it, because scheduling a student conduct hearing with less than 24 hours' notice is patently unreasonable and a deprivation of due process <u>regardless of circumstances</u>. Nor is it relevant that Mr. Doe was informed of the investigation on February 17, 2020, and placed on interim suspension pending a student conduct hearing on February 18, 2020. There is a significant difference between being informed of a hearing at some indeterminate time in the future and being told the date of the hearing less than 24 hours in advance. <u>Cf.</u> <u>Jaksa v. Regents of Univ. of Mich.</u>, 597 F. Supp. 1245, 1250 (E.D. Mich. 1984) ("The hearing was held approximately six weeks after plaintiff was advised of the charges against him, and therefore, he had sufficient time to prepare his defense.").

Second, <u>Doe v. Va. Polytechnic Inst. & State Univ.</u>, 77 F.4th 231 (4th Cir. 2023), does not suggest that Mr. Doe received due process under these circumstances. Nor does it undermine the well established principle that the <u>opportunity</u> for a student to be present at a hearing is a fundamental feature of due process. The Fourth Circuit's language—"When the accused student isn't present at the hearing, he 'should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies,'" <u>id.</u> at 237 (quoting <u>Dixon v. Alabama State Board of Education</u>, 294 F.2d 150, 159 (5th Cir. 1961))—does not mean that a university may <u>deprive</u> a student of his or her right to be present. Moreover, it must be noted that in <u>Doe</u>, the plaintiff received one week's notice prior to his disciplinary hearing. <u>See id.</u> at 234. Accordingly, <u>Doe</u> has no bearing on this Court's prior determination that Mr. Doe did not receive due process.

Therefore, the Court should find—as it did before—that Mr. Doe did not receive due process for the proceedings that resulted in his dismissal from Virginia Tech. Defendants' Motion to Dismiss must be denied.

C.  <u>Qualified Immunity</u>

In <u>Sheppard v. Visitors of Va. State Univ.</u>, 993 F.3d 230 (4th Cir. 2021), the Fourth Circuit held that "there was no clearly established right to continued enrollment in higher education." <u>Id.</u> at 240. While Mr. Doe disagrees with the Fourth Circuit's holding in <u>Sheppard</u>, he recognizes that this Court is bound by it.[10] The holding of <u>Sheppard</u>, however, does not comment on whether it was clearly established that Mr. Doe had a property interest in the value of the PhD, which he had all but earned by the time he was unfairly dismissed from Virginia Tech or the course credits Mr. Doe earned as part of his graduate studies at Virginia Tech. Defendants, moreover, do not appear to address this allegation in their Motion to Dismiss with respect to qualified immunity.

---

[10]    <u>Sheppard</u>, of course, did not pass on whether the insufficiency of the process Mr. Doe received in this matter was clearly established. For the reasons stated in Mr. Doe's prior brief (ECF No. 47), it was clearly established at the time of the hearing that a student accused of misconduct was entitled to more time to prepare than Mr. Doe received.

This property interest was clearly established at the time Mr. Doe was unfairly dismissed from Virginia Tech. The Fourth Circuit has held that "[a] license issued by the state which can be suspended or revoked only upon a showing of cause creates a property interest protected by the Fourteenth Amendment." Richardson v. Eastover, 922 F.2d 1152, 1156 (4th Cir. 1991). A degree awarded by a university, including the credits already awarded in the process of earning that degree, is not meaningfully different. Further, under the standard articulated in Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972), Mr. Doe clearly had "a legitimate claim of entitlement to" the credits he earned in pursuit of his graduate degree, which have now been effectively rendered worthless. Defendant Cherry-Clarke should have recognized Mr. Doe had a property interest in his PhD—which had essentially been earned at the time he was dismissed—and the credits he had most certainly already earned; that dismissing Mr. Doe would constructively deprive him of such property interest; and that the process he received was inadequate under the Fourteenth Amendment.

Therefore, the Court should find that Defendant Cherry-Clarke is not entitled to qualified immunity. Defendants' Motion to Dismiss must be denied.

## III.     Plaintiff's Third Amended Complaint States Claims Under Title IX

Title IX prohibits federally-supported educational institutions from discrimination on the basis of sex. See 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal Financial assistance."). Title IX is enforceable through an implied private right of action. See Cannon v. Univ. of Chicago, 441 U.S. 677 (1979).

In its letter opinion dated February 23, 2023, this Court rejected Defendants' Motion to Dismiss with respect to the timeliness of his Title IX claims and the sufficiency of his allegations based on withholding of grant funds and retaliation, but granted it with respect to the sufficiency of his allegations based on hostile environment. See ECF No. 59, at 22–30. Defendants offer no

27

reason to disturb this Court's prior rulings with respect to the timeliness of Mr. Doe's Title IX claims and the sufficiency of his allegations based on withholding of grant funds and retaliation. All of the allegations that this Court found sufficient on February 23, 2023, were repleaded in Mr. Doe's Third Amended Complaint. Indeed, they were only bolstered by new allegations, such as those discussed infra. Therefore, for the reasons stated in this Court's Memorandum Opinion (ECF No. 59), Defendants' Motion to Dismiss on these grounds must be denied.

This Court, however, should reconsider its ruling regarding Mr. Doe's hostile environment claim under Title IX. "[T]o succeed on a Title IX claim premised on sexual harassment, a plaintiff must satisfy four elements . . . Those elements are: (1) that the educational institution receives federal funds; (2) that the plaintiff "was subjected to harassment based on her sex"; (3) that "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity"; and (4) that "there is a basis for imputing liability to the institution." Feminist Majority Found. v. Hurley, 911 F.3d 674, 686 (4th Cir. 2018) (quoting Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc)).

While this Court previously found Mr. Doe's allegations lacking, Mr. Doe has now alleged additional facts, including the following:

> 21.    As a result of not receiving research assistance, Mr. Doe had to take on a second, full-time job as a teaching assistant, which meant handling and teaching physics to a class of approximately 120 students each semester—which resulted in a series of humiliating and stressful interactions, including being mocked by a student for his English speaking ability on social media, a student attempting to punch him, and another student threatening to sue him over a grade, all under Virginia Tech's watch—and working 9:00 a.m. to 5:00 p.m. each day teaching, all while maintaining his research responsibilities, for which he had to stay up until midnight each night. All of these burdens had a severe impact on Mr. Doe's mental health.

> 34.    Dr. Onufriev then began outwardly retaliating against Mr. Doe. He withheld a recommendation for his green card application and a letter certifying completion of Mr. Doe's Master's degree. He also

assigned excessive, redundant, and contradictory research tasks; set false deadlines to publish papers; and created hostile conditions in the lab in an effort to cause Mr. Doe to voluntarily resign from the program.

35.     Furthermore, during this time period, the mother of Mr. Doe's neighbor showed up at Mr. Doe's front door, asked Mr. Doe questions regarding his knocking on said neighbor's door, and mentioned that Virginia Tech had "warned" her about Mr. Doe. Shortly thereafter, Radford police officers came to Mr. Doe's residence, asked the same sort of questions, and made a racist comment to him.

See ECF No. 86, at ¶¶ 21, 34–35.

While these new alleged facts are certainly relevant with respect to Virginia Tech's retaliation against Mr. Doe, they also establish that his educational environment became hostile. Indeed, for an immigrant from Iran such as Mr. Doe, withholding a recommendation for a green card application does not amount to a mere violation of a "general civility code," Jennings v. Univ. of N.C., 482 F.3d 686, 696 (4th Cir. 2007) (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)), nor does being badmouthed. Likewise, that Mr. Doe had to take a very demanding teaching assistant job in addition to his research responsibilities in order to support himself—necessitated by the withholding of grant funds as a result of sex discrimination—would be found by a reasonable person to be sufficiently hostile or abusive. See id. at 696; Towers v. State Univ. of N.Y., No. CV-04-5243 (FB) (RML), 2007 U.S. Dist. LEXIS 37373, at *10 (E.D.N.Y. May 21, 2007) (holding that a plaintiff "stated a Title VII claim under a hostile work environment theory for the unreasonable workload she was assigned").

Therefore, Mr. Doe has stated claims against Virginia Tech under Title IX. Defendants' Motion to Dismiss must be denied.

## CONCLUSION

For all of the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

John Doe

By:      /s/ Daniel J. Martin
              Of Counsel

John P. Fishwick, Jr., Esquire (VSB #23285)
John.Fishwick@fishwickandassociates.com
Carrol M. Ching, Esquire (VSB # 68031)
Carrol.Ching@fishwickandassociates.com
Daniel J. Martin, Esquire (VSB #92387)
Daniel.Martin@fishwickandassociates.com
Fishwick & Associates PLC
30 Franklin Road SW, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 Telephone
(540) 345-5789 Facsimile
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2023, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By:      /s/ Daniel J. Martin
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road SW, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 Telephone
(540) 345-5789 Facsimile
Daniel.Martin@fishwickandassociates.com