IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JOHN DOE,           ) | |
|           ) | |
|    Plaintiff,    ) | |
|           ) | Case No. 7:21-cv-378 |
| v.           ) | |
|           ) | By:    Michael F. Urbanski |
| VIRGINIA POLYTECHNIC INST. &  ) | Chief United States District Judge |
| STATE UNIV., et al.,     ) | |
|           ) | |
|    Defendants.    ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on defendants' motion to dismiss plaintiff John Doe's Third Amended Complaint for failure to state a claim. ECF No. 93. Doe filed a response to the motion, ECF No. 98, defendants replied, ECF No. 101, and the court heard argument on January 16, 2024. For the reasons stated below, the court **DENIES** defendants' motion to dismiss as to the Due Process claim. In addition, the court **GRANTS in part and DENIES in part** the motion with respect to the Title IX claim. The Title IX claim based on hostile environment is **DISMISSED with prejudice**, but Doe may proceed on his Title IX claims based on his allegations related to retaliation and 2019–2020 grant funding.

## I. BACKGROUND

### A. Factual Allegations

The following facts are taken from Doe's Third Amended Complaint, ECF No. 86, accepted as true and construed in the light most favorable to Doe for the purposes of the motion to dismiss. <u>See</u> <u>Wikimedia Found. v. Nat'l Sec. Agency</u>, 857 F.3d 193, 208 (4th Cir. 2017).

### 1.   2019–2020 Grant Funds

Plaintiff John Doe, a male Iranian citizen, was a graduate student at Virginia Polytechnic Institute and State University (Virginia Tech) pursuing a doctoral degree in physics. Third Am. Compl., ECF No. 86 ¶ 8. Beginning in 2015, Dr. Alexey Onufriev was Doe's graduate advisor. Id. ¶ 9. Onufriev is a molecular biophysicist, and Doe joined Onufriev's laboratory at the Virginia Tech Center for Theoretical and Computation Molecular Biophysics as he pursued his doctoral degree. Id. ¶¶ 13–14.

Doe alleges that after he joined the lab, and continuing through the 2019–2020 academic year, Onufriev discriminated against him based on his sex. Id. ¶ 15. At an academic conference, a researcher from another school approached Doe and asked if Onufriev was still "chasing after" female graduate students. Id. ¶ 16. At another conference, Onufriev told Doe—through another graduate student—that they needed to go see a "good poster." Id. ¶ 17. However, when Doe and the other student visited the booth to see the "good poster," they discovered it was not related to their research and the other student explained that "good poster" was code that Onufriev used to describe an attractive female presenter. Id.

In the 2019–2020 academic year, Onufriev received a sizeable grant from the National Institutes of Health (NIH) based on research that Doe had performed in the lab. Id. ¶ 18. Typically, a graduate student receives a research stipend from a grant in recognition of the work that resulted in the grant award. Id. ¶ 19. However, Onufriev did not pay Doe funds from the grant money for his work and instead provided a fellow female graduate student with a $40,000 research assistant stipend, even though she was not involved with the work that resulted in the grant. Id. ¶ 20. Without these funds, Doe had to take a full-time job as a teaching

assistant in addition to the research work he was doing. Id. ¶ 21. This additional burden severely impacted Doe's mental health. Id.

Doe protested Onufriev's decision to provide the female student with the grant money, given that her work did not support the efforts to obtain the grant and because it would be "fraudulent and misleading" to report to the NIH that Doe's work was grant-funded. Id. ¶ 22. In response, Onufriev "remarked about Mr. Doe's ethnicity" and, referring to the female student, said, "[W]ho can resist a Persian princess?" Id. In March 2019, Doe emailed Onufriev, stating, "All I want is equality between students without respect to gender, race, ethnic[ity] . . . Something that unfortunately, I don't see it [sic] in our group." Id. ¶ 23. Onufriev did not reply to the email. Id. ¶ 28.

In August 2019, Doe discovered, once again, that he would not receive the NIH research stipend for work he was performing, but that the female student would be receiving the funds instead. Id. ¶ 25.[1] Onufriev again called the female student a "princess" and said to Doe, "You cannot compete with her, you are not at her level." Id. ¶ 26. In addition, Onufriev ignored Doe's requests to meet for office hours to discuss his upcoming publications, and failed to keep scheduled appointments. Meanwhile, Doe observed Onufriev "constantly" meeting with the female student at the lab and witnessed them kissing in Onufriev's car. Id. ¶ 26. Doe submitted complaints regarding his suspicion that the female student—with

---

[1] In his first amended complaint, Doe alleged that he did not receive research funds for the 2018–2019 academic year and alleged Title IX discrimination based on those facts. First Am. Compl., ECF No. 21 ¶ 23. The court dismissed the claim as time-barred. Order, ECF No. 36. The Third Amended Complaint references the 2019–2020 academic year. Third Am. Compl., ECF No. 86, ¶¶ 20, 25.

Onufriev's either explicit or implicit sign off—was using other students' research as her own in pursuit of her degree, but those complaints were ignored. Id. ¶ 27.

Even though Onufriev did not give Doe any funds from the research grant, he tried to attach the grant number to Doe's 2019–2020 research reports to the NIH. Id. ¶ 28. Doe did not allow him to do that because he believed that doing so would have been misleading and would constitute grant fraud. Id. Despite Doe's protests, Doe discovered that Onufriev published Doe's paper with a grant number on it and without Doe's permission. Id. ¶ 29. Onufriev used "unknown@vt.com" as Doe's email address on the publication to conceal it from Doe. Id.

As a result of Onufriev's decision to provide the female colleague the NIH funds that had resulted from Doe's research, Doe's educational experience deteriorated as he was forced to take on a separate, full-time teaching assistant position, while the female student could focus on her research and her doctoral degree with the benefit of financial assistance. Id. ¶¶ 30, 31.

### 2.    Alleged Retaliation

In December 2019, Doe reported Onufriev's conduct to Dr. Mark Pitt, Chair of the Physics Department at Virginia Tech. Id. ¶ 32. Pitt shared the details of Doe's complaint with Onufriev, who began retaliating against Doe by withholding a recommendation for his green card application and a letter certifying the completion of Doe's master's degree, assigning excessive, redundant, and contradictory research tasks, setting false deadlines to publish papers, and creating a hostile condition in the lab in an effort to cause Doe to voluntarily resign from the program. Id. ¶¶ 33, 34.

In addition, during this same period, the mother of Doe's neighbor went to Doe's

house, asked Doe questions about why Doe had knocked on her daughter's door, and told Doe that Virginia Tech had "warned" her about Doe. Id. ¶ 35. Doe alleges that, shortly thereafter, Radford police officers came to his residence, "asked the same sort of questions, and made a racist comment to him." Id. ¶ 35.

In late 2019 and early 2020, Doe developed stress and anxiety as a result of his treatment by Onufriev and sought counseling at Virginia Tech's counseling center. Id. ¶¶ 36–37. However, Doe alleges that the counseling center shared his treatment information with Onufriev, who then talked openly about Doe's parents and other matters that Doe had shared only with the university counselor. Id. ¶ 38.

### 3.    Sexual Assault Investigation and Hearing

Around this same time, a female student accused Doe of making unwanted sexual advances towards her in September and November 2019. Id. ¶ 39. Doe, who was "devastated and shocked" by the allegations, asserted that he met the student on a dating app and had a consensual relationship with her. Id. ¶¶ 40–41. He had later seen her on campus and had a friendly conversation with her. Id. ¶ 42. Doe alleges that the student at some point also made a racist comment towards Doe, calling him a "brown guy who smelled very bad." Id. ¶ 39. He denied having assaulted her. Id. ¶ 43.

On November 20, 2019, the student met with staff at the Virginia Tech Office of Equity and Accessibility (VTOEA) and asked that they order Doe not to contact her. Doe was told not to contact the student and she did not pursue the matter further at that time. Id. ¶ 46. However, on January 22, 2020, the student contacted the VTOEA to pursue a formal complaint. Id. ¶ 47.

On February 17, 2020, an investigator with the VTOEA informed Doe that he was under investigation for sexual assault, and the next day placed Doe on an interim suspension pending a student conduct hearing. Id. ¶¶ 48–49. Doe alleges that he "could not comprehend why this other student would make the accusation," and that the "only explanation" was that Onufriev "influenced the university in pursuing the student conduct case, over the [female] student's initial wishes, due to Mr. Doe's complaints within the department about [the] NIH grant fraud and the gender discrimination he experienced." Id. ¶ 50. Subsequently, Doe returned to Virginia Tech's counseling center and was admitted to a local hospital to receive mental health treatment. Id. ¶ 51. Doe was released from the hospital on February 25, 2020. Id. ¶ 52.

Three days later, on February 28, 2020, Doe met with the investigator to go over the student conduct process. Id. ¶ 53. That same day, defendant Tamara Cherry-Clarke, Assistant Director of Student Conduct at Virginia Tech, sent Doe a letter formally charging him with sexual assault and instructing him to meet with her to discuss the process. Id. ¶ 54. On March 3, 2020, Cherry-Clarke met with Doe to discuss the student conduct process and advised him that he had been accused of violating six Virginia Tech policies on intimate partner contact. Id. ¶ 55.

On March 5, 2020, Cherry-Clarke told Doe that his hearing would take place the next day, on March 6, 2020. Id. ¶ 56. At some point on March 5, 2020, Doe emailed Cherry-Clarke, advising her that he did not have enough time to prepare and collect the evidence he needed to defend himself, and requested a continuance of the hearing. Id. ¶ 64. Specifically, Doe had learned that the sexual assault allegations stemmed from an incident with the female student

in an elevator at the Graduate Life Center (GLC), and Doe knew of a witness who was present at the GLC on the day the alleged incident occurred. Id. ¶¶ 58–59. Doe needed additional time to contact the witness to attend the hearing. Id. ¶ 60. Doe also needed more time to review the investigative report that Virginia Tech provided him, to meet with an advisor or retain counsel to assist him at the hearing. Id. ¶ 62. Cherry-Clarke denied Doe's request for a continuance of the hearing, informing him that he had enough time to prepare and that he was first notified of the charge on February 17, 2022. Id. ¶¶ 65, 66.

On March 6, 2020, Doe's student conduct hearing was held, and Doe appeared without counsel or an advisor to defend himself. Id. ¶ 68. During the hearing, Doe alleges that he was not permitted to question any of the witnesses and, due to the lack of adequate notice, was unable to present witnesses of his own. Id. ¶ 69.

On March 9, 2020, Virginia Tech found Doe responsible for sexual assault and dismissed him from the university. Id. ¶ 70. Doe appealed the decision to the Dean of Student Affairs, and the appeal was denied. Id. ¶ 71. As a result of his dismissal, Doe faced deportation to Iran due to the expiration of his student visa. Id. ¶¶ 72, 73.[2] Doe has also been unable to complete his Ph.D. or transfer the credits he earned to another program. Id. ¶ 74.

---

[2] Apparently, Doe is not presently at risk of deportation. See Pl's Mem. Opp'n to Defs.' Mot. to Dismiss, ECF No. 98, at 8 n.3.

**B.  Procedural History**

Doe filed his first lawsuit based on the facts in this case on November 25, 2020. <u>Doe v. Virginia Polytechnic Inst. & State Univ.</u>, No. 7:20-cv-711 (W.D. Va. filed Nov. 25, 2020). Judge Cullen dismissed that action without prejudice on May 27, 2021, for failure to timely serve defendants. On June 25, 2021, Doe filed the instant suit. ECF No. 1. On December 20, 2021, the court dismissed Doe's lawsuit on various grounds, but granted him leave to amend his complaint. Order, ECF No. 20. On January 3, 2022, he filed his first amended complaint. ECF No. 21. Following a motion to dismiss filed by defendants, the court dismissed with prejudice two of Doe's claims and dismissed without prejudice four remaining claims. Order, ECF No. 36; Mem. Op., ECF No. 35 (dismissing with prejudice the Title IX claim as to the 2018–2019 academic year as time-barred and the due process claim based on his loss of a property interest). The court granted Doe leave to file a second amended complaint on any of the claims that were dismissed without prejudice. <u>Id.</u>

On August 26, 2022, Doe filed a second amended complaint, ECF No. 37, and defendants moved to dismiss, ECF Nos. 38, 41. On February 22, 2023, the court dismissed Doe's due process claim, Title IX claim against Alexey Onufriev, and Title IX hostile environment claim with prejudice. Mem. Op., ECF No. 59; Order, ECF No. 60. The court also granted the motion to withdraw filed by Doe's attorney, Rob Dean, and directed Doe to provide the court with the name of his new counsel within 14 days. ECF No. 60. In the months following the court's order, Doe did not provide the court with the name of his new counsel, but instead submitted several <u>pro</u> <u>se</u> filings regarding the case. ECF Nos. 68, 70, 71, 72. In response, the court held a status conference on June 22, 2023, during which Doe expressed

his concern that his former counsel did not include pertinent information in the prior complaints. ECF No. 79. The court decided, in the interest of justice, to allow Doe to file a third amended complaint that contained the excluded facts with the benefit of new counsel. ECF No. 79.

Doe's new counsel appeared in this action on July 10, 2023, and a third amended complaint was filed on August 23, 2023, ECF No. 86. He asserts two causes of action: (1) against defendant Timothy Sands, as president of Virginia Tech in his official capacity, and defendant Tamara Cherry-Clarke, in both her official capacity as Assistant Director of Student Conduct at Virginia Tech and in her individual capacity, for violating the Due Process Clause of the Fourteenth Amendment to the Constitution (Count One), and (2) against Virginia Tech for violating Title IX, 20 U.S.C. § 1681 et seq.(Count Two).

On September 19, 2023, at the parties' request, the court held a status conference to clarify the court's decision to grant Doe leave to file a third amended complaint on claims that it had previously dismissed with prejudice. The court, by oral order, amended its partial dismissal order to provide that—given the change in counsel and Doe's concern that his former counsel omitted materials facts—the due process claims are dismissed without prejudice and Doe was granted leave to file a third amended complaint. ECF No. 91.

Defendants subsequently filed a motion for the court to reconsider that oral order, ECF No. 95, and a motion to dismiss the third amended complaint for failure to state a claim, ECF No. 93. The court held a hearing on the motions on January 16, 2024. Following the hearing, the court issued an order denying defendants' motion to reconsider and granting in part defendants' motion to dismiss as to the due process claim against defendant Tamara

9

Cherry-Clarke in her individual capacity, pursuant to the doctrine of qualified immunity. Order, ECF No. 108. The court informed the parties that it would address the remaining issues raised in defendants' motion to dismiss in a separate memorandum opinion and order, which the court turns to now.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); see also Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a 'complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.'") (quoting Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (emphasis omitted)).

A court must consider all well-pleaded allegations in a complaint as true and construe them in the light most favorable to the plaintiff. Wikimedia Found. v. Nat'l Sec. Agency, 857 F.3d 193, 208 (4th Cir. 2017). Nevertheless, a court is not required to accept as true "a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986);

conclusory allegations devoid of any reference to actual events, United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979); or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001)). "'Thus, 'in reviewing a motion to dismiss an action pursuant to Rule 12(b)(6), a court must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level.'" Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009) (quoting Andrew v. Clark, 561 F.3d 261, 266 (4th Cir. 2009) (alterations omitted)).

## III. DISCUSSION

### A. Due Process

Defendants argue that Count One—a procedural due process claim against Sands and Cherry-Clarke in their official capacities—fails to state a claim for relief because (1) Doe does not have a property interest in his continued enrollment at Virginia Tech, and (2) even if Doe alleges such a property interest, Doe received due process. Defendants separately argue that, should the due process claim survive, Sands and Cherry-Clarke should be dismissed from the action because Virginia Tech is already a named defendant.

To succeed on a procedural due process claim, a plaintiff must show (1) that "he had a constitutionally cognizable life, liberty, or property interest;" (2) that the "deprivation of that interest was caused by some form of state action;" and (3) that the "procedures employed were constitutionally inadequate." Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013) (internal citations and quotations omitted). Here, defendants contend that Doe has again

failed to allege facts sufficient to establish a protected property interest in his continued enrollment at Virginia Tech, and even if he did establish a property interest, he did not show that the procedures employed were constitutionally inadequate.[3]

### i. Property Interest

Defendants assert that Doe has failed to allege a property interest because (1) the allegations regarding sections of Virginia Tech's Code of Conduct (the "Code") in the Third Amended Complaint are from a version that was not in effect during the academic year of Doe's expulsion, and (2) in any event, Doe's references to the Code are insufficient to establish a property interest. Doe argues that, even if the court looks only to the portions of the Code version in effect during Doe's enrollment, he has stated a claim for a property interest both in his continued enrollment at Virginia Tech and in the value of the Ph.D. and the course credits he earned as part of his graduate studies. Accordingly, for the third time in this case, this court must assess whether Doe has alleged facts sufficient to establish that he has a property interest in his continued enrollment at Virginia Tech.

It is well-settled that property interests are not created by the Fourteenth Amendment itself. Instead, a protected property interest arises in a government benefit when an individual has a "legitimate claim of entitlement to it." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."); see also Tri Cnty. Paving, Inc. v. Ashe Cnty.,

---

[3] Defendants do not dispute that Doe's pleading satisfies the second element, that the deprivation of his property interest was caused by some form of state action.

281 F.3d 430, 436 (4th Cir. 2002) ("A mere 'abstract need or desire for it' or 'a unilateral expectation of it' is insufficient." (quoting <u>Bd. of Regents</u>, 408 U.S. at 577)). The claim of entitlement is created and defined by "existing rules or understandings that stem from an independent source such as state law;" in other words, they are created by "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." <u>Bd. of Regents</u>, 408 U.S. at 577.

Accordingly, courts have held that the "independent source" can be "a statute, a regulation, an express or implied contract, or a mutually explicit understanding." <u>Barnes v. Zaccari</u>, 669 F.3d 1295, 1303 (11th Cir. 2012) (internal citations omitted); <u>Logan v. Zimmerman Brush Co.</u>, 455 U.S. 422, 430 (1982) ("The hallmark of property, the [Supreme] Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"). "Regardless of whether a property interest is created by statute, ordinance, or express or implied contract, 'the sufficiency of the claim of entitlement must be decided by reference to state law.'" <u>Doe v. Alger</u>, 228 F. Supp. 3d 713, 726 (W.D. Va. 2016) (quoting <u>Bishop v. Wood</u>, 426 U.S. 341, 344 (1976)).

What is not well-settled, however, is whether a student attending a public university has a property interest in continued enrollment at that university. Inconsistency across jurisdictions seems to stem from the Supreme Court's reluctance to explicitly recognize such an interest; instead, in certain instances, the Court assumes without deciding that the interest exists in order to assess whether a violation occurred. <u>See</u> <u>Bd. of Curators of Univ. of Missouri v. Horowitz</u>, 435 U.S. 78, 84–85 (1978) ("Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth

Amendment requires."); <u>Regents of the Univ. of Mich. v. Ewing</u>, 474 U.S. 214, 223 (1985) ("assum[ing] the existence of a constitutionally protectible property right in [respondent's] continued enrollment").[4]

The Fourth Circuit has followed this approach. <u>See, e.g.</u>, <u>Sheppard v. Visitors of Va. State Univ.</u>, 993 F.3d 230, 239 (4th Cir. 2021) (explaining that the Fourth Circuit has "followed the same watchful approach" as the Supreme Court in assuming, without deciding, the property interest); <u>Butler v. Rector & Bd. of Visitors of Coll. of William and Mary</u>, 121 F. App'x. 515, 518 (4th Cir. 2005) (assuming for purposes of appeal that Butler had a property interest in continued enrollment in a university program); <u>Tigrett v. Rector & Visitors of Univ. of Va.</u>, 290 F.3d 620, 627 (4th Cir. 2002) ("Assuming the Appellants possessed some constitutionally protected interest in continued enrollment, they were not deprived of such an interest by the actions of the [university disciplinary committee].").

It did so as recently as August 2023, when it "assume[d] (without deciding)" that the plaintiff had a cognizable liberty or property interest in his continuing education, so that it could review (and affirm) the district court's ruling regarding sufficiency of process. <u>Doe v. Virginia Polytechnic Inst. & State Univ.</u>, 77 F.4th 231, 236 (4th Cir. 2023), <u>aff'g</u> No. 7:19-cv-249, 2020 WL 1309461, at *1 (W.D. Va. Mar. 19, 2020) (Dillon, J.). There, the Fourth Circuit explicitly noted that it has "long followed this approach in cases involving due-process claims brought by university students." <u>Id.</u> at 236 n.5 (citing <u>Sheppard</u>, 993 F.3d at 239); <u>see also</u> <u>Doe v. The Citadel</u>, No. 22-1843, 2023 WL 3944370, at *2 (4th Cir. June 12, 2023)

---

[4] The Supreme Court recognized a student's property interest in public secondary education in <u>Goss v. Lopez</u>, 419 U.S. 565 (1975), but has not extended that interest to university or graduate education.

(acknowledging that "[b]oth the Supreme Court and this Court have assumed without deciding that university students possess a 'constitutionally protectible property right in their continued enrollment' at a university," before proceeding to assess the sufficiency of process).

Accordingly, given the "dearth of binding case law" on this issue, Hunger v. Lassner, No. 12-00549, 2014 WL 12599630, at *9 (D. Haw. Apr. 30, 2014), and because the court concludes below that Doe has sufficiently alleged that he received inadequate process, it looks to the jurisprudence of other circuits, along with district court cases within this circuit, to assess whether Doe has stated a property interest in his continued enrollment at Virginia Tech. See Doe v. Alger, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) ("[T]his court cannot take [the Fourth Circuit's assuming-without-deciding] approach because it finds that Doe has alleged sufficient facts to state that the process he received was inadequate. Thus, the court may not simply assume, but instead must decide, whether the amended complaint sufficiently alleges a property or liberty interest (or both).").

The court's review of out-of-circuit caselaw reveals that the Fifth and Eighth Circuits also have adopted the assuming-without-deciding approach. See, e.g., Richmond v. Fowlkes, 228 F.3d 854, 857 (8th Cir. 2000) ("Assuming, without deciding, the existence of a property or liberty interest, we conclude that Richmond received all the process that he was due."); Ekmark v. Matthews, 524 F. App'x 62, 63 (5th Cir. 2013) ("Even assuming arguendo Ekmark had any property interest in continuing his residency and achieving certification, he received all the process to which he was entitled under the Fourteenth Amendment.").

Other circuits, however, have affirmatively recognized the interest, most commonly by grounding it in an "underlying state created interest," as required by the Supreme Court's

instruction that a property interest derive from an "independent source." See Davis v. George

Mason Univ., 395 F. Supp. 2d 331, 336 (E.D. Va. 2005) (listing cases), aff'd per curiam, 193

F. App'x 248 (4th Cir. 2006); see also Goss v. Lopez, 419 U.S. 565 (1975) (recognizing a

property interest in public high school education by pointing to two Ohio state statutes that

conferred the entitlement).

In Harris v. Blake, for example, the Tenth Circuit explained that Colorado's statute

providing that public colleges "shall be open . . . to all [state residents]" created a claim of

entitlement to an education in its state college system, and that the payment of tuition secured

that entitlement. 798 F.2d 419, 422 (10th Cir. 1986). Accordingly, the court held that a graduate

student who had paid tuition for a program had a property interest in his enrollment, entitling

him to procedural due process. Id.

Similarly, in Barnes v. Zaccari, the Eleventh Circuit founded its conclusion that a

property right exists for students at public universities and colleges in Georgia in the state

constitution. 669 F.3d 1295, 1304 (11th Cir. 2012). There, the Barnes court reasoned that the

Georgia Constitution places control of the University System of Georgia with the Board of

Regents, who then, under that authority, promulgated a policy manual. The policy manual

vests authority to make the rules and regulations governing student disciplinary actions to the

individual universities. Id. In turn, Valdosta State University (VSU), the public institution at

issue, promulgated its code. Id. A provision in that code "promises VSU students they will not

face disciplinary sanctions until they are found responsible for violating the Code." Id.

Accordingly, VSU's code "constitute[s] [an] official regulation of the State of Georgia," and,

"[u]ntil a student violates it, that student has a legitimate claim of entitlement to continued enrollment at VSU under Georgia law." Id. at 1304–05.

In Branum v. Clark, the Second Circuit concluded that students at public New York universities and colleges have a property interest in their enrollment through implied contract under New York state law. 927 F.2d 698, 705 (2d Cir. 1991). The court reasoned that, because New York law explicitly recognizes "an implied contract between a college or university and its students, requiring the academic institution to act in good faith in its dealing with its students," such an implied contract creates the basis for a property interest entitled to protection. Id. (alterations and internal quotations omitted) (quoting Olsson v. Bd. of Higher Educ., 49 N.Y.2d 408, 414 (1980)).

Again, in Unger v. National Residents Matching Program, the Third Circuit made clear that the district court decisions within its circuit that held that graduate students had a property right in their continued enrollment did so by anchoring it to state law. 928 F.2d 1392, 1397 (3d Cir. 1991) ("The district courts in [Ross v. Pennsylvania State Univ., 445 F. Supp. 147 (M.D. Pa. 1978)] and [Stoller v. College of Medicine, 562 F. Supp. 403 (M.D. Pa. 1983), aff'd without opinion, 727 F.2d 1101 (3d Cir. 1984)], held no more than that a currently attending student had a property right under Pennsylvania law in the continuation of their studies.").

The Seventh Circuit, in a series of cases, similarly requires that a student identify a specific state entitlement to support their claim for a property right in public university enrollment. Charleston v. Bd. of Trs. of Univ. of Ill. at Chi., 741 F.3d 769, 772 (7th Cir. 2013) ("[O]ur circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education."). Applying the

17

Supreme Court's <u>Goss</u> decision, the Seventh Circuit reasoned that high school students have a property interest in their public education because "state law entitles them to receive one." <u>Doe v. Purdue Univ.</u>, 928 F.3d 652, 660 (7th Cir. 2019) (Barrett, J.) <u>cert.</u> <u>denied</u> 601 U.S. _ (Apr. 1, 2024); <u>see</u> <u>also</u> <u>Williams v. Wendler</u>, 530 F.3d 584, 589 (7th Cir. 2008) (Posner, J.) (declining to recognize a property interest in college enrollment because there was no source for the interest, explaining "[t]hat is the difference between college and high school; a high school student's rights will usually be defined by statute"). Accordingly, in the absence of a state law guaranteeing its residents a college education, then-Judge Barrett framed the issue as a contractual one:

> In the context of higher education, any property interest is a matter of contract between the student and the university. And to demonstrate that he possesses the requisite property interest, a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, "such as the right to a continuing education or the right not to be suspended without good cause." Generalities won't do; "the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return."

<u>Doe v. Purdue Univ.</u>, 928 F.3d at 660 (quoting <u>Bissessur v. Ind. Univ. Bd. of Trs.</u>, 581 F.3d 599, 601 (7th Cir. 2009), and then <u>Charleston</u>, 741 F.3d at 773).

In sharp contrast, the First and Sixth Circuits have concluded that no state-specific analysis is necessary, as <u>Goss</u> conferred a generalized property interest in public education for all students. In <u>Gorman v. University of Rhode Island</u>, for example, the First Circuit cited <u>Goss</u> to conclude, without further analysis, that it is "not questioned that a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty

and property." 837 F.2d 7, 12 (1st Cir. 1988); <u>see</u> <u>also</u> <u>Hennessy v. City of Melrose</u>, 194 F.3d 237, 250 n.3 (1st Cir. 1999) (reiterating its holding in <u>Gorman</u> that a student has a property interest in his education in the context of disciplinary proceedings).

The Sixth Circuit has likewise recognized in several decisions that Fourteenth Amendment "protections apply to higher education disciplinary decisions." <u>Doe v. Cummins</u>, 662 F. App'x 437, 445 (6th Cir. 2016) (citing <u>Flaim v. Med. Coll. of Ohio</u>, 418 F.3d 629, 633 (6th Cir. 2005)); <u>see</u> <u>also</u> <u>Jaksa v. Regents of Univ. of Michigan</u> 597 F. Supp. 1245, 1247 (E.D. Mich. 1984), <u>aff'd per curiam</u>, 787 F.2d 590 (6th Cir. 1986) (citing <u>Goss</u> to conclude that the plaintiff may "have a 'property' interest in continuing his education at the University of Michigan," but "[w]hether plaintiff's interest is a 'liberty' interest, 'property' interest, or both, it is clear that he is entitled to the protection of the due process clause"); <u>Doe v. Univ. of Cincinnati</u>, 872 F.3d 393, 399 (6th Cir. 2017) ("State universities must afford students minimum due process protections before issuing significant disciplinary decisions.").[5]

It is against this landscape that courts within the Fourth Circuit—and, specifically, within Virginia—have addressed this issue. The jurisprudence within the Fourth Circuit reveals two key principles. First, as a threshold matter, it is undisputed that the Commonwealth of Virginia has not created a property interest in a continued public university education. <u>See,</u>

---

[5] The Tenth Circuit appears to have joined this approach. Fifteen years after it looked to a Colorado statute to find a property interest in <u>Harris</u>, the court cites <u>Harris</u> for the general proposition that a student had a property interest in a nursing school program in Oklahoma, without undertaking any state-specific analysis. <u>Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.</u>, 245 F.3d 1172, 1181 (10th Cir. 2001) ("As an initial matter, we note that Mr. Gossett had a property interest in his place in the Nursing School program that is entitled to due process protection under the Constitution." (citing <u>Harris</u>, 798 F.2d at 422)); <u>see</u> <u>also</u> <u>Lee v. Kansas State Univ.</u>, No. 12-cv-2638, 2013 WL 2476702, at *6 (D. Kan. June 7, 2013) (noting that Tenth Circuit jurisprudence "has expanded [the right articulated by <u>Goss</u>] to a more generalized property interest in continuing graduate education, with a concomitant procedural due process right").

e.g., Davis v. George Mason Univ., 395 F. Supp. 2d 331, 336 (E.D. Va. 2005) (explaining that the parties failed to "cite any Virginia statute or case law that created such a property interest"); Doe v. Alger, 175 F. Supp. 3d 646, 657 (W.D. Va. 2016) ("[The plaintiff] can cite no case in which the Supreme Court or Fourth Circuit has recognized a property right to continued enrollment in a public college or university—much less a case recognizing that the Commonwealth of Virginia has created such a right."); Brown v. Porter, No. 2:19-cv-376, 2019 WL 8503313, at *5 (E.D. Va. Nov. 26, 2019), report and recommendation adopted as modified, 438 F. Supp. 3d 679 (E.D. Va. 2020) ("[T]he Virginia Constitution is silent on the rights of students seeking post-secondary education"). Accordingly, courts in Virginia must assess whether a student at a public college or university has a property right rooted in a less tangible "independent source," which could include "an express or implied contract, or a mutually explicit understanding." Barnes, 669 F.3d at 1303.[6]

---

[6] Courts in this district have not followed the approach adopted by the First and Sixth Circuits, which, as explained above, interprets Goss to confer a generalized property interest in public education without consideration of the respective state's laws. See, e.g., Doe v. Alger, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) ("Doe is not alleging that a state statute creates his property right, so Goss does not help him."). But see Doe v. Rector & Visitors of Univ. of Virginia, No. 3:19-cv-038, 2019 WL 2718496, at *5 (W.D. Va. June 28, 2019) (Conrad, J.) (concluding that expulsion of a student "clearly implicates a protected property interest" (quoting Doe v. Univ. of Cincinnati, 872 F.3d 393, 399 (6th Cir. 2017)). This court is not inclined to do so now. Instead of recognizing a blanket property interest in public education, Goss stands for the principle that a court must anchor a property interest in an independent source. See, e.g., Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago, 741 F.3d 769, 773 n.2 (7th Cir. 2013):

> Charleston argues that the Supreme Court's decision in Goss v. Lopez . . . recognized a student's protected interest in his or her public education. But he misreads Goss. The Supreme Court found that the Ohio high school students in that case "plainly had legitimate claims of entitlement to a public education" only because an Ohio state statute promised its young residents that education. [Goss, 419 U.S. at 573] (citing the Ohio code, which required local authorities to provide a free education to all residents between five and twenty-one). "Having chosen to extend the right to an education to [high school students] generally," Ohio could not then deprive students of that right without due process. Id. at 574. Here, Charleston's complaint does

Second, courts in this district have determined that, in the absence of a state statute, a plaintiff can plead an "independent source" sufficient to withstand a motion to dismiss by alleging that the university at issue, through its policies or practices, does not expel, suspend, or dismiss students without cause. See Alger, 175 F. Supp. 3d at 658.[7] These cases look to the Supreme Court's Perry v. Sindermann decision, which held that a public junior college professor stated a wrongful termination claim by alleging that "the existence of rules and understandings, promulgated and fostered by state officials, . . . may justify his legitimate claim of entitlement to continued employment absent 'sufficient cause.'" 408 U.S. 593, 602–03 (1972).

In Perry, the Court recognized that, while a "mere subjective 'expectancy'" is insufficient to warrant due process protection, the plaintiff should have survived summary judgment because he "must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of 'the policies and practices of the institution.'" Id. at 602; see also Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 223 (1985) ("[In Perry,] we held that 'agreements implied from the promisor's words and conduct in the light of the surrounding circumstances' could be independent sources of property interests."). The Court explained,

> We have made clear in [Board of Regents v. Roth, 408 U.S. 564 (1972)], that "property" interests subject to procedural due

---

not point to an Illinois statute that promises him an education at a state medical school. Thus, Goss is inapposite.

[7] The Eastern District of Virginia, by contrast, "has conclusively ruled on this issue, . . . finding that a property interest does not exist in continuing education." Abbas v. Woleben, No. 3:13-cv-147, 2013 WL 5295672, at *7 (E.D. Va. Sept. 19, 2013) (emphasis in original). In Nofsinger, for example, the court concluded that the plaintiff failed to identify a protected property interest in her continued enrollment in graduate school because, to do so, she "must point to some Virginia statute or rule showing that she has a 'legitimate claim of entitlement,'" which she had not done. Nofsinger v. Virginia Commonwealth Univ., No. 3:12-cv-236, 2012 WL 2878608, at *6 (E.D. Va. July 13, 2012). The Fourth Circuit affirmed the district court's finding in an unpublished, per curiam opinion. 523 F. App'x 204, 205 (4th Cir. 2013).

> process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." Id. at 577. A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. Id.

Id. at 601.

The Western District of Virginia has recently applied that framework to conclude that the plaintiff failed to sufficiently allege a property interest. See, e.g., Joseph Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d 479 (W.D. Va. 2019) (Dillon, J.) (concluding that the plaintiff failed to allege a property interest because he did not "allege that Virginia Tech only expels or suspends students for cause or point to facts [that would otherwise support] a 'legitimate claim of entitlement'"); Jacob Doe v. Va. Polytechnic Inst. & State Univ., No. 7:19-cv-249, 2020 WL 1309461, at *6 (W.D. Va. Mar. 19, 2020) (Dillon, J.) (finding that the plaintiff did not allege that Virginia Tech employed a policy of expelling students only after a finding of cause as set forth in the students' rights policy, instead "rely[ing] on conclusory allegations" that he had a property interest); Dillow v. Va. Polytechnic Inst. & State Univ., No. 7:22-cv-280, 2023 WL 2320765, at *11 (W.D. Va. Mar. 2, 2023) (Cullen, J.) (concluding that the plaintiff's "conclusory allegation that he had entered into a 'contract' with Virginia Tech," without allegations similar to that in Alger, was insufficient to establish a property interest).

In two other cases, however, the court found that the complaint sufficiently alleged a property interest. First, in Doe v. Alger, the plaintiff alleged that he had a property interest in his continued enrollment at James Madison University (JMU) because, through its policies and practices, JMU had "a system of expelling, suspending, or dismissing students only after a

finding of cause." 175 F. Supp. 3d at 658. The plaintiff further alleged that JMU's policies and procedures, including JMU's adoption of a policy on student rights, "substantially limited [JMU's] ability to suspend, expel or dismiss" students after admission. Id. at 657.[8] Later, in Ortegel v. Virginia Polytechnic Inst. & State University, the court applied Alger to conclude that the plaintiff's allegation that it was Virginia Tech's "policy or practice [to] not disciplin[e] students arbitrarily or without cause" sufficiently stated a property interest at the motion to dismiss stage. No. 7:22-cv-510, 2023 WL 8014237, at *12 (W.D. Va. Nov. 20, 2023) (Dillon, J.) ("Ortegel's allegations regarding Virginia Tech's policy of not disciplining students without cause are . . . similar to what this court considered sufficient to state a property interest at the motion-to-dismiss stage in Alger.").

Here, this court has dismissed Doe's prior complaints for failing to plead allegations sufficient to state a property interest under Alger. Mem. Op. Dismissing First Am. Compl., ECF No. 35, at 19 (July 28, 2022) ("Doe does not identify the 'various policies and customs' that he believes confer a property right on him. Without doing so, his allegations are factually insufficient to plausibly state a claim that he is entitled to relief." (citing Alger, 175 F. Supp. 3d at 657)); Mem. Op. Dismissing Second Am. Compl., ECF No. 59, at 16 (Feb. 23, 2023) ("Doe does not identify any policy or custom on the part of Virginia Tech that substantially limits its ability to suspend, expel, or dismiss students.").

---

[8] When the Alger case reached summary judgment, the court concluded that the undisputed facts showed that the plaintiff had a protected property interest in his continued enrollment at JMU. Doe v. Alger, 228 F. Supp. 3d. 713, 725 (W.D. Va. 2016) (Dillon, J.). The court founded its conclusion on JMU's own admission, in its answer to the complaint, that the plaintiff, by paying tuition, "was entitled to be enrolled thereafter so long as he paid the required fees, remained in good standing academically . . . , otherwise met the requirements for graduation, and complied with JMU's conduct rules." Id. at 727. The court also noted that its conclusion was supported "by JMU's long-standing practice of not suspending or expelling students except for cause." Id. at 728.

On his third attempt, Doe alleges that,

> By providing for the sanction of dismissal solely as an outcome of the Student Conduct Process, Virginia Tech created an agreement and expectation that students, like Mr. Doe, could only be dismissed after a finding is made that a student violated the Student Code of Conduct and in accordance with the procedures of the Student Conduct Process, including but not limited to a formal hearing with procedural guarantees and opportunities provided for by the Student Code of Conduct.

Third Am. Compl., ECF No. 86, ¶ 85. Doe further alleges that "Virginia Tech regularly and routinely only dismisses students after a finding is made that the student violated the Student Code of Conduct and in accordance with the procedures of the Student Conduct Process." Id. ¶ 87. Doe again alleges that Virginia Tech has a "routine practice of dismissing students only for cause and in accordance with the procedures described above." Id. ¶ 96 (emphasis added).[9]

For the first time, Doe founds his allegations on specific references to Virginia Tech's Student Code of Conduct (the "Code"). First, Doe alleges that the Code provides that, upon

---

[9] Doe also alleges that he had a protected property interest in the value of his Ph.D., along with the course credits he earned in working toward obtaining that degree. Third Am. Compl., ECF No. 86, ¶ 90. Because the court is concluding that Doe sufficiently alleged a property interest in his continued enrollment, it need not decide whether Doe also has a property interest in this alternative theory. However, the court notes that, in support of this argument, Doe cites Merrow v. Goldberg, 672 F. Supp. 766 (D. Vt. 1987), which is an out-of-circuit opinion that assumes the existence of this right because it was not disputed by the parties. Id. at 771 n.1 ("Apparently because defendants indicated prior to trial that they did not contest this issue, plaintiff did not attempt to prove [it]. . . . Consequently, we make no conclusion of law as to whether plaintiff has a protected property interest in his credits; instead, we assume the existence of such an interest."). In Byerly v. Virginia Polytechnic Inst. & State University, then-Magistrate Judge Ballou rejected the plaintiff's attempt to use Merrow to establish a property interest in his course credits. No. 7:18-cv-16, 2019 WL 6684523, at *4 (W.D. Va. Dec. 6, 2019) ("[N]one of these cases establish Byerly's protected property interest in . . . his course credits."). Separately, the court finds this argument dubious because, even if the court assumed that Doe had a property right in his credits earned, Virginia Tech did not take those credits away from him. Instead, Doe alleges that he has been unable to transfer those credits to another university, but it seems that that would be the decision of the other universities to which he is applying (i.e., whether to accept Doe's credits earned prior to expulsion from Virginia Tech), rather than Virginia Tech's decision.

a complaint or conduct referral, "Student Conduct will review the conduct referral to determine if there is information regarding behavior that may violate the Student Code of Conduct and thus warrants resolution within the conduct system." Id. ¶ 84. Second, a section of the Code "outlined procedures to address behavior that is alleged to have violated university policy," including "a formal hearing, in which a student is entitled to a number of procedural guarantees and opportunities." Id. ¶ 83. Third, the Code "lists a number of sanctions that might be imposed during the Student Conduct Process, including but not limited to dismissal." Id. ¶ 84. Doe argues that these provisions, taken together, "provid[e] for the sanction of dismissal solely as an outcome of the Student Conduct Process." Id. ¶ 85. In other words, Doe alleges that it created an expectation that students "could only be dismissed after a finding is made that a student violated" the Code. Id.[10]

Accordingly, the court finds that, construing all well-pleaded allegations in the light most favorable to Doe, Doe has now sufficiently pled that he had a property interest in his continued enrollment at Virginia Tech, and the court "will give him the opportunity to prove the legitimacy of his claim to a property right 'in light of the policies and practices of the institution.'" Alger, 175 F. Supp. 3d at 658 (quoting Perry, 408 U.S. at 602–03); see also Doe

---

[10] Defendants argue that certain portions of the Code that Doe references are from a version that took effect in June 2020 (after Doe was expelled). The court agrees that Doe may not rely on specific language that existed only in a version published after Doe's hearing. However, the court finds that the difference in language between the two versions does not affect its analysis because the language is similar in substance. For example, the 2019 version of the Code provided that the "student or organization will be provided with a written statement of charges sufficiently in advance of the hearing." Exh. B, ECF 101-2, at 11. The 2020 version of the Code seems to quantify "sufficient notice," providing that the student is entitled "to receive written notice of charges at least five (5) business days in advance of the hearing and in reasonable detail to allow the respondent to prepare for the hearing." Exh. A, ECF 101-2, at 16. In other words, the substance of the procedural guarantee of "sufficient notice" existed in both versions, and the court will not disregard Doe's new allegations based on these distinctions.

v. Citadel, No. 2:21-cv-04198, 2022 WL 2806473, at *6 n.2 (D.S.C. July 18, 2022), aff'd, No.

22-1843, 2023 WL 3944370 (4th Cir. June 12, 2023) ("Defendants seem to implicitly

acknowledge that they face an uphill battle in arguing that Doe does not have a liberty or

property interest in his continued enrollment as a cadet at The Citadel, particularly at the

motion to dismiss stage.").[11]

## ii.  Deprivation of Procedural Due Process

Having determined that Doe sufficiently alleges a property interest, the court must

decide whether he also states a deprivation of that right without due process. In the Third

Amended Complaint, Doe pleads that the 24 hours' notice he received from Virginia Tech of

his disciplinary hearing was inadequate. Compl., ECF No. 86, ¶ 94. This court has previously

concluded that this allegation is sufficient to state a claim.

> [U]nder the unique facts of this case, Doe has sufficiently alleged
> that the one-day notice of the hearing Doe received was
> inadequate to afford him due process. While he was told on
> February 17, 2020, that he had been accused of sexual assault and
> learned on February 18, 2020, that he would be suspended
> pending an investigation and hearing, he spent part of the
> following week receiving in-patient mental health care. Doe did
> not find out the specific charges being made against him until
> March 3, 2020, and learned on March 5, 2020, that a hearing

---

[11] In so doing, the court remains cognizant of the existing caselaw establishing that a student handbook cannot form an enforceable contract between the university and its students when the terms are not binding on the university. See, e.g., Abbas v. Woleben, No. 3:13-cv-147, 2013 WL 5295672, at *4 (E.D. Va. Sept. 19, 2013) ("[T]his Court has held that university handbooks and catalogs do not form a contract where the terms do not bind the university."); Brown v. Rector & Visitors of Univ. of Virginia, No. 3:07-cv-030, 2008 WL 1943956, at *5 (W.D. Va. May 2, 2008) (Moon, J.), aff'd, 361 F. App'x 531 (4th Cir. 2010). Accordingly, through the tools of discovery, Doe must establish that the understanding of his claim of entitlement to continued enrollment "is mutual, i.e., both parties have assented to it." Alger, 228 F. Supp. 3d at 728 (quoting Sabet v. E. Va. Med. Auth., 775 F.2d 1266, 1270 (4th Cir. 1985)); see also Doe v. Washington & Lee Univ., 439 F. Supp. 3d 784, 790 (W.D. Va. 2020) (Moon, J.) ("It is well settled that Virginia law requires an absolute mutuality of engagement between the parties to a contract, whereby each party is bound and each party has the right to hold the other party to the agreement."). Such mutuality may stem from facts establishing that Virginia Tech has a "long-standing practice of not suspending or expelling students except for cause." Alger, 228 F. Supp. 3d at 728.

> would be held on March 6, 2020. Given these circumstances, Doe
> has alleged that he had an insufficient amount of time to prepare
> for a hearing that carried the very serious consequence of being
> expelled from the university. Accordingly, the court finds that
> under the particular facts of this case, Doe has stated a claim that
> Virginia Tech did not employ constitutionally adequate
> procedures when it gave Doe one day's notice of the hearing.

Mem. Op. Dismissing First Am. Compl., ECF No. 35, at 25 (July 28, 2022); see Mem. Op.

Dismissing Second Am. Compl., ECF No. 59, at 18–19 (Feb. 23, 2023) ("As the court noted

in the memorandum opinion entered on July 28, 2022, given that Doe had one day to prepare

for the disciplinary hearing, he sufficiently alleged that the short time period was inadequate

to afford him due process.").

At the hearing on defendants' motion to dismiss the Third Amended Complaint, Doe,

through new counsel, indicated to the court that due process was violated because of

inadequate notice of the hearing, not insufficient notice of the charges ahead of the hearing.

Accordingly, the court will assess whether inadequate notice of the hearing, based on the facts

alleged in the Third Amended Complaint, states a claim. The court finds—for the third

time—that it does.

"The fundamental requirements of due process are 'notice and an opportunity to be

heard.'" Doe v. Virginia Polytechnic Inst. & State Univ., 77 F.4th 231, 236 (4th Cir. 2023)

(quoting Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II, 91 F.3d 630, 640 (4th

Cir. 1996)). That generally applies with equal force in the context of student disciplinary

proceedings. Brown v. Rectors & Visitors of Univ. of Virginia, 361 F. App'x 531, 532 (4th Cir.

2010) ("When a school takes serious disciplinary action against a student, generally the student

must be offered notice and an opportunity to be heard." (citing Goss, 419 U.S. at 579)). While

neither the Fourth Circuit nor the Supreme Court have expanded upon the "precise requirements" of due process owed to students facing expulsion as part of a disciplinary action, Doe v. The Citadel, No. 22-1843, 2023 WL 3944370, at *2 (4th Cir. June 12, 2023), the Fourth Circuit has drawn from the Fifth Circuit's Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961), for guidance. See, e.g., Doe v. Virginia Polytechnic Inst. & State Univ., 77 F.4th 231, 236 (4th Cir. 2023).

Dixon states, in relevant part, that in cases involving student misconduct, "the best approach is to hold 'a hearing which gives [university officials] an opportunity to hear both sides in considerable detail.'" Doe, 77 F.4th at 236 (quoting Dixon, 294 F.2d at 158–59); see also Butler v. Rector & Bd. of Visitors of Coll. of William & Mary, 121 F. App'x 515, 519 n.2 (4th Cir. 2005) ("Disciplinary dismissals require greater procedural safeguards than academic dismissals."). Further, though the "requirements of due process may be satisfied by something less than a trial-like proceeding," Henson v. Honor Comm. of the Univ. of Va., 719 F.2d 69, 74 (1983) (citing Goss, 419 U.S. at 579), the student should "be given the opportunity to present . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf," Dixon, 294 F.2d at 159.

Of course, to give a student "the opportunity to present their own defense" at a hearing means that the student must receive sufficient notice of that hearing. Indeed, the Supreme Court instructs that requisite notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 13 (1978) (quoting Mullane v. Central Hanover Trust Co., 339 U.S. 306, 314 (1950)); see

also Brady v. Gebbie, 859 F.2d 1543, 1554 (9th Cir. 1988) ("[A]lthough a hearing where the individual has an opportunity to rebut the charges against him is always required in due process cases, when the hearing must be held and what procedural protections must be given at the hearing are determined on a case-by-case basis.").

The issue of notice typically arises in the context of insufficient notice of the charges ahead of the hearing, rather than insufficient notice of the hearing itself. See, e.g., Doe, 77 F.4th at 237 (concluding that the plaintiff received sufficient notice of the charges ahead of the hearing). However, even among those cases, two consistencies emerge. First, the student received substantially more than one day's notice of the hearing. See id. at 234 (one week); Doe v. Loh, No. PX-16-3314, 2018 WL 1535495, at *2 (D. Md. Mar. 29, 2018), aff'd per curiam, 767 F. App'x 489 (4th Cir. 2019) (one week); Doe v. Alger, 175 F. Supp. 3d 646, 651 (W.D. Va. 2016) (more than two weeks); Joseph Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d 479 (W.D. Va. 2019) (four days); Nash v. Auburn Univ., 812 F.2d 655, 661 (11th Cir. 1987) (four days).

Second, courts discredit arguments regarding notice where the student could have asked for a continuance but did not. See Doe, 77 F.4th at 237 (concluding that the plaintiff's allegation that his witnesses could not appear in person at the hearing was insufficient to state a claim in part because he did not seek "to continue the hearing until his witnesses were available"); see also Nash, 812 F.2d at 661 (noting that the parties "made no objections to the timing of the notice and hearing, nor did they request a delay in the schedule between the promised, restated notice and the June 12 hearing").

With those considerations in mind, the court again finds that Doe has sufficiently alleged that the one-day notice of the hearing Doe received was inadequate to afford him due process. Regardless of when Doe learned about his charges, Doe pleads that he learned on March 5, 2020, that his hearing would be held the next day. Compl., ECF No. 86, ¶ 56. Further, upon learning that his hearing was set for the next day, Doe contacted Cherry-Clarke to request a continuance of the hearing, explaining that he did not have enough time to prepare or to gather the evidence he needed to defend himself, and that Cherry-Clarke denied this request. Id. ¶¶ 64–65. Finally, Doe alleges that the inadequate notice affected his ability to present his own defense, including by depriving him of time needed to arrange for a witness to attend the hearing to testify on his behalf. Id. ¶ 61. Accordingly, because Doe had less than 24 hours' notice of a proceeding that resulted in the very serious consequence of expulsion from his Ph.D. program, he has sufficiently stated a claim for a deprivation of due process for purposes of the motion to dismiss stage.[12]

### iii. Individual Defendants

Because the court has concluded that Doe states a claim for procedural due process, the court must also address defendants' argument that it should dismiss defendants Sands and Cherry-Clarke because Virginia Tech is already a named defendant. In support of this

---

[12] Defendants argue that the court should reevaluate its prior ruling because the court concluded that Virginia Tech, through Cherry-Clarke, deprived Doe of due process in part on the fact that Doe spent time receiving in patient mental health treatment in the period leading up to his hearing, but that Doe fails to allege that Cherry-Clarke knew about the hospitalization. Defendants assert that, because the appropriate timing of notice of a hearing is a fact specific inquiry, Cherry-Clarke's lack of knowledge as to Doe's hospitalization is "critical to the analysis." Defs.' Mem. Supp. Mot. to Dismiss, ECF No. 94, at 25. The court disagrees. Regardless of whether Virginia Tech knew about Doe's hospitalization, Doe's allegations that the university (1) informed Doe on March 5, 2020, that a hearing would be held on March 6, 2020, and (2) denied Doe's request for an extension when he asked for additional time to prepare, in light of the very serious consequence of expulsion that he faced in this proceeding, states a claim for a deprivation of due process.

assertion, defendants argue that Virginia Tech is the real party in interest for purposes of the official capacity claims and, accordingly, the official capacity claims against Sands and Cherry-Clarke are duplicative. Doe, for his part, agrees that an official capacity claim "is essentially a claim against the entity in question," but that, here, the due process claim (Count One) is only against Sands and Cherry-Clarke—not Virginia Tech—and thus the defendants are not duplicative. Pl.'s Opp'n to Mot. to Dismiss, ECF No. 98, at 17 n.7.

Indeed, in <u>Love-Lane v. Martin</u>, the district court dismissed the Title VII claim against the superintendent in his official capacity because the plaintiff also brought that same claim against the school board:

> The court notes as a preliminary matter that Plaintiff names both Martin and the Board in her claims for relief under Title VII. . . . Plaintiff's claim against Martin in his official capacity as superintendent actually constitutes a claim against the school district itself, of which he is an agent. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165–66 (1985). Because Plaintiff has asserted a cognizable claim against the Board, as the representative body of the school district, Plaintiff's claim against Martin in his official capacity is redundant and will be dismissed.

<u>Love-Lane v. Martin</u>, 201 F. Supp. 2d 566, 574 (M.D.N.C. 2002). The Fourth Circuit agreed on appeal. <u>Love-Lane v. Martin</u>, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative.").

However, <u>Love-Lane</u>, along with the other cases that defendants cite, involve instances in which a plaintiff brings the same claim against the entity and the individual defendants. <u>See</u>, <u>e.g.</u>, <u>Bhattacharya v. Murray</u>, No. 3:19-cv-54, 2022 WL 808500, at *4 (W.D. Va. Mar. 16, 2022) (explaining that "Bhattacharya has already sued UVA [under Count One]. Therefore,

Bhattacharya may not add claims against Canterbury and Thomas in their official capacities" under that same count); Smith v. Sch. Bd. for City of Norfolk, No. 2:21-cv-138, 2021 WL 5163312, at *6 (E.D. Va. Nov. 5, 2021) (finding "that any claims brought against the individual Defendants in their official capacities are duplicative of those also alleged against the School Board"). Here, by contrast, Doe brings his due process claim against Sands and Cherry-Clarke only and his Title IX claim (Count Two) against Virginia Tech. Accordingly, the court finds that those cases are inapposite and **DENIES** defendants' motion to dismiss Sands and Cherry-Clarke—the only defendants to the due process claim—on that basis.[13]

## B. Title IV

Defendants also argue that Doe's Title IX claim should be dismissed for failure to state a claim. Like the due process claim, this court has ruled twice on Doe's Title IX claim, and defendants' motion should be assessed within that context. In the court's February 23, 2023, opinion assessing the sufficiency of the Second Amended Complaint, the court concluded that Doe's Title IX claim based on hostile environment must be dismissed with prejudice for failure to state a claim, but that Doe could proceed on his Title IX claim as to the 2019–2020 allocation of NIH grant funds and retaliation. Mem. Op., ECF No. 59, at 26–30. In the Third Amended Complaint, Doe again brings a Title IX claim based on the 2019–2020 allocation of NIH grant funds and retaliation, as the court allowed, but also attempts to revive his Title IX

---

[13] At the hearing on defendants' motion, counsel for defendants also argued that Sands should be dismissed because Doe does not allege any personal involvement by Sands in the complaint. However, as previously stated, the court will address the due process claim against Sands and Cherry-Clarke, in their official capacities, as claims against Virginia Tech. Accordingly, the court will not dismiss Sands, "act[ing] in his official capacity as president" and "final policymaker" at Virginia Tech, on that basis. Compl., ECF No. 86, at ¶ 4; see also id. ¶¶ 44, 45 ("Dr. Sands had delegated responsibility for adjudicating allegations of student misconduct to staff in the Virginia Tech Office of Equity and Accessibility and the Virginia Tech Office of Student Conduct," and "ultimately was responsible for supervising and overseeing" that staff.)

claim based on hostile environment. Accordingly, the court must assess whether the Third Amended Complaint now states a Title IX claim based on hostile environment.

To state a Title IX claim based on hostile environment, the Fourth Circuit instructs that a plaintiff must allege (1) that the educational institution receives federal funds; (2) that the plaintiff "was subjected to harassment based on [his] sex;" (3) that "the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity;" and (4) that "there is a basis for imputing liability to the institution." Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007) (en banc). In its prior opinion, the court concluded that Doe failed to allege the second element—that Doe "was subjected to harassment based on [his] sex." Mem. Op., ECF No. 59, at 28–30.

Following careful review of the Third Amended Complaint, the court finds that Doe's new allegations do not resolve this deficiency. To satisfy the second element of Doe's claim, Doe must proffer facts showing that Onufriev subjected him to harassment based on his sex, which "occurs when the victim is subjected to sex-specific language that is aimed to humiliate, ridicule, or intimidate." Jennings, 482 F.3d at 695 (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)). While a plaintiff need not allege that they were "subjected to sexual advances or propositions," the plaintiff must show that they were "the individual target of open hostility because of [their] sex" or were "harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of" the plaintiff's sex. Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003)

33

(citing <u>Smith v. First Union Nat. Bank</u>, 202 F.3d 234, 242 (4th Cir. 2000) and <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)).[14]

Here, the basis of Doe's hostile environment allegation is that Onufriev often met with the female student but ignored Doe's requests to meet for office hours, left him waiting for long periods of time, and often simply failed to show up to scheduled meetings. Doe asserts, however, that additional facts pled in the Third Amended Complaint support his hostile environment claim: (1) that he "had to take on a second, full-time job as a teaching assistant" as a result of not receiving research assistance, Compl., ECF No. 86, ¶ 21, (2) that Onufriev "began outwardly retaliating against" Doe by withholding "a recommendation for his green card application and a letter certifying completion of Mr. Doe's Master's degree," and by "assign[ing] excessive, redundant, and contradictory research tasks," "set[ting] false deadlines to publish papers," and "creat[ing] a hostile environment in the lab in an effort to cause Mr. Doe to voluntarily resign from the program," <u>id.</u> ¶ 34, and (3) that he endured an incident in which a neighbor told him that "Virginia Tech had 'warned' her about" Doe, <u>id.</u> ¶ 35.

However, while some of the new facts certainly provide additional color to Onufriev's rude behavior—bolstering Doe's grant funding and retaliation claims—they do not help Doe establish that he was "subjected to harassment based on his sex." In fact, the deficiency in Doe's harassment claim is captured best by his own allegation that he "was embarrassed, ashamed, and alarmed by Dr. Onufriev's comments <u>about the female student</u> in front of his colleagues." Compl., ECF No. 86, ¶ 24 (emphasis added). Indeed, Onufriev's comments were

---

[14] Although <u>Ocheltree</u> involved a Title VII sexual discrimination claim, courts in the Fourth Circuit "look to case law interpreting Title VII . . . for guidance in evaluating a claim brought under Title IX." <u>Jennings</u>, 482 F.3d at 695.

directed at the female student, and Doe alleges no facts suggesting that Onufriev directed comments at or toward him "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of" men. See e.g., Ocheltree, 335 F.3d at 331–32 (male employees repeatedly made sexual demonstrations and sex-based comments to female plaintiff); Jennings, 482 F.3d at 695 (male coach regularly made sexually-charged comments to team of female soccer players about their bodies and sexual activity); Feminist Majority Found. v. Hurley, 911 F.3d 674, 680–81 (4th Cir. 2018) (students posted threats on social media of gender-specific and sexual violence toward members of feminist student organization).

Accordingly, Doe has not pled facts sufficient to state a claim for Title IX based on hostile environment, and the court dismisses the claim with prejudice. However, consistent with its prior ruling, Doe may proceed on his Title IX claim based on 2019–2020 grant funding and retaliation.

### IV. CONCLUSION

For the reasons stated above, the court **DENIES in part and GRANTS in part** defendants' motion to dismiss, ECF No. 93, as follows:

1.  The motion is **DENIED** as to the Due Process claim.

2.  The motion is **GRANTED** as to the Title IX claim based on hostile environment and **DENIED** as to the Title IX claim based on 2019–2020 grant funding and retaliation.

3.  The Title IX claim based on hostile environment is **DISMISSED with prejudice**.

4.     Doe may proceed on his procedural due process claim against defendants
       Timothy Sands and Tamara Cherry-Clarke in their official capacities, and on his
       Title IX claims against Virginia Tech based on 2019–2020 grant funding and
       retaliation.

An appropriate order will be entered.

Entered: April 2, 2024

Michael F. Urbanski
Chief United States District Judge