**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Civil Action No. 7:21-cv-00378 |
| | ) | |
| **VIRGINIA POLYTECHNIC** | ) | |
| **INSTITUTE AND STATE** | ) | |
| **UNIVERSITY, _et al.,_** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Virginia Polytechnic Institute and State University ("Virginia Tech"), Timothy Sands ("Sands"), and Tamara Cherry-Clarke ("Cherry-Clarke") seek summary judgment against Mr. Doe for his claims arising under Title IX, 20 U.S.C. § 1681, and the Due Process Clause of the Fourteenth Amendment, 42 U.S.C. § 1983. Defendants, however, fail to demonstrate that no genuine dispute of material fact exists regarding Mr. Doe's claims. To the contrary, the record, viewed in the light most favorable to Mr. Doe, demonstrates that Mr. Doe's graduate advisor at Virginia Tech, Dr. Alexey Onufriev, discriminated against him based on his gender, as well as that Mr. Doe was denied due process before being arbitrarily and unfairly expelled from Virginia Tech, just prior to his graduation with a Ph.D. in physics. Accordingly, Defendants' Motion for Summary Judgment must be denied.

**STATEMNT OF FACTS**

Mr. Doe is an immigrant from Iran, of Kurdish background. _See_ ECF No. 136-4, Doe Dep., at 24:2-4, 143:13-15, 176:12-20, 179:18-19. Prior to coming to Virginia Tech, he was educated in Iran, earning a bachelor's degree in physics from the University of Kurdistan and then a master's degree in quantum computing physics at Shahid University. _Id._ at 26:15-21. In 2013, he immigrated to the United

States to enroll at Virginia Tech, with plans to obtain a Ph.D. in physics and master's degree in computer science. *Id.* at 27:22-23, 28:5-13.

Mr. Doe completed his coursework at Virginia Tech in 2017 or 2018, including all of his requirements for a master's degree in computer science. *Id.* at 28:9-10, 178:15-20. In pursuing these degrees, Mr. Doe joined Alexey Onufriev's lab in 2014 or 2015, as he best recalls. *Id.* at 30:1-5. Dr. Onufriev is a professor at Virginia Tech with appointments in computer science as well as physics, engineering science, and mechanics. *See* Ex. 1, Onufriev Dep., at 9:15-21. His lab is the Theoretical and Computational Molecular Biophysics Lab, which works to "apply physics and computation to problems of biological and biomedical relevance" and "develop methodology that is used by others for this purpose." *Id.* at 9:22-10:16.

As Mr. Doe was pursuing a Ph.D., he was overseen by a thesis or dissertation committee, which was co-chaired by Dr. Onufriev, his graduate advisor. *See* Pitt Dep., at 6:14-7:9. Dr. Onufriev co-chaired the committee because Mr. Doe came from the Department of Physics, whereas Dr. Onufriev was a professor in the Department of Computer Science. *See id.* At 11:18-12:9. Also on Mr. Doe's committee was Mark Pitt, the chair of Virginia Tech's physics department, among others. *See id.* at 7:1-9.

Dr. Onufriev's lab ordinarily features few graduate students, and at the time Mr. Doe was there, there were approximately four or five. *See* Onufriev Dep., at 11:1-2, 18-21; Doe Dep., at 52:19-23. During this time, only one graduate student in the lab, Negin Forouzesh, was female, and she joined the lab at approximately the same time as Mr. Doe. *See* Onufriev Dep., at 12:13-17; Doe Dep., at 54:24-55:12, 57:1-3. Throughout his time in Dr. Onufriev's lab, Mr. Doe observed a significant disparity in how Dr. Onufriev treated him versus how he treated Ms. Forouzesh, including the following:

- Dr. Onufriev dedicated a significant amount of time to working with Ms. Forouzesh, sitting in her office from morning to evening, while neglecting and not making himself available to speak with Mr. Doe in person, which led to delays in Mr. Doe's paper being published. *See* Doe Dep., at 47:23-49:15, 174:21-175:12.

- Dr. Onufriev permitted Ms. Forouzesh to publish a paper (which he co-authored), when she was not able to debug the code and was unfamiliar with a unit of measurement used in the paper,[1] while Dr. Onufriev fixated on Mr. Doe's minor grammatical errors; in one instance, Dr. Onufriev threw Mr. Doe's paper on his desk because of one typo and refused to read it. *See id.* at 49:16-51:17.

- Dr. Onufriev insulted Mr. Doe's heritage, when he did not do so to Ms. Forouzesh; to the contrary, Dr. Onufriev often negatively compared Mr. Doe to Ms. Forouzesh, whom he referred to as a "princess" and having "pure blood," even though both Mr. Doe and Ms. Forouzesh were Iranian. *See id.* at 106:15-107:4; 117:15-118:4; 179:14-180:1.

- Relatedly, Dr. Onufriev belittled Mr. Doe in comparison to Ms. Forouzesh, saying that he could not compete with her, whom he called a "Persian princess" or the like. *See id.* at 117:15-23.

- Mr. Doe asked Dr. Onufriev to give him a recommendation for an internship, but he refused, despite writing a recommendation for Ms. Forouzesh. *See* Ex. 2, Plaintiff's Answer to Interrogatory No. 10.

Mr. Doe also observed, on one occasion, Dr. Onufriev and Ms. Forouzesh kissing. *See* Doe Dep., at 110:9-111:21.

---

[1]     As Defendants' note, Ms. Forouzesh's paper was entitled *Grid-based Surface Generalized Born Model for Calculation of Electrostatic Binding Free Energies*. Its abstract notes its subject of the "calculation of solvation free energies" and references the unit used to measure energy discussed by Mr. Doe. *See* https://pubs.acs.org/doi/10.1021/acs.jcim.7b00192.

In 2019, Dr. Onufriev received two grants from the National Institutes of Health ("NIH"), in connection with the work going on in his lab. Grant No. 1R21GM131228-01, entitled "Accurate yet fast implicit solvation," was awarded on February 14, 2019, based on an application submitted on February 18, 2018, with a project period of March 1, 2019, to February 28, 2021. *See* Ex. 3, VT0000672; ECF No. 136-1. Grant No. 1R21GM134404-01, entitled "Explicit ions in implicit solvent: fast and accurate," was awarded on July 31, 2019, based on an application submitted on October 16, 2018, with a project period of August 1, 2019, to July 31, 2021. *See* Ex. 4, VT0002321; ECF No. 136-2.

Mr. Doe worked tirelessly to help Dr. Onufriev with his grant proposals, in one instance working until 4:00 a.m. to prepare a plot. *See* Doe Dep., at 63:9-17. With respect to Grant No. 1R21GM131228-01, the application at several points references Mr. Doe's research and work. *See* Ex. 2, Plaintiff's Answer to Interrogatory No. 10. For instance, in the section on "specific aims," it states, "Practical implicit solvent methods can contribute significantly to improved health in many ways, including . . . facilitating understanding of key biological processes such as protein folding and signaling pathways; designing new proteins; improving understanding of gene expression through studying the interactions between DNA and proteins." *See id.*; ECF No. 136-1, at 43. A major aspect of Grant No. 1R21GM131228-01 was free energy calculations, and Mr. Doe was the only person in Dr. Onufriev's lab doing such calculations. *See* Ex. 2, Plaintiff's Answer to Interrogatory No. 10; ECF No. 136-1, at 11-14, 16-17, 19-21, 23-24 (referencing several papers involving free energy calculations) and 45-46, 48-49 (discussing computation of free energy). Likewise, although Dr. Onufriev did not credit Mr. Doe's work, he noted, "Methods and approaches from this unique field [of solvent models] prove highly useful for the development of explicit solvent models as well, as we have recently demonstrated with the development of OPC water model," noted that the OPC water model "has already shown high promise in practical biomolecular simulations," and noted that the OPC water model would be used for the project's testing. *See* ECF No. 136-1, at 29-30, 49. This relates to a paper started by Mr.

Doe in 2017 or 2018, and ultimately published by him and others in 2020. *See* Ex. 2, Plaintiff's Answer to Interrogatory No. 10. Another paper authored by Mr. Doe demonstrates Mr. Doe's expertise in OPC water models. *See id.*

Grant No. 1R21GM131228-01 was used, in part, to fund a graduate research assistant ("GRA") position for Ms. Forouzesh. *See* ECF No. 137, at 4. However, despite his contributions to Grant No. 1R21GM131228-01 as outlined above, Mr. Doe did not receive any funding whatsoever from Grant No. 1R21GM131228-01. *See* Doe Dep., at 128:13-15. Yet, Dr. Onufriev nevertheless attempted to assert that Mr. Doe's paper, for which he was first author, was funded by Grant No. 1R21GM131228-01. *See* Onufriev Dep., at 55:19-56:23; Doe Dep., at 54:21-23, 128:6-17; Doe Dep.4; *see also* Onufriev Dep., at 49:17-50:15 (noting that the "first author" of a paper typically does most of the work and writes the paper, and that it is the "most prestigious position on the author list").

On March 7, 2019, Mr. Doe confronted Dr. Onufriev about his attempt to reference Grant No. 1R21GM131228-01 on the paper in a text message exchange. *See* ECF No. 136-44.. He questioned why Dr. Onufriev would add that the paper was supported by the NIH when Mr. Doe, the first author, received no funding from the NIH. *See id.* at 2. Mr. Doe was frustrated that he was staying up late to work on his research, waking up early to teach class, and grading hundreds of papers, while the grant used to fund Ms. Forouzesh's GRA position was being associated with his paper. *See id.* at 5. Dr. Onufriev stated the sentence was his acknowledgement since he had "already spent an inordinate amount of time on this paper" and he "felt it common courtesy to acknowledge the NIH and the taxpayers," even though Grant No. 1R21GM131228-01's project period had begun approximately one week prior. *Id.* at 11. Ultimately, this paper was published without acknowledging NIH funding. *See* Onufriev Dep., at 55:15-18.

On October 14, 2019, Mr. Doe forwarded an email to Camillo Mariani, director of the graduate program for Virginia Tech's physics department, which discussed a number of Mr. Doe's

grievances with Dr. Onufriev, including the grant number Dr. Onufriev attempted to write on Mr. Doe's paper and Mr. Doe's desire for equality, illustrating the point by stating that if Ms. Forouzesh was ready to graduate based on Dr. Onufriev's criteria, Mr. Doe was ready too. *See* Ex. 5, VT0005663. Dr. Mariani understood Mr. Doe's email to be regarding discrimination and thus brought that issue to the attention of Dr. Pitt, who did not recall receiving the email. *See id.* (forwarding the email); Ex. 6, Mariani Dep., at 27:20-28:16; Pitt Dep., at 25:9-11. Mr. Doe also had a number of in-person conversations with Dr. Pitt and Dr. Mariani regarding these issues. Doe Dep., at 123:17-126:7.

In November 2019, Mr. Doe was attempting to get a letter from Dr. Onufriev for his green card application. *See* Ex. 7, VT0004678. Mr. Doe was upset because Dr. Onufriev was using lukewarm, conditional language and refusing to attest to some of Mr. Doe's credentials.[2] *See id.* Shortly thereafter, on December 2, 2019, Mr. Doe alerted Dr. Pitt and Dr. Mariani to this issue, and again alerted them to a female student receiving funding from Grant No. 1R21GM131228-01 instead of him despite his work's relation to that grant and despite Dr. Onufriev's attempt to acknowledge that grant on his papers. *See id.*; Ex. 8, VT0003756. Dr. Pitt did not investigate these allegations regarding Grant No. 1R21GM131228-01. *See* Pitt Dep., at 24:20-22.

Shortly thereafter, Mr. Doe's dissertation committee—which was co-chaired by Dr. Onufriev, his advisor—implemented a plan so that Mr. Doe could graduate by the end of the academic year. *See* Pitt Dep., at 11:18-12:19; Doe Dep., at 76:1-3. A letter, penned by Dr. Onufriev and outlining the plan, noted that Mr. Doe's Ph.D. would be based on three papers and/or drafts; that Mr. Doe should only focus on other projects if he had time after completing the minimum requirements; and that "to help [him] accomplish [his] research objectives," he would be offered a full GRA position for Spring 2020. *See* ECF No. 136-9, at 3; Onufriev Dep., at 81:13-82:1. The plan also included certain

---

[2]    While Mr. Doe eventually did obtain a green card, but not without "a lot of difficulty." *See* Doe Dep., at 172:23-173:4.

"milestones," ostensibly related to achieving Mr. Doe's Ph.D. thesis goals, as well as deadlines to report to Dr. Onufriev and the committee every two weeks. *See* ECF No. 136-10; Doe Dep., at 70:12-17.

After receiving the plan document from Dr. Onufriev, Mr. Doe alerted Dr. Pitt and Dr. Mariani that these milestones were not possible, referring in particular to item 7, a requirement to create two movies. *See id.* at 4; Ex. 9, VT0003996. Mr. Doe did not understand how this would help him graduate (and, for his part, neither did Dr. Pitt at the time of deposition). *See* Ex. 9; Pitt Dep., at 20:14-19. It also became apparent to Mr. Doe that the Spring 2020 GRA position offered by Dr. Onufriev was not designed to let Mr. Doe focus on his thesis, as the letter he received indicated it would be, but rather would require him to work on a new project with two of his colleagues. *See* Doe Dep., at 108:9-109:3. Mr. Doe alerted Dr. Pitt and Dr. Mariani to this issue, explaining in an email that he had initially accepted Dr. Onufriev's offer of a GRA position, but that Dr. Onufriev "changed his mind" and would require Mr. Doe to work on a new project. *See* Ex. 10, VT0003801.

Dr. Onufriev also began acting in a manner that Mr. Doe reasonably perceived as trying to make him angry in an effort to provoke a reaction and get Mr. Doe dismissed from Virginia Tech. *See* Doe Dep., at 78:15-79:1. For instance, Dr. Onufriev began insulting Mr. Doe's family and ethnicity. *See id.* at 78:22-23. In late 2019 or early 2020, Dr. Onufriev also refused to sign paperwork for Mr. Doe, which would have let him become a computer science student (thereby allowing him to graduate with a master's degree, because he had completed the course requirements). *See id.* at 86:2-6, 89:6-13. Yet, he signed the same paperwork for another student, Mr. Xiong, which Mr. Doe perceived as a slight to him. *See id.* at 149:9-150:4.

Additionally, it was only after Mr. Doe brought his concerns to Dr. Pitt and Dr. Mariani that he began experiencing issues with his computer files disappearing. *See* Doe Dep., at 78:5-14. Dr. Onufriev opined it was either the local disk failing or an issue with the backup system. *See* Ex. 11,

VT0003925. However, prior to this incident occurring, Dr. Onufriev said to Mr. Doe that he would not graduate and not get a good recommendation, and Dr. Onufriev was one of only two people with access to this system. *See* Doe Dep., at 102:16-19; 118:5-6.

Eventually, it became apparent to Mr. Doe that Dr. Onufriev was exerting his influence on the committee. *See id.* at 72:2-72:11. As Mr. Doe put it: "At the surface, Alexey was pretending at helping [him] to graduate. In reality, he was creating any obstacle, anything he could, to prevent [him] to graduate." *Id.* at 72:12-14. Plaintiff ultimately accepted that nothing could be done about Dr. Onufriev and resolved to keep his head down and finish his Ph.D. *See id.* at 126:14-17. Indeed, he was on track to graduate before he was dismissed from Virginia Tech. *See* Mariani Dep., at 40:20-41:4.

On February 17, 2020, Mr. Doe received a letter stating that he "*may* have been involved in potential violations of" Virginia Tech policies and to inform him that the matter was being investigated. ECF No. 136-14, at 2 (emphasis added). The allegations being investigated related to a sexual encounter he had with a female student, Jane Roe,[3] at Virginia Tech in September 2019 and a subsequent encounter in the elevator at Virginia Tech's Graduate Life Center in November 2019. *See id.* It was only after this encounter in November 2019 that Ms. Roe reported both the alleged November 2019 encounter and the alleged September 2019 encounter to the Virginia Tech Police Department; ultimately, that case was closed without any criminal charges being brought against Mr. Doe. *See* Ex. 12, VT0005547, at 1 (noting a report date of November 18, 2019); Doe Dep., at 150:13-18; 153:6-7, 181:10-12. The letter dated February 17, 2020, did not indicate that there would be necessarily be a student conduct hearing, imminent or otherwise. *See generally* ECF No. 136-14. Indeed, not all investigations result in student conduct hearings. ECF No. 136-25, Cherry-Clarke Dep., at 16:9-11.

---

[3]     Ms. Roe is identified by pseudonym pursuant to this Court's Order. *See* ECF No. 34.

On February 18, 2020, Mr. Doe received a letter stating that he had been interimly suspended from Virginia Tech due to the allegations. *See* ECF No. 136-16. Despite the letter received just one day prior stating that these allegations were merely being investigated, this letter suggested that a student conduct hearing would be scheduled at a later date, though gave no indication as to when it would be scheduled or when the hearing would occur. *See id.* And adding to the contradictions, on February 24, 2020, Frances Keene, Virginia Tech's Interim Assistant Vice President for Student Affairs, sent an email to Mr. Doe stating that "the Title IX Office must first complete its investigation to the situation in which [Mr. Doe was] involved." ECF No. 136-18.

The prospect of being expelled from Virginia Tech was frightening to Mr. Doe, as he was on a student visa and feared being deported to Iran; the time was "very hard" for him. *See* Ex. 2, Plaintiff's Answer to Interrogatory No. 8; Doe Dep., at 160:17-18. On February 21, 2020, Mr. Doe was placed under emergency custody, and he was then committed to another hospital between February 22 and February 25. *See* Doe Dep., at 160:21-163:17; ECF No. 136-19; ECF No. 136-20.

On Friday, February 28, 2020, Mr. Doe received a letter from Tamara Cherry-Clarke, then the Assistant Director of Student Conduct, which, for the first time, indicated that he was being charged with violating Virginia Tech's student conduct policies and that a hearing would be scheduled. *See* ECF No. 136-24. Again, Mr. Doe was not informed of the date or even an idea how soon the hearing would be set. *See id.* However, the letter did schedule an informal meeting with Ms. Cherry-Clarke for the following Tuesday, March 3, 2023, at 1:30 p.m. *See id.*

At the informal meeting of March 3, 2020, the procedure for the student conduct hearing was explained. *See* Doe Dep., at 164:22-165:7. Mr. Doe also informed Ms. Cherry-Clarke about his recent hospitalization and stated that he was not in good condition and needed more time, which she did not accept. *See id.* at 163:18-22, 165:8-13. Although Ms. Cherry-Clarke believes they also set the student

9

conduct hearing for March 6, 2020, at 11:00 a.m., on that date, Mr. Doe does not remember if this was actually discussed with him at the meeting. *See id.* at 166:21-166:23.

In any event, after the informal meeting of March 3, 2020, Mr. Doe was sent two letters, via email using Virginia Tech's Maxient system,[4] at 3:49 p.m. and 3:53 p.m. respectively. *See* Ex. 13, VT0003496; Ex. 14, VT0003498. These emails transmitted letters, one identifying the hearing date as March 4, 2020, and one identifying the hearing date as March 6, 2020. *See* ECF No. 136-33; ECF No. 136-34. Ms. Cherry-Clarke clarified that this was because the initial letter auto-populated with the wrong hearing date, which she did not realize before it was sent to Mr. Doe. *See* Cherry-Clarke Dep., at 20:5-21:6. However, when Mr. Doe tried to open the letter sent at 3:53 p.m.—which necessarily was the letter identifying the hearing date as March 6, 2020— he received a message saying the document was no longer available. *See* Ex. 15, VT0004473. Mr. Doe alerted Ms. Cherry-Clarke to this issue, who, on March 4, 2020, stated she would resend it. *See id.*; ECF No. 136-25, Cherry-Clarke Dep., at 21:15-22:5.

On March 5, 2020, Mr. Doe and Ms. Cherry-Clarke further corresponded regarding the student conduct hearing, and Mr. Doe confirmed that he would attend but advised her that he did not even enough time to prepare and collect all the evidence he needed to defend himself. *See* ECF No. 136-38. Ms. Cherry-Clarke understood this to be a request for additional time. *See* Cherry-Clarke Dep., at 25:5-10. Mr. Doe had also told Ms. Cherry-Clarke verbally that he was not in a good condition, that he needed more time to prepare, to arrange for his witness to testify, and to even just put himself together; he said: "I need to be able to eat, to sleep, to be able to speak." Doe Dep., at 167:12-168:8.

The hearing nevertheless went forward on March 6, 2020. During the hearing, Mr. Doe was not able to ask questions directly, but had to submit them through the hearing officers, who would

---

[4]     As Ms. Cherry-Clarke explained, it Maxient is case management software, which Virginia Tech uses to transmit all documents for student conduct hearings. *See* Cherry-Clarke Dep., at 19:17-20:4.

essentially screen them for "relevance." *See id.* at 168:10-22. One such question Mr. Doe was not able to ask was why the complainant followed Mr. Doe to the elevator and got inside of it with him if she was afraid of and "absolutely did not want to be around" him due to his alleged prior actions. *See* ECF No. 136-43, at 1:29:05-1:30:30. Mr. Doe was not able to ask this question because the hearing officer "did not like it." *See id.*; Doe Dep., at 168:13-14.

On Monday, March 9, 2020, Mr. Doe was found responsible for violating several of Virginia Tech's student conduct policies. *See* Ex. 16, VT0003182. He was given a deadline of March 17, 2020, to file an appeal. *See id.* On March 15, 2020, Mr. Doe again requested additional time and again told Ms. Cherry-Clarke about his hospitalization, but despite being in the midst of the national emergency regarding COVID-19, Ms. Cherry-Clarke (among others at Virginia Tech) declined to extend the appeal deadline.[5] *See* Ex. 17, VT0004950. Ms. Cherry-Clark would later admit, however, that she would certainly "hope" and "assume" that a national emergency would warrant the extension of a period to appeal. *See* Cherry-Clarke Dep., at 26:7-12. Ultimately, on April 20, 2020, Mr. Doe's appeal was denied, and Mr. Doe's dismissal from Virginia Tech became final. *See* Ex. 18, VT0003190.

**STANDARD FOR RULING ON MOTION FOR SUMMARY JUDGMENT**

To grant a motion for summary judgment, the court must conclude that the current pleadings, submissions, and affidavits, when taken in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact entitling the moving party to judgment as a matter of law. *See Celotex Corporation v. Catrett*, 477 U.S. 317 (1986); *Porter v. U.S. Alumoweld Company*, 125 F.3d 243, 245 (4th Cir. 1977); *Tolan v. Cotton*, 572 U.S. 650, 659–60 (2014) (per curiam). Summary judgment is only permissible where, after viewing the facts and inferences in the light most favorable to the nonmoving party, no reasonable juror could find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477

---

[5]     *See Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, March 13, 2020, *available at* https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

U.S. 242, 248-249 (1986). A court may not resolve disputed facts, weigh the evidence, or make determinations of credibility. *See Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986).

"[T]he issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). Moreover, a nonmoving party's testimony suffices to raise a genuine dispute of material fact, even if uncorroborated. *See, e.g.*, *United States v. Currency, U.S., $147,900.00*, 450 F. App'x 261, 266 (4th Cir. 2011) (reversing a grant of summary judgment where the nonmoving party provided a "specific and consistent," but uncorroborated, account about the source of a certain sum in question, because "corroboration is unnecessary to establish a genuine issue of material fact"); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (per curiam) (holding that summary judgment is not warranted when there is conflicting testimony requiring credibility determinations); *Nilson v. Historic Inns Grp. Ltd.*, 903 F. Supp. 905, 908-09 (D. Md. 1995) (denying summary judgment because reconciling the conflicting testimony of two witnesses required a credibility determination).

## ARGUMENT

This Court's Memorandum Opinion and accompanying Order of April 2, 2024 (ECF Nos. 107-108) permitted three of Mr. Doe's claims to proceed: (1) procedural due process in violation of the Due Process Clause, pursuant to 42 U.S.C. § 1983; (2) unlawful discrimination in violation of Title IX with respect to NIH grant funding; and (3) unlawful retaliation in violation of Title IX. After development of the factual record, Defendants have failed to meet their burden to show that there is no genuine issue of material fact entitling Defendants to judgment as a matter of law. Therefore, Defendants' Motion for Summary Judgment must be denied.

I.      **The Evidence Supports Plaintiff's Due Process Claim**

The Due Process Clause of the Fourteenth Amendment provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Procedural due process simply ensures a fair process before the government may deprive a person of life, liberty, or property . . . but does not require certain results." *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013) (cleaned up). "To succeed on a procedural due process claim, a plaintiff must satisfy three elements." *Id.* First, the plaintiff "must demonstrate that he had a constitutionally cognizable life, liberty, or property interest." *Id.* "Second, he must show that the deprivation of that interest was caused by 'some form of state action.'" *Id.* (quoting *Iota Xi Chapter Of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 145 (4th Cir. 2009)). "Third, he must prove 'that the procedures employed were constitutionally inadequate.'" *Id.* (quoting *Patterson*, 566 F.3d at 145).

As discussed in detail below, Mr. Doe has demonstrated that he had a constitutionally cognizable property interest in his continued enrollment at Virginia Tech, including because Virginia Tech, through its policies and practices, created a mutually explicit understanding that it would not expel, suspend, or dismiss him without cause. Second, it is not contested that Virginia Tech, as a public university, engaged in state action by dismissing him. Finally, Mr. Doe has demonstrated that the procedures employed by Virginia Tech were constitutionally inadequate, including because of the short timeframe from when he was notified he was being charged and the student conduct hearing; the even shorter timeframe from when he was notified of the hearing date and the student conduct hearing; and limitations placed on his ability to question the complaining witness. Therefore, the Motion for Summary Judgment must be denied.

A.      **Mr. Doe had a property interest in his continued enrollment at Virginia Tech**

"A protected property interest cannot be created by the Fourteenth Amendment itself, but

rather must be created or defined by an independent source." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 109 (4th Cir. 2011). This property interest must be "more than a mere 'unilateral expectation of it' or 'abstract need or desire for it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Rather, the claim of entitlement is created by "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. Such rules and understandings may include "a statute, a regulation, an express or implied contract, or a mutually explicit understanding." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012) (internal citations omitted); *see also Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (holding that a property interest can be established if the proper parties had "mutually explicit understandings that support [a] claim of entitlement to the benefit"). In the context of public university disciplinary proceedings in Virginia, a plaintiff must show that "a state created property interest in continued enrollment at a public education institution exists in Virginia." *Davis v. George Mason Univ.*, 395 F. Supp. 2d 331, 336 (E.D. Va. 2005), *aff'd per curiam*, 193 F. App'x 248 (4th Cir. 2006).

Courts, including the Supreme Court of the United States, often assume without deciding that a public university student has a property interest in their continued education. *See, e.g., Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 84-85 (1978) ("Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires."); *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985) (accepting university's "invitation to 'assume the existence of a constitutionally protectible property right in [respondent's] continued enrollment'"); *[Joseph] Doe v. Va. Polytechnic Inst. & State Univ.*, 77 F.4th 231, 236 (4th Cir. 2023) ("The district court held that Doe hadn't alleged a cognizable liberty or property interest in his continuing education. We assume (without deciding) that Doe has such an interest."); *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir. 2000) ("Assuming, without deciding, the existence of a property or liberty interest, we conclude that Richmond received all the process that he was

due."); *Ekmark v. Matthews*, 524 F. App'x 62, 63 (5th Cir. 2013) ("Even assuming arguendo Ekmark had any property interest in continuing his residency and achieving certification, he received all the process to which he was entitled under the Fourteenth Amendment."). On the other hand, as this Court has recognized, some courts "have affirmatively recognized the interest." *See* ECF No. 109, at 21-25 (discussing the "legal landscape" of other circuits).

In the context of university disciplinary proceedings, a mutually explicit understanding creating a constitutionally protected property interest exists when the university "substantially limit[s] its ability to suspend, expel or dismiss through its adoption of certain policies and practices . . . [and] . . . regularly and routinely dismiss[es], suspend[s], or expel[s] students only with cause." *Doe v. Alger*, 175 F. Supp. 3d 646, 657 (W.D. Va. 2016);[6] *see also Ortegel v. Virginia Polytechnic Inst. & State University*, No. 7:22-cv-510, 2023 U.S. Dist. LEXIS 207568, at *12 (W.D. Va. Nov. 20, 2023) (holding the plaintiff's allegation that it was Virginia Tech's 'policy or practice [to] not disciplin[e] students arbitrarily or without cause' to be a sufficiently alleged property interest). This rationale stems from due process jurisprudence in the employment context, where "the Supreme Court explained that government employees can have a protected property interest in their continued employment if they have a legitimate claim to tenure or if the terms of the employment make it clear that the employee can be fired only for cause." *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 922 (9th Cir. 2013) (citing *Roth*, 408 U.S. at 576-78; *Perry*, 408 U.S. at 599-603).

In *Perry, supra*, the Supreme Court held that "the existence of rules and understandings, promulgated and fostered by state officials, . . . may justify [a plaintiff's] legitimate claim of entitlement to continued employment absent 'sufficient cause.'" 408 U.S. at 602-03. The *Perry* Court also relied on a provision "in the college's official Faculty Guide," *id.* at 576–78, without reference to whether the

---

[6]     The *Alger* Court also framed this as requiring the plaintiff to show that "the university at issue, through its policies or practices, does not expel, suspend, or dismiss students without cause." *Id.* at 658.

college had a unilateral right to revision of the Faculty Guide. That is because "'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" *Id.* (quoting *Roth*, 408 U.S. at 577).

Here, the evidence is clear that Virginia Tech's policies and practices did not and do not permit it to expel, suspend, or dismiss students without cause. Indeed, Virginia Tech's own policies establish this. The 2019-2020 Hokie Handbook states only that dismissal may be imposed as a sanction for violation of university policy; it does not indicate that a student may be dismissed on other grounds, and certainly not at the unfettered discretion of the university. *See* ECF No. 136-29, at 33-34. Similarly, it provides that "[b]ehaviors that violate the Student Code of Conduct are addressed through the student conduct system." *Id.* at 7. Regarding the student conduct system, it further provides that, "In formal conduct hearings, a student or organization is *entitled* to . . . procedural guarantees," which include "providing a written statement with sufficient detail to enable the student to prepare for the formal hearing; questioning witnesses; producing witnesses; and being accompanied by an advisor. *Id.* at 13 (emphasis added). Based on these guarantees, a reasonable student, like Mr. Doe, and Virginia Tech would both have the explicit understanding that the student would be dismissed only through the student conduct process, which includes a formal hearing.

Virginia Tech's supposed right to change its policies and procedures at any time does not alter the equation. To begin with, the 2019-2020 Hokie Handbook makes clear that these policies are reviewed annually and, as applicable to student conduct, are subject to a lengthy process involving the Student Affairs Policy Review Committee, the Commission on Student Affairs, University Council, and the Board of Visitors. *See* ECF No. 136-29, at 9. The handbook also provides, "Policies are valid for the period given." *Id.* at 8. In any event, it is uncontroverted that this particular version of the Hokie Handbook was in effect at the time of Mr. Doe's student

conduct hearing, and so the terms of Virginia Tech's policies made "clear" that he could be dismissed "only for cause." *Blantz*, 727 F.3d at 922 (citing *Roth*, 408 U.S. at 576-78; *Perry*, 408 U.S. at 599-603). Moreover, in *Perry*, the plaintiff sufficiently alleged a property interest based on his reliance of a provision "in the college's official Faculty Guide," without reference to whether the college had a unilateral right to revision of the Faculty Guide. 408 U.S. at 600.

It was not, however, merely Virginia Tech's policies that created a mutually explicit understanding justifying Mr. Doe's claim of entitlement to continued enrollment, but its practices. Ms. Cherry-Clarke, in her long tenure at Virginia Tech, could not recall a student *ever* being dismissed from the university without the benefit of a student conduct hearing. *See* Cherry-Clarke Dep., at 9:6-11. Given Ms. Cherry-Clarke's current role as Senior Assistant Dean of Students and prior role as Assistant Director in Virginia Tech's Student Conduct Office—where her responsibilities included "coordinating cases to be heard, also serving as Hearing Officer, and providing outreach around campus"—Ms. Cherry-Clarke would certainly be in a position to know Virginia Tech's practices in this sphere. *See id.* at 6:3-7:8. On the other hand, Virginia Tech has presented no evidence that it *does* expel, suspend, or dismiss students without cause.[7] That is perhaps not a surprise, however, as one would not expect a public institution like Virginia Tech to have a policy permitting it to arbitrarily and capriciously expel, suspend, or dismiss its students.

The evidence, especially when viewed in the light most favorable to Mr. Doe, thus fits squarely within the parameters set out in *Alger*, *Ortegel*, and this Court's earlier opinions in this matter as to what is sufficient to create a property interest in continued enrollment at a public university. Defendants contend otherwise, asserting that *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230 (4th Cir. 2021),

---

[7]   On August 16, 2024, Judge Memmer granted in part Plaintiff's Motion to Compel, which required Virginia Tech to provide, among other things, whether any students in the 2019-2020 academic year were suspended, dismissed, or expelled from the university without a student conduct hearing. *See* ECF No. 134. As of the time of this filing, Virginia Tech has not yet answered this discovery. Plaintiff respectfully reserves the right to supplement this brief with any discovery responses provided by Defendants in accordance with this Court's Order.

"expressly rejected" the reasoning of these prior rulings (including this Court's Memorandum Opinion of April 2, 2024, which was decided after *Sheppard*).

Defendants' reliance on *Sheppard*, however, is misplaced. In *Sheppard*, the plaintiff advanced a theory of implied contract pursuant to the university's student code of conduct. 993 F.3d at 239. There, in the context of determining whether the plaintiff's due process right was "clearly established," the Fourth Circuit found that Virginia trial court decisions did not support the plaintiff's theory of implied contract. *See id.* By no means, however, did the Fourth Circuit outright reject that Virginia law may support the existence of an implied contract based on a public university's policies. More to the point, the Fourth Circuit did not hold that a public university's policies and practice of expelling, suspending, or dismissing students only for cause cannot serve as the basis for a mutually explicit understanding creating a claim of entitlement to continued enrollment. Indeed, it did not even consider that issue in *Sheppard*.

Defendants also point to language in *Sheppard* that "mere '[v]iolations of . . . school procedures are insufficient by themselves to implicate the interests that trigger a federal due process claim.'" *Id.* (*quoting Kowalski v. Berkeley Cnty. Schools*, 652 F.3d 565, 576 (4th Cir. 2011)). That language was merely used in *Kowalski* to counter the plaintiff's argument "that school administrators did not follow their own policies." 652 F.3d at 576. And in *Sheppard*, likewise, it was used to counter the plaintiff's argument that "he had a property interest in 'VSU's policies and procedures.'" 993 F.3d at 239. Here, the asserted property interest is not in Virginia Tech's policies and procedures, but in Mr. Doe's continued enrollment. Neither *Sheppard* nor *Kowalski* stand for the proposition that Virginia Tech's policies and practice of not expelling, suspending, or dismissing students without cause cannot serve as the basis for a mutually explicit understanding creating a claim of entitlement to continued enrollment.

Defendants' argument to the contrary conflates theories of implicit contract and mutual understanding, which as *Barnes*, 669 F.3d at 1303, made clear, are distinct.[8]

In summary, the plain language of Virginia Tech's policies and its longstanding practice of only expelling, suspending, or dismissing students with cause justifies Mr. Doe's "legitimate claim of entitlement to continued [enrollment] absent sufficient cause." *Perry*, 408 U.S. at 602-03. Mr. Doe was thus entitled to the protections of the Due Process Clause of the Fourteenth Amendment. Yet, as discussed below, Virginia Tech's student conduct process did not afford him the process he was due. The Motion for Summary Judgment must be denied.

### B.      Mr. Doe was not afforded due process at the student conduct hearing

"The fundamental requirements of due process are 'notice and an opportunity to be heard.'" *Joseph Doe*, *supra*, 77 F.4th at 236 (quoting *Mallette v. Arlington Cnty. Emps.' Supplemental Ret. Sys. II*, 91 F.3d 630, 640 (4th Cir. 1996)). Thus, "[w]hen a school takes serious disciplinary action against a student, generally the student must be offered notice and an opportunity to be heard." *Brown v. Rectors & Visitors of Univ. of Virginia*, 361 F. App'x 531, 532 (4th Cir. 2010) (citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975)). Relying upon *Dixon v. Alabama State Board of Education*, 294 F.2d 150, 159 (5th Cir. 1961), for guidance, the Fourth Circuit had explained that "a student facing discipline should receive notice containing a statement of the specific charges and grounds which, if proven, would justify disciplinary action. . . . In cases involving student misconduct, the best approach is to hold a hearing which gives university officials an opportunity to hear both sides in considerable detail." *Joseph Doe*, *supra*, 77 F.4th at 237.

---

[8]      The other cases cited by Defendants suffer from the same infirmity. *See, e.g.*, Murray v. Liberty Univ., Inc., No. 6:22-cv-00025, 2022 U.S. Dist. LEXIS 160793, at *15–16 (W.D. Va. Sep. 6, 2022) (discussing breach of contract); *George v. Averett Univ. of Danville*, No. 4:19cv8, 2019 U.S. Dist. LEXIS 119600, at *7–8 (W.D. Va. July 18, 2019) (same); *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 588 (E.D. Va. 2018) (same); *Abbas v. Woleben*, No. 3:13CV147, 2013 U.S. Dist. LEXIS 134446, at *11 (E.D. Va. Sep. 18, 2013) (same); *Jacob Doe v. Va. Tech*, No. 7:19cv249, 2020 WL 1309461, 2020 U.S. Dist. LEXIS 47754, at *17 (W.D. Va. Mar. 19, 2020) (discussing implied contract).

"[A]lthough a hearing where the individual has an opportunity to rebut the charges against him is always required in due process cases, when the hearing must be held and what procedural protections must be given at the hearing are determined on a case-by-case basis." *Brady v. Gebbie*, 859 F.2d 1543, 1554 (9th Cir. 1988). "There are no hard and fast rules by which to measure meaningful notice." *Nash v. Auburn Univ.*, 812 F.2d 655, 661 (11th Cir. 1987). However, "[a]n elementary and fundamental requirement of due process . . . is notice reasonably calculated, *under all the circumstances*, to apprise interested parties of the pendency of the action and *afford them an opportunity to present their objections.*" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1978) (emphasis added).

Courts have also found that the accused student should have the right to question the witnesses against them. *See, e.g.*, *Dillon v. Pulaski County Special School District*, 468 F. Supp. 54, 58 (E.D. Ark. 1978) ("Under all the circumstances, due process clearly demanded that the plaintiff should have been given an opportunity to question [the teacher initiating the proceedings] before the school board at its disciplinary hearing concerning the details of his alleged misconduct."); *Speake v. Grantham*, 317 F. Supp. 1253, 1258 (S.D. Miss. 1970) (declaring that plaintiffs and their counsel shall have the right of cross-examination), *aff'd per curiam*, 440 F.2d 1351 (1971); *Esteban v. Central Missouri State College*, 277 F. Supp. 649 (W.D. Mo. 1967) (prescribing hearing procedures, including that "plaintiffs (not their attorney) may question at the hearing any witness who gives evidence against them."). And while the Fourth Circuit has noted that "courts are divided on whether due process requires cross-examination in university disciplinary proceedings," it assumed the existence of such a right in one case (much like its analysis of the property interest issue). *Joseph Doe*, 77 F.4th at 239.

Defendants argue that Mr. Doe received sufficient process because he was notified of the hearing on March 3, 2020. The record, however, is murkier than Defendants suggest. Mr. Doe did not recall whether he and Ms. Cherry-Clarke discussed the hearing date at their informal meeting on March 3, 2020. *See* Doe Dep., at 166:21-23. Moreover, two letters were sent to Mr. Doe after the meeting on

March 3, 2020, and it appears that he was unable to open the letter with the correct hearing date on it until it was sent to him again on the morning of March 4, 2020. *See* Ex. 13; Ex. 14; ECF No. 136-33; ECF No. 136-34; Ex. 15; Cherry-Clarke Dep., at 21:15-22:5. Thus, Mr. Doe first learned of the hearing date between approximately 70 to 48 hours prior to the hearing. Yet, as this Court previously noted, courts generally find the university's process to be sufficient only where "the student received *substantially more* than one day's notice of the hearing"—up to four days, in fact.[9] ECF No. 109, at 37 (emphasis added). Even if Mr. Doe received more than a day's notice of the hearing, he received little more—and what notice he did receive was still constitutionally insufficient.

Aside from the notice of the hearing date itself, Mr. Doe was not even informed that he was being charged with violating Virginia Tech's Student Code of Conduct—with the potential sanction of dismissal—until February 28, 2024. *See* ECF No. 136-24. That was less than a week before the student conduct hearing was actually held. While Defendants instead offer that Mr. Doe was apprised of the allegations against him on February 17, 2020, when he received the letter informing him of the investigation, the cases are clear that a student is entitled to "notice of the charges against him," *Joseph Doe*, 77 F.4th at 237, not merely what charges he *may* receive, at some indeterminate point in the future, based on the outcome of an investigation. Indeed, as is clear from Ms. Cherry-Clarke's testimony, investigating a student is not the same as charging them. *See* Cherry-Clarke Dep., at 16:9-11. And for Mr. Doe's part, he had no expectation that there *would* be a student conduct hearing until he was actually charged with violating the Student Code of Conduct. *See* Doe Dep., at 150:7-18, 181:6-17.

Merely six days' (or four business days') time from notice of the charges to the formal hearing does not comport with many cases where the process a student received before dismissal was found to be sufficient. *See, e.g.*, *Joseph Doe*, 77 F.4th at 234 (hearing held nearly two months after the plaintiff

---

[9]       In *Nash*, *supra*, the plaintiffs "made no objections to the timing of the notice and hearing, nor did they request a delay in the schedule between the promised, restated notice and the [hearing date]." 812 F.2d at 661. Mr. Doe, by contrast, did object to the timing of the hearing, both verbally and in writing.

learned the specific charges against him); *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 671 (7th Cir. 2016) (hearing held over one month after receiving notice of charges); *Speake*, 317 F. Supp. at 1258 (ordering that the plaintiffs be given ten days' notice of the hearing). Moreover, the adequacy of notice must be viewed "under all the circumstances." *Craft*, 436 U.S. at 13. Such circumstances in this case include Mr. Doe's being placed under emergency custody on February 21, and hospitalization between February 22 and 25—of which he informed Ms. Cherry-Clarke. *See* Doe Dep., at 160:21-163:17; ECF No. 136-19; ECF No. 136-20. Under such circumstances, Mr. Doe was not afforded a reasonable opportunity to prepare for the hearing.

It is also significant that Mr. Doe asked for an extension of time, explaining why he needed one. As Mr. Doe testified, he informed Ms. Cherry-Clarke that he was in a very poor condition and needed more time during the informal meeting on March 3, 2020. *See* Doe Dep., at 163:18-22, 165:8-13, 168:12-168:8. Subsequently, in Mr. Doe's email to Ms. Cherry-Clarke on March 5, 2020, he advised her that he did not have enough time to prepare and collect all the evidence he needed to defend himself. See ECF No. 136-38. Any reasonable person would interpret this statement as requesting additional time to prepare for the hearing, especially in the context of Mr. Doe's previous request for an extension. Ms. Cherry-Clarke certainly construed it that way. *See* Cherry-Clarke Dep., at 25:5-10. And while Mr. Doe does not expressly base his due process claim on being denied an extension for the appeal, the fact that an extension was again denied even in the midst of the COVID-19 epidemic, *see* Ex., 17, demonstrates Virginia Tech's disregard as to the sufficiency of the process it afforded Mr. Doe before imposing the severe sanction of dismissal.

Finally, it is not just the timing of Mr. Doe's hearing that rendered the process he received insufficient, but also limitations placed on him during the hearing. Namely, Mr. Doe wanted to ask the complaining witness a straightforward question germane to her credibility—if she was frightened

of him, why did she voluntarily board the elevator with him? *See* ECF No. 136-43, at 1:29:05-1:30:30

. Mr. Doe was arbitrarily denied the opportunity to ask this question. *See id.*; Doe Dep., at 168:13-14.

For all of these reasons, Mr. Doe was not afforded due process at the student conduct hearing.

The Motion for Summary Judgment must be denied.

## II.    The Evidence Supports Plaintiff's Title IX Claims

Title IX prohibits federally-supported educational institutions from discrimination on the

basis of sex. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

education program or activity receiving Federal Financial assistance."). Title IX is enforceable through

an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979). "[T]he private

right of action implied by Title IX encompasses claims of retaliation." *Jackson v. Birmingham Bd. of Educ.*,

544 U.S. 167, 171 (2005).

Dr. Onufriev received a grant from the NIH, Grant No. 1R21GM131228-01, entitled

"Accurate yet fast implicit solvation, on February 14, 2019. Mr. Doe helped Dr. Onufriev achieve this

grant and promised results related to his research, yet Dr. Onufriev later used the award fund a female

student, Ms. Forouzesh, by providing her a GRA position in Spring 2019 as well as Summer 2019,

while awarding Mr. Doe nothing—though that did not stop Dr. Onufriev from attempting to associate

this grant with Mr. Doe's paper. Dr. Onufriev's funding decision was part and parcel of the gender-

based favoritism Dr. Onufriev showed to Ms. Forouzesh, to Mr. Doe's detriment, throughout his time

in Dr. Onufriev's lab. Virginia Tech, moreover, was aware of this discriminatory funding decision.

Relatedly, after Mr. Doe reported Dr. Onufriev's more general discriminatory conduct to Dr.

Pitt throughout the fall of 2019, Dr. Onufriev began retaliating against Mr. Doe. Such acts of

retaliation included impeding Mr. Doe's green card application by using ambivalent language and not

attesting to Mr. Doe's credentials; setting deadlines and creating a graduation plan with milestones

that would, in fact, hinder Mr. Doe academically; offering a GRA position that Mr. Doe would have no choice but to reject because of its requirements; refusing to sign paperwork that would have let Mr. Doe obtain a master's degree in computer science (for which he completed all course requirements); and insulting Mr. Doe's ethnicity and family further, in an attempt to provoke a reaction out of Mr. Doe. It was also after Mr. Doe's reporting that he began experiencing technical issues with his computer files.

Thus, Mr. Doe has brought claims against Virginia Tech under Title IX because (a) he was denied NIH grant funding based on his gender and (b) he was retaliated against based on his complaints alleging gender discrimination. As discussed in more detail below, the former claim is not time barred, and genuine disputes of material fact preclude summary judgment as to both claims. Therefore, the Motion for Summary Judgment must be denied.

### A.    Mr. Doe's Title IX claim with respect to NIH grant funding is not time barred

As Title IX does not contain an express statute of limitations, federal courts generally apply "the most closely analogous statute of limitations under state law," *Reed v. United Transp. Union*, 488 U.S. 319, 323–24 (1989), which in Virginia is the two-year limitations period for personal injury claims. *See Reid v. James Madison Univ.*, 90 F.4th 311, 318 (4th Cir. 2024) ("There is no dispute that Reid's due process and Title IX claims are subject to the two-year statute of limitations provided by Virginia's personal injury cause of action."). Likewise, a federal court "is obliged to follow the state's 'rule for tolling that statute of limitations.'" *Dillow v. Va. Polytechnic Inst.*, No. 7:22cv00280, 2023 U.S. Dist. LEXIS 34952, at *25 (W.D. Va. Mar. 2, 2023) (quoting *Scoggins v. Douglas*, 760 F.2d 535, 537 (4th Cir. 1985)). "Under federal law, a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Maryland House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995). "Furthermore, the burden is upon the party pleading the statute of limitations as a defense to show by a preponderance of the evidence that the cause of

action arose more than the statutory period before the action was instituted." *Clifton D. Mayhew, Inc. v. Blake Constr. Co.*, 482 F.2d 1260, 1262 (4th Cir. 1973).

Mr. Doe first filed a lawsuit regarding his claims on November 25, 2020, which was dismissed without prejudice on May 27, 2021. *See* ECF No. 35, at 28 (discussing this history). Mr. Doe then filed the instant lawsuit on June 25, 2021. *See* ECF No. 1. This Court rejected Mr. Doe's argument that the filing of the prior lawsuit served to toll the statute of limitations. *See* ECF No. 35, at 31-32.

However, the statute of limitations for Mr. Doe's claims—including his Title IX claim with respect to grant funding—was in fact tolled for another reason: the Supreme Court of Virginia tolled *all* statutes of limitations for 118 days between March 16, 2020, and July 19, 2020. *See Dillow*, 2023 U.S. Dist. LEXIS 34952, at *25 (discussing the COVID-19 order's tolling provisions). This tolling provision applies regardless of whether a claim's limitations period ended during the tolling period. *See id.*; *English v. Quinn*, 76 Va. App. 80, 88, 880 S.E.2d 35 (Va. Ct. App. 2022) ("[T]he plain language of the judicial emergency orders 'stopp[ed] the limitations clock' for *all* statutes of limitations between March 16, 2020, and July 19, 2020. By their clear and express terms, the orders' tolling provisions were not limited to deadlines that otherwise would have expired during that period."). The COVID-19 order's tolling provisions also apply to claims arising under federal law that borrow state statutes of limitation. *See Dillow*, 2023 U.S. Dist. LEXIS 34952, at *26 (applying the COVID-19 Order's tolling provisions to the plaintiff's Title IX claim and holding that the statute of limitations was tolled for 86 days between April 24, 2020—when the plaintiff's claim arose—and July 19, 2020). Assuming *arguendo* that Mr. Doe's Title IX claim with respect to grant funding arose on March 7, 2019, which Defendants suggest, the limitations period was tolled for 118 days between March 16, 2020, and July 19, 2020, making Mr. Doe's lawsuit timely if it was filed on or prior to July 3, 2021 (118 days after March 7, 2021). Because the instant lawsuit was filed before then, on June 25, 2021, it was timely.

However, even disregarding the COVID-19 order's tolling provisions, Mr. Doe's claim is not time barred with respect to the NIH grant funding awarded to Ms. Forouzesh in Summer 2019. As noted, Dr. Onufriev not only used Grant No. 1R21GM131228-01 to fund a GRA position for Ms. Forouzesh in Spring 2019, but in Summer 2019 as well. This decision was an independent act of discrimination, and Defendants present no evidence that the decision to award Ms. Forouzesh a GRA position in Summer 2019 was made prior to June 25, 2019. Likewise, Defendants present no evidence that Mr. Doe *knew* of that decision prior to June 25, 2019. The text exchange between Mr. Doe and Dr. Onufriev in March 2019 clearly does not refer to future funding for the Summer 2019 GRA position.

For these reasons, Mr. Doe's Title IX claim with respect to NIH grant funding was timely filed. The Motion for Summary Judgment must be denied.

### B. Genuine disputes of material fact preclude summary judgment for Mr. Doe's Title IX claim based on withholding NIH grant funding

As noted above, Title IX prohibits federally-supported educational institutions from discrimination on the basis of sex. *See* 20 U.S.C. § 1681(a). The statute's use of "on the basis of sex" creates a "but-for" causation standard with respect to Title IX claims. *See Sheppard*, 993 F.3d at 236 ("While admittedly not yet addressed in the context of a Title IX school disciplinary proceeding, the Supreme Court and our Circuit have held that the same or similar language requires 'but-for' causation."). In other words, at the summary judgment stage, the question is: "Could a reasonable jury, viewing the evidence in the record in a light most favorable to Doe, find that sex was a but-for cause of Virginia Tech's disciplinary decision?" *[Joseph] Doe v. Va. Polytechnic Inst. & State Univ.*, Civil Action No. 7:19-cv-00249, 2022 U.S. Dist. LEXIS 144420, at *26-27 (W.D. Va. Aug. 11, 2022), *aff'd*, 77 F.4th 231 (4th Cir. 2023). Recognizing that there can often be multiple "but-for" causes of a single event, this Court in *Joseph Doe* emphasized that this is an "*a* but-for cause" requirement, not "*the* but-for cause" requirement. *Id.* at *27 n.11.

"Courts have applied the familiar *McDonnell Douglas* burden-shifting framework in Title IX sex discrimination cases." *Id.* at *28 n.12 (citing *Doe v. University of Denver*, 1 F.4th 822, 831-35 (10th Cir. 2021)). "The 'burden-shifting' scheme set forth in *McDonnell Douglas*" proceeds in three steps." *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 174 (4th Cir. 2023). First, the plaintiff must make a prima facie showing of discrimination; the defendant then has the burden of rebutting the presumption of discrimination by articulating a legitimate reason for its actions; finally, the burden shifts back to the plaintiff to show that the proffered reason is pretext. *See id.* However, for this last step, a plaintiff need not "introduce *new* evidence, separate from her prima facie case, that *not only* undercut the [defendant's] justification *but also* showed a specific and discriminatory motive." *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 727 (4th Cir. 2019).

A Title IX claim also requires "notice to an 'appropriate person' and an opportunity to rectify any violation." *Gebser v. Lago Vista InDep., Sch. Dist.*, 524 U.S. 274, 290 (1998). "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination. Consequently, in cases like this one that do not involve official policy of the recipient entity, . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.*

First, there are genuine disputes of material fact that, if resolved in Plaintiff's favor, establish Virginia Tech's liability under Title IX for Dr. Onufriev's decision to not award Mr. Doe any funding from the NIH grant. Plaintiff has made a prima facie showing of discrimination. The facts, viewed in the light most favorable to him, show that Mr. Doe significantly contributed to the NIH grant at issue, and that Dr. Onufriev treated Ms. Forouzesh more favorably than compared to him, including by belittling Mr. Doe but calling Ms. Forouzesh a "princess" and saying that Mr. Doe could not compete

with her. *See* Doe Dep., at 47:23-51:17, 63:9-17, 106:15-107:4, 117:15-118:4, 174:21-175:12, 179:14-180:1; Ex. 2. As Mr. Doe put it, Dr. Onufriev had a clear "double standard" when it came to how he treated Ms. Forouzesh, the only female student in his lab at the time, compared to Mr. Doe. *See* Doe Dep., at 63:18-20.

Defendants cite other reasons for awarding Ms. Forouzesh with NIH grant funding, which, on the surface, appear to be legitimate. But those reasons are merely pretext, which is evidenced by not only Dr. Onufriev's disparate treatment of Mr. Doe and Ms. Forouzesh, but Mr. Doe's testimony regarding Ms. Forouzesh's qualifications. A jury could plausibly find that Ms. Forouzesh was chosen for the NIH grant-funded GRA position over Mr. Doe because Dr. Onufriev was showing favoritism to his "Persian princess"—which Mr. Doe could not be on account of his gender—rather than because she was the most qualified and he was not. Alternatively, a jury could plausibly find that both Mr. Doe and Ms. Forouzesh were qualified, but, because of Mr. Doe's gender, Dr. Onufriev showed favoritism to Ms. Forouzesh and only awarded her funding from the NIH grant.

These factors distinguish this matter from other cases where courts have granted summary judgment to the defendant on a claim for gender discrimination under Title IX. In *Joseph Doe*, *supra*, for instance, the plaintiff relied on "generalized evidence of an environment biased against males at Virginia Tech." 2022 U.S. Dist. LEXIS 144420, at *27. Similarly, in *Sheppard*, *supra*, the student did not plead facts to show that he was similarly situated to a female student or facts sufficient to show that the university's treatment of the plaintiff and the female student were materially different. *See* 993 F.3d at 237-38. Here, by contrast, Mr. Doe relies on specific incidents evincing Dr. Onufriev's bias and that he was treated in a materially different manner than Ms. Forouzesh, and Mr. Doe was very much similarly situated to Ms. Forouzesh, down to their backgrounds as Iranians.

It is thus not merely Mr. Doe's belief that he was denied any funding from the NIH grant on account of his gender. To the extent Defendants argue that Dr. Onufriev's testimony should be

believed over Mr. Doe's, that is a quintessential jury issue; given Mr. Doe's academic pedigree and work in the lab alongside Dr. Onufriev, Ms. Forouzesh, and others, his testimony is certainly not incredible as a matter of law. Nor is it an impediment to Mr. Doe's claims that he was "offered" other GRA positions at other points in time. As Mr. Doe testified, these offers, much like the reasons Defendants articulate to justify Dr. Onufriev's funding decision, are pretextual; in truth, the GRA positions would have required Mr. Doe to work on other projects, which Dr. Onufriev knew Mr. Doe would not be able to do. *See* Doe Dep., at 68:22-69:5; 108:9-109:3. Moreover, there is no evidence these GRA positions were related to the NIH grant funds Mr. Doe had helped Dr. Onufriev receive.

Second, in their Motion for Summary Judgment and accompanying brief, Defendants do not appear to contest that the alleged discrimination was reported to Dr. Pitt or that Dr. Pitt was an appropriate person sufficient to place Virginia Tech on notice.[10] In any event, the evidence shows that Mr. Doe did report Dr. Onufriev's discriminatory conduct to Dr. Pitt and that Dr. Pitt was an appropriate person sufficient to place Virginia Tech on notice.

In October 2019, Mr. Doe reported Dr. Onufriev's discrimination in an email to Dr. Mariani, which was forwarded to Dr. Pitt because Dr. Mariani recognized that Mr. Doe was making a complaint about discrimination. See Ex. 5; Mariani Dep., at 27:20-28:16. Mr. Doe also "explained the situation" and "the story of all that is happening" to Dr. Pitt and Dr. Mariani in a number of verbal conversations from that time forward. Doe Dep., at 123:17-126:7. In addition, in December 2019, Mr. Doe emailed Dr. Pitt and Dr. Mariani again, alerting them to, among other things, the fact that Dr. Onufriev received a grant by proposing the outcome of his research, but that another female student was getting paid from that grant. *See* Ex. 8. Dr. Pitt, as the chair, was in "the highest position in the physics department" and "responsible for basically managing the department, both physically, academic

---

[10]     *See* ECF No. 135, at 19-22 (arguing only that Mr. Doe's Title IX claim based on NIH grant funding is time barred and that gender was not a "but-for" cause).

programs and policies, providing evaluations for staff and faculty, basically managing the department." Pitt Dep., at 5:6-21. Dr. Pitt took no corrective action, or even investigated, these allegations of discrimination. *See* Pitt Dep., at 24:20-22.

The Fourth Circuit has not precisely addressed who may qualify as an "appropriate person" under Title IX, but as one district court observed, "[t]he cases make clear that notice of harassment to a school principal, university dean, or *department chair* 'entrusted with the responsibility and authority normally associated with th[ose] position[s]' can be 'actual notice' to an 'appropriate person.'" *Herndon v. Coll. of the Mainland*, No. G-06-0286, 2009 U.S. Dist. LEXIS 12425, at *53 (S.D. Tex. Feb. 13, 2009) (emphasis added) (citing cases); *see also Frederick v. Simpson Coll.*, 149 F. Supp. 2d 826, 837 (S.D. Iowa 2001) (finding the chair of a university department to be an "appropriate person" under Title IX). As the highest official in Virginia Tech's physics department, Dr. Pitt certainly had the authority to address Mr. Doe's claims of discrimination.

The facts, viewed in the light most favorable to Plaintiff, show that Virginia Tech received actual notice of Mr. Doe's claims of gender discrimination, including with respect to NIH grant funding, and that Mr. Doe's gender was a "but-for" cause of such discrimination. The Motion for Summary Judgment must be denied.

### C. Genuine disputes of material fact preclude summary judgment for Mr. Doe's Title IX claim based on retaliation

There are "two elements" to a Title IX retaliation claim: (1) that the plaintiff "engaged in protected activity under Title IX" and (2) " as a result of their protected activity," the plaintiff "suffered an adverse action attributable to the defendant educational institution." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018). "To be actionable, the retaliatory conduct must be 'materially adverse'; that is, it must suffice to 'dissuade[] a reasonable [person] from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). However, "retaliatory harassment . . . can rise to the level of material adversity.") *Id.*

To establish causation, a "plaintiff may establish the existence of facts that suggest that the adverse action occurred because of the protected activity" or "that the adverse act bears sufficient temporal proximity to the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (cleaned up); *accord Grabowski v. Ariz. Bd. of Regents*, No. CV-19-00460-TUC-SHR, 2021 U.S. Dist. LEXIS 265456, at *17 (D. Ariz. Aug. 17, 2021) (finding that the "causal link between protected activity and the adverse actions taken 'may be established by an inference derived from circumstantial evidence' such as a proximity in time between the protected action and the alleged retaliation." (quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867 (9th Cir. 2014))). While the Supreme Court has held that "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013), whether this standard applies to Title IX retaliation claims remains unresolved. *See Hurley*, 911 F.3d at 696 n.10.

Defendants do not appear to dispute that Mr. Doe engaged in protected activity. Indeed, Mr. Doe reported Dr. Onufriev's discriminatory conduct to Dr. Pitt throughout the fall of 2019, including via email in October 2019 and December 2019, and, as this Court suggested in its earlier Memorandum Opinion, this constitutes protected activity. *See* ECF No. 59, at 30. Rather, Defendants assert that Mr. Doe's Title IX retaliation claim fails because (a) Dr. Pitt did not communicate Mr. Doe's reports of gender discrimination to Dr. Onufriev and (b) Mr. Doe's additional assignments were not materially adverse. Defendants are wrong.

First, Dr. Pitt may deny sharing Mr. Doe's reporting with Dr. Onufriev, but the temporal proximity between Mr. Doe's numerous reports to Dr. Pitt beginning in October 2019—continuing in the months thereafter—and Dr. Onufriev's retaliatory conduct gives rise to a causal link between Mr. Doe's protected activity and Dr. Onufriev's retaliatory conduct. "Although there is no 'bright-line rule' for temporal proximity," courts have found lapses of time between two to four months to be

insufficient, depending on the circumstances. *See Roberts*, 998 F.3d at 127. No such lag existed here; to the contrary, given the continuing nature of Mr. Doe's complaints to Dr. Pitt, Dr. Onufriev's retaliatory conduct followed but was essentially concurrent with Mr. Doe's engaging in protected activity. For instance, the green card issue arose the month after October 2019; the deadline and milestone issues arose shortly after Mr. Doe's email in early December 2019; the master's degree in computer science issue arose in late 2019 or early 2020; and Dr. Onufriev began further insulting Mr. Doe around the same time.

Second, as discussed above, Dr. Onufriev's acts of retaliation included more than just setting deadlines and creating a graduation plan with milestones that would, in fact, hinder Mr. Doe academically. He also impeded Mr. Doe's green card application by using ambivalent language and not attesting to Mr. Doe's credentials, *see* Ex. 7; offered a GRA position that Mr. Doe would have no choice but to reject because of its requirements, *see* Doe Dep., at 108:9-109:3; refused to sign paperwork that would have let Mr. Doe obtain a master's degree in computer science (for which he completed all course requirements), *see id.* at 89:6-13; and further insulted Mr. Doe's ethnicity and family in an attempt to provoke a reaction out of Mr. Doe, *see id.* at 78:22-23. It was also after Mr. Doe's reports to Dr. Pitt that he began experiencing technical issues with his computer files. *See id.* at 78:5-14. A reasonable jury could find acts such as these materially adverse, in that they would dissuade a reasonable person from making a charge of discrimination, especially when viewed together. *See Brennan v. Norton*, 350 F.3d 399, 422 (3d Cir. 2003) ("The cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation."); *Stennis v. Bowie State Univ.*, 716 F. App'x 164, 168 (4th Cir. 2017) (finding altered job duties and reducing professional development opportunities to be materially adverse); c*f. Hurley*, 911 F.3d at 697-98 (finding that a letter denying discrimination claims was not, in itself, materially adverse retaliatory action).

Moreover, even if some of Dr. Onufriev's conduct was approved by Mr. Doe's dissertation committee, it does not follow that such acts were not retaliatory or materially adverse. Dr. Onufriev, as Mr. Doe's graduate advisor and co-chair of his dissertation committee, exerted a great deal of influence over the other members; indeed, Dr. Pitt, who was also on the committee, could only "speculate" how they related to Mr. Doe's thesis. *See* Ex. 9; Pitt Dep., at 20:14-19.

The facts, viewed in the light most favorable to Plaintiff, show that Mr. Doe was retaliated against by Dr. Onufriev for engaging in protected activity under Title IX. The Motion for Summary Judgment must be denied.

## CONCLUSION

With respect to Plaintiff's claims for (1) procedural due process in violation of the Due Process Clause, pursuant to 42 U.S.C. § 1983, (2) unlawful discrimination in violation of Title IX with respect to NIH grant funding, and (3) unlawful retaliation in violation of Title IX, Defendants have failed to meet their burden to show that there is no genuine issue of material fact entitling Defendants to judgment as a matter of law. Therefore, Defendants' Motion for Summary Judgment must be denied.

Respectfully submitted,

JOHN DOE

By:     /s/ Daniel J. Martin
        Of Counsel

John P. Fishwick, Jr., Esquire (VSB #23285)
John.Fishwick@fishwickandassociates.com
Carrol M. Ching, Esquire (VSB # 68031)
Carrol.Ching@fishwickandassociates.com
Daniel J. Martin, Esquire (VSB #92387)
Daniel.Martin@fishwickandassociates.com
Fishwick & Associates PLC
30 Franklin Road SW, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 Telephone
(540) 345-5789 Facsimile
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 28, 2024, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

By:      /s/ Daniel J. Martin
Daniel J. Martin (VSB #92387)
Fishwick & Associates PLC
30 Franklin Road SW, Suite 700
Roanoke, Virginia 24011
(540) 345-5890 Telephone
(540) 345-5789 Facsimile
Daniel.Martin@fishwickandassociates.com