IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
September 26, 2024
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

**JOHN DOE,**

**Plaintiff,**

**v.**

**VIRGINIA POLYTECHNIC INST. & STATE UNIV., et al.,**

**Defendants.**

**Case No. 7:21-cv-378**

**By: Michael F. Urbanski**
**Senior United States District Judge**

**MEMORANDUM OPINION**

This matter comes before the court on a motion for summary judgment, ECF No. 135, filed by defendants Virginia Polytechnic Institute and State University ("Virginia Tech"), Timothy Sands, in his official capacity as the president of Virginia Tech, and Tamara Cherry-Clarke, in her official capacity as the assistant director of student conduct. Plaintiff John Doe[1] filed a response in opposition to the motion, ECF No. 142, and defendants replied, ECF No. 144. The court held a hearing on the motion on September 17, 2024. For the reasons discussed below, the court will **GRANT** the motion for summary judgment.

Doe brings two claims. First, Doe brings a constitutional claim pursuant to 42 U.S.C. § 1983 through which he claims that Virginia Tech violated his procedural due process rights as guaranteed by the Fourteenth Amendment when the university dismissed him after finding that he violated multiple school policies related to sexual violence (Count One). Second, Doe brings a statutory claim pursuant to Title IX, 20 U.S.C. §§ 1681–1689, on the grounds that

[1] The court previously ordered the parties to use only the pseudonym "John Doe" to refer to plaintiff in this case. See Order, ECF No. 34.

Virginia Tech and Alexey Onufriev, Doe's graduate advisor, discriminated and retaliated against Doe by improperly withholding federal grant funding from him because of his gender (Count Two).

The undisputed evidence shows that defendants are entitled to judgment as a matter of law on both counts. As to Count One, the evidence shows that Doe had a legitimate entitlement to his continued enrollment at Virginia Tech, such that the university and its officials were required to provide Doe with certain procedural safeguards before depriving him of that right. In other words, Doe had a property interest in his continued enrollment at Virginia Tech. However, the evidence also shows that Doe received all the process he was due, both in the weeks before the hearing and during the hearing itself. Accordingly, the court will grant summary judgment to defendants on Count One.

Summary judgment is also appropriate on Count Two because there is no evidence that Doe's gender impacted his status at Virginia Tech in any way. The evidence does not raise a genuine dispute over whether Onufriev withheld NIH grant funds from Doe because of Doe's gender, nor does the evidence show that any Virginia Tech official took adverse action against Doe for complaints he made about gender discrimination. Therefore, the court will grant summary judgment on Count Two.

## I. Background

Doe's two claims arise from wholly separate factual circumstances. The events giving rise to Doe's Title IX claim span multiple years of Doe's tenure at Virginia Tech, while the events related to his procedural due process claim occurred in late 2019 and early 2020, concluding with his March 2020 dismissal from the university. In accordance with this

chronology, the court will first review the events related to the Title IX claim and then discuss those giving rise to the due process claim.

**A. Doe's Studies at Virginia Tech**

Doe came to the United States from Iran in 2013 to pursue a Ph.D. in physics at Virginia Tech. Doe Dep., ECF No. 136-4, at 27. In Iran, Doe obtained a bachelor's degree in physics from the University of Kurdistan and a master's degree in quantum computing physics from Shahid University. Id. at 26. When he first arrived at Virginia Tech, Doe worked for a professor in the physics department, but by 2015, transitioned to working for Alexey Onufriev, Ph.D., a faculty member of the computer science department.[2] Id. at 29, 32–36. Onufriev's research focused on the development of methodologies used to conduct biological and biomedical research. See Onufriev Dep., ECF No. 142-1, at 10. Doe worked for Onufriev from 2015 until his dismissal from Virginia Tech in March 2020. Id. at 107–109.

Doe started working for Onufriev as a volunteer in 2015 but shifted, through what Onufriev dubbed "a multistep process," to working full-time in Onufriev's lab in pursuit of his Ph.D. Id. at 38. Initially, at the recommendation of one of Onufriev's then-students who knew Doe, Onufriev accepted Doe into his lab as a volunteer. Id. at 37–38. Doe then informed Onufriev that he wished to pursue a master's degree in Onufriev's lab. Id. at 38. Shortly thereafter, however, Doe told Onufriev that he wished instead to pursue a Ph.D. Id. at 39.

Doe and Onufriev recall this chain of events in different ways. Doe Dep., ECF No. 136-4, at 33–38. In Doe's view, this interest was born of necessity because his work in the

[2] While Onufriev's primary appointment is in computer science, he has "adjunct appointments in physics, in engineering science and mechanics, . . . and also in the graduate program of genetics and bioinformatics." Onufriev Dep., ECF No. 142-1, at 9.

physics department had dried up—Doe and his then-advisor obtained data that showed their research would not lead to publication. Doe Dep., ECF No. 136-4, at 37–38. Onufriev, however, had a different perspective. He spoke with Doe's prior faculty advisor, who informed Onufriev that the advisor had "let [Doe] go" because Doe "essentially was not . . . graduate student material." Onufriev Dep., ECF No. 142-1, at 40. Despite this information, Onufriev decided to give Doe an opportunity as a Ph.D. candidate in his lab. Id. at 41. Onufriev told Doe "up front, there is not going to be funding, that any discussion of funding might happen . . . later if there is funding in his area and if he's . . . proven himself as very capable . . . ." Id. Doe then began his work as a Ph.D. student in Onufriev's lab.

Doe and Onufriev worked closely together for the first several years of Doe's Ph.D. candidacy. See id. at 44–45. After about six months, Onufriev realized that he would have to be heavily involved in Doe's research, more so than with other Ph.D. candidates in his lab. Id. at 45–46. As a consequence, Onufriev tasked Doe with testing methodologies, as opposed to developing them. Id. Doe's expertise became "running standard molecular dynamic simulations on proteins using standard protocols with standard water models." Id. at 47. Doe's work led to the publication of a research paper, of which he was first author,[3] and both Doe and Onufriev were optimistic about Doe's future in the lab. Id. at 48–50; see also Doe Dep., ECF No. 136-4, at 45.

That optimism waned for both Doe and Onufriev as Doe's work in the lab continued. In Doe's view, Onufriev refused to make himself available for Doe's questions, instead

[3] In Onufriev's view, Doe's role as first author reflected that he did "most or at least 50 percent . . . of the work," and that Doe wrote the paper himself. Onufriev Dep., ECF No. 142-1, at 50.

spending significant time working with other students in the lab. Doe Dep., ECF No. 136-4, at 46–50. By the end of 2017, Doe had completed a significant portion of the data analysis necessary to write a second paper and needed Onufriev's input on the drafting process. Id. at 46–47. Doe found that Onufriev would not give Doe more than 10 minutes of his time each week but that Onufriev would spend time every day working with another student, Negin Forouzesh, on her research paper. Id. at 47. Yet Doe also found that Onufriev was repeatedly giving Doe feedback on his paper, which frustrated Doe because the edits forced him to redo much of his work. Id. at 47–48. In contrast, Onufriev believed that he was spending a disproportionately large amount of time on Doe's work compared to that of the other students in the lab. Onufriev Dep., ECF No. 142-1, at 59–63. Onufriev "was essentially writing the paper, rewriting it" because Doe regularly made "errors in logic" and typographical errors. Id. at 60. Onufriev "spent a lot of time behind the scenes working . . . on [Doe's] paper," and even though Doe saw "less of [Onufriev] in person," Onufriev did not spend "less time on [Doe's] project." Id. Onufriev found that, where he could resolve an issue in 10 minutes with another student in his lab, resolution of the same issue with Doe took "hours and hours of work." Id. at 61. At the same time, Onufriev "knew that this paper would make or break [Doe's] career," and Onufriev believed that the paper would have a significant impact in the field. Id. at 61–62. The paper was received favorably when it was published in 2019. Id. at 62–63.

Doe believed that this perceived lack of attention stemmed from Onufriev's prejudice against him based on his gender and ethnicity. In March 2019, Doe sent an email to Onufriev in which Doe complained that Onufriev had not given enough time to Doe's paper. See ECF

No. 136-7. Doe wrote that "[a]ll I want is equality between students without respect to gender, race, ethnic [sic], . . . [s]omething that unfortunately, I don't see it [sic] in our group." Id. at 2. Onufriev replied that he had "spent a disproportionate amount of time working on this project/paper, possibly at the expense of time I should have spent on projects of other group members." Id. Onufriev further explained that his group was "a multicultural, multi-gender lab," and that "[t]here is no place for envy in it." Id.

Doe further believed that this antipathy also explained Onufriev's decision not to allocate funds to Doe in two instances. In regular intervals, Onufriev submitted proposals to the National Institutes of Health ("NIH") for the purpose of obtaining grant funding for his lab's research. See Onufriev Dep., ECF No. 142-1, at 15–27. This time- and energy-intensive process required Onufriev to develop a scientific hypothesis; generate preliminary test results; and draft a grant proposal that explained the importance of the project, cited numerous publications in the field, and discussed its potential impact in the scientific community. Id. at 15–18. In some instances, Onufriev included students in the grant proposal drafting process, particularly where the student's research overlapped with the newly proposed project. Id. at 20–21. If the NIH accepted Onufriev's grant proposal, then the NIH disbursed the funds to Virginia Tech, which allocated a portion of the funds to the university and transmitted the remainder to Onufriev for use in pursuit of his research agenda. Id. at 19. Onufriev then used the funds to cover the cost of personnel, travel, and equipment. Id.

One personnel role that was funded by several NIH grants Onufriev received was the position of graduate research assistant ("GRA"). When a student is designated as a GRA, that student receives grant funding for the purpose of conducting research. Id. at 25. GRA funding

covers a salary, tuition, and health benefits for the student. Id. at 25–26. This position allows a student to focus more heavily on research, as opposed to teaching, a role funded through the position of graduate teaching assistant ("GTA"). Id. at 25–26.

Doe took issue with two instances where Onufriev chose other students in the lab to serve as GRAs. First, on February 12, 2018, Onufriev submitted a proposal to the NIH to fund research into "[a]ccurate yet fast implicit solvation," ECF No. 136-1, at 2, a project that sought to design a "novel way of modeling the effects of water," Onufriev Dep., ECF No. 142-1, at 29. As part of the proposal, Onufriev informed the NIH that "a GRA will be recruited from the Department of Computer Science to work 10.63 calendar months in year one, and 9.57 calendar months in year two." ECF No. 136-1, at 40. Second, Onufriev submitted another proposal to the NIH on October 12, 2018, entitled "Explicit Ions in Implicit Solvent: Fast and Accurate," which sought to research the related question of designing a novel way of modeling the effects of water, "plus ions, sodium, potassium." Onufriev Dep., ECF No. 142-1, at 33. This second proposal likewise stated that "a GRA will be recruited from the Department of Computer Science to work 9.87 calendar months in year one, and 8.87 calendar months in year two." ECF No. 136-2, at 35.

The NIH granted funding to Onufriev in connection with both proposals. For the accurate yet fast implicit solvation grant, Onufriev designated Negin Forouzesh, a female student in Onufriev's lab, as the GRA. See Onufriev Decl., ECF No. 136-3, ¶ 17. Onufriev based this decision on Forouzesh's "prior work that supported the grant application and her extensive experience with the generalized Born (implicit solvent) model that she gained while working in my lab (paper published in 2017)." Id. As to the Explicit Ions grant, Onufriev

designated Yeyue Xiong, a male student in Onufriev's lab, as the GRA. See id. ¶ 23. Onufriev chose Xiong based on "his demonstrated expertise in the development of water models," including his 2019 published article on the topic. Id.

Doe believes that Onufriev chose Forouzesh and Xiong over Doe for these GRA positions because of Doe's gender and ethnicity. Doe Dep., ECF No. 136-4, at 63–64. Doe claims that he helped Onufriev obtain grant funding, "but when the grant came in, the double standard and discrimination started." Id. at 63. Onufriev based several deliverables in the NIH grant proposals on Doe's research, and Doe thus believed that he was entitled to a GRA position. Id. at 64. Doe claims that when he discussed the funding issue with Onufriev, Onufriev insulted Doe for being Kurdish, for "not having pure blood," and for not being a "Persian princess," a comparison which Doe attributed to Forouzesh. Id. at 106–108. Onufriev denies that he ever made such comments, though he admits that he may have used the phrase "Persian princess" in connection with a Russian song that invoked the phrase. See Onufriev Dep., ECF No. 142-1, at 126–128. In contrast to Doe's allegations of discriminatory motive, Onufriev recalls that he may have told Doe that Forouzesh "has better expertise in the subject matter of the grant proposal that we were talking about, that she had published a paper in the area, . . . she is an excellent programmer, she's an expert in computational geometry, and she has better expertise than [Doe] in the area of the grant." Id. at 127–128. Doe also contends that he saw Onufriev and Forouzesh kissing in a vehicle in Blacksburg, see Doe Dep., ECF No. 136-4, at 110–112, as further support for this discriminatory animus, an event which Onufriev denies, see Onufriev Dep., ECF No. 142-1, at 128. Doe does not explain

the discriminatory basis for Onufriev's choice of Xiong over Doe in connection with the GRA position on the Explicit Ions grant.

Doe acknowledges that Onufriev offered Doe GRA positions at least twice and that Doe refused both opportunities. Doe Dep., ECF No. 136-4, at 68–72. At the end of 2018, Onufriev asked Doe to serve as a GRA to help Forouzesh with her research. Id. at 68–69. According to Doe, he declined the offer because Onufriev had recently informed Doe that Onufriev would not recommend Doe to future employers. Id. at 69.

Doe's second opportunity for a GRA position occurred toward the end of 2019, while Doe was attempting to complete his Ph.D. In the fall of 2019, Doe applied for permanent residency in the United States. Id. at 98–99. Before applying for a green card, Doe had been living in the United States pursuant to a student visa, which allowed him to remain in the United States as long as he was enrolled as a student. Id. However, Doe's green card application triggered a deadline for Doe to finish his Ph.D. by the spring of 2020. See id.; see also Onufriev Dep., ECF No. 142-1, at 78. At the time, Onufriev did not believe that Doe was ready to graduate with a Ph.D. Onufriev Dep., ECF No. 142-1, at 79. In connection with several other faculty members, who, together with Onufriev, oversaw Doe's Ph.D. progress, Onufriev designed "a multi-point plan" with "very detailed specific checkpoints and guidelines for [Doe] as to what's needed" for Doe to graduate with his Ph.D. by the spring of 2020. Id. at 79–80.

This plan included an offer for Doe to serve as a GRA in Onufriev's lab to give Doe the funding he needed to focus exclusively on finishing his Ph.D. before the spring 2020 deadline. Id. at 80. Onufriev sent this plan to Doe via email on December 10, 2019, see ECF

No. 136-9, and followed up the next day with a more detailed agenda of line-item tasks that Doe needed to complete to graduate, see ECF No. 136-10. The plan noted that "to help you accomplish your research objectives[,] your PhD advisor had offered a full GRA position for you for the Spring of 2020; should you decide to accept, you must respond to your advisor by the end of business on Dec 13th, 2019." ECF No. 136-9, at 3.

On December 13, 2019, Doe informed Onufriev via email that he would accept the GRA position. See ECF No. 136-5, at 3. The next day, however, Onufriev informed Doe that Doe would be working closely with two other members of Onufriev's lab on their project as part of Doe's GRA duties. Id. Doe balked at this information, having not known that the GRA would force him to work on a project additional to his own research. Id. Doe wrote to Onufriev that "[t]his will change everything," and that Doe did not have time for the work. Id. In a lengthy response, Onufriev explained that Doe could continue to work on his research and "at the same time do something useful for the NIH project, and that would justify this type of funding." Id. at 2. Onufriev told Doe that Doe would have more time to work on his project if he accepted the GRA than if he declined it. Id. At the end of the response, Onufriev wrote that "I take this letter as your official and final rejection of the GRA offer," and encouraged Doe to "focus on what's in your research and dissertation milestones, and report your progress as agreed." Id. at 3. In the months that followed, Doe worked to complete his Ph.D. However, Doe had not completed the work by the time he was dismissed from Virginia Tech, and the school did not award him a Ph.D.

### B. Doe's Dismissal from Virginia Tech

The events giving rise to Doe's dismissal from Virginia Tech occurred in the fall of 2019 and spring of 2020, and are unrelated to his Ph.D. studies. In September 2019, Doe began to communicate with a fellow Virginia Tech student, Jane Roe,[4] on Tinder. See ECF No. 136-39, at 1. They exchanged messages and agreed to meet on campus the following day, September 11, 2019. See ECF No. 136-12, at 5.

Doe and Roe present different accounts of the events of September 11, 2019. In Roe's telling, she and Doe met at the Torgerson Bridge, where Doe asked Roe if she would accompany him back to his apartment to have sex. See ECF No. 136-12, at 6–10. Doe and Roe's interaction this day is relevant to this case insofar as it later cause Roe to accuse Doe of sexual violence.[5] Doe contested Roe's accusations and account of that day.

After they parted ways on September 11, 2019, Roe attempted to avoid places on campus where she might interact with Doe, but on November 15, 2019, she saw Doe in the Graduate Life Center, a building on Virginia Tech's campus where she resided at the time. Id. at 10. She was carrying groceries up to her room, and when she reached the elevator, Doe approached her and accompanied her up to her floor. Id. Roe told Doe that she had a boyfriend and that Doe hurt her at his apartment. Id. Doe apologized, and when they reached her room, she closed the door, leaving him in the hallway. Id. Roe then returned to the hallway, finding Doe still there, and the two of them went back to the elevator. Id. Doe stood in the middle of the elevator, and Roe tried to stand as close to the wall as possible to keep away

---

[4] As with Doe, the court ordered the parties to use only the pseudonym "Jane Roe" to refer to the woman who accused Doe in the underlying disciplinary proceedings. See Order, ECF No. 34.

[5] The court need not discuss Roe or Doe's accounts in detail, both of which are captured fully in the materials submitted by the parties in briefing this motion for summary judgment. See ECF No. 136-12; ECF No. 136-39.

from him. Id. While they traveled downstairs in the elevator, Doe leaned in, kissed Roe, and grabbed her body. Id. She pushed him away and, when the doors opened, ran down the hallway away from Doe. Id.

Doe recalls the events of November 15, 2019, differently than Roe. See ECF No. 136-39, 136-43. Doe claims that he saw Roe standing by the elevator of the Graduate Life Center holding a bag of groceries. ECF No. 136-39, at 6. Doe approached her and began conversing with her. Id. When the elevator arrived, Doe accompanied Roe upstairs. Id. Roe told Doe that she had gotten several bruises from him in September. Id. When they arrived at Roe's room, she walked in and began putting the groceries away. Id. She did not close her door. Id. Doe remained in the hallway and, after several minutes, said goodbye to Roe, closed her door, and returned to the elevator. Id. Roe joined Doe at the elevator a minute later, telling him that she had to retrieve additional groceries. Id. Inside the elevator, Doe and Roe kissed each other, and he touched her body, at which point she asked him to stop, which he did. Id. The elevator doors opened, and they said goodbye to each other. Id.

Doe faced disciplinary action from Virginia Tech shortly thereafter. On November 21, 2019, Virginia Tech issued a no contact order between Doe and Roe. See ECF No. 136-13. Then, Doe was approached by officers with the Virginia Tech Police Department while having lunch in downtown Blacksburg. See Doe Dep., ECF No. 136-4, at 146–148. Doe went to the Virginia Tech Police Department and spoke with one of the officers about his interactions with Roe. Id. Doe was not contacted again about the issue until February 17, 2020, when he received a letter from Kristin Barnett, Virginia Tech's Title IX and Compliance Investigator. See ECF No. 136-14. Barnett informed Doe that Roe had made several allegations against

him, which, if true, violated Virginia Tech's policy against harassment, discrimination, and sexual assault. Id. at 1. Barnett summarized the details of Roe's allegations and stated that she had begun an investigation into the accusations. Id. She encouraged Doe to meet with her "to discuss the matter, and to go over processes and procedures." Id. She told Doe that he did not have to participate and that, if he wished, Associate Dean of Students Anthony Scott could serve as his advisor and be "in attendance for any phone calls or meetings." Id. Barnett told Doe that his attendance was not required, but that "the investigation will proceed regardless of your participation." Id. at 2.

A flurry of activity followed in the subsequent three weeks. Doe sent an email to Scott immediately after he received Barnett's letter asking him to meet about the Title IX investigation. See ECF No. 136-15. Doe and Scott met the same day, and on the following day, Doe received notice that Virginia Tech had issued an interim suspension against him. See ECF No. 136-16. Interim Assistant Vice President for Student Affairs Francis Keene wrote that Doe had the opportunity to challenge the interim suspension and that the suspension would not impact any Student Conduct proceedings that would follow from the Title IX investigation. Id. The letter also said that "[a] formal student conduct hearing will be scheduled at a later date and notification will be sent to you under separate cover." Id. Doe met with Keene on February 20, 2024, to challenge the interim suspension, but to no avail—Keene refused to lift the suspension. See ECF No. 136-18.

Right after the February 20, 2020, meeting with Keene, Doe's roommate called Virginia Tech's counseling center out of concern for Doe's wellbeing. See Doe Dep., ECF No. 136-4, at 160. The police took Doe into emergency custody and transported him to Southern Virginia

Regional Medical Center. Id. at 160–163; ECF No. 136-19; ECF No. 136-20. Doe remained there until February 25, 2020, at which point he was discharged, having been diagnosed with "major depression." See ECF No. 136-20, at 1.

On February 26, 2020, Doe sent an email to Barnett in response to her request to schedule a meeting with him about the Title IX investigation. See ECF No. 136-21. Doe wrote that he "just got back from hospital," and needed to speak with Scott before meeting with Barnett. Id. at 4. Barnett asked to meet with Doe the following day, and Doe asked to move the meeting to the following Monday, March 2, 2020, because Doe had "a mandatory meeting with [his] psychiatrist" at Barnett's proposed time and because he needed more time to write his statement. Id. Doe and Barnett eventually agreed to meet, with Scott, that Friday, February 28, 2020. Id. at 2. Barnett clarified that Doe did not need to prepare a statement in advance of this meeting. Id. at 2.

Doe, Scott, and Barnett met at 8:00 a.m. on February 28, 2020. Id. Several hours later, Barnett sent an email to Doe informing him that she had received information relevant to his case and that she wanted to meet with him again later that same day. See ECF No. 136-22, at 2. Doe agreed, and the two met later that afternoon. Id.

Also on February 28, 2020, Doe received a letter from Assistant Director of Student Conduct Tamara Cherry-Clarke informing him that Student Conduct had received a referral related to Doe's potential violations of Virginia Tech's Student Code of Conduct. See ECF No. 136-24, at 2. Cherry-Clarke scheduled an informational meeting with Doe for March 3, 2020, which served several purposes, including to "give [Doe] information about the date/time/location of [his] formal hearing." Id. Cherry-Clarke attached a document to her

letter entitled "Student Conduct Informational Meeting," which discussed the purpose of the meeting and provided an overview of the procedures involved. See id. at 4–8. The document also included information about the formal hearing and stated that "[a] student who is alleged to have violated a policy within the Student Code of Conduct is guaranteed certain opportunities in the conduct process." Id. at 5 (emphasis in original). These "guarantees" were explicitly listed in the document:

- To receive advance notice of the charges in writing.
- To have an advisor present during the hearing. An advisor's participation is limited to conferring with you—they may not participate in the hearing.
- To refute any information or statements presented during the hearing.
- To bring witnesses on your behalf.
- To not participate or answer any questions.
- To challenge the objectivity of the hearing officers if you have grounds to show that they individual(s) is biased or has a conflict of interest.
- To appeal the outcome of the hearing.

Id. The document also shared that "[b]oth complainant and respondent will have an opportunity to present questions for any witnesses and the other party. All questions will be filtered through the hearing officers in order to ensure they are relevant. Should you have a question, you will direct it to the hearing officer, the hearing officer will rephrase it and ask it of the other party if it is relevant to the policy violation. Do not answer any questions that are not asked by the hearing officers." Id. at 7.

Doe met with Cherry-Clarke on March 3, 2020. See Cherry-Clarke Dep., ECF No. 136-25, at 17–19. Cherry-Clarke does not recall the contents of their conversation, but Doe claims that Cherry-Clarke "probably" told him that the hearing had been set for March 6, 2020. See Doe Dep., ECF No. 136-4, at 166; see also Cherry-Clarke Decl., ECF No. 136-32

¶ 9 ("I met with Doe on March 3, 2020[,] for a prehearing meeting. During that meeting, I informed him that the hearing would be held on March 6, 2020[,] at 11:00 a.m."); ECF No. 136-30 (March 3, 2020, email from Cherry-Clarke to Barnett stating that she had met with Doe and that the hearing would occur on March 6, 2020). Doe recalls that he asked for the hearing to be postponed because he had just been released from the hospital. See id. at 167–168. He told Cherry-Clarke that he needed more time to prepare and to "at least put myself together," but Cherry-Clarke refused to postpone the hearing. Id. Cherry-Clarke claims that she was not aware of Doe's hospitalization or mental state, see Cherry-Clarke Dep., ECF No. 136-25, at 25, 28, and that if a student raised a health issue with her, then she would attempt to reschedule the hearing, id. at 11–12.

Confusion as to the date of the student conduct hearing followed the March 3, 2020, meeting. That afternoon at 3:49 p.m., Cherry-Clarke sent an email to Doe in which she attached a letter stating that the hearing would occur the next day, March 4, 2020. See ECF No. 142-13 (email attaching letter); ECF No. 136-33 (letter with March 4, 2020, date). Four minutes later, Cherry-Clarke sent an identical email to Doe, attaching a similar letter that, this time, identified the hearing date as March 6, 2020. See ECF No. 142-14 (email attaching letter); ECF No. 136-34 (letter with March 6, 2020, date). Cherry-Clarke explained that she reviewed the initial letter right after she sent it to Doe, realized her mistake, and corrected it several minutes later. See Cherry-Clarke Dep., ECF No. 136-25, at 19–21. But when Doe went to open the 3:53 p.m. email attaching the letter with the corrected hearing date, he could not access the letter. See ECF No. 142-15. Doe sent an email to Cherry-Clarke on the evening of

March 3, 2020, stating that he could not access the letter. Id. Cherry-Clarke replied the following morning, March 4, 2020, informing Doe that she had just resent it. Id.

On March 5, 2020, Cherry-Clarke sent another email to Doe attaching a letter that asked whether Doe planned to participate in the March 6, 2020, hearing and whether he intended to bring any witnesses. See ECF No. 136-37. In response, Doe confirmed that he would attend the hearing and that he planned to submit the written statement of a friend. See ECF No. 136-38. Doe also wrote that, "[j]ust for the record, I did not have enough time to a prepper [sic] and collect all of the evidence that I need to defend my self [sic]." Id. Cherry-Clarke replied: "[t]hank you for your email. I am aware that you received notice of the investigation on Monday, February 17th and have had opportunities to meet with Title IX Investigator Kristin Barnett. Therefore, this is not an impediment to our process." Id. Also on March 5, 2020, Doe sent a draft of his statement to Scott for his review. See ECF No. 136-42. Doe submitted this statement, along with a friend's written statement, to Cherry-Clarke on the morning of March 6, 2020. See ECF No. 136-41.

The March 6, 2020, hearing went forward as scheduled. The hearing officers began by reviewing the procedures and rules that governed the hearing, and then Roe and Doe gave opening statements. See ECF No. 136-43 (hearing audio). Next, Barnett reviewed the background and findings of the Title IX investigation. Id. The hearing officers then asked Barnett to explain the various notices that Doe received throughout the investigation and in advance of the formal hearing. Id. In recounting her correspondence with Doe, Barnett stated that Doe had informed her on February 26, 2020, that he had been released from the hospital the previous day. Id. The hearing officers did not follow up on this point, and Doe did not

renew his request for a continuance. Id. Thereafter, Doe posed questions for Barnett to the hearing officers, which the hearing officers rephrased and asked on Doe's behalf. Id. Roe declined to ask questions of Barnett. Id. Then, the hearing officers asked Doe and Roe questions about the events of September 11, 2019, and November 15, 2019. Id. Specifically, one of the hearing officers asked Roe to clarify the events of the November 15, 2019, interaction. Id. Roe explained that she joined Doe in the elevator because she had to retrieve additional groceries from the main floor of the Graduate Life Center. Id. Roe stated that she stood as far away from Doe as she could during the elevator ride but that Doe nevertheless approached her, kissed her, and grabbed her without her consent. Id. The hearing officer asked Doe the same question, and Doe said that Roe looked at him and that he interpreted her body language as consent. Id. The hearing officers then gave Doe and Roe an opportunity to pose questions to each other, filtered through the hearing officers. Id. Roe declined to ask Doe any questions, but Doe asked Roe to identify the point at which she became fearful of Doe. Id. Roe said that she became afraid after disclosing the details of her experience with Doe to several acquaintances. Id. Roe also said that, as to the November 15, 2019, interaction, she did not initially believe that Doe would touch her but that she became fearful during the elevator ride back down from her apartment with Doe. Id. Doe attempted to ask Roe why she joined him on the elevator in the Graduate Life Center on November 15, 2020, if she was frightened of him. Id. One of the hearing officers told Doe that the question appeared intended to prove a point and refused to relay the question to Roe. Id. Doe and Roe then gave closing statements. Id.

On March 9, 2020, the hearing officers sent a letter to Doe finding him responsible for rape, sexual coercion, and sexual battery. See ECF No. 142-16, at 1. The officers recounted the statements given during the hearing and found that Doe did not have Roe's consent to engage in sexual intercourse and that he coerced Roe into performing sexual acts. Id. at 2–4. Based on these violations, the officers dismissed Doe from Virginia Tech. Id. at 4. On March 15, 2020, Doe sent an email to Cherry-Clarke asking for more time to appeal the decision. See ECF No. 142-17. Cherry-Clarke refused to extend the deadline, but Doe nevertheless appealed. On April 20, 2020, Interim Assistant Vice President for Student Affairs Martha Glass denied Doe's appeal. See ECF No. 142-18.

**C. Procedural History**

Doe filed his Initial Complaint on June 25, 2021. See Compl., ECF No. 1. After a December 14, 2021, hearing on motions to dismiss filed by defendants, the court granted Doe leave to amend his complaint, see Order, ECF No. 20, and Doe filed a First Amended Complaint on January 3, 2022. See Am. Compl., ECF No. 21. Defendants subsequently filed an additional motion to dismiss, which the court granted on July 28, 2022. See Order, ECF No. 36. The court again granted Doe leave to amend his complaint, and he filed a Second Amended Complaint on August 26, 2022. See Second Am. Compl., ECF No. 37. Defendants then filed more motions to dismiss.

During the pendency of these latest motions to dismiss, counsel for Doe filed a motion to withdraw. ECF No. 57. On February 22, 2023, the court granted the motion to withdraw, and granted in part and denied in part the motions to dismiss. See Order, ECF No. 60. Doe subsequently obtained new counsel, and the court granted Doe leave to file a Third Amended

Complaint, which Doe filed on August 23, 2023. Third Am. Compl., ECF No. 86. Defendants again filed a motion to dismiss, which the court granted in part and denied in part, leaving Doe with a procedural due process claim and a Title IX claim for discrimination and retaliation. See Order, ECF No. 108; Order, ECF No. 110. The parties then proceeded to discovery, and defendants filed this motion for summary judgment on August 19, 2024.[6] ECF No. 135.

## II. Legal Standard

Under Federal Rule of Civil Procedure 56, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."

---

[6] On September 10, 2024, Doe filed a motion asking the court to consider in connection with the motion for summary judgment certain Virginia Tech records produced by defendants after the close of discovery. ECF No. 148. The records are numerous case files from Student Conduct investigations of Virginia Tech students from September 2019 until June 2020, which, according to Doe, "do not appear to identify a single student dismissed from the university for violating the student code of conduct without the benefit of a formal hearing at least being scheduled." Id. at 2. Doe contends that these files "bolster[] [Doe's] position that he had a property interest in his continued enrollment as a graduate student at Virginia Tech." Id. at 3. Doe's motion is **GRANTED** as the court reviewed and considered these materials in connection with the motion for summary judgment.

Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Anderson, 477 U.S. at 248). Even when facts are not in

dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

## III. Discussion

Doe brings two claims against defendants. First, Doe brings a procedural due process claim under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against Sands and Cherry-Clarke in their official capacities for Doe's alleged failure to receive sufficient process during Virginia Tech's disciplinary proceedings against Doe. Second, Doe brings a Title IX claim against Virginia Tech for alleged gender-based discrimination and retaliation. The court will address each claim in turn.

### A. Count One: Procedural Due Process

Doe claims that Sands and Cherry-Clarke, acting in their official capacities, violated Doe's right to procedural due process as guaranteed by the Fourteenth Amendment. To succeed on his procedural due process claim, Doe must establish that (1) "he had a constitutionally cognizable life, liberty, or property interest"; (2) the "deprivation of that interest was caused by some form of state action"; and (3) that the "procedures employed were constitutionally inadequate." Sansotta v. Town of Nags Head, 724 F.3d 533, 540 (4th Cir. 2013). Defendants argue that summary judgment is appropriate because (1) Doe cannot establish that he had a cognizable property interest in his continued enrollment at Virginia

Tech;[7] and (2) even if Doe had such an interest, the undisputed evidence shows that Virginia Tech and its officials afforded Doe constitutionally sufficient process.[8]

**1. Property Interest**

Defendants contend that Doe cannot identify the tangible and independent source giving rise to his property interest in continued enrollment at Virginia Tech. See Mem. Supp., ECF No. 136, at 15–17. The Fourteenth Amendment itself does not create property interests. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution."). Instead, a protected property interest arises in a government benefit when an individual has a "legitimate claim of entitlement to it." Id. ("[Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."); see also Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 79 (4th Cir. 2016) ("For a property interest in a certain government benefit, 'a person must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" (quoting Mallette v. Arlington City Emps.' Supplemental Ret. Sys. II, 91 F.3d 630, 634 (4th Cir. 1996))). Here, Doe must show that "a state created property interest in continued enrollment at a public education institution exists in Virginia." Sheppard v. Visitors of Va. State Univ., 993 F.3d 230, 239 (4th Cir. 2021) (quoting Davis v. George Mason Univ., 395 F. Supp. 2d 331, 336 (E.D. Va. 2005)).

---

[7] Doe claims only that he had a protected property interest in his continued enrollment at Virginia Tech. See Third Am. Compl., ECF No. 86, ¶¶ 88, 90.

[8] Defendants do not dispute that their conduct constitutes state action.

The Supreme Court has refused to explicitly recognize a public university student's property interest in continued enrollment. Instead, the court has assumed without deciding that such an interest exists to reach the issue of whether a deprivation occurred. See Bd. of Curators of Univ. of Missouri v. Horowitz, 435 U.S. 78, 84–85 (1978) ("Assuming the existence of a liberty or property interest, respondent has been awarded at least as much due process as the Fourteenth Amendment requires."); Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 224 (1985) ("assum[ing] the existence of a constitutionally protectible property right in [respondent's] continued enrollment").[9] The Fourth Circuit has followed this approach. See, e.g., Sheppard, 993 F.3d at 239 (explaining that the Fourth Circuit has "followed the same watchful approach" as the Supreme Court in assuming, without deciding, the property interest); Butler v. Rector & Bd. of Visitors of Coll. of William & Mary, 121 F. App'x 515, 518 (4th Cir. 2005) (assuming for purposes of appeal that Butler had a property interest in continued enrollment in a university program); Tigrett v. Rector & Visitors of Univ. of Va., 290 F.3d 620, 627 (4th Cir. 2002) ("Assuming the Appellants possessed some constitutionally protected interest in continued enrollment, they were not deprived of such an interest by the actions of the [university disciplinary committee]."); Doe v. Va. Polytechnic Inst. & State Univ., 77 F.4th 231, 236 (4th Cir. 2023) (assuming without deciding that the plaintiff had a cognizable liberty or property interest so that the court could review, and affirm, the district court's ruling regarding sufficiency of process).

[9] The Supreme Court recognized a student's property interest in public secondary education in Goss v. Lopez, 419 U.S. 565 (1975), but has not extended that interest to university or graduate education.

Faced with allegations that, if true, plausibly alleged that Doe had been deprived of due process, the court declined to follow this approach at the pleading stage. Instead, the court affirmatively found that Doe sufficiently pled the existence of a property interest in his continued enrollment by referencing specific provisions of Virginia Tech's Student Code of Conduct (the "Code") that, taken as true, demonstrated Virginia Tech's agreement to provide certain procedural guarantees to students accused of conduct violations before dismissing them from the university.[10] See Mem. Op., ECF No. 109, at 24–26. In doing so, the court acknowledged that a student handbook does not constitute an enforceable contract between the university and its students when the terms are not binding on the university. Id. at 26 n.11 (first citing Abbas v. Woleben, No. 3:13-cv-147, 2013 WL 5295672, at *4 (E.D. Va. Sept. 19, 2013), then citing Brown v. Rector & Visitors of Univ. of Virginia, No. 3:07-cv-030, 2008 WL 1943956, at *5 (W.D. Va. May 2, 2008), then citing Doe v. Alger, 228 F. Supp. 3d 713, 728 (W.D. Va. 2016); and then citing Doe v. Wash. & Lee Univ., 439 F. Supp. 3d 784, 790 (W.D. Va. 2020)). The court explained that, through discovery, Doe needed to establish that he and Virginia Tech mutually assented to abide by the terms of the Code. Id.

Defendants renew their argument that the Code is insufficient to establish a property interest in Doe's continued enrollment at Virginia Tech, citing principally Sheppard v. Visitors of Virginia State University, 993 F.3d 230 (4th Cir. 2021). See Mem. Supp., ECF No. 136, at 15–17. In Sheppard, Virginia State University ("VSU") sanctioned Sheppard, a student, after an October 2016 on-campus altercation with his former girlfriend, who was also a VSU

---

[10] To reach this conclusion, the court canvassed the fractured state of the law across the nation on the issue of whether a student attending a public university has a property interest in continued enrollment at that university. See Mem. Op., ECF No. 109, at 15–19.

student at the time. See 993 F.3d at 232–33. Just after this altercation, the Chesterfield County General District Court issued a protective order against Sheppard, at his former girlfriend's request, which barred Sheppard from entering VSU's campus or being within 100 feet of his former girlfriend. Id. at 233. Although VSU did not initially suspend Sheppard through its internal disciplinary procedures, the university reversed course after the Chesterfield County General District Court extended the protective order through January 2017. Id. Citing the order, Henry Debose, a university administrator, informed Sheppard in November 2016 that he was suspended and that the university had withdrawn him from his courses. Id.

As relevant here, Sheppard brought a procedural due process claim against Debose, contending that VSU's student code of conduct shielded Sheppard from arbitrary or haphazard suspension without notice or opportunity to be heard. Id. at 238–39. Addressing Sheppard's claim through the lens of qualified immunity, the Fourth Circuit found that Sheppard's right to continued enrollment in higher education was not clearly established. Id. at 240. The court reasoned that the code of conduct, standing alone or in conjunction with the university's policies and procedures, did not manifest VSU's assent to provide Sheppard with the procedural protections he sought. Id. at 239–40. The court pointed to state courts that had refrained from reaching this conclusion, id. at 239 (first citing Bryarly v. Shenandoah Univ., 41 Va. Cir. 238 (Va. Cir. Ct., City of Winchester Jan. 31, 1996); and then citing Fac. for Responsible Change v. Visitors of Madison Univ., 38 Va. Cir. 159 (Va. Cir. Ct., Rockingham Cnty. Oct. 27, 1995)), and to federal courts interpreting Virginia law that had split on the question. Id. at 239 n.9 (first citing Doe v. Marymount Univ., 297 F. Supp. 3d 573, 587–88 (E.D. Va. 2018); and then citing Doe v. Alger, 175 F. Supp. 3d 646, 658 (W.D. Va. 2016)).

The court explained that "the Supreme Court and this Court's assumptions, without express recognition, hardly amount to a clearly established right." Id. at 240. The court also dismissed Sheppard's argument that VSU's policies and procedures established an implied contract or general property interest, finding again that such a legal right was not clearly established. Id.

Sheppard is distinct from this case in several respects. Most notably, Sheppard brought his procedural due process claim against Debose in his personal capacity, which allowed Debose to raise the shield of qualified immunity. Id. at 238 ("This claim can be quickly disposed of on the basis of qualified immunity."). The presence of the qualified immunity defense forced Sheppard to argue that his right to continued enrollment was clearly established,[11] which required that the right come from "settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." See Feminist Majority Found. v. Hurley, 911 F.3d 674, 704 (4th Cir. 2018) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). Here, Sands and Cherry-Clarke do not—and cannot—raise a qualified immunity defense because Doe brings his procedural due process claim against them in their official capacities, as representatives of Virginia Tech. See Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (explaining that qualified immunity "is not available in an official-capacity suit brought against a government entity or a government officer as that entity's agent" (citing Kentucky v. Graham, 473 U.S. 159, 165–67 (1985))).

[11] See also Stanton v. Elliot, 25 F.4th 277, 233 & n.5 (4th Cir. 2022) ("In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." (citing Henry v. Purnell, 501 F.3d 374, 377–78 & n.4 (4th Cir. 2007))).

Accordingly, Doe need not show that his right to continued enrollment at Virginia Tech was clearly established at the time he was dismissed.

The other salient distinction between Sheppard and Doe's case is that the court in Sheppard considered only VSU's code of conduct and its policies and procedures in deciding whether Sheppard had a clearly established right to continued enrollment. 993 F.3d at 239–40. Here, however, the record contains additional evidence that the court will consider in determining whether a reasonable jury could conclude that Virginia Tech and Doe mutually agreed that Doe would receive certain procedural safeguards in the disciplinary process. Specifically, the attachment to Cherry-Clarke's February 28, 2020, letter to Doe states, in part, that "[a] student who is alleged to have violated a policy within the Student Code of Conduct is guaranteed certain opportunities in the conduct process," including advance notice of the charges in writing, to participate in, or refrain from participating in, the formal hearing, and to appeal the hearing's outcome. See ECF No. 136-24, at 5 (emphasis in original). Moreover, Cherry-Clarke testified in her deposition that she conveyed these guarantees to Doe in their March 3, 2020, meeting:

> Q: What did you discuss at that meeting with [Doe]?
> A: It would have been to discuss the potential violations. It would be to discuss the formal hearing process. It would be to talk through his due process.
> Q: And what's your understanding of his due process?
> A: I saw it here somewhere. Actually, it would be on Exhibit 1 [the Code, ECF No. 136-29]. To receive written notice of charges at least five business days in advance of the hearing, to share their versions of events and refute any information presented, to present witnesses or witness statements, to remain silent or not participate, to be accompanied by an advisor, to challenge the objectivity of the Hearing Officer, and if there is a loss of privilege, as far as the sanction, if it was a suspension or dismissal, the student would also have a right to appeal the loss of privilege.

Cherry-Clarke Dep., ECF No. 136-25, at 18 (emphasis added).[12] Cherry-Clarke further testified that Virginia Tech never imposes the sanction of dismissal without a Student Conduct hearing. Id. at 8; see also ECF No. 148 (attaching records that show Virginia Tech regularly scheduled hearings in relation to alleged student conduct violations). Accordingly, the issue is whether a reasonable jury could conclude that Virginia Tech assented to provide these procedural guarantees to Doe as evidenced by the Code, Virginia Tech's policy of not dismissing students without a hearing, the February 28, 2020, letter and attachment, and Cherry-Clarke's statements to Doe in their March 3, 2020, meeting that he would receive "his due process." Id. at 18.

In Doe v. Alger, the court found that James Madison University ("JMU") and its officials had agreed that the university would only expel a student facing conduct violation charges after the student received certain procedural guarantees. 228 F. Supp. 3d 713, 725–29 (W.D. Va. 2016) (Dillon, J.). Citing Perry v. Sindermann, 408 U.S. 593 (1972), the court explained that a property interest need not flow from a statute or contract provision, but could instead arise from "rules and understandings officially promulgated and fostered by the college," so long as the entitlement comported with state law. 228 F. Supp. 3d at 725–726 (citing Perry, 408 U.S. at 599–600, 602 n.7). The court pointed to JMU's admission that sufficient academic performance and payment of tuition entitled Doe to continued enrollment absent cause for suspension or dismissal. Id. at 726–27. The court reasoned that this admission manifested JMU's assent to provide Doe with certain procedural guarantees, which the court

[12] It appears that Cherry-Clarke quoted a version of the Code that did not apply during the relevant period. Nevertheless, Cherry-Clarke's testimony demonstrates that she conveyed certain procedural safeguards to Doe when they met on March 3, 2020.

found sufficient under Virginia law to establish Doe's legitimate entitlement to continued enrollment at JMU. Id. at 728 ("Both defendants (as well as Doe) have stated their understanding that, as long as Doe maintained sufficient academic progress, paid tuition and applicable fees, and did not commit a conduct violation, he had an 'entitlement' to continued enrollment at JMU, and thus a protectable property interest.").

Defendants cite several cases in support of the contention that student codes of conduct and university procedures do not implicate interests that trigger a federal due process claim. In Murray v. Liberty University, Inc., the court explained that "[u]niversity handbooks and catalogs, like the sort that house syllabi, do not establish contractual obligations under Virginia law," and dismissed a breach of contract claim because the plaintiff had not alleged any "language in any handbook, syllabus[,] or catalog that would support any contrary conclusion." No. 6:22-cv-025, 2022 WL 4082483, at *5–6 (W.D Va. Sept. 6, 2020) (Moon, J.). In Jacob Doe v. Virginia Polytechnic Institute & State University, the court found that the student's conclusory allegations that he possessed a liberty and property interest were insufficient to state a procedural due process claim and that his payment of tuition, by itself, did not create an implied contract with the university. No. 7:19-cv-249, 2020 WL 1309461, at *5–7 (W.D. Va. Mar. 19, 2020) (Dillon, J.). In Doe v. Washington & Lee University, the court found that a student had not plausibly alleged the existence of an implied-in-law contract with the university because "it was readily apparent that W&L always retained full discretion whether to readmit [the student]."[13] 439 F. Supp. 3d 784, 791 (W.D. Va. 2020) (Moon, J.). In

[13] The court also found that Virginia law did not support the student's contention that his payment of tuition established an implied-in-law contract. 439 F. Supp. 3d at 795–797 (citing Marymount Univ., 297 F. Supp. 3d at 588).

George v. Averett University of Danville, Virginia, the court found that a student handbook did not create a contract between a student and his university where the handbook permitted the university "to make unilateral changes at any given time." No. 4:19-cv-008, 2019 WL 3310517, at *3 (W.D. Va. July 23, 2019) (Kiser, J.). The court also explained that the student's tuition payment did not create a contract with the university. Id. In Doe v. Washington and Lee University, the court found that the university's student handbook and sexual harassment and misconduct policy did not establish a contract because the university reserved the right to unilaterally make modifications.[14] No. 6:14-cv-052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015) (Moon, J.).[15]

In response, Doe claims that defendants' argument "conflates theories of implicit contract and mutual understanding, which . . . are distinct." Mem. Opp., ECF No. 142, at 19. The court agrees that defendants' cited cases do not fully capture the issues presented here. For one, the cases that involve private universities do not implicate due process, and the courts accordingly did not consider the issue of whether a mutual understanding as to the student's right to continued enrollment existed between the parties. See Murray, 2022 WL 4082483, at *5–6; Doe, 439 F. Supp. 3d at 791; George, 2019 WL 3310517, at *3; Doe, 2015 WL 4647996, at *8. Moreover, none of defendants' cited cases considered evidence beyond the applicable student handbook and policies and procedures, whereas here, in addition to the Code and Virginia Tech's policies and procedures, the record includes Cherry-Clarke's testimony that

[14] Notably, the court stated that "[h]ad Plaintiff been enrolled at a public university, he would have been entitled to due process and the proceedings against him might have unfolded quite differently." Doe, 2015 WL 4647996, at *8.

[15] Defendants also cite Jackson v. Liberty University, which stands for the same proposition and collects additional cases on that point. No. 6:17-cv-041, 2017 WL 3326972, at *5–6 (W.D. Va. 2017) (Moon, J.).

she conveyed Doe's procedural guarantees directly to him during their March 3, 2020, meeting and her testimony that Virginia Tech did not dismiss students without a formal hearing. See Cherry-Clarke Dep., ECF No. 136-25, at 8, 18; see also ECF No. 148.[16] Put simply, this case contains more evidence that a mutual understanding existed between Virginia Tech and Doe as to his procedural guarantees than the cases cited by defendants.

Doe contends that he and Virginia Tech had a mutual understanding that Virginia Tech would not dismiss or otherwise discipline Doe without cause. Doe cites Ortegel v. Virginia Polytechnic Institute & State University, in which the court found that a student had sufficiently alleged a procedural due process claim against Virginia Tech's Title IX Coordinator in her official capacity by contending that Virginia Tech had a "policy of not disciplining students without cause." No. 7:22-cv-510, 2023 WL 8014237, at *12 (W.D. Va. Nov. 20, 2023) (Dillon, J.). Doe also cites Blantz v. California Department of Corrections and Rehabilitation, Division of Correctional Health Care Services, a Ninth Circuit case, which recounts the Supreme Court's teachings in Roth and Perry that "government employees can have a protected property interest in their continued employment if they have a legitimate claim to tenure or if the terms of the employment make it clear that the employee can be fired only for cause." 727 F.3d 917, 922 (9th Cir. 2013) (emphasis in original) (first citing Roth, 408 U.S. at 576–78; and then citing Perry, 408 U.S. at 599–603). While Blantz accurately recounts the holdings of Roth and Perry, the case bears little relevance beyond that point. see id. at 923–25

[16] To be sure, the evidence is sufficient to find that Doe had a property interest regardless of whether the court considers Virginia Tech's case files. See ECF No. 148.

(focusing on the distinction between employees and independent contractors as applied to constitutionally protected property interests).

Doe focuses mostly on the Code and Virginia Tech's policies to argue that he and Virginia Tech had a mutual understanding that the university would not dismiss Doe without cause. See Mem. Opp., ECF No. 142, at 16–17. Doe also claims that Virginia Tech's right to change its policies and procedures does not impact the analysis because the Code states that it is "published annually," reviewed "for accuracy on an annual basis," and "valid for the period given." ECF No. 136-29, at 8, 9. On this point, defendants claim that these terms do not alter Virginia Tech's ability to change the policies at will at any time. Reply, ECF No. 144, at 19.

The most significant evidence, in the court's view, is Cherry-Clarke's statement to Doe during the March 3, 2020, meeting that he would receive certain procedural guarantees before Virginia Tech issued any sanction against him. See Cherry-Clarke Dep., ECF No. 136-25, at 18. Cherry-Clarke testified that she "talked through [Doe's] due process" with him, and, when asked about her understanding of Doe's due process, Cherry-Clarke pointed to those guarantees set forth in the Code. Id.; ECF No. 136-29, at 13. These statements, coupled with the terms of the Code and Cherry-Clarke's testimony that Virginia Tech did not dismiss students without cause, see Cherry-Clarke Dep., ECF No. 136-25, at 8, demonstrate that Virginia Tech and Doe had a mutual understanding that Doe would not be dismissed from the university without cause. Alger, 228 F. Supp. 3d at 728–29; see also Sabet v. E. Va. Med. Auth., 775 F. 2d 1266, 1270 (4th Cir. 1985) ("A claim of entitlement based on an understanding is enforceable in Virginia . . . only if the understanding is mutual, i.e., both parties have assented to it." (first citing Valjar, Inc. v. Mar. Terminals, Inc., 220 Va. 1015, 265 S.E.2d 734

(1980); and then citing Humble Oil Co. v. Cox, 207 Va. 197, 148 S.E.2d 756 (1966))). Accordingly, the evidence shows that Doe had a legitimate entitlement to his continued enrollment at Virginia Tech, which gave him the right to receive due process as guaranteed by the Fourteenth Amendment.

**2. Deprivation of Due Process**

The basic requirements of due process are notice and an opportunity to be heard. Mathews v. Eldridge, 424 U.S. 319, 333 (1976). Beyond this bare minimum, the nature of the process due hinges on the particularities of the case at hand. Morrissey v. Brewer, 408 U.S. 471, 481 (1972). The Fourth Circuit has set forth several factors to review in deciding whether "a given process is constitutionally sufficient":

> (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the . . . fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Doe, 77 F.4th at 236–37 (quoting Elhady v. Kable, 993 F.3d 208, 228 (4th Cir. 2021)).[17] The Fourth Circuit relies on the Fifth Circuit's decision in Dixon v. Alabama State Board of Education, 294 F.2d 150, 159 (5th Cir. 1961), modified in part by Walsh v. Hodge, 975 F.3d 475, 485 (5th Cir. 2020), for guidance on the requirements of due process "[i]n cases involving suspension or expulsion from colleges and universities." Doe, 77 F.4th at 237.

> Dixon explains that a student facing discipline should receive notice "contain[ing] a statement of the specific charges and grounds which, if proven, would justify [disciplinary action]." 294

[17] In Doe, the Fourth Circuit assumed, without deciding, that the plaintiff sufficiently alleged a cognizable liberty or property interest in his continuing education. 77 F.4th at 236.

> F.2d at 158. In cases involving student misconduct, the best approach is to hold "a hearing which gives [university officials] an opportunity to hear both sides in considerable detail." Id. at 158–59. When the accused student isn't present at the hearing, he "should be given the names of the witnesses against him and an oral or written report on the facts to which each witness testifies." Id. at 159; see also Nash v. Auburn Univ., 812 F.2d 655, 663 (11th Cir. 1987). And he should "be given the opportunity to present . . . his own defense against the charges and to produce either oral testimony or written affidavits of witnesses in his behalf." Dixon, 294 F.2d at 159.

Id.; see also Brown v. Rectors & Visitors of Univ. of Va., 361 F. App'x 531, 532 (4th Cir. 2010) ("When a school takes serious disciplinary action against a student, generally the student must be offered notice and an opportunity to be heard." (citing Goss v. Lopez, 419 U.S. 565, 579 (1975))). Of course, "the requirements of due process may be satisfied by something less than a trial-like proceeding." Henson v. Honor Comm. of U. Va., 719 F.2d 69, 74 (4th Cir. 1983) (citing Goss, 419 U.S. 565).

At the pleading stage, this court found that Doe sufficiently pled a deprivation of due process in the Third Amended Complaint. See Mem. Op., ECF No. 109, at 26–30. Namely, the court found that Doe plausibly alleged that Virginia Tech deprived him of due process by informing him on March 5, 2020, that the hearing would occur the next day, March 6, 2020. See id. at 27; Third Am. Compl., ECF No. 86, ¶ 56. The court also referenced Cherry-Clarke's alleged refusal to grant a continuance upon Doe's March 5, 2020, request, to find that Virginia Tech had deprived Doe of due process. See Mem. Op., ECF No. 109, at 30.

Doe broadens his argument at the summary judgment stage. See Mem. Opp., ECF No. 142, at 20–23. Specifically, Doe contends that he received inadequate notice of the hearing and of the charges against him, which deprived Doe of sufficient time to prepare. Doe also

references Cherry-Clarke's refusal to grant Doe's March 5, 2020, request for an extension, but claims that he "does not expressly base his due process claim" on this fact. Id. at 22. Finally, Doe claims that the hearing officers deprived Doe of the opportunity to question Roe when they did not allow him to ask her to explain why she voluntarily joined Doe on the elevator on November 15, 2019. The court will address each contention in turn.

**i. Notice Deprivations**

Doe argues that he received inadequate notice of the charges against him and of the hearing date. The notice analysis, however, is not that granular. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 13 (1978) (quoting Mullane v. Cent. Hanover Tr. Co., 339 U.S. 306, 314 (1950)). Accordingly, the law does not establish a concrete period of advance notice that a university must give to a student accused of conduct violations. Nor does the law distinguish between notice of the charges faced and notice of a hearing date. Instead, notice will be sufficient where it gives the relevant parties sufficient time to prepare.

Here, the evidence shows that Doe had sufficient notice to prepare a defense to the charges he faced. He first learned that he was facing a Title IX investigation on February 17, 2020. He met with Scott, his advisor, that same day. He then met with Keene, Barnett, and Cherry-Clarke before the hearing. He also prepared multiple drafts of a written statement, one version of which he sent to Scott for feedback on March 2, 2020. See ECF No. 144-2. Doe further obtained a written statement from a friend, which he submitted to Cherry-Clarke

before the hearing. The undisputed evidence shows that Doe received sufficient notice throughout the university proceedings.

Doe argues that he received insufficient notice of the charges he faced because he first learned of them through Cherry-Clarke's March 3, 2020, letter. See ECF No. 136-33. Doe claims that the February 17, 2020, notice from Barnett that she was conducting a Title IX investigation into Doe's potential violation of several university policies did not constitute notice of the charges because not all Title IX investigations result in student conduct charges. See ECF No. 136-14; Cherry-Clarke Dep., ECF No. 136-25, at 22–25 ("Q: [N]ot all cases are referred to Conduct, correct? A: No, not everything is referred."). The court is not persuaded by this argument. The February 17, 2020, letter from Barnett explicitly identified the potential charges Doe faced based on Roe's allegations. ECF No. 136-14, at 1. The evidence shows that Doe received notice of the investigation when he received the February 17, 2020, letter from Barnett. Even if the March 3, 2020, letter represents Doe's first notice of the specific charges against him, the three days that occurred between Doe's receipt of that letter and the March 6, 2020, hearing is sufficient. See, e.g., Tigrett v. Rector & Visitors of Univ. of Va., 137 F. Supp. 2d 670, 678 (W.D. Va. 2001) (Moon, J.) (finding that "48 hours provided Plaintiffs with sufficient notice" of the charges they faced), aff'd, 290 F.3d 620 (4th Cir. 2002).

As to notice of the hearing date, the evidence reveals that Doe learned that the hearing would occur on March 6, 2020, no later than March 4, 2020. There is also evidence that Doe learned of the hearing date on March 3, 2020. In her declaration, Cherry-Clarke stated that she told Doe during their March 3, 2020, informational meeting that the hearing would occur on March 6, 2020. See Cherry-Clarke Decl., ECF No. 136-32, ¶ 9. And Doe testified that

Cherry-Clarke "probably" told him that the hearing would occur on March 6, 2020, during their March 3, 2020, meeting. See Doe Dep., ECF No. 136-4, at 166. Further, Cherry-Clarke sent an email to Barnett on March 3, 2020, informing her that the hearing would occur on March 6, 2020. See ECF No. 136-30. However, Doe did not receive written confirmation of the hearing date until March 4, 2020, when Cherry-Clarke resent the corrected hearing notification. See ECF No. 136-34; ECF No. 142-15. Doe admits that he received more notice of the hearing than he alleges in the Third Amended Complaint, acknowledging that he "first learned of the hearing date between approximately 70 to 48 hours prior to the hearing," Mem. Opp., ECF No. 142, at 21, as opposed to the less-than-24-hours' notice that he alleged in his Third Amended Complaint. See ECF No. 86, ¶ 56. This court held at the pleading stage that 24 hours' notice of the hearing is insufficient, and noted that courts have required more than that to satisfy the requirements of due process.[18] See Mem. Op., ECF No. 109, at 29–30. The evidence shows that Doe received more than adequate notice.

Doe also points to Cherry-Clarke's refusal to grant Doe's request to delay the hearing as evidence that he received deficient notice. Doe testified that, during the March 3, 2020, meeting, he told Cherry-Clarke that he had been in the hospital and asked her for an extension, a request which she declined.[19] See Doe Dep., ECF No. 136-4, at 168.[20] And on March 5,

---

[18] At the pleading stage, the court based its finding that Doe had sufficiently alleged inadequate due process in large part on his claim that he first learned of the hearing less than 24 hours before it occurred. See Mem. Op., ECF No. 109, at 30. As Doe concedes, the evidence belies this contention.

[19] Defendants point out that Doe's request for an extension supports the conclusion that he learned during the March 3 meeting that the hearing would occur on March 6. See Reply, ECF No. 144, at 22 ("[I]t belies credulity to suggest that Doe allegedly asked for more time during his meeting on March 3 without knowing when the hearing would be held.").

[20] Cherry-Clarke does not recall the contents of this meeting, but claims that she did not know that Doe had been hospitalized until after university proceedings concluded. See Cherry-Clarke Dep., ECF No. 136-25, at 25, 28.

2020, Doe asked Cherry-Clarke to delay the hearing, writing that he "did not have enough time to a prepper [sic] and collect all of the evidence that I need to defend my self [sic]." ECF No. 136-38. Cherry-Clarke replied that Doe "received notice of the investigation on Monday, February 17th and . . . had opportunities to meet with Title IX Investigator Kristin Barnett. Therefore, this is not an impediment to our process." Id. And during the hearing, Barnett stated that Doe told her that he had been hospitalized in late February, but Doe did not seek an extension at that time, and no one suspended the proceedings. See ECF No. 136-43.

The issue is whether 48 hours' notice, coupled with Cherry-Clarke's repeated refusal to grant Doe's requests for an extension, deprived Doe of due process. Doe contends that he informed Cherry-Clarke that he had been in the hospital in late February, and Barnett confirmed her knowledge of the same fact during the hearing. But Doe did not seek a continuance when the issue of his hospitalization came up during the hearing. Moreover, Doe learned on February 17, 2020, that he faced a Title IX investigation into certain potential conduct violations, which could lead to student conduct charges, 18 days before the March 6, 2020, hearing, though no hearing was scheduled when Doe received this initial letter.[21] When pressed on these facts during argument, Doe claimed that he could have used additional notice to refine his written statement, but did not identify specific changes he would have made, and it is not clear from the evidence that Doe could have made productive use of an extension.

The court considers these facts in light of the Supreme Court's teaching that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Craft,

[21] 2020 was a leap year.

436 U.S. at 13. And the Fourth Circuit has instructed courts to consider "the risk of an erroneous deprivation of [a private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." Doe, 77 F.4th at 236.

Considering the evidence in the light most favorable to Doe, the court finds that he received constitutionally sufficient notice. Doe first became aware of the investigation and potential charges against him on February 17, 2020. He met with his advisor, Anthony Scott, the same day. Doe then had additional meetings with Scott, Barnett, Keene, and Cherry-Clarke in the weeks preceding the March 6, 2020, hearing. To be sure, Cherry-Clarke denied Doe's requests to continue the hearing, even though Doe told her that he had recently been in the hospital. But the court cannot conclude that these refusals deprived Doe of a meaningful opportunity to prepare for the hearing. He drafted multiple iterations of an opening statement, received feedback on that statement from Scott, see ECF No. 136-42, and submitted a written statement from his friend to Cherry-Clarke in advance of the hearing, see ECF No. 136-40. Doe began preparing to fight the charges on February 17, 2020, and in the 48 hours before the hearing, continued to prepare meaningfully.

Analyzed through the factors identified by the Fourth Circuit in Doe, these undisputed facts demonstrate that Doe received sufficient process. See 77 F.4th at 236–37. First, Doe's interest in his continued enrollment was surely affected by defendants' actions, but those actions also would have impacted his interest if Doe received additional notice of the hearing or a continuance. Therefore, this factor favors neither party. Second, 48 hours' notice did not risk "erroneous deprivation" of Doe's interest. Id. at 236. Doe's preparations, including his written statement, the submission of his friend's written statement, and his repeated meetings

and correspondence with Scott and other Virginia Tech officials indicate that "additional or substitute procedural safeguards," such as additional notice of the hearing or a continuance, would have little "probative value, if any." Id. Finally, additional notice of the hearing or a continuance likely would have placed few "fiscal and administrative burdens" on defendants, id. at 237, so this factor remains neutral in the court's analysis. Viewing the undisputed evidence through the lens of these factors, the court finds that Doe was not deprived of due process in advance of the hearing.

**ii. Hearing Deprivations**

Doe also challenges his inability to ask a particular question during the hearing. Doe sought to ask Roe why she joined him on the elevator in the Graduate Life Center on November 15, 2019, if she was frightened of him. See ECF No. 136-43. When Doe asked that question during the hearing, one of the hearing officers stated, "I think that is trying to prove a point," and did not direct the question to Roe. Id. Doe claims that the hearing officer's refusal to ask Roe that question on Doe's behalf deprived Doe of due process.

The Fourth Circuit does not require that universities allow cross-examination during conduct hearings. See Doe, 77 F.4th at 239 (citing Doe v. The Citadel, No. 22-1843, 2023 WL 3944370, at *2 (4th Cir. June 12, 2023) (per curiam)). However, review of the audio recording of the hearing demonstrates that Doe was given the opportunity to ask, and successfully asked, questions of Barnett and Roe during the hearing. See ECF No. 136-43. That the hearing officers declined to force Roe to answer this one question does not amount to a deprivation of due process.

At argument, defendants claimed that Roe had already answered Doe's question through her prior hearing testimony by the time Doe asked this question. The court again reviewed the audio recording of the hearing after argument, and it is not clear that Roe's statements at the hearing provided the information that Doe sought to elicit through this question. Nevertheless, the hearing officers' refusal to relay this question to Roe does not amount to a violation of procedural due process. For one, Doe did not name either of the hearing officers as defendants to the due process claim, and there is no evidence that Sands or Cherry-Clarke influenced the hearing officers' decision not to pose this question to Roe. Nor did Doe plead that the hearing officers violated his due process by refusing to allow him to ask a question—he first raised this argument in opposition to the motion for summary judgment. Moreover, the hearing officers allowed Doe to ask Roe to identify the point at which she became fearful of him, which she said happened after the September 11, 2019, incident but before the November 15, 2019, interaction. The undisputed evidence shows that the hearing officers' refusal to relay Doe's question to Roe does not constitute a procedural due process violation.

**B. Count Two: Title IX Gender Discrimination and Retaliation**

Title IX provides that, with several enumerated exceptions, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[22] 20 U.S.C. § 1681(a). Title IX contains an implied private right of action to enforce its prohibition on intentional sex discrimination and retaliation. Jackson v.

[22] Doe did not plead a claim for discrimination based on ethnicity, nor does the evidence support one.

Birmingham Bd. of Educ., 544 U.S. 167, 171, 173 (2005). Both discrimination and retaliation claims under Title IX require the plaintiff to show that gender was the but-for cause of the injury.[23] See Reid v. James Madison Univ., 90 F.4th 311, 319 (4th Cir. 2024) ("[G]enerally speaking, Title IX . . . discrimination claims are subject to the same analysis as employment discrimination claims brought under Title VII of the Civil Rights Act of 1964."). The court will first address Doe's discrimination claim, then turn to his claim for retaliation.

**1. Discrimination**

Doe contends that Onufriev withheld NIH grant funds from Doe because of his sex. To state a claim for discrimination under Title IX, Doe must show intentional discrimination, which he may do by providing direct evidence, or by proceeding under the McDonnell Douglas burden-shifting framework. Sempowich v. Tactile Sys. Tech., Inc., 19 F.4th 643, 649 (4th Cir. 2021) (first citing Perkins v. Int'l Paper Co., 936 F.3d 196, 206 n.4 (4th Cir. 2019), and then citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)). Doe cannot point to any direct evidence of discrimination, and relies instead on the McDonnell Douglas burden-shifting framework.

Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discriminatory intent. Sempowich, 19 F.4th at 649 (citing Lettieri v. Equant, 478 F.3d 640, 646 (4th Cir. 2007)). "To establish a prima facie case of disparate treatment, a

---

[23] In their memorandum in support of the motion for summary judgment, defendants argue that Doe's Title IX claims are time barred by Virginia's two-year statute of limitations. See Mem. Supp., ECF No. 136, at 19–20. In response, Doe pointed out that the Supreme Court of Virginia tolled the statute of limitations for 118 days between March 16, 2020, and July 19, 2020, because of the global pandemic, which extended the limitations period on Doe's claims such that his June 25, 2021, filing was timely. See Mem. Opp., ECF No. 142, at 24–25. Defendants did not raise this timeliness argument again in their reply or in argument, and the court deems this issue abandoned.

plaintiff must prove four elements: '(1) membership in a protected class; (2) satisfactory . . . performance; (3) adverse . . . action; and (4) different treatment from similarly situated [colleagues] outside the protected class.'" Cosby v. S.C. Probation, Parole & Pardon Servs., 93 F.4th 707, 714 (4th Cir. 2024) (quoting Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)). If Doe meets his burden, then the university must put forward evidence of "a nondiscriminatory explanation for its actions." Sempowich, 19 F.4th at 650 (citing Lettieri, 478 F.3d at 646). If the university successfully does so, "the burden then shifts back to the plaintiff to show that the [university's] explanation was 'actually a pretext for discrimination.'" Id. (citing Lettieri, 478 F.3d at 646).

Doe's discrimination claim fails at the first step—he cannot establish a prima facie case of discrimination. The Fourth Circuit has explained that a claim under Title IX requires "but-for causation." Sheppard, 993 F.3d at 236. That is, Doe must show that, but for his gender, Onufriev would not have withheld these NIH grant funds. The evidence belies any suggestion that Onufriev relied on Doe's gender in disbursing the grant funds. For one, Onufriev assigned the GRA position associated with the second NIH grant to a male student. See Onufriev Decl., ECF No. 136-3, ¶ 23. Even if the court looks only to the first NIH grant, however, there is no evidence to show that Onufriev considered Doe's gender before assigning the GRA position to Forouzesh. Forouzesh had published a paper in 2017 on the exact topic for which Onufriev sought funding, the generalized Born model, and Onufriev provided this funding to Forouzesh because of her background and expertise. See Onufriev Dep., ECF No. 142-1, at 29–30, 114–115. Moreover, Onufriev testified that he did not consider Doe for this funding because the research "was not in his field." Id. at 30. Put simply, there is no evidence

to show that Doe was satisfactorily performing his duties or that he was treated differently than his non-male colleagues. The fundamental flaw in Doe's discrimination claim is that there is no evidence that Doe's gender influenced Onufriev's funding decisions in any respect,[24] and the court will grant summary judgment on this claim.

**2. Retaliation**

Title IX includes an implied private right of action for retaliation. See Jackson, 544 U.S. at 171. A retaliation claim under Title IX requires Doe to prove two elements: first, that he "engaged in protected activity under Title IX," and second, that "as a result of [his] protected activity . . . [he] suffered an adverse action attributable to the defendant educational institution." Hurley, 911 F.3d at 694 (first citing Coleman, 626 F.3d at 191; and then citing Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 90 (2d Cir. 2015)).

At argument, the parties noted their disagreement on the nature of the causal connection required to establish a prima facie case of retaliation. Citing Roberts v. Glenn Industrial Group, Inc., 998 F.3d 111 (4th Cir. 2021), Doe contends that, in certain circumstances, including those presented in this case, temporal proximity alone can satisfy this requirement. In contrast, Virginia Tech argues that temporal proximity alone is insufficient, and that Doe must present "other facts" additional to temporal proximity to satisfy the causal connection requirement, citing Smyth-Riding v. Sciences and Engineering Services, LLC, 699 F. App'x 146 (4th Cir. 2017), and Baqir v. Principi, 434 F.3d 733 (4th Cir. 2006). In

[24] Doe testified that he saw Onufriev and Forouzesh kissing in downtown Blacksburg, see Doe Dep., ECF No. 136-4, at 110–112, and that Onufriev referred to Forouzesh as a "Persian princess," id. at 106–108. But Doe does not connect these contentions, which are otherwise unsupported by the evidence, to Onufriev's funding decisions. Considering the evidence in the light most favorable to Doe, these observations are insufficient to meet Doe's burden under Title IX. See Sheppard, 993 F.3d at 236–37.

Smyth-Riding, the court emphasized that "temporal proximity establishes nothing" if the relevant decisionmaker was unaware of the alleged protected activity when the decisionmaker took adverse action. 699 F. App'x at 153. And in Principi, the court noted that the plaintiff's failure to establish knowledge by the relevant decisionmakers doomed his retaliation claim. 434 F.3d at 748. In Roberts, the court summarized the requirements of the causal connection element:

> "A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes." Johnson[ v. United Parcel Serv., Inc., 839 F. App'x 781,] 783–84[ (4th Cir. 2021)]. A plaintiff may establish the existence of facts that "suggest[] that the adverse action occurred because of the protected activity." Id. (citing Lettieri v. Equant Inc., 478 F.3d 640, 650 (4th Cir. 2007) (recognizing that "relevant evidence may be used to establish causation")). A plaintiff may also establish that "the adverse act bears sufficient temporal proximity to the protected activity." Id. (citing Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 . . . (2001)). The existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action. See id.

998 F.3d at 123.

Though neither party drew the court's attention to it, the recent case of Barbour v. Garland, 105 F.4th 579 (4th Cir. 2024), settles the issue. "[A]s we have explained, a plaintiff may demonstrate causation by temporal proximity, or by 'the existence of facts that suggest that the adverse action occurred because of the protected activity,' or by a combination of the two." Id. at 593 (quoting Roberts, 998 F.3d at 123). Accordingly, Doe may rely upon temporal proximity alone to argue that he has satisfied the causal connection element of his prima facie case.

Here, however, the evidence does not bear out a prima facie case of retaliation. For one, Doe struggles to identify any adverse action taken by Virginia Tech against him. Doe points to Onufriev's creation of certain milestones and deadlines that Doe was required to meet before he could graduate with his Ph.D. Doe also references Onufriev's refusal to include certain language in a letter supporting Doe's green card application, Onufriev's insults against Doe, and even certain technical issues associated with Doe's computer, which he seemingly attributes to Onufriev. These occurrences, even viewed together, do not amount to adverse conduct. Onufriev and other faculty members created certain milestones and deadlines as part of Doe's plan to graduate with his Ph.D., and Onufriev's refusal to include certain language in the green card letter had no impact on Doe, who subsequently received his green card. See Doe Dep., ECF No. 136-4, at 172-173. Additionally, even if Onufriev insulted Doe, there is no evidence to show that these insults affected Doe's status at Virginia Tech.[25] Doe claims that the actions added stress to his life, but does not identify more concrete examples of harm attributable to these actions. Accordingly, any temporal proximity between Doe's protected conduct and these occurrences between he and Onufriev has no bearing on Doe's claim for retaliation.[26] Doe therefore has not established evidence to support a prima facie case of retaliation, and summary judgment is appropriate.

## IV. Conclusion

For the reasons stated above, the motion for summary judgment is **GRANTED**.

---

[25] The suggestion that Doe's computer issues were somehow attributable to Onufriev is wholly unsupported by the evidence.

[26] Doe complained to several faculty members about perceived issues in his relationship with Onufriev, but there is no evidence that these faculty members discussed those complaints with Onufriev. To the extent Doe attempts to rely on more than temporal proximity to establish causation, his argument is undercut by the lack of evidence showing that Onufriev had any knowledge related to Doe's complaints.

An appropriate order will be entered.

Entered: September 25, 2024

Michael F. Urbanski
Senior United States District Judge